IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BILLY R. WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Civil No. 03-239-*E* |
| PENNSYLVANIA STATE POLICE, AN ) | |
| AGENCY OF THE COMMONWEALTH ) | |
| OF PENNSYLVANIA, ) | |
| ) | |
| Defendant. ) | |

## OPINION

Plaintiff Billy R. Williams brings this suit alleging that the Pennsylvania State Police ("PSP") discriminated against him in his employment based on his race, in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, *et seq.*

Presently before the Court is defendant's motion for summary judgment. For the reasons stated herein, we will deny the motion as to Count I.

### I. Background

Title VII of the Civil Rights Act of 1964 "makes it unlawful for an employer 'to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' " Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir.1999), citing 42 U.S.C. §

2000e2(a)(1). In support of his Title VII claim, Plaintiff alleges that he was subjected to a hostile work environment and suffered disparate treatment as a result of his race. Plaintiff has withdrawn his claim of retaliation.[1] Pl.'s Br. In Opp. To State Defendant's M. For Summ. J. (Doc. 21) at 50.

Mr. Williams, an African American, has alleged that he was subjected to a racially hostile workplace and subject to unlawful disparate treatment while he was employed as a Station Commander at PSP's Mercer Station. Mr. Williams began his employment with the PSP on May 22, 1969 and has worked at various headquarters in Pennsylvania. He was first made Station Commander at the Mercer Station in March or April of 1993 until he was transferred in September of 2000 to the Butler Headquarters, where he was assigned as Special Projects Officer. On January 20, 2001, he was transferred to Erie, where he was assigned as a Staff Lieutenant.

The northwestern portion of Pennsylvania is designated by the PSP as Area IV, and is comprised of Troop C (Punxsatawney), Troop D (Butler) and Troop E (Erie). Captain Terry Seilhamer was the Troop Commander for Troop D (Butler) from at least 1992 until February or March of 1999. Thereafter, he was promoted to Major and made the Area Commander for Area IV. Major Seilhamer was succeeded as Troop Commander for Troop D (Butler) by Captain Sidney Simon. Captain Erby Conley was the Troop Commander for Troop E (Erie) from at least 1999 until 2001. Mr. Williams' claims are largeley based on the conduct of his two immediate supervisors: his Troop Commander Captain Simon and his Area Commander, Major Seilhamer.

---

[1] An appropriate order will be entered dismissing Count II of the Complaint.

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial questions." Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir. 1997). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party . . ." Id. at 586-87 (citations omitted). When a moving party has carried his or her burden under Rule 56, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .." Id. (citations omitted). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," and cannot "simply reassert factually unsupported allegations contained in [the] pleadings." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989) (citation omitted). However, "[i]f the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986) (citations omitted).

### III. Discussion

#### A. Hostile Work Environment

Defendant argues that Plaintiff has failed to produce sufficient factual evidence to support his hostile work environment claim. The Third Circuit has set forth five elements that a plaintiff must prove to establish a claim for hostile work environment: (1) the employee suffered intentional discrimination because of his or her race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the employee; (4) the discrimination would detrimentally affect a reasonable person; and (5) the existence of respondeat superior liability. Andrews v. Philadelphia, 895 F.2d 1469, 1472 (3d Cir.1990). In determining whether a work environment is hostile, "the totality of the circumstances must be considered, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance." Harris v. SmithKline Beecham, 27 F.Supp.2d 569, 577 (E.D. Pa.1998). A single action may be sufficient to support a hostile work environment claim if the act is "of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work." Id. at 578. Generally, however, a plaintiff must show that he was subjected to " 'repeated, if not persistent acts of harassment.' " Id., quoting Bedford v. Southeastern Pennsylvania Transp. Auth., 867 F. Supp. 288, 297 (E.D. Pa.1994)).

In analyzing whether a plaintiff has established a prima facie case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." Id. at 276, citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir.1997)).

4

This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id., quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir.1990).

Of course, "racial epithets need not be hurled at the plaintiff in order to contribute to a working environment [that is racially hostile]." Jackson v. Quanex Corp., 191 F.3d 647, 661 (6th Cir.1999). Title VII affords employees the right to work in an environment free from "discriminatory intimidation, ridicule and insult ..., without limiting this concept to intimidation or ridicule explicitly racial in nature." Id., citing Andrews, 895 F.2d at 1485 (holding that overt racial harassment is not necessary to establish a hostile environment); see also Aman, 85 F.3d at 1083 (same). "All that is required is a showing that race is a substantial factor in the harassment, and that if the plaintiff had been white he would have not been treated in the same manner." Aman, 85 F.3d at 1083. Indeed, general harassment often forms an integral and important part of proving the existence of an intentional hostile work environment and courts must resist the appeal to "disaggregate" each non-overt act and consider it in a vacuum. Durham Life Ins. Co., v. Evans, 166 F.3d 139, 149 (3d Cir.1999). Similarly, there are no "talismanic expressions" needed to advance a racial harassment claim and "code words" and symbols may convey a clear message of racial intimidation based on the environment in which they appear and the context in which they are used. Galdamezv Potter, 415 F.3d 1015, 1024 n. 6 (9th Cir. 2005).

The United States Court of Appeals for the Third Circuit's jurisprudence has "never required a plaintiff to demonstrate direct proof that her harasser's intent was to create a discriminatory environment."Abramson, 260 F.3d at 278. Indeed, the first prong of the inquiry

was not "designed to protect harassers who fail to recognize the hostile or abusive nature of their comments and actions." Id. And it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind. Id. at 277-78. Instead, "[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to her [race]." Id. at 277. In other words, the intent to discriminate can be inferred from the entire context and the conduct of the actors involved.

As for comments made by supervisors, the law favors admissibility. See Abrams v. Ligholeir, Inc., 50 F.3d 1204, 121415 (3d Cir.1995) (age related comments by supervisor were probative of supervisor's attitude toward older workers and thus admissible over evidentiary challenge as inadmissible hearsay and unrelated to decision under review); Walden v. George-Pacific Corp., 126 F.3d 506, 521 (3d Cir.1997) ("Our cases distinguish between discriminatory comments made by individuals within and those by individuals outside the chain of decisionmakers who have the authority [over the employee]."); Abramson, 260 F.3d at 286 ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the [adverse employment decision]"). Nor does the fact that the statement was made years before the event in question bar its use to show inherent bias. Roebuck v. Drexel University, 852 F.2d 733, (3d Cir.1988) (upholding admissibility of discriminatory comment by decisionmaker five years before adverse employment action). And it is beyond question that evidence sufficiently reflecting harassing or discriminating bias is admissible to prove intent or motive, the existence of a hostile environment and pretext. Aman, 85 F.3d at 1086. Indeed, such evidence can at times be critical to the interpretation of ambiguous treatment or the general

harassment of an employee. Hurley v. Atlantic City Police Dept., 174 F.3d 95, 111-12 (3d Cir.1999).

In general, although Title VII is a remedial statute, its primary objective is to avoid harm. Faragher, 524 U.S. at 806. Consequently, the law and regulations under Title VII recognize an employer's affirmative obligation to prevent violations. Id. They also afford protection to employers that make reasonable efforts to discharge that duty. Id. Similarly, employees have a coordinate duty to use all reasonable means available to avoid or minimize any injury or damages flowing from Title VII violations. Id.

The standards governing employer liability for a hostile work environment differ depending on the source of the hostility. Clark v. United Parcel Services, Inc., 400 F.3d 341, 348 (6th Cir.2005). Imputing liability for co-worker harassment is grounded in the employer's direct negligence. Ocheltree, 335 F.3d at 333-34. Where a co-worker is the source of the hostile environment, "liability exists where the defendant knew or should of known of the harassment and failed to take prompt remedial action." Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir.1999), quoting Andrews, 895 F.2d 1486; see also Clark, 400 F.3d at 348 ("In the case of a harassing co-worker, '[a]n employer is liable if it knew or should of known of the charged sexual harassment and failed to implement prompt and appropriate corrective measures.'") (quoting Hafford v. Seidner, 183 F.3d 506, 513 (6th Cir.1999); Ocheltree, 335 F.3d at 333-34 (same); Jackson, 191 F.3d at 659 (same); Galdamez, 415 F.3d at 1024 ("Once the Postal Service actually knew (or reasonably should have known) about what Galdamez was experiencing, it was required to 'undertake remedial measures reasonably calculated to end the harassment.'") (quoting McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 (9th Cir.2004)).

In contrast, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807. This liability is predicated on the theory that the "tortious conduct is made possible or facilitated by the existence of the actual agency relationship." Durham Life, 166 F.3d at 150. Liability is divided into two categories: (1) where no tangible employment action is taken, the employer may raise an affirmative defense predicated on the exercise of reasonable care to prevent harm; (2) no defense is available, however, where the supervisor's harassment culminates in "tangible employment action." Id., quoting Faragher, 524 U.S. at 808. A tangible employment action is one that "constitutes a significant change in employment status, such a hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). It likewise may be established by demonstrating a materially adverse change based upon other indices that are unique to the particular situation. Id., citing Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir.1993)). In contrast, a demotion without change in pay, benefits, duties or prestige or even a re-assignment to a less convenient job or location is insufficient. Id., citing Kocsis v. Multi-Care Management Inc., 97 F.3d 876, 887 (6th Cir.1996 and Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir.1994)).

In Drinkwater v. Union Carbide Corp., 904 F.2d 853 (3d Cir. 1990), the Third Circuit affirmed the district court's decision to award summary judgment in favor of the defendant as to plaintiff's hostile work environment claim on the ground that the plaintiff was able to point to only two pieces of evidence suggesting a discriminatory bias against women. The court

concluded that "two comments . . . are insufficient, in and of themselves, to support a hostile environment claim. Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere." Id. at 863; see Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982) (mere utterance of a racial epithet does not alter the terms and conditions of employment to a significantly serious degree to implicate Title VII).

### B. Disparate Treatment

Defendant argues that Plaintiff has failed to put forth sufficient evidence to support his claim for disparate treatment on the basis of race, religion, and national origin. To establish a prima facie case for disparate treatment under Title VII, the plaintiff must show that: "(1) [he] is a member of a protected class; (2)[he] was qualified for the position; (3)[he] was discharged from or denied the position, or suffered adverse employment consequences; and (4) that non-members of the protected class were treated more favorably." Harris, 27 F.Supp.2d at 578, citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The burden of production then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802, 93 S.Ct. 1817. Once the employer satisfies its "relatively light burden," "the burden of production rebounds to the plaintiff, who must [then] show by a preponderance of the evidence that the employer's explanation is pretextual." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994). "[A] plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Thus, if the plaintiff has

9

pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." Id. at 764.

To discredit the employer's proffered reasons, the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," Ezold, 983 F.2d at 531, and hence infer "that the employer did not act for non-discriminatory reasons." Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993).

"[C]ourts need not, and should not, stubbornly analyze all Title VII factual scenarios through the *McDonnell Douglas* formula. Instead, courts must be sensitive to the myriad of ways such an inference [of discrimination] can be created. Simply stated, a Title VII plaintiff has established a prima facie case when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." EEOC v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir.1990) (citations omitted).

### C. Plaintiff's Evidence

We again note that in reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party, Matsushita, 475 U.S. at 587, and that "[t]his standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial questions." Stewart, 120 F.3d at 431. Plaintiff has produced evidence to show that there exist genuine issues of material fact in this case. Arguably, Captain Simon and

10

others were aware of racial tension in Mercer, and compounded the problems at the Mercer Station by engaging in acts that diminished Mr. Williams' ability to administer the station and that undermined plaintiff's authority.

Plaintiff has produced evidence that his subordinates harbored a race based bias against him, and plaintiff communicated these incidents to Captain Simon. Specifically, plaintiff complained that his subordinates slashed his tires, referred to him as "Slappy," drew caricatures of him in the dictionary next to the words "afro" and "negro", covered the door knob to his office in black ink, and dismantled his office chair.[2] The plaintiff has also produced evidence that his superior officer refused to authorize overtime for the Mercer Station (the only station that was denied overtime) during a period when the station was understaffed; this resulted in plaintiff having to perform the functions of lower level supervisors and road supervision and also caused morale problems at the Mercer Station.

Plaintiff has also shown evidence in support of his claim that he was the only African-American station commander throughout most of his tenure within Troop D, and was the only station commander prohibited from visiting his station after hours. Captain Conley has stated that this order was outrageous and would interfere with Mr. Williams' ability to administer his station. Plaintiff has shown that Major Seilhamer referred to the Mercer Station as the "black hole" of the Troop. Plaintiff has come forth with evidence to cast doubt that this was merely a euphemism for a poorly run station, citing his favorable performance evaluations during that time

---

[2]The court will rule on the admissibility of such past actions at a later time, but we note that past discrimination may be admitted to show that the employer's proffered reason for adverse employment action is a pretext for discrimination. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)

11

period and also the fact that the station was running as well or better than other stations within the troop. Mr. Williams has also shown that Captain Simon repeatedly required him to address ridiculous and unfounded complaints made by his subordinates; the same subordinates whom Captain Simon knew had made racial comments, drawn pictures, and otherwise harassed plaintiff at work. Plaintiff has also produced evidence that he was transferred to Butler after an alleged shoving match between a corporal and trooper at the Mercer Station; however, even if plaintiff could have exercised any form of control over the situation (which plaintiff denies because the incident arose after hours, when plaintiff was forbidden from coming to the station) no employment action was taken against other similarly situated individuals who were present during other altercations at other stations. We also note that plaintiff's replacement as Commander of Mercer Station was Caucasian and that although one corporal has testified that conditions at the Mercer station degenerated to levels far worse than those when plaintiff was in command of the station, the replacement was never involuntarily transferred or otherwise disciplined.

  Moreover, plaintiff has shown that after he was transferred in September, 2000, he was assigned the position of Special Projects Officer, which required him to edit an existing manual; Captain Simon stated that this assignment could have been carried out by a lower ranked employee, and to add insult to plaintiff's injury, plaintiff has shown that the manual he produced was never implemented but was actually discarded. Moreover, plaintiff has testified that his office in Butler was very small and that the joke at the Butler station was that he was upstairs sitting in his jail cell. Finally, plaintiff argues that Captain Simon made an unfounded determination that plaintiff had imposed a quota for the number of citations issued by the Mercer

Station. Plaintiff has also presented evidence that the allegations of a quota system were unfounded, including the findings of an arbitrator, the District Attorney's office, and a denial to the press by Captain Simon himself.

Mr. Williams has also presented evidence that Captain Simon's allegations of poor performance by plaintiff are inconsistent with the favorable performance evaluations that Mr. Williams received during the previous six years and in the years after his transfer, and are also inconsistent with Captain Conley's observation that throughout the various times that he worked with Mr. Williams, Mr. Williams earned and generally received respect from his subordinates.

Plaintiff has also shown that when he was transferred to Erie in January, 2001, it was to a position that had different responsibilities and a less prestigious title.

We also note that plaintiff sought psychological treatment and counseling, and he was diagnosed as having anxiety and depression.

We conclude that Williams has adduced evidence sufficient to create a genuine issue of material fact as to whether the he was subjected to a racially hostile work environment as well as intentional discrimination; defendant's proffered reasons for his transfers are arguably pretextual. Under Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994), Williams has shown sufficient implausibilities and inconsistencies in PSP's claims and actions rationales to avoid summary judgment. Reviewing the evidence in the light most favorable to Plaintiff and resolving all reasonable inferences in his favor, the Court finds that he has presented sufficient evidence to raise a genuine issue of material fact. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's claims will be denied.

## IV. Conclusion

For the foregoing reasons, we will deny the motion for summary judgment. An appropriate order will be entered.

Date: *March 13, 2007*

*Maurice B. Cohill, Jr.*
Maurice B. Cohill, Jr.
Senior United States District Court Judge

14