**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BILLY R. WILLIAMS, | } |
| | } |
| Plaintiff, | } |
| | } Civil Action No. 03-239 Erie |
| v. | } |
| | } Judge Cohill |
| PENNSYLVANIA STATE POLICE, AN | } |
| AGENCY OF THE COMMONWEALTH | } |
| OF PENNSYLVANIA, | } |
| | } *Electronically Filed.* |
| Defendant. | } |

**DEFENDANT'S PRETRIAL NARRATIVE STATEMENT**

AND NOW, comes the Defendant, the Pennsylvania State Police, by its attorneys, Attorney General Thomas W. Corbett, Jr., Senior Deputy Attorney General Scott A. Bradley and Chief Deputy Attorney General Susan J. Forney, Chief, Litigation Section, and respectfully submit the following Pretrial Narrative Statement:

**I. STATEMENT OF THE CASE**

Plaintiff, Billy R. Williams ("Williams" or "Plaintiff"), has brought the instant suit under Title VII, alleging discrimination in employment by his employer, the Pennsylvania State Police ("PSP"). Williams has alleged that the PSP permitted a racially hostile workplace to be engendered at its Mercer Station in Mercer, Mercer County, Pennsylvania, and that he was subjected to discrimination and disparate treatment based on his race. Particularly, Williams alleges that he was subjected to a racially hostile workplace while he was employed as a Station Commander at PSP's Mercer Station beginning in June of 1999, and that he was treated differently with regard to discipline than other similarly situated PSP members. Williams' claim is based largely on the conduct of his two immediate supervisors, his Troop Commander,

Captain Sidney Simon, and his Area Commander, Major Terry L. Seilhamer, which resulted in three specific events. The first is a meeting Williams had with Captain Simon wherein Captain Simon addressed a series of complaints that arose from the personnel at Williams' command (Mercer Station). The second was Williams' transfer from the Station Commander post at Mercer Station to Special Projects Officer at Butler (Troop B) Headquarters on September 11, 2000; and the third was his transfer from the Special Projects Officer post at Butler Headquarters to Staff Lieutenant at Erie (Troop E) Headquarters on January 20, 2001.

In support of the position that Williams was not subjected to a racially hostile work environment, the PSP will present evidence pertaining to the material elements of such a claim, including (1) the absence of evidence of intentional discrimination based on Williams' race; (2) the absence of any pervasive and regular acts of discrimination at Mercer Station (or any of Williams' other assigned posts); (3) evidence that Williams' was not detrimentally affected by the prevailing conditions at Mercer Station (or any of Williams' other assigned posts); (4) evidence that the prevailing conditions at Mercer Station (or any of Williams' other assigned posts) would not have detrimentally affected a reasonable person of the same race as the plaintiff, in like position; and (5) the lack of a basis for respondeat superior liability.

The PSP will offer evidence tending to show that the actions that the PSP took with respect to Williams were based entirely on Williams' job performance and that there were no racially discriminatory motives attending any decision or action taken, or order issued, which involved Williams. Evidence will be offered to show that the actions taken by the PSP were in direct response to issues or matters arising at Mercer Station and that were first brought to the attention of Captain Simon by other PSP personnel. Particularly, that Williams' transfer to Butler Headquarters was based on continued deficiencies in Williams' job performance at

Mercer Station first noted in 1999 and later amplified during a formal investigation into the wrongdoing (setting a quota for citations at Mercer Station) committed by Williams in early 2000; and that Williams' transfer to Erie was a direct result of the determination made after the formal quota investigation that Williams had set, or at least attempted to set, an unlawful quota. Indeed, this transfer was initially implemented as discipline imposed by the PSP Disciplinary Officer.

The PSP will offer evidence tending to show that Williams was not treated differently than others similarly situated.  First, the PSP will offer evidence to show that there were no similarly situated white Station Commanders who were treated differently than Williams; that Williams was not treated differently based on his race, and that all actions taken by the PSP with respect to Williams' employment were based on legitimate employment prerogatives and were in no way based on Williams' race.  This evidence will further reflect that the reasons proffered by the PSP for Williams' discipline –his ineffective leadership at Mercer Station and his setting of or attempt to set a quota for issuance of traffic citations– does not admit of pretext.

Accordingly, at trial, the Defendant will submit that Plaintiff cannot offer any evidence that he was subjected to a racially hostile work environment or otherwise discriminated against on the basis of his race, and that the PSP can provide legitimate, non-discriminatory and non-pretextual reasons for its decision to discipline Plaintiff.

## II.  MATERIAL FACTS TO BE PROVED AT TRIAL

1.  The PSP is committed to equal employment opportunities and maintains policies that prohibit harassment and/or discrimination based on, *inter alia*, race.

2.  Williams' claim is based largely on the conduct of his two immediate supervisors, his Troop Commander, Captain Sidney Simon –a biracial individual whom Williams referred to at

his deposition as an "Uncle Tom"– and his Area Commander, Major Terry L. Seilhamer –a white individual who Williams referred to as a "racist."

4.   PSP personnel wishing to make complaints about their supervisors could proceed in one of two ways.  A complaint could be forwarded through the chain of command within the PSP or a complaint could be made to a union representative.  A complaint to the union representative could then be presented to the appropriate troop commander.

5.   In 1999, a number of complaints about Williams by PSP personnel at Mercer Station were directed to Corporal Ray Meldar, the station representative for the troopers' union at FOP Lodge 54 (Butler).  Corporal Meldar notified Captain Simon of these complaints.  Captain Simon agreed to meet with the PSP personnel at Mercer Station to discuss these complaints.

6.   In separate meetings, Captain Simon met with both the troopers and the non-commissioned officers (corporals and sergeants) assigned to Mercer Station.

7.   During these meetings, Captain Simon heard numerous complaints regarding Williams' ability to command Mercer Station.  Captain Simon disregarded any complaint he felt to be a personal attack against Williams and directed his focus to those claims that dealt with the effective and efficient operation of Mercer Station.

8.   None of these complaints implicated Williams' race.

9.   After assuming command of Troop D (Butler) in January of 1999, Simon had become aware of problems engendered by Williams' management of Mercer Station.  These problems included "poor communication skills… micromanaging, late reports arriving to the station to Butler headquarters, incorrect submissions, and the morale at the station was at a low level."

10.  After meeting with PSP personnel from Mercer Station, Captain Simon arranged a meeting with Williams.  In his meeting with Williams, Captain Simon addressed those issues he felt were pertinent to Williams' performance and ability to command Mercer Station.  He did not agree with every complaint that was made about Williams, but offered advice and direction with respect to the performance issues that were raised.  No formal discipline was entered against Williams, nor was Williams punished in any way.

11.  Even after this meeting, Captain Simon was made aware of continued performance and morale issues at Mercer Station.  Captain Simon engaged in various actions to ameliorate the situation at Mercer Station, but these problems continued.

12.  In May of 2000, Captain Simon issued Williams' Annual Performance Review. This evaluation presented Williams with Captain Simon's concerns regarding Williams' management of Mercer Station, indicating "[t]hat basically all areas, with the exception of a couple satisfactories, were below the level of standards that are acceptable in the Pennsylvania State Police to run a substation, to be a station commander, and that he would have to improve in these sections in order to continue in that capacity."

13.  In February of 2000, Captain Simon was presented with information that indicated that a quota had been established at Mercer Station which required that PSP Troopers assigned to the midnight shift issue a minimum of twenty citations per month in order to maintain their shift assignment.

14.  Under 71 P.S. § 2001 (relating to Issuance of citations or tickets and illegality of quota requirements),

> No political subdivision or agency of the Commonwealth shall
> have the power or authority to order, mandate, require or in any

other manner, directly or indirectly, suggest to any police officer, State Police Officer, game commission officer, fish commission officer or any other officer employed by such political subdivision or agency of the commonwealth that said police officer, state police officer, game commission officer, fish commission officer or any other officer shall issue a certain number of traffic citations, tickets or any other type of citation on any daily, weekly, monthly, quarterly or yearly basis.

15.  Captain Simon initiated an investigation into the allegation that a quota had been established for the midnight shift at Mercer Station.  Following this investigation, the following findings were made:

16.  In December of 1999 or January of 2000, a staff meeting was convened at Mercer Station.  Several PSP Troopers, including Corporal Whalen, who was responsible for scheduling at Mercer Station, testified under oath that at this staff meeting Williams made the statement that the night shift Troopers needed to issue twenty citations per month or they would be removed from the night shift.

17.  At the end of January of 2000, Corporal Whalen was directed to remove several PSP Troopers from the night shift, "[a]s per Lt. Williams."  The Troopers to be removed had not issued twenty citations during the month of January, 2000.  After this order was issued, several PSP Troopers who had not issued twenty citations during the month of January, 2000, were permitted to remain on the midnight shift after several corporals and sergeants intervened with Williams on their behalf.

18.  During a subsequent roll call meeting at Mercer Station in early February, 2000, Corporal Whalen discussed with several troopers a list he had created which charted the productivity levels of the troopers assigned to Mercer Station and contained the notations "acceptable" or "unacceptable" next to each name.

19.   One of the PSP Troopers present at this roll call meeting contacted an attorney in Mercer, Jack Cline, Esquire.  Attorney Cline subsequently wrote a letter to Captain Simon which indicated that an illegal quota had been established at Mercer Station.

20.   Captain Simon went to Mercer Station and announced that there was no quota. Captain Simon further directed that an investigation be made into the charge that an illegal quota had been ordered at Mercer Station and that all former night shift troopers be returned to the night shift.

21.   Following the internal investigation conducted by Captain Simon, designated as Internal Investigation IAD #2000-0111, it was determined that Williams had ordered an illegal quota in violation of state law.  It was also determined in the course of this investigation that there were serious problems with Williams' job performance at Mercer Station.  Captain Simon issued his Summary Report at IAD #2000-0111 on September 15, 2000, and determined that the allegations of Williams' attempt to establish a quota, and the concurrently discovered untruthfulness in an investigation and unacceptable performance as a Station Commander are sustained and formal disciplinary action is warranted.

22. The findings of Captain Simon's Summary Report at IAD #2000-0111 were listed in the Disciplinary Action Report subsequently issued by Captain Simon to Williams on September 20, 2000.

23. The findings of Captain Simon's investigation were approved by Major Seilhamer and then forwarded through the appropriate chain of command to Captain Barry Titler, the Director of PSP's Department Discipline Office.  On January 4, 2001, based on the Summary Report prepared by Captain Simon at IAD #2000-0111, Captain Titler issued disciplinary

sanctions against Williams, which included a ten-day suspension from duty and a disciplinary transfer to Troop E in Erie, Pennsylvania.

24.  Prior to and during Captain Simon's investigation of the quota at Mercer Station, he became aware that there were serious morale and management problems at Mercer Station. Consequently, on September 11, 2000 –after the investigation into the quota allegations had been completed but before his report had been issued– Captain Simon transferred Williams to Troop D (Butler) Headquarters in Butler and assigned him to a position as Special Projects Officer. This transfer was approved by Major Seilhamer.

25.  This was not a disciplinary transfer but was necessary because of the serious morale and management issues Captain Simon had observed at Mercer Station prior to and during his investigation of the quota allegation.  The timing of the transfer was specifically precipitated by two events which caused him, Captain Simon, to believe that Williams had "lost control of Mercer Station."  These two events included a "shoving match" or "fight" between two troopers at Mercer Station and a statement by a trooper that he would not personally address Williams while he, the trooper, was on station but off duty.

26.  As Special Projects Officer, Williams was directed to create an Officer of the Day (OD) manual for Troop D using another PSP Troop OD manual.

27.  Williams formally requested a transfer to New Castle Station while serving in the Special Projects position.  The request was denied.

28.  On January 4, 2001, pursuant to the disciplinary sanctions issued by Captain Titler, Exhibit No. PSP 27, Williams was transferred to Troop E (Erie) Headquarters.  Williams reported to Captain Conley at Troop E (Erie) Headquarters on January 9, 2001, and was assigned

as the Staff Lieutenant.  The disciplinary nature of this transfer was subsequently rescinded as a result of a grievance Williams filed, although the transfer itself was sustained.

29.  Williams has never requested a transfer from Troop E (Erie) Headquarters; nor did he seek any further promotions.  Williams' position as Special Projects Officer at Troop D (Butler) Headquarters was subsequently filled by Sergeant Al Brown, a white male.  Since his transfer in 2001, Williams has performed exceptionally well as the Staff Lieutenant at Troop E (Erie) Headquarters.

30.  On February 20, 2001, following his transfer to Troop E (Erie) Headquarters, Williams was ordered by Lieutenant Todd Johnson, the acting Troop Commander, to begin serving his ten day suspension.  However, the order was rescinded within 45 minutes.

31.  Williams' ten day suspension was subsequently overturned by the arbitrator. Consequently, Williams never served the suspension nor suffered any loss of pay or rank as a result.

32.  Sometime in 1995, Williams filed a complaint against then-Captain Seilhamer and the PSP with the Equal Employment Opportunity Commission ("EEOC") raising claims of race-based discrimination; Williams thereafter received a right-to-sue letter from the EEOC in 1996. Williams did not file any civil action based on that right-to-sue letter.

33.  After June 1, 1999, Williams never submitted any formal complaints or requested that any action be taken with regard to the source of the "Slappy" comments or the caricature in the station dictionary.

34.  Although Williams reported claims of harassment and discrimination to the PSP Equal Employment Opportunity Officer relative to an earlier complaint regarding events at

9

Mercer Station in 1994 and 1995, Williams did not discuss his current claims with the PSP Equal Employment Opportunity Officer until late 2002 and 2003, well after he had filed his PHRC Complaint in this case.

35.   On June 7, 2000, Attorney Craig A. Markham submitted a four-page letter with attachments to then PSP Commissioner Paul J. Evanko on behalf of Williams.  The letter purportedly "address[ed] a chronic problem [Williams] continues to endure with unfounded complaints from FOP Lodge 54 Butler."  In the text of the letter, Williams complained about the manner in which Captain Simon handled these "unfounded complaints," suggesting that the FOP were "us[ing] the state police to harass Lieutenant Williams."  The letter only referred to Captain Simon's actions with respect to Williams and does not name or identify Major Seilhamer; nor does the letter in any way state or imply that the complained of harassment was based on or motivated by Williams' race.

36.   The PSP viewed this letter as a complaint by Williams regarding his treatment by his immediate supervisor; accordingly, on June 21, 2000, the Director of the PSP's Bureau of Professional Responsibility directed that the Commander of Area IV, Major Seilhamer, open an inquiry into Williams' complaints at Supervisory Inquiry IAD #2000-0420.

37.   Major Seilhamer investigated Williams' complaints, which included ordering Captain Simon to submit a written response to Williams' complaints and an interview with Williams.   Thereafter, on August 4, 2000, Major Seilhamer issued a report, wherein he

> found absolutely no evidence that Captain Simon is either participating in or condoning any effort by either the local FOP Lodge or the PTSA to harass Lieutenant Williams, as is alleged in attorney Markham's correspondence.  Captain Simon is properly performing his duty as Troop Commander and is doing no more than requiring Lieutenant Williams to properly perform his duty as the Mercer Station Commander and exert appropriate leadership….

> Because both Captain Simon and Lieutenant Jungling have very clearly informed him on several occasions that he will be held accountable if the situation does not improve at the Mercer Station, Lieutenant Williams is obviously anticipating that this accountability may possibly include his reassignment/transfer from the Mercer Station. Thus, it appears that the allegations contained in the correspondence submitted by attorney Markham are a 'pre-emptive strike' designed to intimidate the Captain and prevent any such future reassignment/transfer of the Lieutenant, should the Captain determine such a course of action to be necessary.

38.  On September 15, 2000, Williams filed a grievance, designated as Grievance No. D-200, which challenged his transfer to the Special Projects position at Troop D (Butler) Headquarters.  Therein, Williams asserted that, although no reason for the transfer was contemporaneously given by Captain Simon, Williams believed that this was a disciplinary transfer related to the then still ongoing quota investigation at Mercer Station and was part of "a continuing pattern of HARASSMENT, Denial of Constitutional Rights, Due Process Rights, Civil Rights and Contractual Rights."  Williams did not claim or allege that the transfer was motivated by his race or by any prior complaints he had made about racial discrimination or harassment.

39.  On January 20, 2001, Williams filed a grievance, designated as Grievance No. D-203, which challenged the discipline issued by Disciplinary Action Report –a ten-day suspension without pay and a transfer to Troop E (Erie) Headquarters– following the finding that Williams had set a quota for citations for the midnight shift at Mercer Station.  Williams denied any wrongdoing in connection with the quota allegations and reiterated his belief that he was being subjected to "a yearlong campaign of false complaints" regarding his performance as Station Commander at Mercer Station.  Williams again did not claim or allege that the discipline imposed was motivated by his race or by any prior complaints he had made about racial discrimination or harassment.

40. These two grievances were combined for resolution at Williams' request. Following an extensive hearing before a neutral arbitrator, the arbitrator issued a 19-page opinion which rescinded Williams' ten-day suspension and the disciplinary nature of the transfer to Troop E (Erie). The arbitrator did not otherwise rescind the transfer to Troop E (Erie).

41. On or about April 16, 2001, Williams filed an administrative complaint with the Pennsylvania Human Relations Commission, which was docketed therein at No. 0099029. This charge was dual filed with the Equal Employment Opportunity Commission ("EEOC"), at No. 17FA12205. A "right to sue" letter issued on May 5, 2003. This complaint raised two claims: first, "[b]eginning on June 1, 1999, and continuing up to and including the present time, the respondent is subjecting me to a hostile work environment because of my race, African American;" and, second, "[o]n January 9, 2001, the respondent suspended me from employment and transferred me because of my race, African American."

42. On October 13, 2001, Williams requested a personal meeting with Colonel Paul J. Evanko, who at the time was Commissioner of the PSP. In support of this request, Williams submitted, *inter alia*, a Use of Force or Complaint Reception and Processing Worksheet (PSP Form SP1-101) and a memorandum to Colonel Evanko. Williams indicated that the Complaint Worksheet detailed "Captain Sidney A. Simon's violation of [Williams'] rights, humiliation of this officer and intensely systematic, malicious persecution of this officer from June 1999 until present." Williams also asserted that Captain Simon's handling of the quota allegation "was in retaliation for [Williams'] previous complaints against Captain Simon and a continuation of his violations of [Williams'] Freedom of Speech, Constitutional Rights and Civil Rights.

43. In the memorandum and the attached Complaint Worksheet, Williams described a series of incidents and events involving actions taken or orders given by Captain Simon which

Williams believed supported his claim originally advanced in Attorney Markham's letter, that Captain Simon was being used by the troopers' union to harass Williams. Williams also included events and incidents that had occurred since he submitted Attorney Markham's letter and which were subsequently incorporated in to the Complaint which initiated this action.

44. Williams also indicated in the cover memorandum that "[a]t the present time, this officer has not discussed this matter with the Equal Employment Opportunity Officer or anyone else."

45. On October 16, 2001, Captain Conley, Williams' then supervisor, forwarded Williams' request for a meeting with the Commissioner through channels to his supervisor, Major Seilhamer. Thereafter, on November 1, 2001, Williams was notified that "[h]is request to have a personal meeting with the Commissioner has been denied. However, if [Williams] desires to meet with the Department Equal Employment Opportunity Officer, he should contact her direct and set up the meeting."

46. On January 16, 2003, Williams submitted a memorandum to Major W. Jon Pudliner, Director of the PSP's Bureau of Professional Responsibility. Therein, Williams indicated that he had filed another Use of Force or Complaint Reception and Processing Worksheet (PSP Form SP1-101) with the Bureau of Professional Responsibility on December 13, 2002, and had not received any response thereto. This memorandum also repeated Williams' claims that he had been subjected to a series of false accusations regarding the citation quota and his overall performance as Station Commander at Mercer Station, which Williams' referred to as "harassment [and] discriminatory practices." Williams again did not claim or allege that this was motivated by his race or by any prior complaints he made about racial discrimination or harassment.

47.   On January 17, 2003, Williams submitted a similar memorandum to Lieutenant Colonel Jeffrey B. Miller, Commissioner of the PSP.  Therein, Williams requested a personal meeting with the Commissioner and the PSP's Equal Opportunity Employment Officer because the Bureau of Professional Responsibility was denying his request for "an investigation of [his] lawful complaint against department members/personnel" regarding "unlawful orders, discrimination, lying under oath, [and] retaliation for inquiry."  In this memorandum, Williams did make a reference to "unlawful **racists** orders" by Captain Simon and included Major Seilhamer for the first time within the scope of his allegations.

48.   By memorandum dated January 23, 2003, Major Seilhamer directed Williams' immediate supervisor, Captain Conley, to "inform Williams that Major W. Jon Pudliner [  ] thoroughly reviewed the Worksheet and accompanying correspondence that [Williams] submitted" and that Major Pudliner "determine[ed] that the allegations contained therein have already been fully addressed by BPR investigation IAD #2000-0111, Supervisory Inquiry IAD #2000-0420, and the arbitration decision in Case #01-CI-102 & 232, Lieutenant Billy R. Williams, Grievant."

49.   On July 28, 2003, Williams filed the instant Civil Complaint, which alleged that he was subjected to a racially hostile work environment and retaliation for making complaints about racial harassment and/or discrimination.  In response, the PSP generated an internal inquiry, designated as General Investigation IAD #2003-0575.  During this investigation, Lieutenant Donald T. Carnahan of PSP's Internal Affairs Division obtained tape-recorded statements from Captain Simon, Lieutenant Todd Johnson and Captain Michael Hample.  Portions of these statements were transcribed and included as attachments in the final report submitted by Lieutenant Carnahan.

14

50.  Williams did not file any administrative complaints against the PSP with the EEOC or the PHRC since his PHRC complaint was filed in 2001.

### III.  WITNESSES

The Defendant does not at this time anticipate calling any witness not already identified in the Plaintiff's Pretrial Narrative Statement.

### IV.  EXHIBITS

In addition to the exhibits listed in Plaintiff's Pretrial Narrative Statement, the Defendant may present any or all of the following:

1.  Civil Complaint, No. 03-239 Erie

2.  Transcript of Deposition of Billy R. Williams, October 21, 2004

3.  Notes of Testimony, Captain Sidney A. Simon, May 25, 2001

4.  Notes of Testimony, Captain Sidney A. Simon, October 19, 2000

5.  Anderson Memo (to Whalen), 02-01-00

6.  Cline Letter (to Simon), 02-10-00

7.  Simon Memo (to Commander, Area IV), 02-16-00

8.  Simon Memo (to Station Commander, Troop D Mercer), 02-23-00

9.  Supervisor's Notation, 04-25-00

10. Supervisor's Notation, 05-10-00

11. Williams Memo (to Jungling), 05-12-00

12. Markham Letter (to Evanko)(w/attachments), 06-05-00

13. Director, BPR Memo (to Commander, Area IV), 06-21-00

14. Simon Memo (to Seilhamer), 07-11-00

15. Supervisor's Notation, 07-11-00

16. Williams Memo (to Seilhamer), 07-14-00

17. Williams Memo (to Seilhamer), 07-19-00

18. Seilhamer Memo (to Director, IAD), 08-04-00

19. Notification of Inquiry, IAD #2000-0111, 08-04-00

20. Statement of Lieutenant Billy R. Williams, 08-04-00

21. Williams Memo (to Carnahan), 08-04-00

22. Summary Report, IAD #2000-0111, 09-15-00

23. Williams Memo (to Simon), 09-19-00

24. Simon Memo (to Commander, Area IV), 09-20-00

25. Disciplinary Action Report, IAD #2000-0111, 09-20-00

26. Seilhamer Memo (to Deputy Commissioner of Administration), 09-25-00

27. Titler Memo (ATTENTION: Williams), 01-02-01

28. PHRC IN-4 Form (General Questionnaire), 02-26-01

29. PHRC Complaint, No. 0099029 (EEOC No. 17FA12205), 04-16-01

30. Williams Memo (to Evanko), 08-10-01 w/Markham Letter, 08-22-01

31. Use of Force or Complaint Reception and Processing Worksheet

32. Williams Memo (to Commissioner), 10-13-01

33. Conley Memo (to Commander, Area IV), 10-16-01

34. Seilhamer Memo (to Conley), 10-16-01

35. Opinion and Award, Case No. #01-CI-102 & 232, 09-06-02

36. Titler Memo (ATTENTION: Williams), 10-02-02

37. Williams Letter (to Robinson), 10-20-02

38. Williams Letter (to Robinson), 10-23-02

39. Disciplinary Action Report, IAD #2000-0111, 11-11-02

40. Williams Letter (to Schweiker), 11-24-02

41. Williams Letter (to Schweiker), 11-24-02

42. Williams Memo (to Evanko), 11-24-02

43. Williams E-mail (to Robinson), 12-02-02

44. Williams E-mail (to Robinson), 12-04-02

45. Williams E-mail (to Robinson), 12-06-02

46. Williams Letter (to Sinkler), 12-21-02

47. Pudliner Memo (to Commander, Area IV), 01-13-03

48. Pudliner Letter (to Earll), 01-13-03

49. Williams Memo (to Pudliner), 01-16-03

50. Williams Memo (to Miller), 01-17-03

51. Conley Memo (to Director, BPR), 01-22-03

52. Conley Memo (to Commissioner), 01-22-03

53. Seilhamer Memo (to Conley), 01-23-03

54. Seilhamer Memo (to Deputy Commissioner, Operations), 01-27-03

55. Seilhamer Memo (to Conley), 01-27-03

56. Williams Memo (to Miller), 01-29-03

57. Conley Memo (to Commissioner), 02-03-03

58. Seilhamer Memo (to Periandi), 02-06-03

59. Periandi Memo (ATTENTION: Williams), 03-27-03

60. Seilhamer Memo (to Conley), 03-31-03

61. Look Letter (to Williams), 04-14-03

62. Ferguson Letter (to Williams), 05-05-03

63. General Investigation Report, IAD #2003-0575, 11-25-03

64. Annual Performance Review, 05/99-05/00

65. Annual Performance Review,  05/00-05/01

66. Annual Performance Review, 05/01-05/02

67. Annual Performance Review, 05/02-05/03

68. PSP Field Regulation FR 1.35

69. PSP Equal Employment Plan, 01-01-99-12-31-99

## V.  DAMAGES

No damages are sought by the Defendant in this case.

## VI.  UNUSUAL LEGAL ISSUES

There are no unusual legal issues involved in this case.

## VII.  LENGTH OF TRIAL

It is estimated that the Defendant will require three days of trial to present its defense.

---

The Defendant reserves the right to amend or supplement this pretrial narrative statement up to and including the time of trial.

WHEREFORE, the Defendant respectfully requests that the Court accept the foregoing as the Defendant's Pretrial Narrative Statement in this case.

Respectfully submitted,

THOMAS W. CORBETT, JR.
Attorney General

      s/ Scott A. Bradley
Scott A. Bradley
Senior Deputy Attorney General
Attorney I.D. No. 44627

Susan J. Forney
Chief Deputy Attorney General

Office of Attorney General
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 565-3586
Fax:    (412) 565-3019

Date:  May 25, 2007