Exhibit A
PHRC IN-4 Form
(General Questionnaire)
02-26-01

**PA Human Relations Commission Use Only**

*1-30-01*

| | |
|---|---|
| Docket No. | _____ |
| EEOC No. | _____ |
| Social Security No. | _____ / _____ / _____ |

PHRC can investigate complaints of discrimination in: (1) Employment based upon race, color, religion, ancestry, age (40 and above), sex, national origin, non-job related handicap or disability, known association with a handicapped or disabled individual, possession of a diploma based on passing a general education development test, or willingness or refusal to participate in abortion or sterilization; and (2) Public Accommodations based upon race, color, religion, sex, ancestry, national origin, handicap or disability, known association with a handi-capped or disabled person, use of a guide or support animal due to blindness, deafness or physical handicap or because the user is a handler or trainer of such animals.

## IN-4 FORM    GENERAL QUESTIONNAIRE
### Questionnaire on the incident you are complaining about.

Rev. 03/99

To avoid rewriting your answers, please read this short questionnaire from beginning to end before filling out your answers to individual questions. Please answer every applicable question as fully as possible, and to the best of your present knowledge, information and belief. If you are unsure of your answer, please say so. It is your responsibility to notify this Agency of a change of address or times of unavailability. Failure to notify this Agency may result in dismissal of the matter.

Name  **BILLY R. WILLIAMS**

Address  **650 WEST 10TH. ST**

City  **ERIE**          State  **PA**     ZIP Code  **16502**

County  **ERIE**     Telephone No. H **(814) 457-0342**     W **(814) 898-1691**

May we call you at work?     (Yes)         No _____

Caution:        Failure to correctly identify the name of the legal entity you are complaining about will hinder the processing of your complaint.  Bring pay stubs, W-2 forms, contracts, etc. to aid in verification of the name and address.

Name of Organization your complaint is against:

Name  **PA. STATE POLICE**

Address  **TROOP D, BUTLER, 200 BARRACKS ROAD**

City  **BUTLER**          State  **PA**     ZIP Code  **16001-2689**

Type of Business  **STATE POLICE**

County  **BUTLER**     Telephone No.  **724-284-8100**

Number of employees who work at the organization named above.  Please check one.

Less than 4 _____     15 to 100 _____     201 to 500 __**X**__     Unknown _____

4 to 14 _____     101 to 200 _____     501 plus _____

**IN-4 FORM**          **General Questionnaire**          **(page 2)**

Name and address of person who will know how to contact you and who does not reside in your home.

Name _Joyce Hyche_

Address _816 West 17th St._

City _Erie_          State _PA_    ZIP Code _16502_

Telephone No. H (_814_) _459-1753_    W (_814_) _451-6006_

In this Questionnaire, you will see the word "class" mentioned. **Class means the person's race, sex, age, ancestry, religion and so on.** Depending on the issues in the complaint, you may belong to two or more classes. For example, a Black female could belong to two classes: race/Black and sex/female. A White male could belong to race/White and sex/male. All persons named in the complaint or questionnaire should be identified by their class as follows: John Doe (White male), John Doe (under age 40), Jane Doe (Black female). For example,  if your complaint is based on race, include the race of all persons mentioned. If it is a sex complaint, mention the sex of all persons mentioned.

1.    Discrimination means difference of treatment. Please explain what happened to you and why you feel you were treated differently. In other words, what happened to persons of a <u>different class</u> that makes you feel they received more favorable treatment than you. Give specific dates.

_OVER THE PAST TWO YEARS TIL PRESENT I HAVE_
_BEEN THE VICTIM OF A SYSTEMATIC CAMPAIGN_
_OF HARASSING, DISCRIMINATING, FALSE ACCUSATIONS,_

2.    If you believe the organization treated you this way because of one or more of the reasons listed below, please check those reasons. If you believe the employer treated you this way for a reason which is not listed, explain what you believe to be the reason.

|   |   |   |
|---|---|---|
| ____ Sex | ____ Ancestry | ____ Age (40+) Date of Birth _____ |
| _X_ Race | ____ National Origin | ____ Use of guide dog or support animal |
| _X_ Color | ____ GED | ____ Participation in/or refusal to participate in |
| ____ Religious Creed | _X_ Retaliation | Abortion/Sterilization |
|   |   | ____ Non-job related handicap/disability |
|   |   | Identify your disability _____ |

3.    Did you complain to management about the problem(s)? Identify the name and title of the person to whom you complained and describe what action was taken by management.

_MAJOR TERRY GILHAMCR_

**IN-4 FORM**                **General Questionnaire**                **(page 3)**

4. Has anyone else been treated as you were? Please list them and identify by Race, Sex, Age, etc.

   Name _____    Race, Sex, Age, etc. _____

   *NO* _____

   _____

   _____

4a. What happened to him or her? _____

   _____

   _____

5. Name other people who have been treated differently. Please list them and identify their Race, Sex, Age, etc.

   Name _____    Race, Sex, Age, etc. _____

   *OTHER  LIEUTENANTS  (5 WHITE) (1 BLACK)* _____

   _____

   _____

5a. What happened to him or her? _____

   _____

   _____

6. Because of the action taken against you, did you suffer any monetary loss or lose benefits. Please include any out-of-pocket expenses.

   *LOST   2 HOURS   EACH  DAY  TRAVELLING  TO AND*

   *FROM  WORK. ( SEPT 11, 2000 — JANUARY 29, 2001)*

   _____

6a. What have you done to make up for the loss(es) or benefit(s) you have listed above.

   *NOTHING* _____

   _____

   _____

Exhibit B
PHRC Complaint
No. 0099029
(EEOC No. 17FA12205)
04-16-01

 

# COMMONWEALTH OF PENNSYLVANIA

## GOVERNOR'S OFFICE

## PENNSYLVANIA HUMAN RELATIONS COMMISSION

Billy R. Williams,                 :

      Complainant          :     0099029

                v.        :  PHRC Docket No.

                    :  EEOC Charge No.

COP, Pennsylvania State Police ,   :  *17FA12205*

      Respondent          :

## COMPLAINT

1.    The Complainant herein is:

        Billy R. Williams
        650 West 10th Street
        Erie, PA  16502

2.    The Respondent herein is:

        COP, Pennsylvania State Police
        Troop D, Butler, 200 Barracks Road
        Butler, PA  16001-2689

3.    I allege the respondent violated § 5 of the Pennsylvania Human Relations Act, as follows:

    a.    Beginning on June 1, 1999, and continuing up to and including the present time, the respondent is subjecting me to a hostile work environment because of my race, African American.

        (1)    On May 22, 1969, I began employment for the respondent.

        (2)    I initially held the position of Cadet.

Billy R. Williams          v.      COP, Pennsylvania State Police

(3)    On May 12, 1990, I was promoted to the rank of Lieutenant.

(4)    From June 1999 until the present time, Sidney Simon, respondent Captain and the Commissioner of the respondent have repeatedly harassed me on the job. Instances of such harassment include but are not limited to the following:

    (a)    Captain Simon repeatedly subjects me to false allegations regarding the performance of my duties and submits negative, unwarranted notations and memos to my personnel file.

    (b)    Since September 11, 2000, I have twice been subjected to involuntary transfers at the direction of Captain Simon and the Commissioner of the Pennsylvania State Police. In September 2000, I was transferred from Mercer Station to Butler station and in January 2001 I was transferred from Butler Station to Erie station.

    (c)    Whenever troopers subordinate to my supervision do not like my directives or orders, they often lodge totally false allegations to their union (FOP) against me as a means of harassing me. The union reported the charges to Captain Simon whose reactions toward me are always adverse regardless of my innocence or the ridiculous nature of the allegations.

    (d)    I was compelled to submit weekly briefing notes of all of my discussions and I was ordered to submit monthly recaps of all of my activities to Captain Sidney Simon.

(5)    Similarly situated Caucasian employees are not subjected to similar scrutiny, involuntary transfers, job requirements and adverse actions.

(6)    The respondent allows the rascist behavior of my subordinates by giving credence to their complaints.

b.    On January 9, 2001, the respondent suspended me from employment and transferred me because of my race, African American.

(1)    Paragraphs 3.a.(1) through (6) are incorporated herein as if fully set forth as above.

  

Billy R. Williams          v.          COP, Pennsylvania State Police

> (2)  On January 9, 2001, I received a notice from Captain Robert B. Titler, notifying me that I was being suspended from employment for ten days without pay and transferred for allegedly violating department rules and regulations.
>
> (3)  Similarly situated Caucasian employees such as: Lieutenants Grolemund, Brown and Jungling have not been suspended and transferred under similar circumstances.

4.  The complainant prays that the respondent be required to provide all appropriate remedies under § 9 of the Pennsylvania Human Relations Act.

5.  This charge has been dual filed with EEOC.

  

Billy R. Williams          v.      COP, Pennsylvania State Police

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

_04/16/01_
(Date Signed)

_Billy R Williams_
Billy R. Williams

# Exhibit C
# Plaintiff's Proposed
# Trial Exhibits 2B through 14

STD-601, 9-80

COMMONWEALTH OF PENNSYLVANIA

DATE:       December 30, 1992

SUBJECT:    Class-New Castle Station
            December 30, 1992

TO:         All Personnel
            New Castle Station

FROM:       Lieut. Billy R. Williams
            Station Commander
            Troop D - New Castle

        Attendance:

            Lieut. Williams              Cpl. Harrison
            Tpr. Gargasz                 Tpr. Jones
            Tpr. Kelly                   Tpr. McNeal
            Tpr. Orloff                  Tpr. Schrantz
            Tpr. Vascetti                 ''  CLIFTON
                                          ''  DUSYUC

    1.  Thanks for the cards.

    2.  Review When Station Commander wishes to be called after hours.
        (Order posted attached).

    3.  Review the following Special Orders:

            92-224      Communications Tower Inspection
            92-225      Pennsylvania Motor Vehicle Financial Responsibility Law
            92-226      Radiological Dosimetry Equipment
            92-227      Special Emergency Response Team
            92-229      Training and Distribution of Photographic Equipment
            92-230      Training - Intoxilyzer 5000 Maintenance Officer
            92-231      Position Vacancy - B.P.R. Section
            92-233      Canine Drug Enforcement Program
            92-234      Videotape - State Police Services
            92-235      Training-Basic Fingerprint Classificaiton
            92-236      Accreditation Training Program
            92-237      Training-PA. State Police Training Calendar

    4.  OVERTIME - New Castle will adhere to the Captain's policy on
        overtime.  I am not going to approve overtime in order
        to do late reports, PERIOD.  If you are running behind
        in your paper work, advise your immediate supervisor,
        prior to it becoming a major problem.

        There may be times when we run with one mid-nighter's
        car for a couple of hours in order to let the other car
        get caught up on the paper work.  Mid-nighter will keep
        up their paper work.  There will be NO permanent mid-nighters.



PLAINTIFF'S
EXHIBIT
2B
tabbies

-2-

OVERTIME Con't:

    This does not bar overtime, if you make a major arrest late
in your shift, just remember between 2300 hours and 0630 hours,
<u>NOTIFY</u> THE O.D. for approval.

STD-601, 9-80

COMMONWEALTH OF PENNSYLVANIA

**DATE:**     December 30, 1992

**SUBJECT:**     Notification of Station Commander
After Hours

**TO:**     All Personnel
New Castle Station

**FROM:**     Lieut. Billy R. Williams  *BRW*
Station Commander
Troop D - New Castle

1.  I wish to be notified via telephone in the following instances:

   A.  Member/employee is injured seriously on or off the job.
   B.  Any kind of shooting incidents involving station personnel
   C.  Any other MAJOR instance that I should know about prior to
       0830 hours.

2.  THIS POLICY IS NOT TO INTERFERE WITH OR RELEASE OF THE RESPONSIBILITY
    OF NOTIFYING THE O.D., AS PER TROOP D ORDERS AND POLICY.

3.  In ALL instances, I am to be notified at my home telephone #
    814-459-0342, ONLY.

4.  REMINDER:  The O.D. must be contacted first in all instances of
              overtime after 2300 hours and before 0630 hours.

CC:

         Station Non-Coms
         Communication Room
         Station Bulletin Board

BPR 8032

STD-501-9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:  November 15, 1993

SUBJECT:  Complaint Against Known and Unknown Pennsylvania State Police Members for Spreading a Vicious, Slanderous and Racist Lie.

TO:  Lt. Robert J. Haught, Patrol Section Commander; Troop D, Butler

FROM:  Lt. Billy R. Williams
Station Commander
Troop D, Mercer

1.    The following is a recap of the facts as I know them.

On August 26, 1993 at approximately 0900 hours while at the Beaver Station relative to BPR Number 6943, I was stopped in the parking lot of the Beaver Station by Corporal Carl M. Harrison. Corporal Harrison related to me that Trooper Clair Damon, Pennsylvania State Police, New Castle, just a few days before had told him that I was under a Criminal and BPR Investigation for raping a white woman on the front seat of the State Police car.

That the BPR Investigator and Troop Records and Identification Unit had used a special light to check and find stains on the seat, that patches had been cut out of my car seat for evidence. I advised Corporal Harrison that it was positively not true.

Upon my arrival back at Mercer Station at approximately 1300 hours, I called New Castle and asked the Patrol Supervisor, Sergeant Max A. Mohney, to tell Trooper Damon to stop spreading the lie around the troop that I had raped a white woman in the State Police car.

At approximately 1440 hours I received a call from Trooper Damon telling me that he didn't start it, that he didn't tell Corporal Harrison that I had raped a woman. He said he had just asked Corporal Harrison if he had heard about it. Trooper Damon went on to say that it had been going around the New Castle Station since May 1993. He said he had heard it at the New Castle Picnic and Roast (Note: Which was attended by about fifty to sixty people; Other State Police personnel, FBI, Police Chiefs and Officers from other Police Departments, and public citizens) and that he had also heard it in his office at New Castle while talking to a Weight Team Member from PennDOT, an unnamed State Police Member had came into his office and started talking about it. Trooper Damon also stated that Sergeant Max A. Mohney had



told him that he had heard the same thing when he first arrived at the New Castle Station.

Since I was aware that Sergeant Tobias had attended the New Castle Roast, I asked him if he had heard the lies that were being spread about me. He stated he had and that he had told numerous people it was not true.

At approximately 1530 hours on August 26, 1993, I called the Troop Commander, Captain Terry L. Seilhamer, and advised him about what I had heard and that Trooper Damon was spreading a vicious lie around the Troop. Captain Seilhamer advised me to get everything down on paper and that he was planning to visit the Mercer Station the next day, Friday, August 27, 1993.

On August 27, 1993 the Captain visited the Mercer Station and met with myself and all supervisors about Troop Policy on Radar Teams. At the conclusion of the meeting the Captain advised all present that this story was not true. I gave the Captain a BPR Complaint Sheet naming Trooper Damon and other unknown State Police personnel. The following week I contacted Trooper Darryl Horton, Pennsylvania State Police, New Castle, to see if he knew who besides Trooper Damon was spreading this vicious lie. Trooper Horton stated he had heard nothing, that they had kept it away from him because they knew he was my cousin.

A few days later I received a telephone call from Jim Cioffi, Landlord of the New Castle Station, he stated he had been at the New Castle Station Roast and had overheard numerous State Police personnel spreading this vicious lie around. He stated that he told people that he knew me and no way could it be true.

On October 27, 1993, I received a telephone call from Trooper Horton, Pennsylvania State Police, New Castle, stating that he had walked into and overheard a conversation where some Station personnel were saying that it was true, that I was being investigated for raping a woman, that they knew about the investigation of Trooper Brennan for rape but that the investigation on me was separate, that the woman was from Hermitage, that a BPR Captain was doing the investigation.

The following is a list of people who I know have heard this scandalous lie:

    (1)    Lt. Gregory L. Patterson — Troop S, Mercer
    (2)    Sgt. Kermit R. Tobias, Jr. — Troop D, Mercer
    (3)    Cpl. Harrison — Troop D, Beaver
    (4)    Tpr. Albert W. Bynum — Troop D, Beaver
    (5)    James Cioffi, Landlord, New Castle Station
    (6)    Sgt. Max Mohney — Troop D, New Castle
    (7)    Tpr. Damon
    (8)    PennDOT Weight Member

(9)   Everybody who attended the PSP, New Castle Roast
      in August 1993
(10)  Tpr. Timon D. Moore - Troop D, New Castle

This Officer is extremely concerned that a vicious, slanderous, racist lie such as this was spread around by members of the Pennsylvania State Police for over seven months and counting. It is obvious that my race, black, seems to be the driving force as to why these State Police Members were so willing to spread and pass along this damn lie.

I am also concerned that on the surface it would appear that some Pennsylvania State Police Members have seen fit to divulge information from a BPR Investigation being done on a Trooper. Within that investigation the use of a special light, stains on a car seat, R & I cutting out samples from the car seat, should have been confidential information.

Rev. 5-90

# GRIEVANCE FORM

GRIEVANCE NO.
D – 138

NAME AND RANK OF GRIEVANT/SPOKESPERSON
Billy R. Williams – Lieutenant

☐ IF GROUP GRIEVANCE, CHECK BLOCK & LIST NAMES BELOW

TROP, BUREAU
Troop D

STATION/DIVISION
Mercer

NAME OF REPRESENTATIVE (IF ANY)

TYPE OF GRIEVANCE    (CHECK ONE)
☐ CONTRACT INTERPRETATION    ☒ APPEAL DISCIPLINE

DATE OF ALLEGED CONTRACTUAL VIOLATION OR WHEN YOU BECAME AWARE OF SAME; OR DATE ACKNOWLEDGMENT OF PENALTY TO BE IMPOSED

DATE: 03/30/94

ALLEGED VIOLATION- CITE SPECIFIC CONTRACT PROVISIONS: IF DISCIPLINE—CITE ART. XXVIII (DISCIPLINE)

Section 1
Section 10
(Side letter of Agreement on Discrimination because of Race)

DETAILS—FULLY EXPLAIN ALLEGED VIOLATIONS; FOR DISCIPLINE SEE INSTRUCTION SHEET

On March 30, 1994 at approximately 1120 hours, while at Mercer Station; Captain Terry L. Seilhamer accompanied by Staff Services Commander Lt. David R. Jungling advised this officer that based on some things he had just recently heard I was being transferred to Butler Headquarters. He stated that there appeared to be a problem with some of my orders, not clear or constantly changing. Also that I was being brought over to Butler for 11 weeks to replace Lieutenant Simpson who is going to the F.B.I. Academy and in those 11 weeks he and the other Lieutenants at Butler could help me improve my administrative abilities.

He also stated that Sgt. David Julock would be transferred to Butler for the same 11 weeks. I was advised that Sgt. Robert Martin Troop D, Butler would come to Mercer and be acting Lieutenant. He felt that he, Sgt. Martin could deal with the problems and Sgt. Tobias on his level.

Captain Seilhamer was very vague and evasive when I asked any questions.

       (1) I was verbally given notification of involuntary transfer to Butler Headquarters for 11 weeks.
       (2) I was informed that accusations had been made against me of unknown nature.

                                       (Details Continued:)

LIST OF ATTACHMENTS; COPY D.A.R., RESPONSE LETTER, ETC.

(1) Copy of Troop Conference Notes dated March 30, 1994
(2) Copy of Troop D Personnel Order 94-11, dated March 31, 1994

LIST OF WITNESSES, NAME AND RANK

Gregory N. Patterson – Lieutenant
Kermit R. Tobias – Sergeant
David M. Julock – Sergeant

SUGGESTED REMEDY:

(1) Immediate transfer back
(2) Opportunity to confront my accusers
(3) Reimbursement of all expenses and travel time lost as a result of this transfer

NAME AND RANK OF GROUP GRIEVANCE MEMBERS (EACH NAME MUST BE INITIALED)

SIGNATURE OF GRIEVANT/SPOKESPERSON
Lt. Billy R. Williams

**PLAINTIFF'S EXHIBIT**
4

DATE FILED
04/08/94

Details Continued:
Page 2

       (3)   Captain Seilhamer indicated my administrative abilities needed
            some improvement
       (4)   I have never been given an opportunity to confront my accusers
       (5)   I have never been given an official D.A.R. to address these
            accusations or problems.
       (6)   I have never received official notification of the complaints
            against me <u>nor</u> received any supervisory notification indicating
            lack of supervisory or administrative  ability

Due to all of the above, I have never been given an opportunity to defend myself in
regards to any accusations or address any sortages in regards to my administrative
abilities.

On 31 March 94 I was notified that Sgt. David Julock, Troop D. Mercer would be
replacing me and named acting Lieutenant, Station Commander.  Sgt. David M. Julock
was written up in February 1992, staff inspection report for his lack of Super-
visory skills and indecisiveness.   The previous station commander, Lt. Gregory
Patterson was ordered by Captain Terry L. Seilhamer to counsel Sgt. Julock
for same.

On March 23, 1994 at Troop Conference, Captain Terry L. Seilhamer had announced
that Sergeant Albert L. Brown, III, Troop D, Buttler would be Acting Lieutenant
Crime Section Commander at Butler from 04/09/94 to 06/26/94.

Refer to attachment #1, Troop Conference Notes, dated March 30, 1994.

May 9, 1994

MEETINGS HELD  ON 04/21/94  WITH THREE   (3) OFFICERS OF BRADY PAUL
LODGE #54 AT PENNSYLVANIA STATE POLICE, BUTLER.

FIRST MEETING 0949 - 1011
SECOND MEETING 1034 - 1041

On 04/21/94 at approximately  0920 hours  I was  asked by Corporal
Paul Montag as we passed in the hallway outside my office at Troop
D, Butler, if he could talk to me about something later today if I
was  not  going  anyplace.    I  said okay.  At approximately 0949
hours: Corporal Paul  Montag,  Corporal  Vogel  and  Trooper Peter
Marsico knocked and entered my office.

Corporal Montag started telling me that Captain Seilhamer had gone
to the F.O.P. Meeting the night before, 04/20/94, and had request-
ed  the  Lodge's  assistance  and  backing because of my grievance
accusing him of discrimination.

Corporal Montag than stated, "I've known the Captain  a long time,
he's a lot of things, but I know he is not a racist."

Corporal Vogel  then asked me what was I basing the discrimination
part of my grievance on, because  Troop Commanders  have the right
to transfer  people.  To which I stated, "That's right except when
it is wrong, violates  peoples rights  and is  a result  of disci-
pline, as  I consider  my case to be, I'm suppose to have Due Pro-
cess Rights before punishment takes place.

Corporal Montag then stated,  "I  understand  you  talked  to Paul
McCommons, did he tell you to file this discrimination part of the
grievance?  The Captain seems to think you  wouldn't have  done it
if it  wasn't for  Paul McCommons.   I  stated, "I'm man enough to
know when I've been discriminated against, besides the  only thing
Paul McCommons  told me  was the  correct procedures  for filing a
grievance under Article 28, Sections, after I had  told him  I had
been discriminated against and illegally transfered to Butler from
Mercer without any type of due process, based on a  complaint made
to the  Captain by  the F.O.P. Lodge on behalf of the two (2) Cor-
porals from Mercer who had disobeyed my lawful orders on assigning
unmarked cars.   Their accusations triggered my transfer'

I  also  advised Corporal  Montag,  Corporal  Vogel  and  Trooper
Marsico, that I had spoken to at least  ten (10)  other persons on
and off  the job  prior to talking to Paul McCommons.  i.e. an At-
torney, other Lieutenants,  other  Staties  and  F.O.P.  Lodge #28
President, Bill  Loftus, even  a Secretary at PSTA, Harrisburg.  I
told them I had contacted Bill  Loftus  at  home  after  hours and
asked for  information and  advice on how to file a discrimination
grievance against my Troop Commander for  transferring me illegal-
ly. Bill  Loftus acknowledged that he had never seen a discrimina-
tion grievance and wouldn't know how  or what  section to  use and

that Loftus had advised me to contact F.O.P. Butler Lodge's Pres-
ident. But when I told him I couldn't because Butler's Lodge had
already sided with the Corporal's making the complaint against me
and had gone to the Captain on their behalf.

Bill Loftus advised that if I had a problem with going to the
Butler Lodge for help to try PASTA Offices in Harrisburg or to
give the F.O.P. President, Paul McCommons, a call since he (Bill
Loftus) did not know how to file a discrimination grievance.

When I called the PSTA Office in Harrisburg the Secretary recom-
mended I call the local lodge for assistance. I told Montag,
Vogel and Marsico that by the time I called Paul McCommons I had
already made up my mind to file a grievance listing discrimination
as part of it.

I asked Paul McCommons about the contract booklet, proper section
and procedures. That at no time did Paul McCommons tell me to add
anything to my grievance.

Paul McCommons simply answered my questions, which is exactly what
I expect from any Officer of the F.O.P. since I am a dues paying
Member and have been for years.

Corporal Vogel again asked me what other reason I was basing my
discrimination grievance on. I advised Corporal Vogel that I
would answer that question in a different forum at a later date.

I was asked by Corporal Vogel and Corporal Montag at least once or
twice again to tell them exactly what Paul McCommons had said to
me and if I had told the Captain that Paul McCommons was the rea-
son I filled out the discrimination section of the grievance. I
repeatedly answered, "no, that is ridiculous."

Corporal Montag stated he had received the complaint from the two
Corporals in Mercer and since he felt like there may be a problem
he took the complaint to the Captain as F.O.P. Lodge President.
That he nor the Lodge had asked the Captain to transfer me, just
to look into the complaint. Corporal Montag then asked me if I
had any problems with personnel at Mercer, I stated, "no, not as
far as I know."

Corporal Vogel asked if I had spoken to the Major relative to my
concerns. I stated the Major asked me a few minor questions on
April 12, 1994 after I was transferred on April 11, 1994, but no
one, not the Major or Captain, has ever asked me any direct ques-
tions about my orders to the Corporals but both had asked Sergeant
Julock twice on March 30 at Mercer and March 31st at Butler.

Corporal Montag ended the conversation stating again that the
Captain was not racist. I replied I am not calling the Captain a
racist and I still say I am being discriminated against. No Of-
ficer in the history of the Pennsylvania State Police has ever
been transferred strictly because he asked two Corporals to ex-

plain why they disobeyed his orders, intentional or not.

Meeting ended at approximately 1010 hours.

All three; Corporal Montag, Corporal Vogel and Trooper Marsico came back to my office at 1034 hours and stated they had been down talking to the Captain.

They stated they wanted to clarify Paul McCommons' involvement. I told them I had decided on my own that I was discriminated against. That as I said before I first discussed it with Bill Loftus (C Lodge #28), the Guardians Attorney, Other Staties, long before discussing it with Paul McCommons.

That the only thing Paul McCommons did was explain my grievance rights and tell me the correct sections to cite in my grievance.

They also asked if I thought the Lodge had discriminated against me, I told them up until now I have nothing to base that on.

They left my office at 1041 hours.

Note:  I was surprised to hear that they had gone right back to the Captain and discussed my earlier comments with him, as I am the grievant in this matter.

Comments:  After thinking all of this over I am surprised by four (4) things - (1) Two of three (3) Officers of a F.O.P. Lodge did not appear to care at all about the obvious violation of the F.O.P. labor contract. (2) Why Corporal Vogel and Corporal Montag appeared so offended by the wording on the discrimination section when it is the exact wording from the F.O.P. contract agreement. (3) Why my due process rights did not appear to matter to them. (4) Why they did not appear to care at all about the fact that allegations against me were untrue.

Note:  Trooper Marsico said very little at both meetings, he primarily took notes on a little pad.

Lt. Billy R. Williams
650 West 10th Street
Erie, PA  16502

May 23, 1994

PSTA
3625 Vartan Way
Harrisburg, PA  17110

Re:  Greivance #D-138

Dear President:

As a result of the two meetings held between myself and representatives of Brady Paul Lodge #54 on 04/21/94, I am requesting that the following people be added to my list of witnesses for my Grievanve hearing:

1.  Cpl. Paul Montag – Butler
2.  Cpl. David M. Minarik – Mercer
3.  Cpl. Matthew M. Tuzynski – Mercer

Meetings held at Lodge #54's request on behalf of Capt. Terry C. Seilhamer, Commanding Officer, Troop D. Butler.  These meeting were held in regards to Capt. Seilhamer 's request for assistance and backing from Lodge #54 on 04/20/94 at lodge meeting.  A request made as a result of my filling Grievance #D-138 against him.

In light of Cpl. Paul Montag, Butler (President of Lodge #54 until 4/20/94) comments stating that he had received the complaint from corporals Minarik and Tuzynski against me and gone to Capt. Seilhamer on their behalf. He stated that he went to Capt.  Seilhamer to have him look into the complaint and that he nor lodge #54 had requested that I be transferred.  Also I have enclosed the following items;

1.  Copy of my notes from meetings held 04/21/94
2.  Copy of my letter to the new president (since 04/20/94 Sgt. Robert Martin

Sincerrly,

*Billy R. Will*

Lt. Billy R. Williams
F.O.P. Lodge #48
#317

**GRIEVANCE FORM**

GRIEVANCE NO. D-140

NAME AND RANK OF GRIEVANT/SPOKESPERSON

Billy R. Williams - Lieutenant

☐ IF GROUP GRIEVANCE, CHECK BLOCK & LIST NAMES BELOW

OOP/BUREAU

Troop D - Butler

STATION/DIVISION

Mercer

NAME OF REPRESENTATIVE (IF ANY)

TYPE OF GRIEVANCE (CHECK ONE)   ☐ CONTRACT INTERPRETATION   ☒ APPEAL DISCIPLINE

DATE OF ALLEGED CONTRACTUAL VIOLATION OR WHEN YOU BECAME AWARE OF SAME/OR DATE ACKNOWLEDGMENT OF PENALTY TO BE IMPOSED

DATE: 06/16/94

ALLEGED VIOLATION: CITE SPECIFIC CONTRACT PROVISIONS. IF DISCIPLINE—CITE ART: XXVIII (DISCIPLINE)

Article 28 - Section 1 - Section 10
Side Letter of Agreement on Discrimination Because of Race

DETAILS—FULLY EXPLAIN ALLEGED VIOLATIONS / FOR DISCIPLINE SEE INSTRUCTION SHEET

I request that this Grievance #D-140, be merged with Grievance #D-138.

1.  On June 16, 1994 while at New Castle Station for a briefing session concerning a multiple homicide investigation (4 victims) which took place on June 15, 1994, refer to D6-649969, this officer had worked with the Officer of the Day, Lieutenant Rager and Major Case Team on June 15, 1994 until 12:00 o'clock midnight.  Upon my arrival at New Castle Station at approximately 0750 hours Captain Terry L. Seilhamer pulled me to the side and advised me that Lieutenant John Lechner (Station Commander, New Castle) was here to take charge of the investigation.  That he and the Major had decided to call Lieutenant Lechner in off vacation and put him in charge because I was only going to be the Crime Section Commander for another week and a half before going back to Mercer.

Note:  My removal is not consistent with Administrative Regulations and Troop Special Order 94-10, dated January 28, 1994.  Refer to Attachment #2.

2.  Between May 3, 1994 and May 18, 1994 I was not put in charge of or even on the Criminal Investigator Selection Committee.  The Crime Sergeant, Albert Brown was instead.  Other Committee Members were Corporal Raymond E. Magensky

Details Continued on Page 2

LIST OF ATTACHMENTS/COPY D.A.R., RESPONSE LETTER, ETC.

1.  Copy of Troop D Personnel Order 94-11 dated, March 31, 1994.
2.  Copy of Troop D Special Order 94-10 dated, January 28, 1994.
3.  Copy of Letter dated, February 21, 1994 from the Commissioner
4.  Copy of Grievance D-138

LIST OF WITNESSES/NAME AND RANK

Lieutenant John N. Lechner

SUGGESTED REMEDY:

Pay the grievant the amount of overtime equal to the overtime hours that Lieutenant John N. Lechner had/or Supervisor Major Case Team

NAME AND RANK OF GROUP GRIEVANCE MEMBERS (EACH NAME MUST BE INITIALED)

**PLAINTIFF'S EXHIBIT**
**5**

SIGNATURE OF GRIEVANT/SPOKESPERSON

Lt. Billy R. Williams

DATE FILED

06/28/94

| STEP -1- | IF DISCIPLINE, SUBMIT DIRECTLY TO STEP -2- |

**RESPONSE TO CONTRACTUAL INTERPRETATIONS ONLY**

GRIEVANCE WAS RECEIVED _____ AND IS ☐ AFFIRMED ☐ DENIED

DATE _____

SIGNATURE (TROOP C.O./BUR. DIR.)                    DATE MEETING HELD

☐ CHECK TO APPEAL TO NEXT LEVEL    SIGNATURE                    DATE:

**NOTICE: MUST BE POSTMARKED WITHIN 5 DAYS FROM RECEIPT OF FIRST STEP RESPONSE**

| | | | | |
|---|---|---|---|---|
| GRIEVANCE SUMMARY FORM COMPLETED | ☑ YES ☐ NO | F.O.P. REPRESENTATIVE NOTIFIED ☐ YES ☐ NO | F.O.P. REPRESENTATIVE PRESENT ☐ YES ☐ |
| CHECK APPROPRIATE BLOCK | GIVEN OPPORTUNITY TO REVIEW INFORMATION USED FOR D.A.R. | ☐ YES ☐ NO  DATE: | RIGHTS EXPLAINED ☐ YES ☐ |

**DISCIPLINE ONLY**

REASON FOR APPEAL

FORM                                   GRIEVANCE BOARD ACTION

**STEP NO. 2 — GRIEVANCE COMMITTEE ACTION**

DECISION RENDERED:

**STEP NO. 3 — ARBITRATION**

| DATE HEARING SET | LOCATION | ARBITRATOR ASSIGNED |

DECISION RENDERED:

Page - 2                          ..                     Grievance No. D-140
Details Continued -


Mercer and Trooper Charles Barger, Butler.

Not putting me, the Crime Section Commander, on this Committee is not con-
sistent with past practice. <u>Refer to Attachment #3</u> dated, February 21, 1994.

I consider both of these actions to be related to the events of March 30,
1994 and my subsequent transfer (punishment).  I request that this Grievance
be merged with Grievance D-138.     REFER TO   ATTACHMENT #1

STD-501. 9-86

Troop D Personnel Order
No. 94-11
COMMONWEALTH OF PENNSYLVANIA

DATE:          March 31, 1994

SUBJECT:       Assignments and Transfers

TO:            Headquarters Staff and Station Commanders

FROM:          Captain Terry L. Seilhamer
               Commanding Officer
               Troop D, Butler

REFERENCE:     (a)  FR 3-2, Section 2.04, General Transfers.

        1.   The following temporary Intratroop Transfer is hereby
announced, effective from April 11, 1994 through June 24, 1994:

| NAME | FROM | TO |
|------|------|-----|
| Lt. Billy R. Williams | Station Commander Mercer | Acting Crime Section Commander - Butler |

        2.   This transfer will be in effect while Lt. Brian J. Simpson
is attending the FBI National Academy.

TLS/ksm

DISTRIBUTION:
Director, Bureau of Personnel
Commander, Area IV-Punxsutawney
C.O., Troop D
C.O., Criminal Invest. Section
C.O., Patrol Section
C.O., Staff Services Section
OIC-Patrol Unit-Butler
OIC-Criminal Invest. Unit-Butler
OIC-Vice Unit-Butler
OIC-Staff Services Section-Butler
Station Commanders-Beaver
                Kittanning
                Mercer
                New Castle
OIC-Region VI Strike Force
OIC-Tactical Narcotic Team-V
Headquarters File

PLAINTIFF'S
EXHIBIT
6

Africander ● agcy

**af-ter-piece** \'af-tər-ˌpēs\ n : a short usu. comic entertainment performed after a play

**af-ters** \'af-tərz\ n pl, Brit : DESSERT

**af-ter-shave** \'af-tər-ˌshāv\ n : a usu. scented lotion for use on the face after shaving

**af-ter-taste** \-ˌtāst\ n : persistence of a sensation (as of flavor or an emotion) after the stimulating agent or experience has gone

**af-ter-tax** \'af-tər-ˌtaks\ adj : remaining after payment of taxes and esp. of income tax ⟨an ~ profit⟩

**af-ter-thought** \-ˌthȯt\ n 1 : an idea occurring later 2 : a part, feature, or device not thought of originally

**af-ter-time** \-ˌtīm\ n : FUTURE

**af-ter-ward** \'af-tə(r)-wərd\ or af-ter-wards \-wərdz\ adv : at a later or succeeding time : SUBSEQUENTLY, THEREAFTER

**af-ter-word** \-ˌwərd\ n : EPILOGUE 1

**af-ter-world** \-ˌwərld\ n : a future world : a world after death

**Ag** symbol [L argentum] silver

**AG** abbr 1 adjutant general 2 attorney general

**ag-** — see AD-

**Ag-a-da** \ə-'gäd-ə, -'gȯd-\ var of HAGGADAH

**again** \ə-'gen, -'gin, -'gān\ adv [ME, opposite, again, fr. OE ongean opposite, back, fr. an + gen, gean still, again; akin to OE geanagainst, OHG gegin against, toward] 1 : in return : BACK ⟨were he would pay him ~ when he was able —Shak.⟩ 2 : another time : once more : ANEW ⟨I shall not look upon his like ~ —Shak.⟩ 3 : on the other hand ⟨he might go, and ~ he might not⟩ 4 : in addition : BESIDES ⟨~ there is another matter to consider⟩

**again and again** adv : OFTEN, REPEATEDLY

**against** \ə-'gen(t)st, -'gin(t)st, -'gān(t)st\ prep [ME, alter. of againes, fr. agein] 1 : directly opposite : FACING 2 : obs : exposed to 2 a : in opposition or hostility to b : unfavorable to c : as a defense or protection from 3 : compared or contrasted with 4 : in preparation or provision for 5 a : in the direction of and into contact with b : in contact with 6 : in a direction opposite to the motion or course of : counter to 7 a : as a counterbalance to b : in exchange for c : as a charge on 8 : before the background of

**against** conj, archaic : in preparation for the time when ⟨throw on another log of wood —father comes home —Charles Dickens⟩

**Ag-a-mem-non** \ˌag-ə-'mem-ˌnän, -nən\ n [L, fr. Gk Agamemnon] : a king of Mycenae who was the leader of the Greeks in the Trojan War

**aga-mete** \ā-'gam-ˌēt, 'ag-ə-ˌmēt, ˌā-gə-'mēt\ n [ISV, fr. Gk agametos unmarried, fr. a- + gametēs to marry — more at GAMETE] : an asexual reproductive cell

**agam-ic** \(ˌ)ā-'gam-ik\ adj [Gk agamos unmarried, fr. a- + gamos marriage — more at BIGAMY] : ASEXUAL, PARTHENOGENETIC — **agam-i-cal-ly** \-i-k(ə-)lē\ adv

**agam-ma-glob-u-lin-emia** \ˌā-ˌgam-ə-ˌglab-yə-lə-'nē-mē-ə\ n [NL, fr. a- + ISV gamma globulin + NL -emia] : a condition in which the body forms few or no gamma globulins or antibodies — **agamma-glob-u-lin-emic** \-'nē-mik\ adj

**aga-mo-sper-my** \'ag-ə-mō-ˌspər-mē, 'ag-ə-mō-ˌspər-\ n [Gk agamos + E sperm)] : APOGAMY; specif : apogamy in which seed union is not completed and the embryo is produced from the innermost layer of the integument of the female gametophyte

**aga-pan-thus** \ˌag-ə-'pan(t)-thəs\ n [NL, genus name, fr. Gk agapē + anthos flower — more at ANTHOLOGY] : any of several African plants (genus Agapanthus) of the lily family cultivated for their umbels of showy blue or purple flowers

**agape** \ə-'gāp, also 'gap\ adj or adv 1 : wide open : GAPING 2 : being in a state of wonder

**agape** \ä-'gä-(ˌ)pā, 'äg-ə-ˌpā\ n [LL, fr. Gk agapē, lit., love] 1 : LOVE 4a 2 : LOVE FEAST — **aga-pe-ic** \ˌag-ə-'pā-ik\ adj — **aga-pe-i-cal-ly** \-'pā-i-k(ə-)lē\ adv

**agar** \'äg-ˌär\ n [Malay agar-agar] 1 : a gelatinous colloidal extractive of a red alga (as of the genera Gelidium, Gracilaria, and Eucheuma) used esp. in culture media or as a gelling and stabilizing agent in foods 2 : a culture medium containing agar

**agar-agar** \ˌäg-ˌär-'äg-ˌär\ n [Malay] : AGAR

**agar-ic** \'ag-ə-rik, ə-'gar-ik\ n [L agaricum, a fungus, fr. Gk agarikon] 1 a : any of several pore fungi (genus Fomes) used esp. in the preparation of punk b : the dried fruiting body of a fungus (F. officinalis) formerly used in medicine 2 : any of a family (Agaricaceae) of fungi with the sporophore usu. resembling an umbrella and with numerous lamellae on the underside of the cap

**agate** \'ag-ət\ n, often attrib [MF, fr. L achates, fr. Gk achatēs] 1 : a fine-grained variegated chalcedony having its colors arranged in stripes, blended in clouds, or showing mosaike forms 2 : something made of or fitted with agate: as a : a drawplate used by gold-wire drawers b : a bookbinder's burnisher c : a playing marble of agate 3 : a size of type approximately 5½ point

**agate line** n : a space one column wide and ¹⁄₁₄ inch deep used as a unit of measurement in classified advertising

**agate-ware** \'ag-ət-ˌwa(ə)r, -ˌwe(ə)r\ n 1 : pottery veined and mottled to resemble agate 2 : an enameled iron or steel ware for household utensils

**agave** \ə-'gä-vē\ n [NL Agave, genus name, fr. L, a daughter of Cadmus, fr. Gk Agauē] : any of a genus (Agave) of plants of the amaryllis family having spiny-margined leaves and flowers in tall spreading panicles and including some cultivated for their fiber or for ornament

**agaze** \ə-'gāz\ adj : engaged in the act of gazing

**AGC** abbr advanced graduate certificate

**agcy** abbr agency

PLAINTIFF'S EXHIBIT
7

| a | about | ä | kitten | ər | further | a | back | ā | bake | ä | cot, cart |
|---|---|---|---|---|---|---|---|---|---|---|---|
| aȯ | out | ch | chin | e | less | ē | easy | g | gift | i | trip | ī | life |
| j | joke | ŋ | sing | ō | flow | ȯ | flaw | ȯi | coin | th | thin | th | this |
| ü | loot | u̇ | foot | y | yet | yü | few | yu̇ | furious | zh | vision |

Lt. Billy R. Williams
Station Commander
Mercer
May 5, 1995

Robert Martin, President
F.O.P. Lodge 54
200 Barracks Rd.
Butler, PA  16001

Dear President:

Once again I have a problem with a complaint that Lodge 54 has made against me that is totally without merit.  On this date 5 May 95, I was advised by Lt. David Jungling that the F.O.P. made some complaint against me relative to the payroll checks not being given out until 0900 hours. I believe Troop Special Order #95-28 is very clear on distribution and release of payroll checks.  The supervisor that attended Troop Conference when this subject was discussed was very clear on his instructions to other station personnel regarding release and distribution of payroll checks.

The bottom line is this, non of this was my orders.  The supervisor was following the Captain's orders as he is required to do, but Lodge 54 chose not to ask me anything prior to making this complaint or I would have told them that.  Since other stations are doing the same thing as Mercer Station I assume the supervisor got it correct.

The facts are these; I arrived at Mercer Station at 0753 hours this date.  The first person I met and saluted was Cpl. Frederick P. DeMask.  At approximately 1000 hours I was sitting in my office, I overheard a few loud comments coming from the hallway concerning "Stupid Orders about payroll checks" and other strong words.  I immediately called Sgt. David M. Julock, Patrol Supervisor, Cpl. Frederick P. DeMask, Crime Supervisor and Cpl. robert F. Schrantz into my office and reviewed Troop Special Order 95-28 with them.  Doing this meeting Cpl. DeMask advised me that he had made a complaint earlier to Cpl. Paul Montag, F.O.P. Butler about the guys getting their payroll checks so late on Friday (0900 hours).

At approximately 1030 hours, I received a telephone call from Lt. Jungling concerning the F.O.P. complaint and other matters.

Sgt. David M. Julock later while conversing with Sgt. William V. Marquis, New Castle Station was told that New Castle was not giving out payroll checks untill 0900 hours as per orders.

Cpl. Robert Schrantz at 1045 hours checked with Sgt. Douglas W. Humble, Beaver Station and he was told that Beaver was not giving out payroll checks until 0900 hours.

PLAINTIFF'S
EXHIBIT
8A

38

P. 2

Therefore the question that comes to mine is if all the Stations are giving payroll checks out at 0900 hours on Fridays, why did Lodge 54 make a complaint against me and not the other stations. It is obvious that I was singled out for this rediculous complaint. I am of the opinion that it is because of my race and the attitude around here that a Black man should not be in charge of anything. I find it very strange that Cpl. Frederick P. DeMask, the F.O.P. Station Rep. would not voice his concerns or atleast raise the issue to me for discussion prior to making a complaint against me to Lodge 54 Butler.

I consider this to be another example of F.O.P. Lodge 54 discriminatory practice towards me and I simply am not going to accept this harassment anymore. Anything similar to this ridiculous discriminatory harassing action directed towards me in the future by Lodge 54 I will be forced to seek legal redress.

Fraternily yours,

Lt. Billy R. Williams
Station Commander
Troop D, Mercer

cc: Capt. Terry L. Seilhamer

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| FEPA | |
| X EEOC | |

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Billy R. Williams | (814) 459-0342 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 650 West 10th Street, Erie, PA 16502 | | 12/25/45 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Pa State Police | Cat D (501 +) | (412) 284-8100 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 200 Barracks Road, Butler, PA 16001 | | 019 |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN
[X] RETALIATION   [ ] AGE   [ ] DISABILITY   [ ] OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| / / | / / |
| [ ] CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

1. I have been employed with the above-named Respondent since May 22, 1969 and have held the position of Lieutenant since May of 1990. I have been subjected to harassment in the workplace in that on June 16, 1994, I was removed from a Murder Investigation Team without just cause; on November 20, 1994, my office door handle and the door handle to my clothes locker in the men's locker room, were both vandalized (black ink); and in December of 1994, someone drew a caricature of me with my name below it on a picture of an Afro-American in a Webster Dictionary.

2. On June 16, 1994, I was informed by Captain Terry L. Seilhamer, that I was being removed from the Murder Investigation Team. The reason given was because I was only going to be the Crime Section Commander for another week and a half before going back to Mercer. My removal is a cl violation of PSP Administration Regulations and the Troop Special Order #94-10, which requires that the Crime Section Commander be placed in charge of murder investigations.

3. I believe that the Respondent discriminated against me because of my race, black, and in retaliation for having filed two (2) prior grievances concerning discriminatory treatment, in violation of Title VII of the Civil Rights Act of 1964, as amended, in that I am treated less favorable than similarly situated whites.

| [ ] I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
| Date                    Char | |

EEOC FORM 5 (Rev. 06/92)

PLAINTIFF'S EXHIBIT 813

FEPA COPY

STATE OF _____PENNSYLVANIA_____          CASE NAME Williams vs Pa State

CITY/COUNTY OF Erie/Erie _____          CASE NUMBER _____

# AFFIDAVIT

I, Billy R. Williams_____ being first duly sworn upon my oath affirm and hereby say:
    *(Name)*

I have been given assurances by an Agent of the U.S. Equal Employment Opportunity Commission that this Affidavit will be considered confidential by the United States Government and will not be disclosed as long as the case remains open unless it becomes necessary for the Government to produce the affidavit in a formal proceeding. Upon the closing of this case, the Affidavit may be subject to disclosure in accordance with Agency policy.

I am 49 years of age, my gender is Male _____ and my racial identity is _____ Black _____.
                                    *(sex)*                                      *(race)*

I reside at 650 West 10th Street _____ ,
                           *(Number/Street)*

City of Erie _____ , County of _____ Erie _____ ,

State of _____ PA _____ , Zip Code ____16502____ .

My telephone number is *(including area code)* _____(814) 459-0342_____ .

My statement concerns Pa State Police _____ which is
                      *(Name of Union/Company/Agency)*

located at 200 Barracks Road _____ ,
                      *(Number/Street)*

in _____Butler_____        PA      16001 .
        *(City)*           *(State)*    *(Zip)*

My job classification is *(if applicable)* Lieutenant _____ .
                                          *(job title)*

My immediate supervisor is *(if applicable)* , Terry L. Seilhamer , Captain .
                                              *(Name)*            *(job title)*

1. Relevant work history:  I have been employed with the Respondent since May 22, 1969 and have held the position of Lieutenant since May of 1990.  I am currently assigned to the Mercer Barracks in charge of Troop D.


2. Coverage/Respondent's business:  the Respondent is State Government - PA State Police Department which employs in excess of 250 employees.

3. Personal Harm:  In my position as a Lieutenant, I have been subjected to the following harassment:  On June 16, 1994, while at New Castle Station for a briefing session concerning a multiple homicide investigation (4 victims) which took place on June 15, 1994, I had worked with the Officer of the Day, Lieutenant Raber and Major Case Team on June 15, 1994, until 12:00 p.m.  Shortly thereafter, Captain Terry L. Seilhamer pulled me to the side and advised me that Lieutenant John Lechner (Station Commander - New Castle) was to take charge of the investigation.  I believe my removal from this murder investigation was because of my race, black and in retaliation for having filed two (2) prior grievances concerning discriminatory treatment of me with repect to unsustained accusations made against me by two white PCO's and an involuntary transfer to Butler Headquarters for 11 weeks effective

X BRW   Page 1 of 3
  *(initials)*

EEOC AFF-A (08/89)

STATE OF ___PENNSYLVANIA___                    CASE NAME __Williams vs Pa State__
CITY/COUNTY OF ___Erie/Erie_____              CASE NUMBER_____

## AFFIDAVIT (cont.)

from April 11, 1994 through June 24, 1994.

In addition, on November 20, 1994, my office door handle and the door
handle to my clothes locker in the men's locker room were both
vandalized (black ink) by unknown individuals at the Mercer Barracks.
THis was the second time in 1994, my office at the Mercer Barracks had
been vandalized in 1994, Previously in February of 1994, my office
chair was damaged, scissors were broken, and my son's picture was
tampered with.

In December of 1994, unkown individuals defaced Respondent's property by
drawing a caricature of me on a picture of an Afro-American with by name
below it in a Webster Dictionary.

4.  Respondent's explanation for the alleged harm and its policies and
practices:  Captain Seilhamer told me that he decided to call Lieutenant
Lechner in off vacation and put him in charge because I was only going
to be the Crime Section Commmander for another week and a half before
going back to Mercer.
I believe my removal is not consistent with Administrative Regulations
and Troop Special Order #94-10, which requires that the Crime Section
Commander be placed in charge of murder investigations.
In addition, whites similarly situated were not removed from the murder
investigation,  incident number D6-649969, multiple Homicide.

5.  Direct Evidence:  none

6.  Witnesses: X   Lt. John N. Lechner- called in from vacation


                                                          9
7.  Comparative data:  Of the 16 on the investigations team, 12 were
from other stations and they were allowed to remain in the murder
investigation.  Also, two officers on the investigations team were

** Text Continued on Attached Sheet(s) **

I have read and had an opportunity to correct this Affidavit consisting of _____ handwritten ☐
typed ☐ pages and swear that these facts are true and correct to the best of my knowledge and belief.

                                    X _Billy R. Williams_____

Subscribed and sworn to before me
this _____ day of MAY 17 1995      .

Notarial Seal
Grant Richard Twiss, Notary Public
Erie, Erie County
My Commission Expires April 3, 1997
Member, Pennsylvania Association of Notaries

EEOC AFF B (08/89)

May  1 09:48 1995  CP Initials ⟨ _BMW_ ⟩  Chg # , Attachment Page 1

---------------------------------------------------------------------

Equal Employment Opportunity Commission
Affidavit, Additional Text

---------------------------------------------------------------------

leaving the troop in 2 weeks (Trooper ~~Formkhella~~ Lee M. Formichella was transferring to
Troop E, Erie, effective 7/2/94; and Sgt. John Whenthy was retiring
effective 7/2/94) and neither one of these officers were replaced on the
investigation team.  All of these individuals are caucasians.

8.  Class harm:  individual harm

9.  Remedy/relief sought:  As of 6/28/94, Lt. Lechner and Sgts. Brown
have approximately 120 hours or more in overtime.  Which means replacing
me caused me to lose somewhere between $4,000 to $6,000 which in turns
has an adverse impact on my retirement pension; cease harassment.

10. I have subjected to numerous and on going discriminating, harassing complaints
made against me thru F.O.P. Lodge 54 to Capt. Seilhamer even though  I have never
violated any PSP Rule, Order or Regulation. Neither have I ever disobeyed any
F.O.P. Rule or By-Law, Yet Lodge 54 has asked Lodge 48 to look at kicking me
out of the Lodge.  It is my opinion these totally false complaints were lodged
against me because of my race.

PICTURE
NOTED!

Bob

COMMONWEALTH OF PENNSYLVANIA

DATE:        February 7, 1995

SUBJECT:     Midnight Patrol 02/07/95 - Tpr. Paul L. Archer and
             Tpr. William T. Probst

TO:          Sgt. David M. Julock, Patrol Supervisor, Troop D, Mercer

             Lt. Billy R. Williams $\mathcal{BW}$
             Station Commander
FROM:        Troop D, Mercer

ENCLOSURE:   (1)  SP7-002, Mobile Unit Log dated 02/07/95

        1.  Trooper Paul L. Archer and Trooper William T. Probst's Mobile
Unit Log indicates that on a night when the temperature was at or below zero
degrees with a wind chill of -15°, 02/07/95, they only drove a total of 37
miles.  (Enclosure 1) starting mileage 37959 and ending 37996.

        2.  Mobile Unit Log does not reflect any 10-7 or 10-23s from 0138
until 0634 hours when they went 10-7 Station.

        3.  Incidents D3-673725 and D3-673726 occurred at 2330 and 2350
hours respectively.

        4.  Sgt. David M. Julock, have Tpr. Archer and Tpr. Probst type a
STD-501 answering these special questions.

                A.  Where did they go after leaving the accident scene of
                    D3-673725 and D3-673726?

                B.  Did they stop on Station?  Time

                C.  Did they stop for lunch - Time and Place

                D.  Explain the circumstances of only driving a total of 37
                    miles when they were responsible for patroling the entire
                    County

                E.  Why didn't they check out a portable radio?

        5.  Incident Memo D3-673726 needs corrected under remarks section,
it states, Refer to D3-673726 (itself).

BRW/mld



PLAINTIFF'S
EXHIBIT
8 C

34

SP 7 002 (7 92)

PENNSYLVANIA STATE POLICE

## COMMUNICATIONS MEMO

| | | |
|---|---|---|
| 1. | MOBILE UNIT LOG | X |
| 2. | RADIO DISPATCHER LOG | |

3. STARTING MILEAGE: 37959
4. ENDING MILEAGE: 37996

| 5. LOCATION REASON | 6. INITIALS | 7. CODE | | | 8. TIME | 9. OUT OF SERVICE | 10. IN SERVICE |
|---|---|---|---|---|---|---|---|
| 10-8 STATION | DRA | 1 | 2 | 3 | | | 2358 |
| D3-673725 & D3-673726 | DRA | ① | 2 | 3 | 2355 | 0033 | 0138 |
| 10-7 STATION | DRA | 1 | 2 | 3 | | 0634 | |
| | | 1 | 2 | 3 | | | |
| | | 1 | 2 | 3 | | | |
| | | 1 | 2 | 3 | | | |
| | | 1 | 2 | 3 | | | |
| | | 1 | 2 | 3 | | | |
| | | 1 | 2 | 3 | | | |
| | | 1 | 2 | 3 | | | |
| | | 1 | 2 | 3 | | | |
| | | 1 | 2 | 3 | | | |
| | | 1 | 2 | 3 | | | |

| 11. UNIT NO. | 12. PORTABLE NO. | 13. OFFICER(S) | 14. ZONE(S) | 15. SHIFT | 16. DATE | 17. SUPV. INT. |
|---|---|---|---|---|---|---|
| 6 | | TPR. ARCHER + PROBST | ALL | 11-7 | 02/07/95 | [illegible] |

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:                February 8, 1995


SUBJECT:             Midnight Patrol 02/07/95 -Trooper Paul L. Archer and
                     Trooper William T. Probst


TO:                  Sgt. David M. Julock, Patrol Supervisor, Troop D, Mercer


                     Lt. Billy R. Williams *BRW*
FROM:                Station Commander
                     Troop D, Mercer


      1.  Advise Trooper Donald R. Faulconbridge, Midnight Desk Officer,
in the future anytime Midnight Patrols - D or S are on Station, their Radio
Logs will reflect same, i.e., 10-7, 10-6 and the time span.

      2.  Midnighters, 02/07/95 indicates that they sat on Station for
at least 3-1/2 hours.  I suspect closer to 5 hours.  This happened in the middle
of a winter storm with zero degree temperature outside.  People could have been
freezing to death, broke down or something.

      3.  There is nothing on the Mobile Unit Log for Car #6.  This *AT*
indicates them being on Station until 0634.

BRW/mld

STD-501, 5-66

COMMONWEALTH OF PENNSYLVANIA

DATE:        February 28, 1995

SUBJECT      Elimination of Permanent Midnight Shifts

TO           Trooper Samuel J. Plummer, Patrol Unit, Troop D, Mercer

FROM         Lt. Billy R. Williams
             Station Commander
             Troop D, Mercer

REFERENCE:   (a)  STD-501, dated 02/21/95, from Tpr. Samuel J. Plummer
                  to Lt. Billy R. Williams

        1.  In your letter of February 21, 1995, you indicate you have some
medical problems, i.e., arthritis and stress, both of which are aggravated
by insufficient rest and that you are taking some prescribed medications.

        2.  I am more than willing to assist and help out any personnel
facing medical problems.

        3.  Before I can assist you I will need some additional information
from your physician.

        4.  Obtain a detailed letter within the next 10 days explaining ex-
actly what your medical problems are and exactly what he recommends.  Also
have your Doctor describe all medications he has prescribed and any possible
side affects, if any.

        5.  Once I've received the letter from your Doctor, I'm sure we can
work out something with the schedule to accommodate you and also get our
mission done.

        6.  As far as the elimination of the two members assigned midnights, I
will only say this, no one is going to sit on Station in the middle of a
winter snow storm, zero tempratures, while ignoring the possibility that
people might be broken down and freezing to death on the County roads within
the Pennsylvania State Police Patrol Zones.

        7.  I may consider bringing back a permanent midnight patrol at a later
date with the addition of more manpower.

BRW/mld

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

DATE:                   February 20, 1996

SUBJECT:                Disruptive Actions on Station

TO:                     Corporal Patrick A. Whalen, Patrol Supervisor, Troop D, Mercer

FROM:                   Lt. Billy R. Williams BRW
                        Station Commander
                        Troop D, Mercer

        1.  On 02/15/96 you requested to speak with Sgt. Julock and
myself relative to being allowed to place two more desks in the Patrol
Corporal's office because you wanted your own desk.  I took note of your
actions after I advised you that you couldn't place two desks in that
office due to the lack of space, that we would get the landlord to put up
another bookshelf, check and obtain another file cabinet and go along
with each of the four (4) Corporals in Patrol taking half a desk for
books, etc.  When you didn't like my answer you jumped up huffing and
puffing and stormed out of my office while I was telling you I'd think it
over on a later date.  This was basically what Sergeant Julock had
already told you earlier in the day.  I consider your actions, i.e.,
jumping up and storming out to be insubordination and it had better not
happen again.  It is my understanding that when Sergeant Julock told you
no earlier, you advised him that you'd go to me and if I said no, you'd
go to the Captain.

        2.  While attempting to justify your need for your own desk
you stated that you intended to also take over the weapons locker for
Troop S, to which I advised you that you would not.  I took note of your
body language, shrugging your shoulders, tone of voice etc., which all
indicated to me you had a hard time accepting my order.  What I found to
be very arrogant on your part was the fact that Sergeant Julock had
already advised you earlier that you couldn't take over the Troop S
weapons locker, yet you still came into my office later and indicated to
us that you intened to do it, which triggered my absolute No!

        3.  I had to have Sergeant Julock advise you to salute me
after you had been here for a couple of days without doing so.

        4.  It has also filtered back to me that you have been going
around the Station from end to end, day and night telling everyone in
Troop D and S something to the effect that you were sent to the Mercer
Station to clean up the mess.

        5.  I've also heard another of your alleged statements.
Something along the lines that this place is so F'd up its going to take
you longer than you thought to make changes.

        6.  As a result of your above actions, which I might add all
took place in within four days of your arrival at this Station on
02/12/96.  I want to counsel you on a few things.



PLAINTIFF'S
EXHIBIT
A

(A)  You work for Troop D, Mercer, not Troop S and D.

(B)  You are stationed in Troop D, Butler <u>not</u> Troop S or T.

(C)  <u>I will not</u> tolerate <u>any</u> subsequent acts of insubordination <u>ever,</u> borderline or not.

(D)  You've been here less than one week and already you've managed to rise the stress level of quite a few people here at the Mercer Station. As quite a few have gone to the Patrol Sergeant to inquire about all these orders and changes you've told them that are going to take place because of some reason you were sent here.

Let me explain this to you, the Commissioner sets policy for the entire Pennsylvania State Police. Captain Seilhamer sets policy for the Troop. <u>I</u> set policy for Mercer Station. If you recall on your first day here I ordered you and Corporal Hoy to read over all current Troop Special Orders and review the last System and Review Inspection Report dated January 1995.

Whatever this mandate to change things around, that you seem to think you were sent here for, <u>"Forget It"</u>.

(E)  If you see anything within your assigned supervisory responsibilities that does not meet FR, AR or Troop Regulations, I expect you to correct them, <u>but</u> you will not be running around the Station making changes just for the sake of change or in some kind of way to show Station personnel that your the boss. You are one of four Corporals in the Patrol Unit, no more or no less.

The last time I checked the two stripes on your sleeve, they did not equal two bars on your shirt collar.

(F)  Finally, I expect you to channel all that energy you seem to have in a useful manner, resolving problems <u>not</u> creating them for the Station.

BRW/mld

SP 3-352 (1-93)

# SUPERVISOR'S NOTATION

| 1. NAME: | 2. DATE: |
|---|---|
| Corporal Patrick A. Whalen | 02/20/96 |

**3. THIS IS TO ADVISE YOU:**

That on 02/12/96 I gave you a direct, lawful order to supervise the clearning of Station weapons.  I gave you the option of utilizing any Patrol Trooper to do said cleaning with a completion date of 02/17/96.  As of this date you have failed to obey my order to clean the weapons.

I'm going to give you the benefit of the doubt, that maybe you forgot or something, even though I am aware you WENT around the Station on the evenings of 02/15 and 02/16, telling anyone who would listen, that you in fact were not going to clean said weapon locker).

If there is some kind of problem, you can discuss same with me.  But in the future disobedience of my lawful, direct orders may lead to a more formal action against you by this Officer.

| 4. SUPERVISOR'S SIGNATURE: | 5. BADGE NO. (IF APPLICABLE): |
|---|---|
| Lt. Billy K War B Jr (2007)   JR-Duan2 (1107) | 221 / 2/21/86 |
| 6. SUBORDINATE'S SIGNATURE: | 7. BADGE NO. (IF APPLICABLE): |
| | 4945 |



PLAINTIFF'S
EXHIBIT
9B

# SUPERVISOR'S NOTATION

PAGE 1 OF 2

| 1. NAME: | 2. DATE: |
|---|---|
| Corporal Patrick A. Whalen | 02/21 '96 |

**3. THIS IS TO ADVISE YOU:**

That on 02/15/96 at approximately 0930 hours, you took Car #12 from the Station. The car I had been utilizing since 02/14/95 due to Car #1 being at Butler Headquarters for its 8,000 mile checkup. You took Car #12 without asking my permission or even bringing it to my attention.

At the time you took Car #12, there were several other marked patrol units available, one being the Jeep. There were also one or two unmarked Crime Unit cars on Station.

At the time I assumed you took Car #12 simply because you perhaps didn't know I was using same <u>but</u> since then it has come to my attention that you knew I was using Car #12 in advance, even discussing it with another supervisor and calling Car #12 your car prior to taking it.

I realize you took Car #12 and relayed a camera to the Burglary Crime scene,

| 4. SUPERVISOR'S SIGNATURE: | 5. BADGE NO. (IF APPLICABLE): |
|---|---|
| 6. SUBORDINATE'S SIGNATURE: | 7. BADGE NO. (IF APPLICABLE): |

SUPERVISOR'S NOTATION (Continued)

Corporal Patrick A. Whalen

Incident D3-709931, Kidds Mill Road.  I took notice of the fact you only stayed at said crime scene for approximately thriteen minutes. Your failure to stay at said crime scene may have played a part in the incomplete initial investigation of this Burglary scene.  A fact that leaves the Crime Unit Member assigned the follow-up investigation to go back to square one.

You were one of two Patrol Corporals working that day and there was nothing going on at the time that required you to leave the crime scene after only thirteen minutes.

As I specifically ordered you on 02/12/96, you are to read over Troop Special Order 93-28, Supervision, and all other Troop Orders.

That the taking of Car #12, while knowing the Station Commander was utilizing same constitutes insubordination <u>and</u> if anything similar happens again, I may initiate more formal action against you.

(A)  You work for Troop D, Mercer, not Troop S and D.

(B)  You are stationed in Troop D, Butler not Troop S or T.

(C)  I will not tolerate any subsequent acts of insubordination ever, borderline or not.

(D)  You've been here less than one week and already you've managed to rise the stress level of quite a few people here at the Mercer Station. As quite a few have gone to the Patrol Sergeant to inquire about all these orders and changes you've told them that are going to take place because of some reason you were sent here.

Let me explain this to you, the Commissioner sets policy for the entire Pennsylvania State Police.  Captain Seilhamer sets policy for the Troop. I set policy for Mercer Station.  If you recall on your first day here I ordered you and Corporal Hoy to read over all current Troop Special Orders and review the last System and Review Inspection Report dated January 1995.

Whatever this mandate to change things around, that you seem to think you were sent here for, "Forget It".

(E)  If you see anything within your assigned supervisory responsibilities that does not meet FR, AR or Troop Regulations, I expect you to correct them, but you will not be running around the Station making changes just for the sake of change or in some kind of way to show Station personnel that your the boss.  You are one of four Corporals in the Patrol Unit, no more or no less.

The last time I checked the two stripes on your sleeve, they did not equal two bars on your shirt collar.

(F)  Finally, I expect you to channel all that energy you seem to have in a useful manner, resolving problems not creating them for the Station.

BRW/mld



MARTIN F. HORN
COMMISSIONER

GILBERT A. WALTERS
SUPERINTENDENT

801 BUTLER PIKE
MERCER, PA 16137-9651

TELEPHONE
Area Code 412
662-1837

FAX NUMBER
Area Code 412
662-1940

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

**STATE REGIONAL CORRECTIONAL FACILITY
AT MERCER**

February 1, 1996

Lt. William Williams
Pennsylvania State Police Barracks
826 Franklin Road
Mercer, PA 16137

Dear Lt. Williams:

Thank you for the assistance which you and your Officers provided during our emergency situation on January 26, 1996. Your response time to our call for assistance was outstanding and the technical advice as well as practical suggestions which you provided to Deputy Superintendent Desuta and Major Veschio were extremely valuable. Your willingness to dispatch your Officers in our search, as well as your canine Officer and H-6 Unit is, likewise, appreciated.

Again, thank you for your cooperation and support.

Sincerely,

Gilbert A. Walters
Superintendent

GAW:bar

cc:    Deputy Desuta
       Major Veschio
       File



PLAINTIFF'S
EXHIBIT
9C

U. S. Department of Justice

Drug Enforcement Administration
Room 1328 Federal Building
1000 Liberty Avenue
Pittsburgh, Pennsylvania 15222

March 12, 1999

Capt. Sidney A. Simon
Pennsylvania State Police, Troop D
Butler, Pennsylvania 16001

Dear Capt. Simon:

     The Drug Enforcement Administration/Philadelphia Field
Division wishes to present a Certificate of Appreciation to the
Pennsylvania State Police (PSP), Troop D, in Mercer, Pa.  The PSP
Troop D Interdiction Unit consists of Tpr. Richard Houk, Tpr. Mark
Gladysz, Tpr. Kevin Hughes, Tpr. Ted Hunt, Tpr. Terry Whalen, Cpl.
Gary Sawor, Tpr. Chris Hugar, and Supervisor, Sgt. Michael J.
Britvich.  For the past few years, the DEA Pittsburgh District
Office has been working very closely with the PSP/Troop D on
Interstate 80 regarding interdiction drug investigations. Troop D
has been very proactive regarding traffic stops which have resulted
in  significant drug seizures on I-80 in the Mercer, Pa. area.
These traffic/drug investigations also include seizure of large
amounts of U.S. currency which were proceeds from illegal drug
activities.

     After the PSP/Troop D made a positive drug and/or cash
seizure, PSP Sergeant Michael J. Britvich would immediately contact
the DEA/Pittsburgh D.O.  At this point, a major drug investigation
would be conducted jointly between the PSP/Troop D and the DEA.
The drug seizure was normally from a multi-state criminal narcotic
organization which transports illegal drugs and cash derived from
illegal drug trafficking.  Sometimes, these vehicles had electronic
false compartments installed in the vehicles. The couriers who were
arrested during these major drug investigations  would be
prosecuted by the United States Attorneys Office, (Western District
of Pa).

     The following is a list of major drug investigations which
were developed due to alert PSP Troopers during vehicle traffic
stops in Mercer, Pa.  During these investigations most of the drug
couriers cooperated with law enforcement officials after their
arrests. The courier's cooperation was due mostly to the high
professionalism and joint efforts of the PSP Troop D and DEA PDO
working together to advance each investigation.

STD-501, 9-66

COMMONWEALTH OF PENNSYLVANIA

DATE:        14 Aug 1999

SUBJECT:     Work Schedules

TO:          Sgt. Randy Anderson
             Troop D, Mercer

FROM:        Lt. Billy R. Williams
             Station Commander
             Troop D, Mercer

1. I've reviewed the work scheule. I believe you need to make a few changes.

   a. Number of weekends off MUST be fairly equal.
   b. Most mid-nighers should be for 7 nights followed by a 4 day weekend.
   c. I fail to see the need for so many 3 day weekends followed by a second 3 day weekend.
   d. Mid-nighters should not start on FRIDAY
   e. Tpr. Marzano has hardly any weekends off (WHY). He's one of our workers. ENSURE HE GETS MORE WEEKENDS OFF
   f. You are hereby ordered to consult with Sgt. David Julock, obtain some of his old schedules.
   g. I failed to see a number of sick days NOTindicated on your master roster as per my past order.

8/27 GLADYSZ 11-7 HEARING 0930 FRENCH's

8/22 AM SHIFT ┌ 1 CPL    5 MINIMUM NEEDED
              └ 3 TPR's

8/26 MILLER 7-3 HEARING - NOTHING IN REQD BOOK (PROBABLY MARZANO's 113x)

8/23 - 6 PM TPR's SCHEDULE INDICATES 5

8/26 MARZANO 2-10 2 HEARINGS 1130 FRENCH + 1500 SILVIS

8/26 - CPL KELLY ZONES - ALREADY SCHEDULED FIREARMS INSTRUCTOR PM

8/26 - AM ┌ 1 CPL ┐ - ONLY 1 AM DESK PCO MATEO
          └ 4 TPRS ┘   NEED 6 MINIMUM

8/27 - 2 PM 3-11 DESK PEOPLE

8/30 - 6 AM TPRS - SCHEDULE TOTALS SHOW 5

9/10 - TPR WOLFSON 4 DAYS OFF IN ONE WEEK

**WILLIAMS, BILLY R**

| | |
|---|---|
| **From:** | WILLIAMS, BILLY R |
| **Sent:** | Friday, November 26, 1999 11:09 AM |
| **To:** | SIMON, SIDNEY A |
| **Cc:** | JUNGLING, DAVID R |
| **Subject:** | Monthly Activity, November 1999 |

Station Commander attended Lackwannock Township meeting on 9 Nov 99. There were approximately 30-40 citizens in attendance Due in part to an attempted abduction of an 8 year old girl on 09/09/99, Tpr. Dan Solomon's investigation. Several questions centered around PSP response time and our efforts to catch subject. i.e interviews, photo lineup and my orders relating to unmarked Psp vehicles following ther buses one or two days a week thru December.

No outservice training month of November

No vice activity month of November

Station FOP meeting was held on 15 Nov 99, between Tpr. Katavitch and myself. Issues/complaints raised by FOP were an alleged order by me for troopers to count dead deer in the entire lenth of zone 71 (interstate 79). I advise FOP that complaint was false. That due to a citizen complaint Tpr. Shevitz (zone car) was dispatched to milepost 114 to look for large number of dead deer on road/berm and if need be contact Game Commission. Tpr. Shevitz responded and counted four (4) deer in immediate vicinity and had station telphone Game Commisson. The FOP also asked about my giving Cpl. Kelly a supervisor's notation for having multiple patrol units on station the night of 9 Oct 99, for a lunch break. I advised FOP of the multiple discrepancies and fact I had already discussed the iissue Troop Commander. There were a few other issues of the same vein.

On 11/16/99, Tpr. Robert I lewis investigated an Involuntory Deviate Sexual Intercouse incident at George Junior Republic, Pine Township, Mercer Co. Accused 16 yoa, assaulted a George Junior Social worker with a sharp kitchen utensil. He forced the famale social worker, who was in the process of counseling him to perform oral sex on him and then forced her to relenquish the keys to her vehicle. He then fled George junior in the stolen auto and became involved in an accident at Rt. 208 and George Junior Rd. Accused charged with multiple Felony charges and will be charged as an adult Placed in Mercer Co. Jail in lieu of $50, 000.00, bond

**Williams, Billy R**

| | |
|---|---|
| **From:** | WILLIAMS, BILLY R |
| **Sent:** | Friday, November 26, 1999 1:31 PM |
| **To:** | JUNGLING, DAVID R |
| **Cc:** | SIMON, SIDNEY A |
| **Subject:** | Grievances - Mercer |

I've started checking into subject matter i.e change in shifts without 24 hour notice. Cpl Whalen has advised me that on or about 16 Nov 99. Tpr. Turik approached him and stated do you know that you've got me going to days off on 20th and 21st from a 2-10 shift on 19 nov 99. Cpl. Whalen advised him that he would change it. Tpr. Katavitch's scheduled was changed from daylight to second shift with all notions placed on weekly roster's. Sgt. Anderson has advised me that Tpr. Katavitch's complaint centers around method of notification of changed shifts. That he believes it has to in person that simply placing the change on the schedule is not enough.

P.S. I will check further into this matter upon return to work next week!  I've just been informed that my beloved sister has passed away.

Tracking:

| Recipient | |
|---|---|
| JUNGLING, DAVID R | 11/26/99 - 1:49 pm |
| SIMON, SIDNEY A | 11/30/99, 7:37 am |
| ANDERSON, RANDY | 11/26/99 2:12 pm |
| WHALEN, PATRICK S | 1/29/1999 11.28 am |

1

**Williams, Billy R**

| | |
|---|---|
| **From:** | WILLIAMS, BILLY R |
| **Sent:** | Tuesday, December 21, 1999 2:42 PM |
| **To:** | SIMON, SIDNEY A |
| **Cc:** | JUNGLING, DAVID R; ANDERSON, RANDY  ; JULOCK, DAVID M |
| **Subject:** | Annual Leave/Higher Classification |

Reporting officer requests to take annual leave on following dates with Sgt. Randy Anderson and Sgt. David  Julock being Acting Station Commander.

22 and 23 Dec 99  - Sgt. David M. Julock

28 and 30 Dec 99,  5 and 7 Jan 2000   Sgt. Randy Anderson

| **Tracking:** | **Recipient** |
|---|---|
| | SIMON, SIDNEY A |
| | JUNGLING, DAVID R |
| | ANDERSON, RANDY |
| | JULOCK, DAVID M |
| | WILLIAMS, BILLY R |

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:       April 4, 2000

SUBJECT:    Monthly Activity Report - Lt. B.R. Williams, MARCH 2000

TO:         Capt. Sidney Simon, Commanding Officer, Troop D, Butler

FROM:       Lt. Billy R. Williams, Station Commander, Troop D, Mercer

March 1. Attended NWTC – mandatory in service training.

March 2. Attended CPR training – Butler (yearly training)

March 6. Timesheets 0815-0940 hours
March 6. Visited with SALEM TOWNSHIP SUPERVISORS ( 1930- 2035 hours )

March 7. Took 8.0 hours comp time.
March 8.  Took 8.0 hours comp time

March 9. 4.0 hours comp time 0830-1230 hours,  Spoke to Judge Fornelli RE: PFA
orders. Information needed by PSP. Judge was concerned with statements a corporal
had made to the Prothonotary Office about PSP not accepting PFA without ALL
required data.

March 13. Assigned by Troop Commander to check into circumstances surrounding
complaint by RICHARD CARR, D& P Salvage , Sllippery Rock to Rep. FARGO 'S Office
RE: to Tpr. Whalen not assisting CARR with paper work for abandoned vehicle from
June 99. 1420 – 1615 hours.

March 14. RE: Richard Carr, made numerous telephones calls to PennDOT, Harrisburg
0830 – 1159 hours, before matter was resolved
March 14. 1000 hours – spoke to a LIISA SCOTT, # 440-466-7161, RE: complaint
against Tpr. KATAVITCH for being rude during telephone conversation with her
husband and threatening to arrest husband for shop lifting at Grove City Outlet Mall.
**NOTE:** On March 17, Tpr. Katavitch stated he was not rude and the fact the store no
longer wanted to press charges so therfore he was not going to arrest Mr. Scott.

March 16. 1500-1509, Short  discussion with Sgts. And four (4) corporals relative to
orders from Lt.JUNGLING to advise station not  to call PSP harrisburg directly without
going thru the Chain of Command. Supervisors were ordered to review suject at Roll
Calls. I.E. not to call transportation unit about car # 3.

March 19. Sunday, OD. I visited all Troop D, Stations I.E. Mercer ( 0800 hours), New
Castle ( 0945 hours), Beaver ( 1035 hours),  Kittanning (1140) and Butler ( 1230). Back
to Mercer .

March 20. Conducted Station Class at 1400 – 1445 hours.

March 21. 0920 hours proceeded to a woman's body laying in her yard  northern Mercer Co. Rte. 19.

Marc 21.   1300 hours meeting with PennDOT and Construction Company RE: construction on Int –80, March – Nov. 2000. Acc'd by Sgt. JULOCK and Cpl. Whalen.

March 21. 1500 hours , special meeting with FAIRVIEW TOWNSHIP SUPERVISORS re: Traffic enforcement in their township. Citizens complaining about truck speeds and atvs on back roads. Supervisors requested special meeting so that citizens would not be there.

March 22, As per Troop order I showed Promotion videos to station.

March 23. 1200 – 2000 hours showed promotion videos to Troopers, Corporals and Sgts. as per Troop order.

March 24, traveled to Butler to return promotion videos before taking 4.0 hours comp time due to neck pain.

March 30. 0750 hours spoke to Tpr. Katavitch relative to any FOP issues. Tpr. Katavitch stated nothing to discuss.

**Williams, Billy R**

| | |
|---|---|
| **From:** | WILLIAMS, BILLY R |
| **Sent:** | Tuesday, April 04, 2000 11:49 AM |
| **To:** | SIMON, SIDNEY A |
| **Subject:** | MARCH Activity Report - for Lt. Billy R. Williams |



MARCH ACTIVITY
REPORT LT. WMS....

1

| | |
|---|---|
| **From:** | WILLIAMS, BILLY R |
| **Sent:** | Thursday, April 27, 2000 5:06 PM |
| **To:** | SIMON, SIDNEY A |
| **Subject:** | Weekly Briefing 04/17 - 04/21/2000 |

04/17/00, briefing with Sgt. Anderson and Sgt. Julock discussed weekend activty. i.e. No major incidents. up coming line inspection
  0915 hours - I discussed repairs to PSP vehicles with Cpl. MIFSUD i.e. timely manner and location. Repairs to Mercer cars to be done in mercer county unless we can't get three bidders.
1530 hours discussed shooting incident of 12 yo male subject with Sgt. Anderson. Mainly his failure to discuss same with me in a timely manner. Sgt. Anderson answers did not appear to be honest i.e. when he first learned of incident. I brought in Sgt. Julock and asked Sgt. Julock to have the investigator Trooper GUSTAFSON to type me a memo relative to parent complaint PSP was late in filing charges.

04/18/00, breifing with Sgts. no activity    0900-0909 hours

1345 hours, Discussed spray painting incident of Tpr. SCHUPP'S mailbox with Sgt. JULOCK, Cpl. TUZYNSKI and Tpr. HOUK ( WHO CONFESSED TO INCIDENT) I THANKED Tpr. HOUK for being truthful and ORDERED CPL. TUZYSNKI to counsel him.

04/19/00, I attended the PEMA, prison meeting at SRCF- MERCER 0940-1141 hours. Requested 5.0 OD comp time from Lt. JUNGLING.

04/20/00, 0900 hours Sgt. Julock and Cpl. Tuzynski advised me that Tpr. King was on a day off at home and had a male subject in the county prison for A DUI arrest from 04/16/00. That the subject was from from New York State and had been locked up since 04/16/00. That his hearing was scheduled for 0845 hours and his attorney was waiting at Mag. French's office. They then stated that Tpr. King was home baby sitting and refused to come in for said hearing.
  I advised them to contact Mag. French office and see if we could get hearing date/time changed. She refused. I than advised Sgt. JULOCK to call Tpr. King and advised him he was needed for the hearing and to offerPSP personnel to babysit if he couldn't get a babysitter. Tpr. KING refused stating he was not going to leave his kids with strangers (PSP PERSONNEL). I than advised the Sgt. and Cpl. that I would call the Acting Troop Commander, Lt. JUNGLING for guidance before I issued a direct order for Tpr. KING to attend said hearing. I contacted Lt. JUNGLING and we discussed options i.e. discharge etc. finally agreeing that Tpr. KING had to attend said hearing.
I than advised Sgt. JULOCK to call Tpr. KING back and order him into said hearing and once again offer him State Police personnel to babysit.
  I ordered Cpl. TUZYNSKI to arrange for paper work and DUI prisoner to be taken to the hearing by another Trooper/Supervisor.
  Tpr. King attended said hearing taking his two sons with him.  AT 1000 hours Tpr. KING stopped by station with his two sons and I and both Sgt. JULOCK and Cpl. TUZYNSKI apolized to Tpr. King about the original mix up in him not getting advance notice of hearing.

NOTE: WHILE discussing this matter Cpl. TUZYNSKI admitted he had forgotten to leave notice advance notice with Tpr. King once he was notifed on 04/18/00. He cited the stress he was under from the ongoing investigation on him by PSP Butler. I ordered Sgt JULOCK to counsel Cpl. TUZYNSKI relative to this matter.
                    Lt. JUNGLING called back and stated Tpr. King's wife had stopped into Butler to make a complaint relative to this matter and ordered STD-501'S from reporting Officer, Sgt. JULOCK and Cpl. TUZYNSKI which we all submitted immediately.


04/21/00, off due to GOOD FRIDAY HOLIDAY.

21ß.

**Williams, Billy R**

| | |
|---|---|
| **From:** | WILLIAMS, BILLY R |
| **Sent:** | Monday, May 01, 2000 4:49 PM |
| **To:** | SIMON, SIDNEY A |
| **Cc:** | WILLIAMS, BILLY R |
| **Subject:** | Weekly Briefing - 04/24/00 - 04/28/00 |

04/24/00 - 0802 hours Cpl. Tuzynski approached me in hallway complaining something about Tpr. Epps-Butler buying/giving his kids a dog in the midst of investigating him and while he already has two dogs at the house. Cpl. Tuzynski was very irate. Therefore I called Lts. Bell and Jungling to advise them of same.
0900 hours Daily briefing Sts. Anderson and Julock, reviewed weekend activity.

04/25/00, I attended legal Update training in Butler 0900- 1430 hours. At 1400 hours I reported to Butler to Lt. Jungling. Reviewed number of issues relating to tenative leave revisions. My orders to Tpr. King to attend the hearing on 04/20/00 and his wife's coplaint. NOTE: I went over this entire matter in my review for last week i.e. 04/20/00.
1520 hours Staff meeting reviewed  Line Inspection Report, Assisned Sgt. ANDERSON - crime and Cpl. WHALEN - patrol to closely watch drug stops/ searches for racial profiling. late reports to Butler.

04/26/00, Dailly briefing, with Sgts. WE MUST GET REPORTS INTO TO BUTLER ON TIME WITHOUT EXCEPTION.

1515 hours I issued Supervisor Notation to Cpl. TUZYNSKI for failing to notify Tpr. KING about hearing on 04/18/00.

1530 hours I finally spoke to Mrs TOMKINS RE; to her BPR. complaint against station for not responding to her son assauilting her in Oct 99. She cursed her son out for telling me she was home. She stated she would fiill out the verification form this time if I would send her another one. I agreeded.

04/27/00 Daily Briefing , Sgts. 0900 -0914 reviewed status of corrections to Line Inspection.

04/28/00, Both Sgts. indicated nothing to brief me on this date.
0911 hours Sick visit with Trp. ONDICk 0911- 0948 hours. did not rquest any assistance. . But did ay once again that his current medications were not working to good.

14 A

DATE:        May 7, 2000

SUBJECT:     Monthly Activity - April 2000 - Lt. Billy R. Williams

TO:          Capt.ain Sidney Simon, Commanding Officer, Troop D, Butler

FROM:        Lt. Billy R. Williams, Troop D, Mercer

April 3. 2000, 1615-1650, discussion with Sgt. JULOCK and Tpr. GLADYSZ RE: to Tpr. GLADYSZ being denied double time pay on time sheet for less than 8 hours between shift on 03/21/00 – 03/22/00. I.e. worked 8-4, 03/21, made drug (money) bust 1302 hours workedcase until 1830 (2.5 hours overtime). Due back at work 0600 hours on 03/22/00. Tpr. GALDYSZ asked Cpl. WHALEN for permission to take State Car home permission granted. Tpr. GLADYSZ left work at 1830 hours and within ten minutes ( Tpr. GLADYSZ words) made a second drug arrest for cocaine on I-80. NOTE:(After being tested at Erie Lab later determined not to be drugs.)

Tpr. GLADYSZ brought subjects on station and contacted Drug Law Unit. Tpr. GLADYSZ and Drug Law worked case until 0130 hours. Prior to 2300 hours Cpl. MARTSOLF changed Tpr. GLADYSZ 's schedule for 03/22/00 from 0600-1400 to 0700 –1500 hours ( less than 24 hour notice as per contract).

Tpr. GLADYSZ was asking for 9.5 hours time and half for 03/21/00, 8 hours time and half for 03/22/00 ( less than 8 hours notification) and DOUBLE TIME for 1.5 hours. I reviewed the contact with him and he was still unhappy. He kept saying the second drug stop happened within ten minutes of leaving station so therefore he was entitled to continuation pay i.e. DOUBLE TIME also. I denied the double time and payed the other . I also discussed this matter with Lt. JUNGLING. NOTE: I later reviewed incident memo which indicates drug stop was at 1850 twenty minutes after leaving station not the ten minutes Tpr. GLADYSZ was saying.

April 4, 2000, Tpr. GLADYSZ complainted about Sgt. ANDERSON's order to him not to take all 216 pairs of sun glasses off a subject who was illegally trying to sell phoney Oakley sun glasses for $8.00 at exit 3 . Tpr. GLADYSZ contacted crime unit for advice and Sgt. ANDERSON told him to keep only one (1) pair. Once I confered with Sgt. Anderson I ordered him to contact the DA. The DA did not want to touch this case with the one pair of sun glasses.

April 4, 2000, Tpr. CAIMONA complained to me about Sgt. Anderson ordering him to return a gun to a female subject who had brought the gun to PSP Mercer because she had found it in luggage belonging to her niece. After running a stolen records check/NCIC with negative results. Sgt. ANDERSON had ordered Tpr. CAIMONA to return the gun to lady.

After returning said gun Tpr. CAIMONA discussed this matter with Cpl.
MARSOLF who recommended that he go back and get the gun back from the lady.
Which he did. While this is going on Cpl. MIFSUD sent a letter to registered gun owner
in Altoona, Pa. Who called stating the gun had been stolen. Tpr. CAIMONA advised him
to file a police report with local PD. Which he did. Tpr. CAIMONA was unhappy that the
Sgt. had ordered him to return the gun so soon.

At 1600 hours Tpr. CAIMONA and an agent from  the AG office with a police officer
from Meadville PD. entered my office to discuss this gun incident as the AG and
Meadville PD. had arrested the girl and her boy friend a few days eariler for selling drugs
and they were in the county jail. They wanted the girl to turn informant for the AG's
office. They wanted data relative to the gun from us.


April 5, 2000,  during morning briefing I discussed Tpr. CAIMONA complaint with Sgt.
ANDERSON  and his reasoning for returning gun without direct contact with rightful
owner. Sgt. ANDERSON had no answer. I advised him Iwe woud discuss this entire
matter again after I gather additional facts.

April 5, 2000, attended Mercer County Police Chief monthly meeting 1145 – 1330 hours


April 6, 2000, Butler 0915 – 1400 with Lt. JUNGLING and Sgt. ANDERSON for SRCF-
Mercer plan.

April 10, 2000, attended Wolf Creek Township meeting 1930 hours.

April 11, 2000, Richard CARR,  D& P Towing, Slippery Rock met with me relative to still
not receiving valueless title for moter home from PennDOT. I made two telephone calls
to harrisburg PennDOT while he was in my office. PennDOT stated ther was some kind
of mix up  and that the problem should be resolved shortly.

During daily briefing I was advised that unkown person had spray painted  Tpr.
SCHUPP's mailbox  with orange paint. I ordered Sgt. JULOCK to assign a Corporal to
investigation this incident Sgt. JULOCK assigned Cpl. TUZYNSKI.

Staff meeting held at 1500 hours, attendees Lt. Williams, Sgt. JULOCk, Cpls.
ROSSMAN, WALKER and TUZYNSKI. Discussed up coming line inspection, reports
and Tpr. SCHUPP's mailbox i.e investigation started and this type activity will not be
tolerated at all.

April 12,2000, Troop Conference with Sgt. JULOCK and Cpl. Wolinsky.

April 14, 2000, Sick visit with Tpr. ONDICK at station.

April 18,2000, Cpl. TUZYNSKI brought Tpr. HOUK to me where he confessed to Spray
painting Tpr. SCHUPP'S mailbox. He stated he was sorry, had apologized to Tpr.
SCHUPP already. I accepted his apology explaining why we can't  have this type
behavior and thanked him for being truthful in a timely manner. I than ordered Cpl.
TUZYNSKI to counsel him.

April 19, 2000 Attended MB Annual Prisoner Hearing Meeting (PEMA) at SRCF Mercer 1045-1130 hours as per orders from Commanding Officer 03/04/00.

April 20, 2000, 0900 hours Sgt. JULOCK and Cpl. TUZYNSKI advised me that Tpr. King was on a day off at home and had a male subject in the county prison for a DUI arrest from 04/16/00. That the subject was from New York state and had been locked up since 04/16/00. That his hearing was scheduled for 0845 hours and his attorney was waithing at Mg. French's office They then stated that Tpr. KING was home babysitting and was refusing to come into work for said hearing.

I advised them to contact Mag. French's office and see if we could get hearing date/time changed. She refused to change date or time. I than advised Sgt. JULOCK to call Tpr. KING and advise him he was needed for the hearing and to OFFER PSP personnel for babysitting his two kids ( boys) if he couldn't get a babysitter. Tpr. KING refused PSP personnel babysitting his kids . I believe one kid was 4 or 5 and the other one was 8.  The KING refused stating he WAS NOT going to leave his kids with strangers (PSP PERSONNEL). I than called the Sgt. and Cpl. That I would call Lt. JUNGLING Acting Troop Commander for guidance before issuing a DIRECT ORDER to Tpr. KING to come in for said hearing. I contacted Lt. JUNGLING and discussed this matter i.e. discharge/ordering trooper in etc. finally agreeing that Tpr. King had to attend said hearing.

I than advised Sgt. JULOCK to call Tpr. KING and once again to OFFER PSP PERSONNEL for babysitting  and ordering him into station for hearing. I than ordered Cpl. TUZYNSKI to arrange for other PSP personnel to take paper work pick up prisoner and transport him to hearing and his attorney at Mag. FRENCH's Office. Tpr. KING attended said hearing taking his two spons with him. At 1000 hours Tpr. KING stopped by station with his two sons. At which time I apologized for the original mix up in  relative to he not getting advance notice of hearing change.

NOTE: While discussing this matter with Sgt. JULOCK and CPL. TUZYNSKI at 0930-0955 hours Cpl. TUZYNSKI admitted he had forgotten to leave hearing notice in Tpr. KING's mailbox once he the Corporal was notified on 04/18/00. I than ordered Sgt. JULOCK to counsel Cpl. TUZNYNSKI. Lt. Jungling called to say Tpr. KINGS wife had stopped by Butler to complain about this matter to him and ordered STD –501 from myself, Sgt. JULOCK and Cpl. TUZYNSKI.  LATER I LEARNED THAT CPL. TUZYNSKIHAD LAYED THE HEARING NOTICES ON SGT. JULOCK desk on 04/18/00 something he had been doing in the past for Sgt. JULOCK review of possible overtime. Sgt. JULOCK had failed to mention it to me on 04/20/00.

04/24/00, Sgt. JULOCK advised me that he has schedule requests for specific days / shifts from all but three persons in patrol i.e. special requests to attend kids softball games on specific days/shifts, babysitting days etc. I advised him to help the troopers out as much as he can **BUT PSP OPERATIONAL NEEDS COME FIRST**

04/25/00,  Legal update training , Butler
With Lt. Jungling 1400 hours to discuss Mrs. King complaint from 04/20/00 Staff meeting from 1510 hours. Lt. Wms, Sgts. ANDERSON, JULOCK, Cpls. MIFSUD, WHALEN and TUZYNSKI major area covered recent line inspection and possible

profiling of minorities by Sgt ANDERSON and Cpl. WHALEN ordered to closely monitor and report to station commander monthly.

04/26/00, Supervisory Inquiry # 1999-856, 1515 hours spoke to complaintant Peggy ᒐ TOMPKINS finally after numerous attempts she answered her telephone. I could hear her curse out her youg son for telling me she was home. Tompkins related she had received paper work from the BPR unit but had chosen not to fill it out as it was too many pages. She went on to indicate she would be willing to fill it if I mailed her another verification form which I did.

04/28/00, 0911-0930, Sick visit Trooper ONDICK at Mercer Station.

04/28/00, Sgt. JULOCK and myself took our clerk Mrs. DUNDER out to lunch for secretary week.

# WILLIAMS, BILLY R

| | |
|---|---|
| From: | WILLIAMS, BILLY R |
| Sent: | Sunday, June 04, 2000 5:43 PM |
| To: | SIMON, SIDNEY A |
| Cc: | WILLIAMS, BILLY R |
| Subject: | Weekly briefings   - Week 05/22-26, 2000 |

Sgt Anderson was on vacation all week.

)5/22/00, Stopped on station before going to scheduled Line Inspection of BEAVER Station.
0804. Sgt. JULOCK advised me that he had something important to tell me. He proceeds to tell me that he was called into the Station at 0500 hours this date by Tpr. Mark GLADYSZ and Tpr. Robert PERRINE, (midnighters) about some kind of loud confrontation at the Station the night before (2300 hours) with Cpl. ROSSMAN. Sgt. JULOCK went on to say that Cpl. ROSSMAN aperently had thought that one or both had put fingerprint ink in his hat band and on his issued weapon or something. That there might have been some kind of shoving also.
          Sgt. JULOCK further stated that Cpl. ROSSMAN had first raised the issue of ink on his items the week before to him. That he Sgt. JULOCK had asked Cpl. ROSSMAN if he wanted an investigation conducted. Cpl. ROSSMAN told Sgt. JULOCK he did not. That he would find out who did it on his own.

          I instructed Sgt. JULOCK to place said information on worksheet. I than contacted the Troop Commander and advised him of same. Sgt. JULOCK left my office and returned ten- fifteen minutes later with a white envelope from Tpr. GLADYSZ. When Sgt. JULOCK opened said envelope up it contained two copies of a STD - 501, addressed to me from Tpr. GLADYSZ. In said STD - 501, Tpr. GLADYSZ accused Cpl. ROSSMAN of harassment and stated that he had pushed Cpl. ROSSMAN twice during said confrontation.

          I than recontacted the Troop Commander and advised him of the STD-501, letter from Tpr. GLADYSZ. I tan left station for the Line Inspection at BEAVER Station. After stressing to Sgt. Julock that we had to keep these three apart pending the investigation.

          At approximately **1345 hours** I recieved a telephone call at **BEAVER** Station from Tpr. PERRINE he stated he was in the room with Cpl. TUZYNSKI and that he. That on advise from **his ATTORNEY** he was at MERCER STATION on his **own time** to present himself for **ARREST. Based on what he had been told by Cpl. ROSSMAN**. Something about possible criminal
charges maybe filed aainst who ever had placed ink on his items and broke into his locker ( key left on top of locker).

          I told Tpr. PERRINE that he was not being arrested for anything to just go back home. I asked him if this was a joke and he stated it wasn't.  I also ordered Tpr. PERRINE not to discuss this matter on station as it was the subject of a BPR,.I cut my Line Inspection of BEAVER Station short and headed back to Mercer Station.

05/23/00, Line Inspection BEAVER STATION

05/24/00, briefing with Sgt. JULOCK  discussed the confrontation and assureing the parties were kept apart Sgt. JULOCK advised me that all the parties had kissed and made up.  Later Cpl. Wolinsky Acting Crime Sgt. advised of the accidental death of a male subject by a garbage truck.

05/25/00, briefing relative to death with Sgt. JULOCK and Cpl. Wolinsky.

05/27/00, worked saturday because of orders from Major and Captain i.e increased manpower on roads for holiday weeken.

At 1530 hours I spoke with Tpr. GLADYSZ in order to give him the STD-501 from the Troop Commander i.e. Restricted Duty Status. Tpr. GLADYSZ wanted Tpr. MARZANO in the room  and I agreed.

During shift I issued (1) traffic citation and (6) written warnings.

DATE:           June 12, 2000

SUBJECT:        Monthly Activity - May, 2000 for Lt. Billy R. Williams

TO:             Commanding Officer, Troop D, Butler

FROM:           Lt. Billy R. Williams, Troop D, Mercer

May 1, Timesheets 0830-1030 hours.

May 3,  Attended Mercer County Police Chief monthly meeting 1200 – 1340 hours.

May 4, Range/ Qualification, 1400 – 2200 hours.

May 5, Discussed corrections to Line Inspection Report with supervisors.

May 6, Saturday OD- complied sick leave statics.

May 7, Sunday OD – visited BEAVER, BUTLER, KITTANING, NEW CASTLE and MERCER Stations.

May 8, Ordered supervisors to have Tprs. Brennen and Miller to pickup pennies they placed on floor in locker room and patrol room.

2000 hours attended Township meeting Lake Township

May 11, Attended Troop Conference in Butler

May 15- 19, Attended Police Chief's Command Institute Training in Cranberry Township.

May 22, Advised by Sgt. JULOCK of confrontation incident between Cpl. ROSSMAN and Tpr. GLADYSZ on 05/21-22/2000. Started over someone placing ink in Cpl. ROSSMAN's hat. Tpr. GLADYSZ submitted letter stating he was harassed by Cpl. ROSSMAN leading him to push Cpl. ROSSMAN twice. BPR worksheet was submitted.

     Consulted with Troop Commander relative to BPR worksheet.


I went to BEAVER STATION to conduct a line inspection. 1330-1345 hours. Tpr. PERRINE called me at BEAVER STATION and advised me that as a result of information he had been told by Cpl. ROSSMAN during a confrontation with Cpl. ROSSMAN he had consulted with his attorney and was now at Mercer Station on his own time to present himself for arrest. I advised Tpr. PERRINE that he was not being arrested. And that he should return home.

3

briefly met with Tpr. PERRINE and restated that he was not going to be arrested and he was not to speak of this subject as it was now an official BPR investigation.

May 23, Line Inspection Beaver Station all day.

May 24,  briefly spoke with Tpr. GLADYSZ at his request.

May 26, Completed Line Inspection Beaver Station.

May 27, Saturday worked 1200-2000 hours, as per Troop Ciommander and Area Commander's orders relative to increased PSP patrols on Memorial Day holiday weekend. I issued one traffic citation for speeding (radar) and six written warnings for speeding (radar).

1330 hours met with Tpr. GLADYSZ and gave him  letter from Troop Commander relative to his resticted duty and temporary transfer to New Castle Station.

May 30, met with Cpl. ROSSMAN, 1500 hours relative to letter from Troop Commander and his temporary transfer to PSP Meadville. Restricted Duty.

**WILLIAMS, BILLY R**

| | |
|---|---|
| From: | WILLIAMS, BILLY R |
| Sent: | Tuesday, August 15, 2000 9:56 AM |
| To: | JULOCK, DAVID M (MERCER); ANDERSON, RANDY ; WOLINSKY, JOSEPH J; WHALEN, PATRICK S ; MARTSOLF, JAMES H ; TUZYNSKI, MATTHEW M ; MIFSUD, BRAD W |
| Cc: | WILLIAMS, BILLY R ; SIMON, SIDNEY A |
| Subject: | Township Meetings: Sheriff Dept. offering to patrol townships!!!!!!!!!!!!!! |

At last night 's Township meeting ( PINE TOWNSHIP ) I was advised by the Pine Twp. Supervisors that the SHERIFF Dept has been going around to some of our townships offering assistance patroling for traffic violations and crime problems. I advised them that we are their Police Force and that we have the manpower to handle anything in the township. AND I remind YOU that in the recent past PINE Twp. was discussing going Regional with Grove City, Liberty and Springfield Twps.

I remind the CORPORALS MY RECENT ORDER !!! the order is one to go clear their zones after Roll Call is very clear. If there is any reason why they can't go clear their zones per the situation THEN YOU need to explain same to me immediately after Roll Call. AND since the 4-12 shift has roll call to attend they have 30 minutes to review the Roll Call notes THAN they are to go clear their zones also.

We now have had three fatal accidents on SR 173 in two months. TWO CAUSED BY STOP SIGN VIOLATIONS and one caused by CROSSING THE CENTER LINE. We need to increase our omnipresence along the 173 corridor from PINE TWP. in the south to FRENCH CREEK in the north. Whenever the RADAR/CENTIPETE Trooper ( Shevitz) is assigned a special detail the Corporals are to ensure the Desk does not send him on minor incidents pulling him away from his assignment.

FURTHER more it would appear that some of the supervisors are in fact NOT following the dictates of TROOP SPECIAL ORDER 93-28, SUPERVISION I.E at scene.

This also plays into the fact we now have a few citizens complaints that we did not respond in a timely manner to their legitimate complaint in both instances a corporal was in fact in the decison process.

SIGNATURE AND DATE:

Cpl BMM 5262          08/16/00

Cpl                        08/16/00

                            09/14/00

Cpl J N Martsolf          08/16/00

Cpl                        8/28/00

RETURN TO LT-B.R. WILLIAMS.

SP 3-352 (1-93)



# SUPERVISOR'S NOTATION

| 1. NAME: | 2. DATE: |
|---|---|
| Cpl. Frederick P. DeMask | 03/04/97 |

3. THIS IS TO ADVISE YOU:

That during the recent System and Process Division Review at the Mercer Station, February 4-18, 1997, it was discovered that you disobeyed my orders relative to updating and maintaining all your Operation Manuals with all current changes.

You disobeyed my order and long standing Pennsylvania State Police Directives relative to maintaining Manuals by blatantly placing change sheets #3 into your OM 7-9 and your Vehicle Code but chose not to place the actual pages that were changed into said manual. It is clear you were attempting to fool either myself and/or the Systems and Process Team with this blatant disregard for proper procedure.

Over the past 12 months I issued numerous orders and reminders to update all Manuals at numerous Staff Meetings. I followed these orders up by issuing a written direct order on October 24, 1996 relative to updating Manuals and checking same.

| 4. SUPERVISOR'S SIGNATURE: | 5. BADGE NO. (IF APPLICABLE): |
|---|---|
| | 223 |
| 6. SUBORDINATE'S SIGNATURE: | 7. BADGE NO. (IF APPLICABLE): |
| | 1107 |



**PLAINTIFF'S EXHIBIT**
10

SUPERVISOR'S NOTATION –
Cpl. Frederick P. DeMask                                                          03/04/97
Page–2

     This was followed by each Supervisor being given a copy of a letter from the Director of Systems and Process Division, Captain Darrell G. Ober, dated October 29, 1996, during the first week of November 1996. Yet you chose to disregard all of the above.

     With this Supervisor's Notation I want to make it clear that I will not tolerate any of your continued disobedience of direct orders.

     Any similar actions in the future will result in more formal disciplinary action against you.

Lieutenant Billy R. Williams
Station Commander
Pennsylvania State Police
Troop D, Mercer

March 2**6**, 1997

Raymond J. Melder, President
F.O.P. Local 54
Troop D, Butler
200 Barracks Road
Butler, Pennsylvania 16001-2689

Dear President:

In light of the totally false complaints that Corporal William Hoy, Troop D, Mercer, made against me on January 13, 1997 to Lodge 54 which centered around my denying him 2.5 hours of overtime, complaints which the Lodge then took to the Troop Commander, Captain Terry L. Seilhamer. I think it is time Lodge 54 and myself get a clear understanding about this blatantly false allegation against me and the previous ones Lodge 54 made against me to Captain Seilhamer since 1993 and my arrival at Mercer.

Over the past four years, Lodge 54 has made yearly blatant false allegations to Captain Terry L. Seilhamer against me on behalf of certain members from Mercer, for the most part Corporals, who didn't like my orders <u>and</u> had disobeyed them and once I took action against them, i.e., Supervisor's Notations <u>SP3-357</u>, start an inquiry into why my <u>lawful orders</u> were not being followed the Corporals would run to the F.O.P. Lodge with totally false allegations against me who in turn took those totally false and blatant lies to the Troop Commander in an attempt to get my lawful orders changed or get this Officer punished in some manner.

NOTE: NOT ONCE OVER THE PAST FOUR YEARS AND NUMEROUS COMPLAINTS AGAINST ME TO THE TROOP COMMANDER DID LODGE 54 <u>EVER</u> CALL ME IN ADVANCE OF GOING TO CAPTAIN SEILHAMER, INVITE ME TO THE MEETING WHEN LODGE 54 PRESENTS THE COMPLAINT AGAINST ME TO THE CAPTAIN NOR DID LODGE 54 CALL ME AFTER MAKING SAID COMPLAINTS.

In all those yearly complaints lodged against me, I challenge Lodge 54 or anyone else to show <u>any</u> proof that I have <u>ever</u> violated the <u>F.O.P. Contract, Troop Policy</u> or <u>Commissioner Directive</u> and/or is-sued any <u>unlawful orders.</u>

Note: With this letter I want to serve notice to F.O.P. Lodge 54 that I refuse to be your little <u>Whipping Boy</u> every year.

In case Lodge 54 has forgotten their false allegations, let me take time to refresh your memory relative to the complaints (that I'm aware of), since 1993.

39

PLAINTIFF'S EXHIBIT
11

On January 13, 1997, Corporal William Hoy made a complaint against me to you at Butler Headquarters because I denied him 2.5 hours of overtime. He in turn requested that Lodge 54 speak to Captain Terry Seilhamer on his behalf and make a request for him to speak to the Captain concerning the events surrounding my denying him overtime on January 2, 1997.

Corporal Hoy is extremely lucky that I chose to give him a Supervisor's Notation on January 2, 1997 and not B.P.R. him for insubordination, AWOL and the violation of OM 7-8, i.e., the unauthorized tape recording he made of a telephone conversation of a telephone call he placed to Corporal Matthew Tuzynski's residence on January 1, 1997. (In fact he is lucky he didn't get arrested for violation of the States Wire Tap Law as he failed to tell Corporal Tuzynski that the telephone call was being recorded and that he was making a personal copy of said conversation. The only thing that saved him was the fact our recording system makes a beeping noise. (I might add Corporal Tuzynski stated he never knew the call was being recorded).

It is very strange that Corporal Hoy would call Corporal Tuzynski relative to the schedule from one of only three telephones at Mercer Station that are hooked up to the recording system as opposed to the other 22 telephones in the Barracks.

The tape recording episode combined with the 99% false STD-501 he typed to me and the belated information Corporal Hoy placed on the weekly roster (one in red ink, one in red pencil) makes it abundantly clear Corporal Hoy intentionally disobeyed my orders relative to the January 2, 1997 schedule.

NOTE: I'm still curious as to why, when Corporal Hoy was running around Butler on January 13, 15 and 17, 1997, with <u>his so called evidence, i.e., tape recording,</u> Lodge 54 didn't take it off of him or at least tell him the tape recording was illegal and a violation of Pennsylvania State Police rules.

Just prior to the January 1997 episode, Corporal Hoy committed other violations of Proper Conduct. Just to name a few of the things he had done. (1) Inappropriate comment in the presence of a female co-worker. (2) Got two Troopers to assist him in taking a locked closet door off it's hinges looking for pay checks on a Thursday before payday.

He still remains the only Pennsylvania State Police Supervisor <u>ever</u> barred from the private chambers of the President Judge of Mercer County for some comments he made to the Judge's Law Clerk. He got that distinction within one month of being transferred to Mercer in 1996.

<u>Note:</u> For the record I meant exactly what I said to Corporal William R. Hoy on the Supervisor's Notation and STD-501. If he does anything of a similar nature I will B.P.R. him and he can run to Lodge 54 all he wants.

August 1993: Lodge 54 made a complaint against me alleging that my assigning a full time Radar man put the other Troopers safety at risk. (At the time we were putting out four or five patrols per shift) not counting assistance from Troop S. This complaint coming from Corporal Frederick P. DeMask, F.O.P. Station Representative.

This complaint against me led to the Troop Commander, Captain Terry L. Seilhamer visiting Mercer Station the last week of August 1993 and meeting with Mercer Supervisors and myself.

Strange thing about this complaint, I always cited the Captain's own Troop policy on Radar Details.

NOTE: Where has Lodge 54 been over the past year and a half when Mercer Station has only been able to put out two patrols a shift due to limited manpower, if Lodge 54 is so worried about Member's safety.

March 1994: Corporal Minarik made a complaint to Lodge 54 relative to my orders on assigning unmarked cars in which he cited some bull about unsafe cars and violation of state laws. Corporal Montag, then Lodge President, took this totally false complaint to the Troop Commander which led to my immediate transfer to Butler for 11 weeks. After I filed Grievance D-138 the Captain requested assistance from the Lodge on 4/20/94. Because I was alleging discrimination this in turn led to Lodge 54 taking a vote (I believe I heard it was 21 to 5) to appoint a three man committee to check into assisting the Captain.

That three man committee questioned me twice on 4/21/94 at Butler Headquarters. The committee was made up of Cpl. Paul Montag, Cpl. Peter S. Vogel and Tpr. Peter Marsico. In order to see if in fact they were going to assist the Captain.

No one I've ever mentioned this three man committee to have ever heard of a labor organization doing anything like that.

May 1995: Corporal Frederick DeMask made a complaint to you and then you went to Lieutenant David Jungling relative to my not giving out paychecks until Friday as opposed to Wednesday or Thursday. Even though I was following the Commissioner's order, Lodge 54 made a complaint against me. I might add the other Troop D substations were doing the same thing as the Mercer Station but Lodge 54 only made this stupid complaint against me.

January 1995: Cpl. Frederick P. DeMask made a complaint against me through Lodge 54 to the Captain that I would be bias toward him if I was on the selection committee choosing the Crime Supervisor for my Station. As a result of Corporal DeMask and F.O.P. Lodge 54's unproven complaints I was not placed on the Selection Committee for my own Station. The Selection Committee was made up of Lt. Brian Simpson, Sergeant Al Brown and Cpl. Paul Montag.

<u>Note:</u>  Corporal DeMask  should have been made to prove this totally
false allegation.  Again <u>I was never given a chance to disprove this
lie.</u>

<u>August/September 1996:</u>  I issued an order limiting last minute leave
requests on weekends, i.e. (asking Friday night to take Saturday
off) because I was concerned about Member safety, at a time when our
total incidents were up  and we could only put out  two patrols or
sometimes <u>three</u> (3) on a good day.

Corporal Frederick DeMask made a complaint against me to you and in
turn you complained to the Troop Commander.  I'm sure you remember
this complaint as it led to you firing Corporal DeMask as Station
F.O.P. Representative for lying to you  and the Lodge.  Of course,
Corporal DeMask's version to me about his firing was that you fired
him because he had told me in advance/<u>warned me</u> that you had got the
Troop Commander  to change  my order before the Captain was ready to
change it in a day or two.

<u>Note:</u>  It took Lodge 54 three or four years to find out what most
people at Mercer Station have always known about your ex-representa-
tive, i.e., at best you might get half of the truth.  Corporal
DeMask was Station F.O.P. Representative for all those years yet he
never requested to meet with me on a monthly basis.  Even in light
of a F.O.P. Lodge 54 order dated May 12, 1995.  Yet every time he
made a allegation against me Lodge 54 would go running to the Troop
Commander and request an investigation, excuse me, make a request
for inquiry.

I know of no Pennsylvania State Police Directives that state that
the F.O.P. runs the Station and that I have to issue only orders
that Lodge 54 likes.

These totally false allegations over the past four years have caused
me a lot of stress and have impacted on my yearly performance eva-
luations and caused me an 11 week transfer to Butler in 1994.  So
therefore, in this new year, I'm serving notice that I simply will
not take this harassing treatment anymore and as I previously stated
I will not be Lodge 54's <u>"Whipping Boy".</u>

Fraternally Yours,

Billy R. Williams
Lt. — PSP, Mercer

— 4 —

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:       May 19, 1997

SUBJECT:    Flyer  - Gift Certificate - Jack Kevorkian, M.D. - Addressed
            to Lieutenant Billy R. Williams

            Captain Terry L. Seilhamer
TO:         Commanding Officer
            Troop D, Butler

            Lieutenant Billy R. Williams *BRW*
FROM:       Station Commander
            Troop D, Mercer

ENCLOSURES:  (1)  Copy of Gift Certificate - Jack Kevorkian, M.D.

             (2)  Copy of STD-501, from Cpl. Frederick P. DeMask to
                  Lt. Billy R. Williams, dated 01/30/97.

             (3)  Copy of Mobile Unit Log, Trooper Brad Mifsud, dated
                  01/22/97, car #16.

             (4)  Copy of Mobile Unit Log, Cpl. Frederick P. DeMask,
                  dated 01/22/97.

             (5)  Copy of Mobile Unit Log, Trooper Joseph Katavitch,
                  dated 01/22/97, car #9.

             (6)  Copy of STD-501, dated 12/31/94, from Lt. Billy R.
                  Williams to Lt. Ronald A. Raber, re: BPR 8703, (Page
                  3, last Paragraph).

        1.   In  light  of  Corporal  Frederick  P.  DeMask's  recent
revelations  that  he  has  had  thoughts  of  violence  here  in  the  recent
past,  apparently  between  October  and  April  1997,  I'm  reminded  of  a
recent  incident  which  took  place  at  Mercer  Station  in  my  office.

        2.   On  or  about  February  3,  1997,  I  came  to  work  at  about  0800
hours  and  as  soon  as  I  opened  the  door  and  walked  into  my  office,  I
noticed  enclosure  (1)  laying  on  the  floor  just  inside  my  office.

        3.   I  read  it  and  immediately  got  angry.   I  called  Sergeant
David  M.  Julock  into  my  office  and  showed  the  flyer  to  him  and  asked
if  he  might  have  any  ideas  on  who  may  have  placed  it  in  my  office.
Sergeant  Julock  indicated  he  did  not  know  or  have  any  ideas  on  whom
may  have  placed  enclosure  (1)  in  my  office.

        4.   Sergeant  Julock  then  went  on  to  state  that  a  few  days
before  he  had  seen  the  flyer,  but without my name on it.   He  said
Corporal  DeMask  had  a  number  of  them  and  that  Corporal  DeMask  had
given  him  one.

PLAINTIFF'S
EXHIBIT
12

5.  As I said before, at first I was very upset about this matter and considered cutting a BPR Complaint Sheet, but after a day or two I cooled down and decided to just try and let it go.

6.  The reason why Corporal DeMask's recent revelation struck home is because just days before this, January 30, 1997, I discussed a situation with him where a Trooper was called back in off the road so that Corporal DeMask could take an unmarked car home to lunch.

7.  The facts are these, in late January 1997 Trooper Brad Mifsud approached me in my office and complained about car #16 being taken off him just so Corporal DeMask could go to lunch. He related that on January 22, 1997, he was assigned car #16, an unmarked patrol car (my order) because there were no marked units available. All marked units were assigned to Patrol Troopers or were in the shop.

8.  At approximately 1120-1130 hours, Trooper Mifsud was preparing to go 10.7, his residence for lunch, when he was ordered to return to Station immediately. Upon arrival back at Station he was immediately met by Corporal DeMask who took the keys to car #16 and went to lunch himself.

9.  In relating this matter to me, Trooper Mifsud indicated he didn't think it was right for Corporal DeMask to do this. I advised him that I would look into the matter.

10.  On January 30, 1997, I had Corporal DeMask type me a STD-501 in which he did, enclosure #2. Corporal DeMask indicated that it was not his order and that he would never take a car off anyone just so he could go to lunch and that whom ever had given me the information was lying.

11.  I reviewed Corporal DeMask's letter and the green Mobile Unit Logs. I noted the following:

>  (a)  Trooper Brad Mifsud was assigned car #16 at the beginning of the 8-4 shift by me.
>
>  (b)  Trooper Joseph A. Katavitch was assigned car #9 at the start of the AM shift.
>
>  (c)  Trooper Katavitch came on Station at 1106 hours after handling incident #D3-749670.
>
>  (d)  Trooper Mifsud was order back to Station and given car #9.
>
>  (e)  Corporal DeMask immediately took car #16 and went straight home for lunch.

12.   On Thursday, January 30, 1997 at approximately 1500 hours I met again with Corporal DeMask and indicated to him I had no major problem with the matter except that it could have been handled in a more thoughtful manner.

13.   So on Monday, February 3, 1997, I walked into my office and saw enclosure (1) and was immediately reminded of previous vicious acts done in my office, i.e.

     (a)   February 20, 1994 - Wheels removed from my office chair, desk scared and son's picture tampered with.

     (b)   November 20, 1997, black ink placed on the door handle to my office and handle on locker room locker, refer to BPR 8703 and enclosure (5).

14.   IT IS MY BELIEF THAT ALL OF THE ABOVE AND A FEW OTHER INCIDENTS ARE ALL RELATED.

BRW/mld



# GIFT CERTIFICATE

## for the office of

## JACK KEVORKIAN, M.D.

To: _____ BRW

## GOOD FOR ONE VISIT

From: _____ Everyone

Expiration Date: _____

Supervisor's Notation - Trooper Gerald L. Schreiber          12/05/97

order to fully comply with Troop Commander Order of 08/08/91, Cpl. Larry Karns' Supervisor's

Notation dated 05/05/97, Corporal William Hoy's Supervisor's Notation dated 07/02/97.

    Any further failure by you to <u>fully</u> comply with proper Rules of Criminal Procedure

Troop Commander Directive or any orders of any kind and I will initiate formal disciplinary

action against you. _Bru_

---

SP 3-352 (1-93)



# SUPERVISOR'S NOTATION

| 1. NAME: | 2. DATE: |
|---|---|
| Trooper Gerald L. Schreiber | 12/05/97 |

3. THIS IS TO ADVISE YOU:

    That for some unknown reason you have chosen to continue disobeying Troop Orders,

re: To comply with proper rules of Criminal Procedure, as per Pennsylvania Code, Title

234, specifically ~~Title~~ RULE 53, i.e. substitution of Section 3361 or similar sections for

Section 3362.

    On Citation F0404919-4, issued 11/07/97, Defendant Roy Ward, B/M/66, Farrell,

Pennsylvania, you clearly chose to disobey previous orders to comply with Troop D

Commanding Officers Directive, dated 08/08/91, re:  Rules of Criminal Procedure.

    With this Supervisor's Notation I want you to understand that this is a direct

| SUPERVISOR'S SIGNATURE: | 5. BADGE NO. (IF APPLICABLE): |
|---|---|
| _L7. Bus R. Wu_ | 223 |
| SUBORDINATE'S SIGNATURE: | 7. BADGE NO. (IF APPLICABLE): |
| _TPR Gerard L Schreiber 4296_ | 4296 |

PLAINTIFF'S
EXHIBIT
_13_

SP 3-352 (1-93)

# SUPERVISOR'S NOTATION

**1. NAME:** Tpr. Robert I. Lewis

**2. DATE:** 04/02/98

**3. THIS IS TO ADVISE YOU:**

That your recent actions on 03/30/98, at approximately 1615 hours, i.e.;

loud tremulous tirade within the Crime Unit in which you belittled my orders from the

Staff Meeting, just held hours before, and your continued tirade about the Troop

Commander not knowing anything about criminal work is <u>not</u> acceptable behavior.

It is clear to me your tirade, as usual, was designed to get the entire

Stations attention, especially mine. I note your loud tirades generally have one theme,

the Troop Commander and myself issue stupid orders and neither one of us have any crime

**4. SUPERVISOR'S SIGNATURE:** Lt. Bery R. Willey

**5. BADGE NO. (IF APPLICABLE):** ZZP

**6. SUBORDINATE'S SIGNATURE:** 3894

**7. BADGE NO. (IF APPLICABLE):**



PLAINTIFF'S
EXHIBIT
14

Supervisor's Notation Cont'd.                                    04/02/98
Tpr. Robert I. Lewis


experience.  You are hereby placed on notice that I consider this to be insub-

ordination and unbecoming conduct.


        Any repeat of similar actions by you may result in disciplinary action

and/or removal from the Crime Unit.


        In the past I've ordered first, Cpl. Frederick P. DeMask and then Sgt.

David M. Julock to counsel you relative to these same types of actions and your

failure to comply with military courtesy, i.e.; saluting me.  I notice both these

activities increase especially the loud tirades whenever you hear of an order you

don't like.


        Therefore, effectively immediately you are ordered to contact the Peer

Contact Program.