Exhibit D
Transcript of Deposition of
Billy R. Williams
10-21-04

# CONDENSED TRANSCRIPT

Deposition of: Billy R. Williams

October 21, 2004

Billy R. Williams vs.
Pennsylvania State Police



## Powers Garrison & Hughes

*Court Reporting & Video Services*

600 Warner Centre
332 Fifth Avenue
Pittsburgh, PA  15222
412-263-2088

**www.pghdepo.com**

Page 1

```
1
2       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
3
        . . . . .
4
   BILLY R. WILLIAMS,     )
5                         )
        Plaintiff,  )
6                    )
   vs.              ) Civil Action
7                   )
   PENNSYLVANIA STATE    ) No. 03-239 E
8  POLICE, an Agency of  )
   the Commonwealth of   )
9  Pennsylvania,         )
                         )
10      Defendant.  )
   _____
11
   BILLY R. WILLIAMS,     )
12                        )
        Plaintiff,  )
13                  )
   vs.              ) Civil Action
14                 )
   PENNSYLVANIA STATE    ) No. 03-130 E
15 TROOPERS ASSOCIATION, )
                         )
16      Defendant.  )
17          - - - - -
18      DEPOSITION OF BILLY R. WILLIAMS
19          - - - - -
20 REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
   WITHOUT AUTHORIZATION FROM THE CERTIFYING
21 AGENCY
22          . . . . .
23
24
25
```

Page 3

```
1
2       DEPOSITION OF BILLY R. WILLIAMS
3  a witness herein, called by the Defendants
4  for examination, taken pursuant to the Federal
5  Rules of Civil Procedure, by and before
6  Marlene A. Robinson, a Professional Court
7  Reporter and Notary Public in and for the
8  Commonwealth of Pennsylvania, at the Office of
9  the Attorney General, Erie Regional Office,
10 4801 Atlantic Avenue, Erie, Pennsylvania, on
11 Thursday, October 21, 2004, at 10 a.m.
12          - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
1
2
3  COUNSEL PRESENT:
4  For the Plaintiff:
5     Law Offices of Neal A. Sanders
      by Neal A. Sanders, Esq.
6
   For the Defendant Pennsylvania State Police:
7
      Office of the Attorney General
8     by Scott A. Bradley, Senior Deputy
      Attorney General
9
   For the Defendant Pennsylvania State Troopers
10 Association:
11    Law Office of Bryan Campbell
      by Bryan Campbell, Esq.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2              I N D E X
3              - - - - -
4
5      WITNESS: BILLY R. WILLIAMS
6
7  E X A M I N A T I O N:         PAGE
8
9  BY MR. BRADLEY                  5
10 BY MR. SANDERS                139
11 BY MR. BRADLEY                175
12 BY MR. SANDERS                182
13 BY MR. CAMPBELL               183
14 BY MR. SANDERS                239
15 BY MR. CAMPBELL               245
16 BY MR. SANDERS                250
17 BY MR. BRADLEY                252
18 BY MR. SANDERS                254
19 BY MR. CAMPBELL               256
20
21 E X H I B I T S:
22
23 WILLIAMS EXHIBIT NO. 1          50
24
25
```

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 5

1
2    P R O C E E D I N G S
3        -----
4        BILLY R. WILLIAMS
5    the Plaintiff herein, having been first duly
6    sworn, was examined and testified as follows:
7        -----
8        EXAMINATION
9    BY MR. BRADLEY:
10    Q.    Just to set the stage here, Mr.
11    Williams, as you may be aware, we are here to
12    take your deposition in the consolidate cases
13    of Williams versus the Pennsylvania State
14    Police at No. 03239 Erie Docket in the United
15    States District Court for the Western District
16    of Pennsylvania, and Williams versus the
17    Pennsylvania State Police Troopers Association
18    of No. 03130 Erie Docket.
19        My name is Scott Bradley.  I'm a
20    Deputy Attorney General with the Pennsylvania
21    Office of the Attorney General.  I represent
22    the Pennsylvania State Police in the case you
23    have against the Pennsylvania State Police.
24    With me is Mr. Bryan Campbell who is
25    representing the Troopers Association in the

Page 6

1        B. Williams - by Mr. Bradley
2    case at 03-130 E.
3        We're here in the offices of the
4    Attorney General in Erie for the purpose of
5    taking your deposition.  This is a case where
6    you, the Plaintiff, have brought allegations
7    against both the State Police and the Troopers
8    Association alleging discrimination based on
9    your race.  Also, I believe you have some
10    claims of retaliation.
11        Both Mr. Campbell and myself will be
12    asking you questions about your lawsuits and
13    the circumstances underlying your claims.  Do
14    you understand that?
15    A.    Yes, I do.
16    Q.    You have been placed under oath.
17    The court reporter here is taking down
18    everything I say, everything Mr. Campbell says,
19    everything your attorney, Mr. Sanders, will
20    say, and of course, everything that you will
21    say.  Then of course when this is finished,
22    there will be a transcript.
23        Could you at this time state your
24    name for the record?
25    A.    Billy R. Williams.

Page 7

1        B. Williams - by Mr. Bradley
2    Q.    Do you go by any alias?
3    A.    No, I do not.
4    Q.    Can you read, write and understand
5    the English language?
6    A.    Yes, I can.
7    Q.    As we go through this, if you don't
8    understand a question I ask, please ask me to
9    clarify it.  If you don't know the answer to a
10    question, that's an appropriate answer.  You
11    can just say "I don't know."  If you need to
12    take a break at any time, please let me know
13    and we will try to accommodate that.  Do you
14    have any questions before we begin?
15    A.    I do not.
16    Q.    The most important thing to remember
17    is the court reporter can only take down one
18    person at a time.  I will try to listen to the
19    end of your answer if you try to listen to the
20    end of my questions.  If we can both try not to
21    anticipate the ends of each others' statement,
22    then I think we'll be okay.
23        You were present for the depositions
24    of several other witnesses in this case; is
25    that correct?

Page 8

1        B. Williams - by Mr. Bradley
2    A.    That is correct.
3    Q.    Do you have a basic understanding of
4    how this process is going to proceed?  I will
5    ask questions, and you will answer.
6    A.    I do.
7    Q.    Then Mr. Campbell will ask some
8    questions, and you'll provide the answers.
9    Then Mr. Sanders may have some questions for
10    you at the end.
11    A.    Okay.
12    Q.    What is your date of birth?
13    A.    December 25, 1945.
14    Q.    Where were you born?
15    A.    Waynesboro, Mississippi.
16    Q.    Just for the record, what do you
17    characterize as your race?
18    A.    African-American.
19    Q.    I want to ask some questions about
20    your educational background.  Did you complete
21    high school?
22    A.    Yes, I did.
23    Q.    What year?
24    A.    1964.
25    Q.    What high school?

Powers, Garrison & Hughes

Page 9

1    B. Williams - by Mr. Bradley
2    A.   Erie Technical Memorial High School.
3    Q.   That is here in Erie, Pennsylvania?
4    A.   Here in Erie. They changed the name
5  to Central High School now.
6    Q.   Do you have any education past high
7  school?
8    A.   I took some college courses while in
9  the United States Navy.
10   Q.   Where did you take those courses?
11   A.   Aboard ship, I was stationed aboard
12  the Historia US 933, a correspondence course
13  while in the United States Navy.
14   Q.   Was this offered through the Navy
15  itself?
16   A.   Yes.
17   Q.   It wasn't tied to a particular
18  university or college?
19   A.   No.
20   Q.   Is that the extent of your formal
21  education?
22   A.   Correct.
23   Q.   Next I want to ask some questions
24  about your employment history. You have
25  already indicated at some point you were with

Page 10

1    B. Williams - by Mr. Bradley
2  the US Navy. Was that immediately after
3  graduating from high school?
4    A.   While in high school, I had a job
5  with the Erie Times Newspaper in the
6  12th grade. I took print as a course in
7  school. From there, I went to the
8  United States Navy. I was in the Navy for
9  two years. I got out of the Navy and I worked
10  at Fenestra, a company that made steel doors.
11   Q.   Can you spell that?
12   A.   F-E-N-E-S-T-R-A, Fenestra. They've
13  gone out of business now.
14   Q.   Going back to your service in the
15  Navy, would that have been from 1964 to 1966?
16   A.   1966 to 1968. I went in the
17  Reserves. From high school, I signed up for
18  the Reserves. I forget what they called it
19  back then. Before I went to the Navy, I went
20  into the Reserves. Then they called you up and
21  you went into the full Navy. I was in the
22  Reserves for about four or five months and then
23  went into the Navy.
24   Q.   After you graduated from high school
25  in 1964, were you employed anywhere?

Page 11

1    B. Williams - by Mr. Bradley
2    A.   Erie Time News.
3    Q.   You maintained that employment up
4  until you entered the Navy as a regular
5  enlisted person?
6    A.   Correct.
7    Q.   What was your highest rank with the
8  Navy?
9    A.   High-Seaman III.
10   Q.   Is that High-Seaman III?
11   A.   Yes.
12   Q.   Do you know what the corresponding
13  rank in the Army would be? Would that be a
14  private, corporal or sergeant?
15   A.   I would not know that.
16   Q.   You already indicated that you left
17  the Navy in 1968?
18   A.   Correct.
19   Q.   Why did you leave the Navy?
20   A.   I spent my time in the Navy and got
21  discharged.
22   Q.   You were discharged? Was it an
23  honorable discharge?
24   A.   Honorable discharge, correct.
25   Q.   Then what did you do?

Page 12

1    B. Williams - by Mr. Bradley
2    A.   I started working at Fenestra.
3    Q.   You did mention that. That was a
4  door manufacturing company?
5    A.   Correct. They made steel doors for
6  commercial manufacturers.
7    Q.   What did you do for them?
8    A.   I welded steel doors. I ran the
9  welder machine and helped load the trucks.
10   Q.   How long did you work there?
11   A.   Until I joined the state police in
12  1969.
13   Q.   How did you come to join the
14  Pennsylvania State Police? Were you recruited?
15  Was this a life-long ambition, or was this just
16  an opportunity that came around at the right
17  time or any other?
18   A.   The opportunity came around at the
19  right time. I saw a posting in the City of
20  Erie that the state police were recruiting
21  people to join the state police. In 1968, I
22  saw the posting. I signed up to take the test.
23  I took the test in 1968 and joined after I
24  passed the test.
25   Q.   Did you just take the test the one

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 13

1        B. Williams - by Mr. Bradley
2    time?
3        A.   Correct. I was ranked 34 out of 942
4    on the test.
5        Q.   Did you then go directly to the
6    academy?
7        A.   Yes, I did. I was in that class in
8    Hershey in 1969. It was a three-month class.
9    It was a class of 124; 120 graduated.
10       Q.   That was at the Pennsylvania State
11   Police Training Academy?
12       A.   Correct, in Hershey.
13       Q.   In Hershey. So you had completed
14   your academy work in 1969?
15       A.   Correct. I started May 22 and
16   graduated August 14 from the State Police
17   Academy.
18       Q.   Do you know what your class ranking
19   was?
20       A.   At that time, they didn't give a
21   score. However, going and taking the final
22   exam, I was tied for the class lead. My
23   platoon leader advised me the day before we
24   took the final test at the academy that I was
25   tied for the class lead. I always assumed I

Page 14

1        B. Williams - by Mr. Bradley
2    aced that test, but they gave us no final
3    standing.
4        Q.   You indicated that your academy
5    class was approximately 120 or 124?
6        A.   124 started, and I believe four
7    dropped out during the training, during those
8    few months of training.
9            MR. SANDERS: Lieutenant, let
10   me try as I made this observation. Scott was
11   trying to warn you from the beginning.
12           Try to slow down a little bit, if
13   you could, because Marlene over here, if she
14   quits on us, we'll have to get somebody else.
15   Just give a breath or two, let Scott finish,
16   let there be dead silence in the room and then
17   answer. Thanks.
18       A.   Okay.
19   BY MR. BRADLEY:
20       Q.   Do you recall the racial composition
21   of your academy class?
22       A.   Yes, there were two of us in the
23   class.
24       Q.   Two African Americans?
25       A.   Correct.

Page 15

1        B. Williams - by Mr. Bradley
2        Q.   Were the rest all white or
3    Caucasian, or where there any Asians or any
4    other minority groups?
5        A.   All Caucasians.
6        Q.   What was your first assignment out
7    of the academy with the state police?
8        A.   Troop D, Butler.
9        Q.   Were you actually assigned to the
10   Butler barracks?
11       A.   Yes.
12       Q.   That would have been as a trooper?
13       A.   Trooper in the patrol section.
14       Q.   I believe we discussed this at
15   Captain Conley's deposition, but I believe he
16   indicated that within each troop there are
17   three sections. Is that correct?
18       A.   That's at headquarters. There are
19   three sections at headquarters.
20       Q.   There's three sections at
21   headquarters?
22       A.   Yes.
23       Q.   What are those three sections?
24       A.   Staff, crime and patrol.
25       Q.   This would be the headquarters in

Page 16

1        B. Williams - by Mr. Bradley
2    Hershey?
3        A.   Troop D, Butler. Every troop has a
4    headquarters.
5        Q.   Within the troop headquarters, there
6    are these three sections, staff, crime and
7    patrol?
8        A.   Correct.
9        Q.   Could you briefly describe what each
10   section does, and we can begin with staff.
11       A.   Staff is primarily responsible for
12   training and maintenance of the vehicles in the
13   troop. Like I say, it's training. It's
14   keeping track of training records for everybody
15   in the troop, monitoring the payment of bills
16   within the troop, and a lot of times the staff
17   section commander is also the labor
18   representative in the troop, at least he's
19   supposed to be.
20       Q.   The crime section?
21       A.   Crime section is the supervised
22   section that mainly deals with criminal
23   investigation.
24       Q.   The patrol section?
25       A.   They mostly deal with the patrol on

4 (Pages 13 to 16)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 17

1    B. Williams - by Mr. Bradley
2  highways and the county roads. They normally
3  are the initial responders to any type of
4  incident.
5    Q.  When you began your first assignment
6  with the state police, you were assigned to
7  Troop D which is the Butler area?
8    A.  Correct.
9    Q.  You were assigned to the Butler
10 barracks?
11   A.  Correct.
12   Q.  You were in the patrol section?
13   A.  Correct.
14   Q.  Do you recall who your supervisor
15 was at that time?
16   A.  I cannot remember at this time.
17   Q.  Would the barracks station commander
18 and your supervisor be the same person?
19   A.  No.
20   Q.  Do you recall who the barracks
21 station commander was at that time?
22   A.  The troop commander was
23 Captain Jim Barger.
24   Q.  B-A-R-G-E-R?
25   A.  Correct.

Page 18

1    B. Williams - by Mr. Bradley
2    Q.  How long did you work in the patrol
3  section at the Butler barracks?
4    A.  Until I transferred out in May of
5  1970. I went to the interstate.
6    Q.  Is that a separate troop?
7    A.  Yes. I went to the interstate
8  system out of Meadville. It had just started
9  in May of 1970. It's a new patrol section they
10 started.
11      MR. SANDERS: May of 1970?
12      THE WITNESS: May of 1970.
13   Q.  Does that troop have a letter
14 designation?
15   A.  It used to be S, but it's been
16 discontinued.
17   Q.  Was it Troop S at the time you were
18 there?
19   A.  Troop S, right, the whole time.
20   Q.  What is that referred to now?
21   A.  It has been disbanded.
22   Q.  There is no Troop S anymore?
23   A.  They disbanded in 1997.
24   Q.  Do they now have each local troop
25 cover the interstate in its own area? Is that

Page 19

1    B. Williams - by Mr. Bradley
2  how that works?
3    A.  Correct.
4    Q.  Let me now go back to Troop S. Were
5  you still in the patrol section at Troop S?
6    A.  Yes.
7    Q.  Did Troop S have staff and crime
8  sections?
9    A.  No.
10   Q.  It was strictly a patrol section?
11   A.  Strictly patrol and interstate
12 system.
13   Q.  Would your responsibilities have
14 been I-79 and I-80?
15   A.  I-79.
16   Q.  Strictly I-79?
17   A.  Meadville to Erie.
18   Q.  How long were you with Troop S?
19   A.  About 11 years.
20   Q.  Where did you go from there?
21   A.  From Meadville, I was transferred to
22 Dubois in 1981. I was in Dubois roughly for
23 about eight or nine months, and I then got
24 promoted to corporal.
25   Q.  Was that your first promotion with

Page 20

1    B. Williams - by Mr. Bradley
2  the state police?
3    A.  Correct.
4    Q.  Had you applied for promotions in
5  the interim?
6    A.  No. I never took the test before.
7    Q.  After you were promoted to corporal,
8  did you remain at Dubois?
9    A.  No. I was assigned to -- I can't
10 think of the station right now. I'm sure it
11 will come to me shortly.
12   Q.  What was your assignment at Dubois?
13   A.  I was patrol corporal. Oh, you mean
14 in Dubois?
15   Q.  In Dubois, yes.
16   A.  I was patrol trooper.
17   Q.  You still remained in the patrol
18 section?
19   A.  Patrol of Interstate 79 -- I mean
20 Interstate 80, Lock Haven. When I made
21 corporal, I went to Lock Haven.
22   Q.  Do you know why you were transferred
23 in 1981 to Dubois?
24   A.  It was a disciplinary transfer.
25   Q.  What was the basis of that?

Page 21

1    B. Williams - by Mr. Bradley
2    A.   I was accused of gambling.
3    Q.   Did you challenge that transfer, or
4  did you at any point after the allegation was
5  made?
6    A.   No. I challenged the allegation,
7  but I didn't challenge the transfer, no.
8    Q.   After being promoted to corporal,
9  you were assigned to Lock Haven?
10   A.   Correct.
11   Q.   Was that a voluntary transfer at
12 that point?
13   A.   In the state police, when you get
14 promoted they give you options. You have to go
15 where the promotion is. The promotion was in
16 Lock Haven, and my choice was to accept it or
17 turn it down.
18   Q.   You accepted it?
19   A.   I accepted it.
20   Q.   What section were you assigned to at
21 Lock Haven?
22   A.   I was in the patrol section.
23   Q.   You indicated you were the patrol
24 corporal?
25   A.   Correct. I believe there were four

Page 22

1    B. Williams - by Mr. Bradley
2  of us there.
3    Q.   Four patrol corporals?
4    A.   Correct.
5    Q.   How many patrol troopers did you
6  supervise, if you can remember?
7    A.   Roughly, I would say about 17 or 18.
8    Q.   How long did you remain stationed at
9  Lock Haven?
10   A.   Six months.
11   Q.   Was this still 1981, or was this in
12 1982?
13   A.   1982.
14   Q.   After Lock Haven, where did you go?
15   A.   I requested a transfer to my home
16 area, and I was assigned to Coury barracks out
17 of Erie.
18   Q.   What was your assignment there?
19   A.   I was the patrol corporal, one of
20 three patrol corporals.
21   Q.   How many troopers did you supervise
22 there?
23   A.   About 20.
24   Q.   That would have been 1983 at that
25 point?

Page 23

1    B. Williams - by Mr. Bradley
2    A.   When I first arrived at Coury, it
3  was in 1982.
4    Q.   1982. How long did you remain
5  there?
6    A.   Two years, and then I made sergeant.
7    Q.   Was it the same pattern here? You
8  took the test, and then you were promoted to
9  sergeant?
10   A.   Correct.
11   Q.   Was there any time between 1981 and
12 I guess we're talking up to 1984 now when you
13 took the sergeant's test, was there any time in
14 that period that you attempted to take the
15 sergeant's test?
16   A.   I passed the sergeant's test the
17 first time I took it.
18   Q.   Did a sergeant's position become
19 available shortly thereafter?
20   A.   Yes. Again, you had to go to where
21 the openings were. I lucked out that there was
22 an opening in Erie.
23   Q.   That's where you went?
24   A.   Correct.
25   Q.   This was a different barracks than

Page 24

1    B. Williams - by Mr. Bradley
2  Coury?
3    A.   Yes, it was Erie City, Erie
4  headquarters.
5    Q.   Do you recall what year we're
6  talking about now?
7    A.   January of 1984.
8    Q.   Again, were you assigned to the
9  patrol section?
10   A.   Yes. I was in the patrol section
11 roughly for about a year.
12   Q.   How many patrol sergeants would
13 there have been in Erie at this time?
14   A.   Three.
15   Q.   At this point, how many subordinates
16 were you supervising?
17   A.   About 47. Correction, 47 troopers
18 and about six foremen, about 53.
19   Q.   After that, where was your next
20 assignment?
21   A.   I was a patrol sergeant for roughly
22 a year and then an opening came in for staff
23 section sergeant. I applied for it and got the
24 position.
25   Q.   Was this also at the Erie station?

Page 25

1      B. Williams - by Mr. Bradley
2    A.   The Erie station.
3    Q.   How long did you hold the position?
4    A.   Until -- from 1985 to 1990 when I
5  got promoted to lieutenant.
6    Q.   Did you again have to take a test
7  for the lieutenant promotion?
8    A.   Correct.
9    Q.   Did you pass the test on the first
10  time you took it?
11    A.   I believe it was the second time I
12  took it.
13    Q.   Do you recall the first time you
14  took the test?  Do you recall when it was?
15    A.   I don't remember at this time.
16    Q.   After you were promoted to
17  lieutenant, did an assignment opening become
18  available?
19    A.   Yes.  I went to Troop M, Bethlehem.
20  That's where the opening was at.
21    Q.   You accepted that?
22    A.   Yes, I did.
23    Q.   What section were you in in Troop M?
24    A.   Staff lieutenant.
25    Q.   How long did you serve as staff

Page 26

1      B. Williams - by Mr. Bradley
2  lieutenant in Troop M?
3    A.   From May of 1990 until I believe it
4  was February of 1992.
5    Q.   Did you transfer at that time?
6    A.   Yes.
7    Q.   Was that a voluntary transfer?
8    A.   Yes.
9    Q.   Where did you transfer to?
10    A.   Troop D, Butler at the New Castle
11  station.
12    Q.   What was your assignment there?
13    A.   Station commander.
14    Q.   As station commander, would you have
15  responsibility for all three sections --
16    A.   Correct.
17    Q.   -- at the station?
18        MR. SANDERS:  Say "correct"
19  again because you didn't wait until the end of
20  the question.
21        THE WITNESS:  Correct.
22        MR. SANDERS:  Thank you.
23  Better to have two yeses than one.
24    Q.   Who was your immediate supervisor
25  when you were station commander in New Castle?

Page 27

1      B. Williams - by Mr. Bradley
2    A.   Captain Terry L. Seilhamer.
3    Q.   That's spelled S-E-I-L-H-A-M-E-R?
4    A.   Correct.
5    Q.   What was his position, if you know?
6    A.   He was the troop commander, Troop D,
7  Butler.
8    Q.   This might be a good time to talk
9  about Troop D a little bit.  How many stations
10  are in Troop D?
11    A.   Five.
12    Q.   Can you identify them?
13    A.   Butler was the headquarters, Beaver,
14  New Castle, Mercer and Kittanning.
15    Q.   How long were you the station
16  commander at New Castle?
17    A.   I believe until March or April of
18  1993.
19    Q.   Then where did you transfer to?
20    A.   An opening came available at the
21  Mercer barracks.  I voluntarily requested to be
22  transferred to Mercer.
23    Q.   That was an opening for a station
24  commander?
25    A.   Correct.

Page 28

1      B. Williams - by Mr. Bradley
2    Q.   So you assumed the duties of station
3  commander at the Mercer station?
4    A.   Yes, in March or April of 1993.
5    Q.   Was Captain Seilhamer still your
6  supervisor as you were the station commander at
7  Mercer?
8    A.   Yes.
9    Q.   How long did you hold that position?
10    A.   Until I was transferred September 11
11  of 2000.
12    Q.   Where were you transferred to?
13    A.   Troop D, Butler headquarters.
14    Q.   You did not request this transfer?
15    A.   Did not.
16    Q.   What was the assignment you had at
17  Troop D, Butler headquarters?
18    A.   Something called the special
19  projects officer.
20    Q.   Were you connected to any of the
21  three sections you had identified earlier?
22    A.   No.
23    Q.   Were you still immediately
24  supervised by Captain Seilhamer in this
25  position?

**Billy R. Williams**
October 21, 2004

**Billy R. Williams v.**
Pennsylvania State Police

Page 29

1    B. Williams - by Mr. Bradley
2    A.   No.  At that time, I was supervised
3  by Captain Sidney Simon.
4    Q.   Did Captain Simon at some point
5  become the troop commander at Troop D?
6    A.   Yes.  I believe it was sometime
7  around either February or March of 1999.
8    Q.   He took Captain Seilhamer's
9  position?
10   A.   Correct.  Captain Seilhamer made
11 major and moved his office upstairs.  Simon was
12 made captain.
13   Q.   After Captain Seilhamer was promoted
14 to major, do you know what his assignment was?
15   A.   He was an Area 4 commander.  He
16 simply moved up upstairs.
17   Q.   Would Area 4 be compromised of
18 several different troops?
19   A.   Yes.
20   Q.   That would include Troop D?
21   A.   D, E, and C.
22   Q.   Is that Butler, Erie, and --
23   A.   Punxatawney.
24   Q.   Punxatawney.  How long did you serve
25 as a special projects officer at Troop D,

Page 30

1    B. Williams - by Mr. Bradley
2  Butler headquarters?
3    A.   Until such time the state police
4  punished me again and transferred me to Erie,
5  roughly five-and-a-half months from
6  September 11, 2000 until January 20, 2001.
7    Q.   On January 20, 2000 you were
8  transferred to Troop B, Erie?
9    A.   Correct.
10   Q.   What was your assignment there?
11   A.   Staff lieutenant.
12   Q.   Was this a voluntary transfer?
13   A.   No.
14   Q.   As I understand, you remained staff
15 lieutenant at Troop B in Erie?
16   A.   Correct.
17   Q.   When you first transferred to Troop
18 B, Captain Conley was your immediate
19 supervisor?
20   A.   Yes.  Are you talking about in 2001?
21   Q.   In 2001.
22   A.   Yes.
23   Q.   He has since retired; is that
24 correct?
25   A.   Correct.  He turned age 60 and was

Page 31

1    B. Williams - by Mr. Bradley
2  forced to retire.
3    Q.   Who replaced him as the captain?
4    A.   Captain Michael Hample.
5    Q.   Do you know the spelling of his last
6  name?
7    A.   H-A-M-P-L-E.  Michael J. Hample.
8    Q.   Are you currently supervised by
9  Captain Hample?
10   A.   Correct.
11   Q.   At the time you were station
12 commander at New Castle and Mercer, can you
13 describe your relationship with
14 Captain Seilhamer?
15   A.   At New Castle, the relationship was
16 a commander/subordinate relationship.  Can you
17 rephrase the question?
18   Q.   Were you able to get along with
19 Captain Seilhamer is what I'm asking basically?
20 Did you have any problems with him?
21   A.   For the most part in New Castle,
22 yes, we got along.
23   Q.   Did you have any problems with
24 Captain Seilhamer?
25   A.   None that I recall at this time at

Page 32

1    B. Williams - by Mr. Bradley
2  the New Castle station.
3    Q.   How about at the Mercer station?
4    A.   At the Mercer station, I had a very
5  rocky relationship with Major Seilhamer because
6  of the actions he took towards me.  The
7  relationship between him and I seemed to change
8  once I got to Mercer.
9    Q.   This would have been while he was
10 still a captain and still your immediate
11 supervisor?
12   A.   Correct.
13   Q.   Can you pinpoint the genesis of that
14 disruption in your relationship?
15   A.   For an unknown reason to me,
16 starting in 1993, he started taking some of
17 what I have described as discrimination actions
18 against me while at Mercer station.
19   Q.   Discriminatory in what manner?
20   A.   He started punishing me for no
21 reason.  For no reason at all, he transferred
22 me, the same as he and Captain Simon did in
23 2000.  He transferred me on some trumped-up
24 charges.  It's my opinion that he was behind
25 the trumped-up charges.  At least he knew the

**Powers, Garrison & Hughes**

Page 33

1    B. Williams - by Mr. Bradley
2  charges against me or the complaints against me
3  were trumped-up and had no basis. He gave
4  credence to them.
5    Q.  Would this have been the transfer in
6  2000 you're speaking of?
7    A.  No. I'm talking about the transfer
8  in 1994. Captain Seilhamer transferred me to
9  Butler in 1994 for three months allegedly to be
10 the acting crime lieutenant since the crime
11 lieutenant was going away for three months to
12 the FBI academy.
13   Q.  Let me get this straight. In 1994
14 you were temporarily transferred to Butler?
15   A.  Correct.
16   Q.  You were the crime lieutenant?
17   A.  That's right. In name only because
18 he stripped me of the duties of a crime
19 lieutenant. He gave the duties to a white
20 sergeant in the state police, and he gave me
21 the duty of correcting reports. All the duties
22 of the lieutenant went to the sergeant, so I
23 was just there correcting reports.
24   Q.  That was in 1994?
25   A.  Correct.

Page 34

1    B. Williams - by Mr. Bradley
2    Q.  You indicate that that was an
3  involuntary transfer?
4    A.  Correct. I filed a grievance.
5    Q.  You were eventually returned to your
6  position as station commander in Mercer after
7  that?
8    A.  Yes, I was.
9    Q.  That was when?
10   A.  1994.
11   Q.  Your return was based on the return
12 of the crime lieutenant to that station?
13   A.  That and the fact I filed a
14 grievance. It had been told to me that the
15 intention of the transfer was that I was to
16 remain in Butler. I was convinced that had I
17 not filed a grievance, I was going to remain
18 transferred to Butler because the crime
19 lieutenant made it well known that he wanted
20 Mercer station.
21   Q.  Did you prevail on that grievance?
22   A.  Yes. Partially I did and partially
23 I didn't. I filed two grievances. I filed a
24 grievance for the transfer. Then the fact that
25 once I was there, he stripped me of the duties

Page 35

1    B. Williams - by Mr. Bradley
2  of the crime lieutenant and did not assign me
3  to a murder investigation which denied me
4  approximately 200 to 300 hours of overtime.
5    When the grievance went to
6  arbitration, I won on the grievance as far as I
7  asked for overtime pay for 100 hours of the
8  actual drive time from Mercer to Butler, but I
9  lost on the other part of it.
10   Q.  The only part you won was that they
11 agreed to provide you compensation for the
12 extra travel time?
13   A.  Correct.
14   Q.  All other things you had grieved,
15 you didn't prevail on?
16   A.  Correct.
17   Q.  I believe you had indicated earlier
18 that you believe that then-Captain Seilhamer
19 was acting in a discriminatory manner to you.
20 You talked about some actions that were taken.
21    I want to get back to your
22 characterization of his acts as discriminatory.
23 Again, I want to ask you in what manner did you
24 believe they were discriminatory?
25    MR. SANDERS: Other than what

Page 36

1    B. Williams - by Mr. Bradley
2  you have already told us. Is there anything
3  more to it other that what you already told him
4  about the white sergeant?
5    THE WITNESS: Let me think for
6  a second.
7    A.  Captain Seilhamer routinely punished
8  me for false complaints lodged against me that
9  he knew were false. They were lodged against
10 me by members --
11    MR. SANDERS: Do you know that
12 you're talking now about the 1994 situation
13 he's asking you about?
14    THE WITNESS: Correct.
15   A.  1994, 1995, 1996, he routinely
16 punished me for alleged complaints from members
17 of the Mercer station and the FOP out of
18 Butler. He knew they were false. He condoned
19 the false complaints. In fact, he encouraged
20 the false complaints against me.
21    When I complained to him about
22 members destroying my office, these same
23 members were making derogatory comments about
24 me, calling me Slappy behind my back, writing
25 pictures of me in the dictionary. One that my

9 (Pages 33 to 36)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 37

1      B. Williams - by Mr. Bradley
2 attorney recently gave you today is one
3 example, but there were like three or four
4 occasions where they -- in the dictionary on
5 some of the pages like the negro page, there is
6 a diagram of my picture. On the afro page in
7 the edition of the dictionary, they drew a
8 picture and put glasses and freckles on it and
9 said B.R. Williams.
10      I had my tires slashed. I had my
11 tires flattened with nails at Mercer station.
12 I had my office chair totally dismantled. I
13 had black ink put on my door, on my office
14 door. I had blank ink put on my locker at
15 Mercer station. It goes on and on and on. At
16 no time did Captain Simon (sic) see fit to put
17 a stop to it. In fact, his actions encouraged
18 that behavior.
19    Q.  You indicated that Captain Simon
20 (sic) never did anything about the --
21    A.  I mean Captain Seilhamer.
22    Q.  Did you mean Seilhamer?
23    A.  Yes.
24      MR. SANDERS: Then captain,
25 now major.

Page 38

1      B. Williams - by Mr. Bradley
2      MR. BRADLEY: Correct.
3    Q.  Again, you described this series of
4 events that occurred, and what you feel was
5 Captain Seilhamer's role in these events. I
6 again want to focus on your characterization as
7 discriminatory. Maybe I can ask it this way.
8      I'm assuming when you say it was
9 discriminatory, you're saying that it was done
10 because you're African-American? Is that
11 correct?
12    A.  That's correct. Actions were done
13 against me that were not done towards any other
14 white commander in the troop.
15    Q.  Other than the fact that they were
16 done against you as an African-American, do you
17 have any evidence that they were motivated by
18 your race and not -- if you can separate this
19 out in your mind, it was done because of your
20 race and not because of who you are?
21      MR. SANDERS: Other than what
22 he has already told you?
23    Q.  Other than what you have already
24 told me. I understand that you've described
25 the series of events.

Page 39

1      B. Williams - by Mr. Bradley
2      MR. SANDERS: And the picture
3 in the dictionary that he gave you.
4      MR. BRADLEY: And the picture
5 and some of the other things. I think some of
6 these things came up in Captain Conley's
7 deposition.
8 BY MR. BRADLEY:
9    Q.  What I'm asking you is do you have
10 any evidence or direct knowledge that this was
11 done not because of Billy Williams but because
12 Billy Williams was black, if you understand
13 that question?
14    A.  All his adverse actions against me
15 were done to me, strictly in my opinion,
16 because of my race.
17    Q.  Okay.
18    A.  He denied me overtime.
19    Q.  Again, we're talking about
20 Captain Seilhamer at this point?
21    A.  Correct. Then Captain Seilhamer,
22 now he's a major.
23    Q.  Right.
24    A.  All his actions clearly were done to
25 me because of race. I was giving the same

Page 40

1      B. Williams - by Mr. Bradley
2 orders as the white commanders in the troop,
3 and he punished me and not them. Clearly it
4 was because of my race. His actions against me
5 were because of my race.
6    Q.  As I understand it and since you
7 haven't provided me with any other indications
8 from Captain Seilhamer other than his actions,
9 it's your position that the discriminatory
10 nature of his acts are clearly present in the
11 acts themselves?
12    A.  He condoned the acts. He encouraged
13 the acts.
14    Q.  Now we're talking about two separate
15 things. When you talk about encouraging and
16 condoning the acts, now you're talking about
17 things that other people did. Is that correct?
18    A.  I'm talking about things they did
19 with his permission and condoning. He allowed
20 it to happen. He had the power to put a stop
21 to it, and he did not. He refused.
22      MR. SANDERS: What Scott is
23 asking you, Lieutenant, is other than what
24 you're telling him, I guess, do you have any
25 other information to share with Scott going

Powers, Garrison & Hughes

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 41

1  B. Williams - by Mr. Bradley
2  back to the 1994 period of time where you
3  believe Seilhamer did anything directly himself
4  that you witnessed that you feel was racially
5  motivated?
6  A.  Not that I can think of right now.
7  I'm sure there are other things. I can't think
8  of them right now.
9  Q.  Just to clarify what I'm trying to
10  say, it's your position that just based on the
11  actions Captain Seilhamer directed towards you
12  and because he didn't direct these same actions
13  towards white commanders, that is the
14  basis for your claim of discrimination based on
15  race?
16  A.  That's part of it.
17  Q.  With respect to Captain Seilhamer,
18  what other part is there?
19  MR. SANDERS:  Just focus now
20  on the 1994 period. 1994, 1995 and 1996 period
21  Scott is asking you about.
22  A.  Like I said, he transferred me. He
23  would not allow me to run Mercer station
24  without direct influence from him. He punished
25  me for false complaints again me.

Page 42

1  B. Williams - by Mr. Bradley
2  He had initiated a policy of what he
3  called a "Butler run." It was a little
4  punishment that he started up. If anything
5  happened at your station that he didn't like,
6  he would make you drive down to Butler as a
7  form of humiliation. Then he would openly brag
8  about it to the troop. He did that on a
9  regular basis in my case.
10  Q.  Did he do that to other troopers or
11  officers in Troop D?
12  A.  I don't know.
13  Q.  I guess maybe as the final question
14  in this area, did Captain Seilhamer -- again at
15  this period, 1994, and in that time frame --
16  did he ever directly indicate that his actions
17  were based on race? Did he ever say it? Did
18  he ever put it in writing?
19  Did he ever imply it in something he
20  said to somebody else that you overheard or
21  came back to you through a third party? Do you
22  understand the question?
23  A.  I don't know if he actually ever put
24  it in writing or actually said it to anybody.
25  Look at his actions. I filed a grievance.

Page 43

1  B. Williams - by Mr. Bradley
2  Besides the transfer, also there was
3  an instance in 1994 where a PCO accused me of
4  lying during an arbitration hearing.
5  Captain Simon (sic) punished me despite the
6  fact --
7  MR. SANDERS:  Simon or
8  Seilhamer?
9  THE WITNESS:  Seilhamer. I'm
10  sorry.
11  MR. SANDERS:  That's all
12  right. That's why I'm here.
13  A.  Seilhamer punished me while knowing
14  that PCO had lied. He still punished me while
15  knowing she, in fact, got a five-day
16  suspension, and the state police had tried to
17  file criminal charges against her for lying.
18  Yet, he punished me knowing that she was lying.
19  That was grievance No. D-136. The
20  grievance No. D-138 that was filed in 1994 was
21  the illegal transfer that he transferred me
22  down to Butler. I should say through 1994
23  whenever a section commander went away to the
24  FBI academy or took an extended leave or a
25  vacation, they always got replaced with his

Page 44

1  B. Williams - by Mr. Bradley
2  sergeant or corporal.
3  When he transferred me in 1994, that
4  was the first time since he had been the troop
5  commander that he ever did that with a
6  lieutenant from another station. Clearly, he
7  was acting discriminatory towards me.
8  Like I said, once I got there, I had
9  to file grievance No. D-140 because he stripped
10  me of the power. I was there as a crime
11  lieutenant in name only. I had no power. In
12  fact, he ordered me that I could not issue any
13  orders while I was there.
14  MR. SANDERS:  Scott is asking
15  you, is that in writing? Is that a document,
16  the order?
17  THE WITNESS:  No, that was
18  verbal. He told me that verbally.
19  Q.  What explanation did
20  Captain Seilhamer give you for your transfer to
21  Butler in 1994?
22  A.  He claimed that he wanted a
23  lieutenant to replace Lieutenant Simpson going
24  to the FBI academy. He also claimed that he
25  had a complaint from a person in the Mercer

Powers, Garrison & Hughes

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 45

1    B. Williams - by Mr. Bradley
2  station that my orders were not clear.
3        Therefore, he was transferring me to
4  Butler for some alleged administrative help.
5  Like I say, once I got there, I strictly had to
6  correct over 3,000 crime reports from the
7  troop. That was my entire duties. All these
8  other duties mandated by state police
9  regulations of crime lieutenant were stripped
10  of me. He gave those to a white sergeant.
11        MR. SANDERS: Whose name is?
12        THE WITNESS: Sergeant L.
13  Brown. He was the crime section supervisor.
14    Q.   Again, from what all you have told
15  me, it's your position that the discriminatory
16  nature -- again, this would be based on your
17  race -- of those acts is reflected in the acts
18  themselves? There is no other evidence of
19  discrimination on the part of Captain Seilhamer
20  in these decisions?
21    A.   None I can think of right now. I'm
22  sure there are other ones, but I can't think of
23  them right now.
24    Q.   When you say "other ones," you're
25  referring to other incidents that may support

Page 46

1    B. Williams - by Mr. Bradley
2  your contention that these acts were
3  discriminatory; is that correct?
4    A.   Yes.
5    Q.   But there would be no statements or
6  writings or other third-hand comments from
7  Captain Seilhamer of a racial nature?
8    A.   There may be, but I can't think of
9  them right now.
10    Q.   If Seilhamer had ever directly or in
11  writing or that you had heard from a third
12  party said something about your race, would you
13  have recalled that?
14    A.   I know he started calling Mercer a
15  black hole once I was there. Around 1998, he
16  started making comments about calling Mercer
17  station a black hole.
18    Q.   Had have you ever heard the term
19  "black hole" before?
20    A.   Yes, in high school.
21    Q.   In what context did you hear it?
22    A.   A black hole is like in the universe
23  where stuff gets sucked into the black hole.
24    Q.   Do you feel that when
25  Captain Seilhamer used the term "black hole" he

Page 47

1    B. Williams - by Mr. Bradley
2  meant that it was a problem, or do you believe
3  he meant it in a racially motivated way?
4    A.   The time I first heard it, I thought
5  it was racially motivated. For no reason out
6  of the blue he started calling Mercer a black
7  hole. To this day I don't understand why he
8  started calling Mercer station a black hole
9  except for the fact that I was there.
10        It made no sense to me because
11  Mercer station was running just like every
12  other station in the troop. In fact, it ran a
13  lot better and a lot smoother than a lot of the
14  other stations in the troop. He designated
15  Mercer station to be the black hole of the
16  troop.
17    Q.   Do you understand that there have
18  been others that have different opinions about
19  how Mercer station was running at that time?
20    A.   That may be.
21        MR. SANDERS: Can we take a
22  short break?
23        MR. BRADLEY: Sure.
24        (Short recess taken.)
25    Q.   Just one question before we get to

Page 48

1    B. Williams - by Mr. Bradley
2  the exhibit. Other than Captain Seilhamer's
3  reference to the Mercer station as being a
4  black hole, do you recall him making any other
5  racial comments or comments that you would
6  construe as racial either orally, in writing,
7  or that you heard from a third party?
8    A.   I can't recall at this time racial
9  comments, but I do recall that I was told on
10  one or two occasions back then that after I
11  filed those grievances that I better watch my
12  back, and that he was making statements that at
13  some point in the future that he would take
14  care of me.
15    Q.   With respect to the term "black
16  hole," did Captain Seilhamer ever use that in
17  your presence?
18    A.   Yes. He used it at a troop
19  conference.
20    Q.   So that would have been in a room
21  full of state police officers?
22    A.   Correct. Lieutenants, sergeants,
23  and corporals.
24        MR. SANDERS: Just to put this
25  on the record, I think the witness mentioned a

Powers, Garrison & Hughes

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 49

1    B. Williams - by Mr. Bradley
2  term gabby (sic) or something. Did you ever
3  attribute that to --
4      MR. CAMPBELL: Slappy.
5      MR. SANDERS: Slappy. Did you
6  ever attribute that to Seilhamer?
7      THE WITNESS: No. That came
8  from a person out of Mercer station.
9  BY MR. BRADLEY:
10     Q.   So you said you heard
11 Captain Seilhamer use the term "black hole" in
12 front of a troop conference?
13     A.   At a troop conference, correct. He
14 was talking about Mercer station. I forget
15 what context he was using it in. It was used
16 in a negative kind of way.
17     Q.   Negative in terms of the operation
18 of the Mercer station?
19     A.   Negative as to the Mercer station
20 entirely. It could not have been about the
21 operation because in my opinion, the operation
22 ran fairly smooth at Mercer.
23     Q.   Again, you admitted there were
24 different opinions as to that?

Page 50

1    B. Williams - by Mr. Bradley
2      A.   I suppose that might have been
3  possible, but in my opinion, it ran smooth.
4      Q.   I understand that, but there are
5  others that held a different opinion.
6      A.   That could be possible.
7          (Williams Exhibit No. 1 was
8  marked for identification.)
9      Q.   I want to direct your attention to
10 Deposition Exhibit No. 1. Do you recognize
11 that document?
12     A.   Yes, I do.
13     Q.   Can you describe it for the record?
14     A.   It looks like a complaint I made to
15 the Pennsylvania Human Relations Commission.
16     Q.   When was this complaint made?
17     A.   I believe it was signed here
18 April 16, 2001.
19     Q.   You recognize this as the complaint
20 you filed with the Pennsylvania Human Relations
21 Commission?
22     A.   Correct.
23     Q.   If you look at the first page at
24 Paragraph 3-A it says, "Beginning on June 1,
25 1999, and continuing up to and including the

Page 51

1    B. Williams - by Mr. Bradley
2  present time, the respondent is subjecting me
3  to a hostile work environment because of my
4  race, African-American." Is that what this
5  says?
6      A.   Correct.
7      Q.   In this case, the respondent is the
8  Pennsylvania State Police?
9      A.   Correct.
10     Q.   Since you signed this Complaint on
11 April 16, 2001, have you filed any other
12 Pennsylvania Human Relations Commission -- and
13 I may at times say PHRC when I refer to the
14 Human Relations Commission -- complaints since
15 you signed this one?
16     A.   I signed one against the union.
17     Q.   Against the union?
18     A.   Correct.
19     Q.   As against the state police, have
20 you filed any other PHRC complaints since you
21 filed this one?
22     A.   Human Relations complaints?
23     Q.   Yes.
24     A.   No.
25     Q.   How about -- and I don't even know

Page 52

1    B. Williams - by Mr. Bradley
2  what the initials stand for -- specifically,
3  are you familiar with the term EEOC?
4      A.   Yes.
5      Q.   The Equal Employment Opportunity
6  Commission?
7      A.   Correct.
8      Q.   Have you ever filed, apart from
9  Exhibit No. 1 -- which I understand was
10 cross-filed with the EEOC, as is required by
11 law?
12     A.   Right.
13     Q.   Since April 16, 2001, have you filed
14 any EEOC complaints other than the one you
15 indicated against the Troopers Association?
16     A.   I filed a complaint with the EEOC
17 and the Pennsylvania Human Relations Commission
18 in 2001. The EEOC deferred to Human
19 Relations --
20         MR. SANDERS: He knows that.
21 He is saying after you did that. After, did
22 you do that?
23         THE WITNESS: Afterwards, no.
24     Q.   Prior to that, did you file
25 complaints with either the PHRC or the EEOC?

Page 53

1      B. Williams - by Mr. Bradley
2     A.   EEOC.
3     Q.   How many?
4     A.   One. I filed one in 1995 against
5   Captain Seilhamer and the state police.
6     Q.   That was against the state police?
7     A.   Captain Seilhamer and the state
8   police, correct.
9     Q.   Did you specifically name
10  Captain Seilhamer at that time?
11    A.   Yes, him and the state police are
12  certainly named in the complaint.
13    Q.   That was in 1995?
14    A.   Correct.
15    Q.   Did that address some of the matters
16  we have already talked about this morning that
17  you indicated occurred at the Mercer station in
18  1994?
19    A.   1994, 1995, yes.
20    Q.   Would that also have included the
21  transfer to Butler as the crime section
22  lieutenant?
23    A.   Yes.
24    Q.   Now, I was a little confused in your
25  answer. Was the EEOC filing in 1995 the only

Page 54

1      B. Williams - by Mr. Bradley
2   one prior to Exhibit No. 1, or have there been
3   others?
4         MR. SANDERS:  Did you
5   understand the question, Lieutenant?  Other
6   than this in 1991, and other than the one you
7   just told Scott and Bryan about in 1995, Scott
8   is asking were there any others?
9         THE WITNESS:  No.
10    Q.   Do you recall what happened to your
11  EEOC complaint in 1995?
12    A.   After about a year-and-a-half of
13  complaints, they advised me that they did not
14  find enough evidence to hold my complaint.  I
15  forget how they worded it.  They gave me a
16  right to sue letter.  I decided not to pursue
17  it at that time.
18    Q.   Do you recall what year the right to
19  sue letter was issued?
20    A.   I believe it was in 1996.
21    Q.   As far as you can recall, you
22  filed -- and I'm going to use them as a group,
23  EEOC and PHRC -- you filed the EEOC and PHRC
24  complaint in 1995, and you filed one in 2001
25  with respect to the state police?

Page 55

1      B. Williams - by Mr. Bradley
2     A.   Correct.
3     Q.   To the best of your recollection
4   now, there were no other EEOC/PHRC complaints
5   filed again the Pennsylvania State Police?
6         MR. SANDERS:  Yet.
7     A.   By me?
8     Q.   Yes.
9     A.   No.
10        MR. BRADLEY:  That's why I
11  said up to today.
12    Q.   You have indicated that you also, I
13  believe in 2001, filed a complaint with the
14  Pennsylvania State Troopers Association as a
15  respondent separate from this one?
16    A.   I don't believe it was in 2001 that
17  I filed it.  I think it was later when I filed
18  it.
19    Q.   I should just for the record --
20  would that have been in 2002?
21    A.   I believe so.
22    Q.   As I indicated in Paragraph 3-A, you
23  used the date of June 1, 1999.  Was there any
24  event or occurrence on June 1, 1999 that caused
25  you to select that date?

Page 56

1      B. Williams - by Mr. Bradley
2     A.   Yes.
3     Q.   What was that?
4     A.   Major Seilhamer's Uncle Tom,
5   Captain Simon, called me on the morning of
6   June 1 at approximately 8:30 and told me --
7         MR. SANDERS:  Let's get it
8   straight.  Who called you now?
9         THE WITNESS:  Captain Simon.
10    Q.   What did you say after you said
11  Captain Simon?
12    A.   I called him Uncle Tom.
13        MR. SANDERS:  He referred to
14  him as an Uncle Tom.
15    A.   He is biracial.
16    Q.   He is not your uncle, is he?
17    A.   No, he is not.
18    Q.   He is not named Tom, is he?
19    A.   No, he's not.
20    Q.   I'm understanding you to use the
21  term "Uncle Tom" as a derogative term?
22    A.   Yes.
23    Q.   What does that term mean to you?
24    A.   He took action against me --
25    Q.   Just outside of this context, in the

14 (Pages 53 to 56)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 57

1       B. Williams - by Mr. Bradley
2   outside world, what does that term mean to you?
3       A.   He's a black man taking
4   inappropriate actions against another black man
5   on behalf of a white American.
6       Q.   You're referring to Captain --
7       A.   Captain Sidney A. Simon.
8       Q.   You started to say that
9   Captain Simon made a phone call to you.
10      A.   Yes.  If I may back up a little bit.
11      Q.   Sure.
12      A.   Captain Simon had just took over the
13  troop.  He got promoted to captain.
14          MR. SANDERS:  Slow down.
15  Otherwise, she's (indicating) going to quit.
16      A.   He had recently taken over the
17  troop.  He got promoted to captain I want to
18  say around February or March of 1999.
19          His first direct contact with me as
20  a station commander for Mercer station was this
21  June 1, 1999 telephone call.  He started off
22  with telling me that he wanted me to make the
23  Butler run, come down to Butler as soon as
24  possible.  I could take my time, but get there
25  as soon as possible.  He wanted to address some

Page 58

1       B. Williams - by Mr. Bradley
2   complaints alleged against me by the union.
3          I proceeded to Butler headquarters.
4   Once I got there, Captain Simon advised me he
5   wanted to talk to me, and that
6   Lieutenant Jungling was going to be taking
7   notes of my answers to these alleged complaints
8   against me.
9          He listed six or seven totally false
10  complaints against me.  I answered each one of
11  the totally false complaints.  I don't know if
12  you want me to go into detail with the false
13  complaints or not.
14      Q.   Let's just back up a minute.  I
15  think we might get into those in a minute.
16  Captain Simon was recently promoted to the
17  troop commander for Troop D; is that correct?
18      A.   Correct.
19      Q.   Where had he been stationed prior to
20  that?
21      A.   I don't know him that well.  I
22  believe he came from Troop A, Greensburg Troop.
23      Q.   Did you have any contact with him
24  before he was the Troop D troop commander?
25      A.   Yes.  I believe I saw him a couple

Page 59

1       B. Williams - by Mr. Bradley
2   times during some training for lieutenants in
3   Harrisburg over the years once or twice.  There
4   was no formal introduction or anything like
5   that.  I just knew who he was and told him
6   good-bye during the term of the class.
7       Q.   You didn't socialize with him?
8       A.   Not at all.
9       Q.   Prior to that, you had no -- I'm not
10  sure what the word is.  He was never your
11  supervisor, and you were never his supervisor
12  prior to him becoming the troop commander at
13  Troop D?
14      A.   Correct.
15      Q.   When he called you, did he accuse
16  you of doing these things, or did he say there
17  have been some complaints about your actions
18  and I would like to discuss them with you?
19      A.   First of all, he used the term
20  "Butler run."  That was a term straight from
21  the major that Major Seilhamer had started like
22  I previously stated.  Right away, I knew he had
23  a negative connotation to him.  The Butler run.
24  I'm thinking, gee, this guy had just got here
25  and is already talking about the Butler run,

Page 60

1       B. Williams - by Mr. Bradley
2   just taking on the troop.
3          He was clearly meaning by the tone
4   of his voice that he felt that I had done
5   something wrong already.  I was coming down to
6   Butler to defend myself.
7       Q.   Again, did he use accusatory words,
8   or was it just the tone of his voice that you
9   derived that from?
10      A.   I recognized it as both.
11      Q.   You're indicating that he did use
12  accusatory language?
13      A.   Yes.  Something to the effect of --
14  I can't quote him word for word because of the
15  time frame.  It was something to the effect
16  about I needed to explain to him about some
17  complaints the FOP had lodged against me.
18      Q.   The Butler run, would that be
19  similar to being called on the carpet?  Are you
20  familiar with that term?
21      A.   Yes.
22      Q.   What does that mean to you?
23      A.   That means travel down to Butler and
24  like you say, called on the carpet.
25  Major Simon used to laugh about it.  Like, you

Powers, Garrison & Hughes

Page 61

B. Williams - by Mr. Bradley

1  know, he used that as a punishment weapon, you
2  know.
3
4       Q.   Basically, that meant that you had
5  to get in your car, drive down, and go explain
6  yourself to him?
7       A.   Correct.
8       Q.   Did you feel that there is some
9  racial connotation to the term "Butler run"?
10      A.   Not necessarily.
11      Q.   Now, you've indicated that
12  Captain Simon wanted to discuss some complaints
13  he had received?
14      A.   Correct.
15      Q.   Did he indicate to you where the
16  complaints came from?
17      A.   Yes, FOP, Lodge 54.
18      Q.   Let's take it again.  Out of your
19  specific dealings with Captain Simon in June of
20  1999, can you explain to me within the state
21  police what the process is if a trooper or a
22  noncommissioned officer has a problem with a
23  supervisor?  I understand that there is --
24      A.   He can --
25      Q.   Let me just finish the question.  I

Page 62

B. Williams - by Mr. Bradley

1       understand that there are sort of two things at
2  play here.  There is a paramilitary chain of
3  command within the state police, but also there
4  is a labor union representing the troopers.
5  Maybe we can get clarification on that.
6            Where is the division within the
7  state police between union and nonunion and
8  union and management?  Is it just the troopers
9  or is it the troopers and the noncommissioned
10  officers?
11      A.   Everyone on state police is a member
12  of the union, bargaining union for the entire
13  state police.
14      Q.   Are all troopers in the same union?
15      A.   Yes, commissioners, the troopers on
16  the road to the lieutenants, captains, the
17  major, are all in the same bargaining union.
18  They bargain for all of us.
19      Q.   If you can then address in terms of
20  complaints from troopers or noncommissioned
21  officers about their superiors -- and I don't
22  know if it's the same or different -- how would
23  those complaints be processed given the chain
24  of command in the state police and given the

Page 63

B. Williams - by Mr. Bradley

1       fact that they're all members of the same
2  bargaining unit?
3       A.   They have a right to sit down with
4  the commander and discuss the issue with the
5  commander as far as the chain of command; or
6  they have a right to, if the commander is
7  taking some inappropriate action or an unlawful
8  order given, they have a right to go to the
9  commander's supervisor, the next person above
10  the commander.
11           Also, they can take it up with the
12  union.  It's like a dual track if they want to
13  proceed that way, one or the other.  They could
14  take it up with their station FOP rep or the
15  FOP president out of Butler.
16      Q.   I think what you said is they can
17  either take it up through their chain of
18  command, and there are ways to bypass their
19  immediate supervisor if they feel that there
20  has been an unlawful order given?
21      A.   Correct.
22      Q.   Or they could take it up through
23  their FOP, through the bargaining unit?
24      A.   Correct.

Page 64

B. Williams - by Mr. Bradley

1       Q.   With respect to the seven
2  complaints -- I believe that's the number you
3  used, seven complaints --
4       A.   Six or seven.
5       Q.   -- that Captain Simon identified to
6  you, had any of those matters ever been brought
7  up to you through the chain of command?
8       A.   No.
9       Q.   Apparently, they were then brought
10  up through the bargaining unit; is that
11  correct?
12      A.   FOP Lodge 54 out of Butler.
13      Q.   Let's discuss how that process would
14  work.  The trooper or troopers would make a
15  complaint to the local president or local
16  steward; is that correct?
17      A.   Station representative.
18      Q.   Station representative.  What would
19  be the obligation of the station representative
20  to do at that point?
21      A.   I guess they would discuss it among
22  themselves.  If they thought it was appropriate
23  or not, they would take it up with the troop
24  commander.

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 65

1    B. Williams - by Mr. Bradley
2    Q.   Does that appear to be what happened
3  in this case?
4    A.   Yes.
5    Q.   At least to the point we get to
6  where Captain Simon was preparing to make the
7  phone call to the complaints came to
8  Captain Simon in an ordinary manner?
9         MR. SANDERS: If you know.
10   A.   I don't know how it got to him.
11   Q.   If we assume that complaints were
12  made to the station in the process you
13  described it, if we assume that troopers at
14  Mercer station made complaints to their station
15  representative, and the station representative
16  went to the troop commander, that would be in
17  the ordinary course as far as you know?  Is
18  that correct?
19   A.   In this instance, I don't know.
20  Prior to the complaint, it had something to do
21  with Butler and Mercer, so I don't know how the
22  mixture got into the captain.
23   Q.   Let's move on to the complaints
24  themselves.  To the best of your recollection,
25  can you recall what those seven issues were?

Page 66

1    B. Williams - by Mr. Bradley
2    A.   They were all false issues.
3         MR. SANDERS: Just tell him
4  what they were.
5    A.   The one issue was I allowed deputy
6  sheriffs to patrol the interstate highways.
7  Another issue was that I ordered my troopers,
8  subordinate officers, to serve PFA orders.  The
9  one was that I denied overtime for a Trooper
10  Shriver for a car crash incident.  That was in
11  joint with Butler and Mercer.
12        Another one was I was not getting
13  into my uniform or that I was late getting into
14  my uniform on a couple of occasions.  There
15  were two or three others.  I can't think of
16  them right now.
17   Q.   Describe what happened then during
18  your meeting with Captain Simon.
19   A.   As I said, as soon as I walked in
20  his office, he advised me that
21  Lieutenant Jungling would be taking notes.
22  Lieutenant Jungling had this big pad out with
23  an ink pen.
24        He made me aware they were going to
25  take down every single word I said or

Page 67

1    B. Williams - by Mr. Bradley
2  responded.  Right away I'm thinking I'm on
3  trial.  He started with a question that I was
4  allowing deputies to patrol the interstate
5  highways.  I promptly pointed out to
6  Captain Simon that that was false.  I pointed
7  out to him the state law.
8         The state law under Vehicle Code
9  Section 6109 -- I pointed out to Captain Simon
10  and Lieutenant Jungling that state police have
11  no authority to have a deputy sheriff patrol
12  the highways.  Under Pennsylvania law, the only
13  authority the state police have was any police
14  department that was doing speed enforcement on
15  that highway needs permission on a limited
16  access highway, an interstate highway or any
17  limited highway, you needed permission from the
18  state police for state law.  It did not need
19  any permission to patrol the highways.  The
20  deputy sheriffs weren't officers.
21        He acted like he was surprised.  In
22  fact, he had to go get a copy of the state law.
23  He looked up the Vehicle Code and found out I
24  was correct.
25        On the other one, the overtime with

Page 68

1    B. Williams - by Mr. Bradley
2  Trooper Shriver, again, I told him he had bad
3  information.  I had given approval for overtime
4  for Trooper Shriver.  I had given him, I
5  believe, an hour-and-a-half of double time and
6  two-and-a-half of regular time-and-a-half for
7  an accident.
8         What had happened was he
9  responded -- he was an advanced crash
10  investigator, which is why Butler called him
11  out for a crash that happened where a local PD
12  was chasing a vehicle.  The vehicle crashed
13  into the civilians.  There was a big crash.
14        The first telephone call to me was I
15  was the OD that night.  That's how I got
16  involved.  I was OD that night.  I was home in
17  Erie when I got that telephone call about 12 at
18  night.  Harrisburg PD had chased the guy in a
19  police chase.  He had crashed.  It was a major
20  crash and a lot of injuries.
21        Harrisburg PD then were claiming
22  that they really weren't chasing the guy, it
23  was just an accident.  They requested, through
24  Butler, for an investigator from the state
25  police to come out and investigate the crash

Powers, Garrison & Hughes

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 69

B. Williams - by Mr. Bradley
1 
2 because of the involvement of their officer.
3        Based on that initial -- they
4 already called out Trooper Shriver and then
5 they called me like in the afterthought to tell
6 me they had called Trooper Shriver out.
7        I said, okay, no problem. I called
8 back to get an update about an hour-and-a-half
9 later. I found out they had called him out and
10 he should not have been called out. There was
11 a troop order, I think it was Troop Order
12 No. 9910, which specifically laid out the
13 circumstances where state police and the
14 advanced crash investigators could be called
15 out. This accident did not fit that criteria.
16        So at that point, I told the
17 corporal in Butler that since Shriver had been
18 there already and the overtime he accumulated
19 up to that point, that I expected him to secure
20 from the scene within two hours and return back
21 to his station. If they needed him beyond
22 that, he was due to work at 8 a.m. the next
23 day, he could come out then if they needed him
24 any further.
25        The allegation was that I denied him

Page 70

B. Williams - by Mr. Bradley
1 
2 overtime. I explained to the captain, and I
3 proved about the hour-and-a-half of double time
4 and I believe two-and-a-half hours of regular
5 time even though the call-out was not
6 justified.
7    Q.   Let's step back a bit. You talked
8 about the seven complaints that Captain Simon
9 raised with you. Was there anything within
10 these issues themselves that you felt there was
11 some racial component to, or were they just
12 questioning the way you were handling your
13 operation of Mercer?
14    A.   I'm really thinking at the time that
15 these complaints were because of past history
16 with the union and the state place and
17 Major Seilhamer. It was racially motivated.
18        On the face of the complaints, they
19 were clearly or any sane person that knows
20 state police rules and regulations knew that on
21 the face they were false complaints. They were
22 totally false from day one.
23    Q.   It was more the action of being
24 called in to defend these things that you felt
25 were clearly defensible and defensible on their

Page 71

B. Williams - by Mr. Bradley
1 
2 face that you felt was the racial component to
3 this. There was nothing within the complaints
4 themselves or anything surrounding the issues
5 regarding the complaints that had a racial
6 component?
7    A.   I don't know. Like I say, I felt
8 like the whole thing was racial; changing
9 uniforms late. I thought it was all clearly
10 racially motivated. Because of past history, I
11 had a long past history with the union.
12        Also the fact that on numerous
13 occasions I had to ask the union to stop making
14 these false complaints against me, these
15 discriminatory false complaints. I even sent
16 the union a letter on one or two occasions.
17    Q.   Other than the fact that you believe
18 that it was racially motivated based on your
19 history with -- I guess at that point it would
20 have been Major Seilhamer and other things
21 going on with the union, was there anything
22 about this had this not occurred in that
23 context -- and I don't know if you can separate
24 it out in you mind -- but was there any racial
25 aspect to this directly?

Page 72

B. Williams - by Mr. Bradley
1 
2        Again, sort of what I was asking you
3 with regard to Captain Seilhamer's actions back
4 in the early 1990s. Was there anything that
5 was said or that was done or that was written
6 or that came back to you from a third party
7 that you felt was evidence of some racial
8 motivation other than the fact of it happening?
9    A.   One thing I can say to the fact that
10 Captain Simon came down for the Butler run is
11 once I got there, how I was treated, and the
12 type of questions he was asking me, it was
13 clear the whole thing to me was racially
14 motivated.
15    Q.   When you say how you were treated,
16 are you referring to the fact that there was
17 somebody present to record what was being said
18 at the meeting?
19    A.   That plus his tone. Here is a new
20 troop commander who just took over the troop
21 and didn't know me except to say hi and bye
22 over the years. It was with his very
23 accusatory, negative like who are you and
24 almost like he was some supreme court justice
25 or something, that I'm responding to this

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 73

1      B. Williams - by Mr. Bradley
2  supreme person on high. Explain this to me,
3  why you did this, you know, and on and on and
4  on.
5          If I could backtrack a little bit.
6  The complaint about serving PFAs, that had came
7  up in discussion with me and the union like a
8  year-and-a-half before. What had happened was
9  the judge in Mercer County issued all police
10  departments, that they would have to help serve
11  the PFAs. If they didn't serve them or pick up
12  violators of any court orders, that he would
13  arrest the commanders.
14          I sent that through the chain of
15  command and got them signed and got opinions
16  from our legal counsel to comply with the court
17  order or you go to jail on your own. Every
18  member at Mercer station was aware of that. In
19  fact, it was a joke about -- well, I'm assuming
20  it was a joke. I first heard it, it was a
21  joke, but later on it came back that maybe the
22  guy was serious.
23          It was let's not comply and let
24  Lieutenant Williams go to jail when the judge
25  gave this big speech for violating the order.

Page 74

1      B. Williams - by Mr. Bradley
2  I explained that to Captain Simon. I addressed
3  that issue with the previous commander,
4  Captain Simon, a year-and-a-half before the
5  court order.
6          Everybody was involved in this
7  except for Captain Simon because he was new.
8  Certainly Lieutenant Jungling and the staff
9  with him, he was involved originally, and he
10  sought legal counsel, so he knew. They all
11  knew that before they even called me down there
12  except for maybe Captain Simon.
13  Q.    You also refer in your Complaint to
14  involuntary transfers as evidence of a hostile
15  work environment by the state police. I guess
16  since June 19, 1999, we're talking about
17  two transfers; is that correct?
18  A.    Correct.
19  Q.    That is the transfer from Mercer to
20  Butler as a special projects officer in 2000?
21  A.    Correct.
22  Q.    And the transfer to Erie as the
23  staff lieutenant in 2001, correct?
24  A.    Correct.
25  Q.    Starting with the transfer to

Page 75

1      B. Williams - by Mr. Bradley
2  Butler, who informed you that you were being
3  transferred?
4  A.    Captain Simon, on September 6, he
5  sent me an E-mail.
6          MR. SANDERS: Give us the
7  year.
8          THE WITNESS: September 6,
9  2000.
10  A.    I was at a police chief meeting at
11  the Mercer County Police Chiefs Association.
12  As soon as I got back to the station, I was
13  advised by the station personnel that
14  Captain Simon called and Captain Simon told
15  them that he had sent an E-mail that I needed
16  to address right away.
17          I tried calling him. He was not in
18  the office. I read the E-mail. The E-mail
19  said, "Bill" -- that was another thing. He
20  never called me by my rank. In the state
21  police, you're supposed to call the commanders
22  like Lieutenant Williams. He always from day
23  one called me Bill as opposed to the white
24  lieutenants. He called them by their name and
25  rank. That was from day one from the first

Page 76

1      B. Williams - by Mr. Bradley
2  time he took over the troop. That's another
3  thing I was offended about with him.
4          Anyway, the E-mail said, "As soon as
5  you get back to your station, give me a call."
6  I waited. I called him and got no response. I
7  finally called the desk, and they said he was
8  out to lunch or something.
9          I waited until about 1:30 or 2:00
10  and I got him on the phone. He told me that I
11  was being transferred effective the following
12  Monday, September 11, and for me to pack up my
13  clothes, clean out my office because I was
14  being transferred.
15          I asked him why. He said I believe
16  part of my grievance I filed with -- I can't
17  think of his exact words. Basically, it was,
18  you know I can't tell you why now, but you had
19  problems at Mercer station, and I'm bringing
20  you down here. The commission has created a
21  special slot for you as special projects
22  officer. You will answer to me when you get
23  here.
24          I will give you further details next
25  Monday when you get here. Basically, about a

19 (Pages 73 to 76)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 77

1      B. Williams - by Mr. Bradley
2  ten-minute -- I would not even call it a
3  discussion. It was ten minutes of this is
4  what's going to happen. Get down here, you're
5  transferred.
6      Q.   At that point he gave you no reason?
7      A.   None.
8      Q.   Although he alluded to another
9  matter?
10     A.   I tried asking him if it was related
11 to my ongoing internal investigation and so
12 forth, and he would not answer.
13     Q.   That ongoing investigation was --
14     A.   That was the quota incident.
15     Q.   The alleged quota incident?
16     A.   Yes.
17     Q.   When did the alleged quota incident
18 occur?
19     A.   February 2000.
20     Q.   At the time of that telephone call,
21 the only message you were hearing was that
22 because of this quota incident, you were being
23 transferred?
24          MR. SANDERS: I'm forced to
25 put an objection on the record. I don't think

Page 78

1      B. Williams - by Mr. Bradley
2  the lieutenant said that Simon used the term or
3  words "quota" investigation.
4          MR. BRADLEY: I will withdraw
5  the question.
6      Q.   In your mind, why did you think you
7  were being transferred in 2000?
8      A.   In my mind, I think I was being
9  transferred because of Major Seilhamer's
10 continuation of the events from 1993, 1994,
11 1995, 1996, 1997 with Major Seilhamer, and
12 because Captain Simon was acting as a puppet
13 for Major Seilhamer.
14     Q.   Were there any statements,
15 documents, or remarks by third parties, or
16 comments by others that you ever heard to
17 support your feeling? We're now talking about
18 September of 2000.
19     A.   I don't know.
20     Q.   You're not aware of any?
21     A.   I can't think of any at this time.
22     Q.   You indicated that you were at the
23 Butler station for approximately
24 five-and-a-half months as the special projects
25 officer?

Page 79

1      B. Williams - by Mr. Bradley
2      A.   Correct.
3      Q.   Were you performing duties in that
4  role?
5      A.   The only duty he gave me was I had
6  to make up a Troop OD manual for the troop. I
7  made the manual up, and then he tossed it out.
8          MR. SANDERS: Who is "he"?
9          THE WITNESS: Captain Simon.
10     A.   They never used the manual, never
11 implemented the manual.
12          MR. SANDERS: What does OD
13 stand for?
14          THE WITNESS: Off-duty
15 officer, officer off duty.
16     Q.   Now, when you say "tossed out," does
17 that mean it was never used or never
18 implemented, or do you actually mean you saw
19 Captain Simon throw --
20     A.   They never used --
21          MR. SANDERS: Let him finish
22 the question. Relax.
23     Q.   Are you saying that you actually saw
24 Captain Simon throw it in the garbage can?
25     A.   The manual was never implemented in

Page 80

1      B. Williams - by Mr. Bradley
2  Troop D, and I was made aware of it. I can't
3  think of who it was. I was made aware that the
4  manual that I put together was tossed out.
5      Q.   What do you mean by "tossed out"?
6      A.   In the trash can.
7      Q.   Other than the OD manual, did you
8  have any other assignments as special projects
9  officer?
10     A.   None.
11     Q.   It was from there you had
12 transferred to the staff lieutenant position
13 the Erie?
14     A.   Yes. They gave me a disciplinary
15 transfer to Erie in January. I was advised on
16 January 9, 2001 that I was being transferred
17 effective January 20, 2001 to Troop E, Erie. I
18 filed a grievance.
19     Q.   This was a disciplinary transfer?
20     A.   Correct, along with a ten-day
21 suspension.
22     Q.   That was related to the quota
23 investigation?
24     A.   Correct.
25     Q.   Just from a chronological

Powers, Garrison & Hughes

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 81

1     B. Williams - by Mr. Bradley
2  standpoint, there was a finding that you had
3  imposed a quota at the Mercer station. As a
4  result, you were ordered to be suspended for
5  ten days and transferred to Erie; is that
6  correct?
7     A.   No. Are you saying there is a
8  finding? A finding by who? I guess I don't
9  understand the question.
10    Q.   I'm saying that at some point -- I'm
11 not talking about how it ended up at the end,
12 but at some point, there was a determination
13 made that you had imposed a quota at Mercer
14 station.
15         MR. SANDERS: Just so you
16 understand -- because you're not using the word
17 "accusation." You're using "determination."
18 He's thinking you're asking about the final
19 arbitrator's decision.
20    Q.   What I'm asking about is the basis
21 for your disciplinary transfer. I assume that
22 before you can be disciplined, there has to be
23 a finding. Is that not a correct assumption?
24    A.   Correct.
25    Q.   That is correct?

Page 82

1     B. Williams - by Mr. Bradley
2     A.   Correct. Captain Simon advised
3  me -- I believe it was on September 20 or
4  September 15, that he --
5         MR. SANDERS: Of 2000?
6     A.   2000, that he determined that I had
7  set some kind of quota at Mercer station, which
8  I clearly denied.
9     Q.   I understand that. Again, I'm only
10 talking chronologically now. I'm not talking
11 about who was right or who was wrong.
12         Chronologically, there was a finding
13 that you had imposed a quota at Mercer. As a
14 result of that, you were ordered to be
15 suspended for ten days and ordered to be
16 transferred to Erie; is that correct?
17    A.   Yes.
18    Q.   As I understand it, you did file a
19 grievance.
20    A.   Correct.
21    Q.   As a result of that grievance, the
22 suspension was lifted?
23    A.   It was put on hold.
24    Q.   It was put on hold. Now, as a
25 result of the finding, you were actually

Page 83

1     B. Williams - by Mr. Bradley
2  transferred to Erie?
3     A.   Correct.
4     Q.   At that time, were you suspended at
5  any point?
6     A.   Yes, for about 45 minutes on
7  February 20.
8         MR. SANDERS: Of what year?
9         THE WITNESS: 2001.
10    Q.   Would that be part of the ten days?
11    A.   Yes.
12    Q.   That was the time it took you to
13 file the grievance?
14    A.   No. I had already filed the
15 grievance. I filed the grievance back in
16 January, I think January -- I can't think of
17 the date.
18         MR. SANDERS: 2001.
19    A.   2001.
20    Q.   Maybe this would be a better way to
21 do it since you're more familiar with this
22 process than I am. Captain Simon made a
23 finding that you had imposed a quota at Mercer
24 station. He made that recommendation up the
25 line. Then an order was sent out suspending

Page 84

1     B. Williams - by Mr. Bradley
2  you ten days and transferring you to Erie?
3     A.   Correct. He made that through
4  Major Seilhamer up through the chain of command
5  up to Captain Titler, the disciplinary officer.
6     Q.   Can I have the spelling of that?
7     A.   Barry Titler, T-I-T-L-E-R. He
8  rendered his decision, I believe, I received it
9  on January 9, 2001. I think it was dated
10 January 4, 2001, but I received it on
11 January 9, 2001.
12    Q.   That is Captain Titler's decision?
13    A.   Correct.
14    Q.   That's the discipline that we're
15 talking about?
16    A.   Correct.
17    Q.   The ten-day suspension and the
18 transfer to Erie?
19    A.   Yes.
20    Q.   Once you received that disciplinary
21 sanction, what happened next?
22    A.   I filed a grievance, which should
23 have blocked the transfer and the ten-day
24 suspension, but it didn't. They transferred me
25 anyway.

21 (Pages 81 to 84)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 85

1       B. Williams - by Mr. Bradley
2    Q.   The suspension was blocked?
3    A.   All but 45 minutes of it.
4    Q.   Was that 45 minutes on the front end
5  or the back end, if you understand the
6  question?
7    A.   Let me explain because they didn't
8  dock my pay, but if I may explain?
9    Q.   Sure.
10   A.   I arrived in the troop on
11  January 24. I was transferred on the 20th,
12  which was Saturday. I must have reported maybe
13  January 22.
14       MR. SANDERS: To Erie?
15       THE WITNESS: To Erie,
16  Troop E, Erie.
17   A.   Captain Conley advised me that he
18  had been advised that I was to serve a ten-day
19  suspension along with the transfer. He was
20  going on vacation or something. He stated that
21  at some point in the next month or two, he
22  would actually have me serve the ten-day
23  suspension.
24       He decided on sometime in February.
25  He had the acting troop commander -- Captain

Page 86

1       B. Williams - by Mr. Bradley
2  Conley was gone on vacation or maybe he was on
3  some kind of assignment for the state police,
4  but he was gone -- the acting troop commander,
5  who was another junior lieutenant to me, came
6  to my office --
7       MR. SANDERS: Whose name is?
8       THE WITNESS: Lieutenant
9  Johnson, he was acting lieutenant.
10   A.   He approached me on the morning of
11  February 20. I believe it was Monday or
12  Tuesday. Anyway, February 20 he approached me
13  and said, hey, you need to start serving your
14  ten-day suspension. Give me your badge, give
15  me your gun and so forth.
16       I then turned in my badge, my gun
17  and my ID card. I gave it all to him. I
18  prepared to leave the station. I was packing
19  my civilian clothing. I called my son to come
20  pick me up, you know, to bring my personal car
21  to me.
22       My son had arrived. I was packing
23  my civilian clothes into my car. He approached
24  me again, and he said he had double-checked
25  with Harrisburg. Harrisburg said that because

Page 87

1       B. Williams - by Mr. Bradley
2  I had filed a grievance not to force me to take
3  the ten-day suspension. So that's why I say it
4  was for 45 minutes.
5    Q.   That's the calculation in your own
6  mind; is that correct? There is nowhere I
7  could look at a state police document and see
8  that you served only 45 minutes of the
9  suspended sentence?
10   A.   It lasted exactly 45 minutes because
11  I timed it. I was aware of the time. Like I
12  say, he reversed it, so there's nothing in
13  writing because on paper as far as that day is
14  concerned, I worked from eight to four.
15   Q.   You received pay for that entire
16  period?
17   A.   Correct.
18   Q.   Let me take a step back.
19  Captain Simon made the initial determination
20  that you had imposed a quota at Mercer. Did he
21  make any recommendation as to punishment?
22   A.   He recommended that I be punished.
23  He does not set the degree of punishment.
24   Q.   He made a finding and recommended
25  that discipline be imposed?

Page 88

1       B. Williams - by Mr. Bradley
2    A.   Correct.
3    Q.   Did he make any recommendation as to
4  what discipline should be imposed?
5    A.   He's not allowed.
6    Q.   Do you know who ultimately made the
7  determination of the discipline in the case?
8    A.   The name on the document was
9  Captain Barry Titler, disciplinary officer.
10   Q.   I believe from your Complaint that
11  you're suggesting that this disciplinary
12  transfer to Erie was also racially motivated.
13  Is that correct?
14   A.   Correct.
15   Q.   Do you have any evidence to support
16  that contention given the fact that at least
17  the paperwork shows that it was based on this
18  finding of a quota?
19   A.   No white lieutenant has ever been
20  transferred for that alleged allegation that
21  everybody knew was totally false. Everybody
22  involved in the process like Simon, Titler, and
23  the commissioner. They all knew it was false.
24   Q.   They have never come forward and
25  said it was false, have they?

Powers, Garrison & Hughes

Page 89

1    B. Williams - by Mr. Bradley
2    A.   Not to me they haven't.
3    Q.   As far as you know, you don't have
4   any evidence to the contrary to show that
5   Captain Simon didn't believe that you had
6   imposed a quota?
7    A.   He told a news reporter twice on
8   two occasions, on February 17, 2000 and
9   September 27, 2000, that there was no quota at
10  Mercer station. He told the news reporter, so
11  clearly he knew that there was no quota, but he
12  still punished me.
13        Otherwise, if there was a quota at
14  Mercer Station, why would he tell the news
15  reporter who represented the citizens of
16  Pennsylvania there is no quota, but then he was
17  still punishing me? It made no sense to me.
18  Like I said, he knew there was no quota at
19  Mercer station.
20   Q.   Other than those statements, is
21  there any evidence that you have that anything
22  that occurred in this process from
23  Captain Simon's finding up to Captain Titler's
24  discipline order, is there evidence that you
25  have that would reflect a racial motivation?

Page 90

1    B. Williams - by Mr. Bradley
2      MR. SANDERS: Other than what
3   he has already told you, that it went through
4   Seilhamer to get to Titler? Other than that?
5        THE WITNESS: None that I can
6   think of right now.
7    Q.   Again, your position is that this is
8   reflective of this past relationship and
9   pattern you've had with Captain Simon and
10  Major Seilhamer?
11   A.   Major Seilhamer along with
12  Captain Simon once he took over.
13   Q.   You also in the Complaint refer to
14  racist behavior of your subordinates. I know
15  that we have talked about some things that
16  happened at the Mercer station in 1994, 1995
17  and 1996.
18        Since June of 1999, were there any
19  incidents -- and I guess this would be June of
20  1999 up until your transfer to Butler -- at the
21  Mercer station that you would categorize as
22  racist behavior by any of the troopers at the
23  Mercer station?
24   A.   I was aware that some of the members
25  would continue to call me Slappy in 1991 behind

Page 91

1    B. Williams - by Mr. Bradley
2   my back. I was aware of another picture of me
3   drawn in one of the dictionaries in 1999.
4   Those are the only two I can think of at this
5   time. That, along with all of the false
6   complaints that were routinely done against me.
7    Q.   That picture you referred to, is
8   that the picture you provided today, or is that
9   a similar picture?
10   A.   Similar picture.
11   Q.   The one you provided today was from
12  1994 or 1995?
13   A.   That was in, I believe, 1995 or 1996
14  approximately.
15   Q.   You indicate that there was a second
16  drawing.
17   A.   I think there were as many as two or
18  three of them between 1995 and 1999 that I saw.
19   Q.   I'm talking between 1999 between the
20  time you had your conversation with
21  Captain Simon and he asked you to explain
22  yourself with regard to seven issues from the
23  time of that telephone call until your transfer
24  to Butler?
25   A.   I believe there was one instance.

Page 92

1    B. Williams - by Mr. Bradley
2    Q.   One instance involving the picture?
3    A.   Yes, that I saw.
4    Q.   Now, at Butler you didn't have any
5   subordinates in your position as special
6   projects officer, did you?
7    A.   Did not.
8    Q.   Notwithstanding that, were there any
9   things that occurred in the time period that
10  you were at the Butler headquarters in 2000
11  that you felt were racist behavior directed
12  toward you?
13   A.   First of all, they put me in a room,
14  a little tiny office that had a little window
15  in the door like a jail cell. I noticed quite
16  a few people walk the hall, look in the window,
17  and occasionally laugh and make little
18  comments. I was highly offended from it.
19        It was the only office on the second
20  floor at Butler station that had a little
21  window on the door. All the other offices got
22  solid doors, but they stuck me in that room.
23  The room had like jail cell glass in it about
24  like that (indicating).
25   Q.   You were holding your hands together

Page 93

1      B. Williams - by Mr. Bradley
2  in something approximating a circle?
3      A.    Approximately a square foot, about
4  12 inches by 10 foot by 12 inches tall by
5  10 foot (sic) wide.
6      Q.    Ten inches?
7      A.    10 to 12 inches.  About like that
8  (indicating) in the door.
9      Q.    You said ten feet.
10     A.    I mean inches.  I'm sorry.
11     Q.    You indicated that you heard
12 comments and laughing as people --
13     A.    Laughing in the hallway --
14          MR. SANDERS:  Lieutenant,
15 relax.  Drink your water.  Let Scott get a word
16 in.  Otherwise the poor lawyer here is not
17 going to get a chance to get his full question
18 in.  I don't even know how Marlene is doing.
19 We'll see it later.
20     Q.    Did you ever hear any of those
21 comments?
22     A.    I heard the laughing.
23     Q.    You don't know what they were
24 saying?
25     A.    No.

Page 94

1      B. Williams - by Mr. Bradley
2      Q.    Other than that, was there anything
3  that occurred at Butler that you would describe
4  as racist behavior directed toward you?
5      A.    I never personally heard the
6  comments, but I was made aware that the joke
7  around Butler was that Lieutenant Williams was
8  upstairs sitting in his jail cell.
9      Q.    Again, that's related to the office
10 that you had.  Were there any other incidents
11 at Butler that you can recall at this time that
12 you feel was racially directed toward you,
13 racist behavior directed toward you?
14     A.    None I can think of right at this
15 time.
16     Q.    Did you ever make a request to be
17 moved out of that office?
18     A.    Yes, I did.
19     Q.    Who did you make that request to?
20     A.    Captain Simon and Lieutenant
21 Jungling.
22     Q.    What did they say to you?
23     A.    No.
24     Q.    Did they give you a reason?
25     A.    No.

Page 95

1      B. Williams - by Mr. Bradley
2      Q.    How many times did you request that?
3      A.    I submitted a written request for a
4  transfer out to New Castle station once and was
5  denied.
6      Q.    I think you answered a different
7  question.  The question I'm asking you is did
8  you ever complain about being put in that
9  office that you felt was like a jail cell?
10     A.    No.
11     Q.    You indicated that you made a
12 request for a transfer to a different station.
13     A.    Correct.
14     Q.    That was denied?
15     A.    Correct.
16     Q.    While at Troop E in Erie as the
17 staff lieutenant, I assume that you had
18 subordinates?
19     A.    Correct.
20     Q.    Was there anything occurring there
21 that you feel was racist behavior by your
22 subordinates at Troop E in Erie?
23     A.    My subordinates underneath me, or
24 the subordinates that work at the barracks?
25     Q.    Let's start with directly underneath

Page 96

1      B. Williams - by Mr. Bradley
2  you.
3      A.    No.
4      Q.    Now, moving on to the barracks.
5      A.    Other subordinates, yes.
6      Q.    What form did that take?
7      A.    On numerous occasions, personnel at
8  the Erie station refused to salute me on an
9  ongoing basis since day one even though state
10 police regulations require daily saluting of
11 commissioned officers.
12          (Discussion held off the
13 record.)
14     A.    That only happened that I noticed
15 towards me and not the other commissioned
16 officers.  That's only about five or six people
17 at the Erie station.
18     Q.    Are there other African-American
19 officers at the Erie station?
20     A.    No.
21     Q.    Was Captain Conley saluted when he
22 was at the Erie station?
23     A.    Yes.
24     Q.    Is Captain Conley African-American?
25     A.    Correct.

24 (Pages 93 to 96)

Page 97

1    B. Williams - by Mr. Bradley
2    Q.   But there are now no other
3    African-American officers?
4    A.   I'm the only lieutenant commissioned
5    officer in the entire troop.
6    Q.   Are there any other activities by
7    troopers not under your command that you would
8    characterize as racist behavior directed at
9    you?
10           MR. SANDERS:  In Erie.
11    Q.   In Erie.
12    A.   None I can think of right now.  If I
13    may, I just thought of something.  The state
14    police had a policy about the chain of command.
15    I noticed that the Erie chain of command is
16    skipped quite a bit when it comes to me by
17    other commissioned officers and by
18    subordinates.
19    Q.   Can you give one example of that?
20    A.   Yes.  Trooper Rogers, he works in
21    drug law in Erie.  He was assigned or he worked
22    for drug law out in Harrisburg.  He was given
23    an office in the next building that the state
24    police rent next to the state police barracks
25    in Erie.  He had an office there.

Page 98

1    B. Williams - by Mr. Bradley
2           He didn't like having to walk over
3    to the office.  He bypassed me because I had an
4    office under my command which had a trooper in
5    it.  My troop communications specialist was in
6    the office.  Trooper Rogers had an office next
7    door.  He bypassed me and went to the crime
8    lieutenant and asked the crime lieutenant for
9    his permission to give up his office next door
10    and move into the staff office where the troop
11    communications specialist was.
12           He intentionally bypassed me knowing
13    that I was the second commander.  The crime
14    lieutenant gave approval to it.  When I found
15    out about it and objected to it, he said he
16    sent me an E-mail as to he had done it and had
17    given him permission to move.
18    Q.   Let me just stop you there.  Who
19    sent you the E-mail?
20    A.   Lieutenant Johnson.
21    Q.   He's the one that approved
22    Trooper Rogers' request?
23    A.   Correct.  When I found out about it,
24    I basically went through the roof and told him
25    no, he was not moving there.  Then I approached

Page 99

1    B. Williams - by Mr. Bradley
2    the captain and brought it to the captain's
3    attention.  The captain told me that Rogers had
4    gone to him also, and they had given him
5    approval.  I advised the captain --
6           MR. SANDERS:  Whose name is?
7           THE WITNESS:  Captain Michael
8    Hample.
9    A.   -- Captain Hample, that I was
10    concerned about the space and also about the
11    fact that I was concerned about having a dog
12    cage.  He brought his dog cage over and stuck
13    it in the staff office.  It was a tiny office,
14    so I was kind of offended.
15           He had an office next door, and
16    there is no reason I can think of that he
17    should get out and the staff would give up his
18    office and all that space over there basically
19    because he is too lazy to walk across the
20    alleyway; and also hiding out in the staff
21    section that dog cage.  That dog cage is still
22    there to this day in that office.  It has been
23    dismantled and folded together, but it's still
24    there.
25    Q.   Have you made any complaints to your

Page 100

1    B. Williams - by Mr. Bradley
2    supervisor regarding these incidents where
3    other troopers refused to salute you or where
4    you were skipped in the chain of command?
5    A.   I did to Captain Conley about the
6    salute.  He addressed the issue.  I did not
7    mention it to Captain Hample because
8    Captain Hample had stated in his policy that he
9    does not like saluting, which is against state
10    police rules and regulations, he does not like
11    saluting.  So I figure there is no one to go
12    to.
13    Q.   With respect to being skipped in the
14    chain of command, you gave the one example.
15    Without going into them, do you feel there are
16    other instances where you had been skipped in
17    the chain of command at Erie?
18    A.   It's a daily occurrence now.
19    Q.   Have you made complaints to
20    Captain Hample?
21    A.   No.  That's his management style.
22    When he took over the troop, he basically said
23    that he did not believe in sticking to the
24    chain of command and he preferred not saluting.
25    He just didn't like the idea of saluting every

25 (Pages 97 to 100)

Page 101

1    B. Williams - by Mr. Bradley
2  day. Based on that, I figured to not mention
3  it to him.
4    Q.  You have never brought that up to
5  anybody within the state police at a level
6  above you?
7        MR. SANDERS: He's asking you.
8    A.  I brought it up to Captain Conley.
9        MR. SANDERS: Other than
10 Conley.
11   A.  Other than Conley, no.
12   Q.  Just to complete the record, you
13 indicated that you had filed a grievance
14 regarding the discipline that was imposed by
15 Captain Titler based on the finding made by
16 Captain Simon. What was the ultimate result of
17 that grievance?
18   A.  The ten-day suspension was denied.
19 I will show you the rule that he did not
20 believe -- I forget how he worded it -- that I
21 set a quota at Mercer station. There was no
22 quota that had been set at Mercer station. The
23 personnel supervisor who came up with that
24 allegation basically fabricated that
25 allegation.

Page 102

1    B. Williams - by Mr. Bradley
2    Q.  The suspension was lifted?
3    A.  Correct.
4    Q.  You never had to serve that?
5    A.  Correct.
6    Q.  What happened with respect to the
7  transfer?
8    A.  He allowed the transfer based on
9  alleged job performance. It was never
10 addressed by the union.
11   Q.  The decision by the arbitrator, did
12 you have any way to challenge that?
13   A.  No. Arbitrators, as per state law,
14 their decisions are final.
15   Q.  Since being transferred to Erie,
16 have you made formal requests to be transferred
17 out of Erie?
18   A.  No, because of the ongoing
19 grievance. I filed a lawsuit.
20   Q.  Pardon me?
21   A.  Because of the filing of the EEOC
22 complaint and the filing of the lawsuit.
23   Q.  Until this day, you have never made
24 a request to be transferred from Erie?
25   A.  No.

Page 103

1    B. Williams - by Mr. Bradley
2    Q.  Page 3 of the Complaint, I believe
3  this is referring to the suspension and
4  transfer. You refer to Lieutenants Grolemund,
5  Brown and Jungling. If we could take those one
6  at a time. You indicate that they were neither
7  suspended or transferred under similar
8  circumstances.
9        Let's begin with Lieutenant
10 Grolemund. First, could you identify who he
11 is.
12   A.  Francis Grolemund. He is retired.
13 He was the station commander at New Castle and
14 then at Mercer.
15   Q.  He was the station commander at
16 Mercer prior to you?
17   A.  After me.
18   Q.  After you?
19   A.  Correct. He has since retired.
20   Q.  What is it that he did that you feel
21 he was not suspended or transferred for?
22   A.  Basically, the same type or they are
23 all station commanders or staff. I was doing
24 the exact same thing they were for day-to-day
25 orders and regulations and enforcing them. I

Page 104

1    B. Williams - by Mr. Bradley
2  got punished and transferred for issuing the
3  same type of orders that they were doing. They
4  never got transferred for the same type of
5  orders. They never got transferred or never
6  got punished.
7    Q.  With respect to them, we're not
8  talking about the quota investigation.
9    A.  Correct.
10   Q.  We're just talking about the manner
11 in which they ran their station?
12   A.  Correct.
13   Q.  You're indicating that you were
14 doing the same things they were doing, and yet
15 you were suspended and transferred?
16   A.  Same orders, same directive,
17 correct.
18   Q.  At least with respect to the
19 suspension and the transfer to Erie, at least
20 as far as the documentation goes, that was
21 based on a finding that you had imposed a quota
22 at Mercer; is that correct?
23   A.  Also based on alleged poor work
24 performance at Mercer station, which was not
25 part of the internal investigation.

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 105

1      B. Williams - by Mr. Bradley
2      Q.   As far as that goes, would you agree
3  that Lieutenants Grolemund, Brown and Jungling
4  had never been subjected to a finding that they
5  had imposed a quota?
6      A.   As far as I know, that is correct.
7      Q.   Again, I understand that it's your
8  position that you were running your station in
9  the same manner they were running their
10 station, and you were suspended and transferred
11 and they were not.
12     A.   I was giving out the same orders
13 that any other state police would issue on a
14 day-to-day basis, but false complaints and
15 allegations were made against me because they
16 did not want a black commander at Mercer
17 station in my opinion.
18     Q.   By "they," who do you mean?
19     A.   Major Seilhamer, Ray Meldar, the ROP
20 person, certain members of the Mercer station,
21 and Captain Simon.
22     Q.   Who was the station commander before
23 you took over at Mercer station?
24     A.   Lieutenant Greg Patterson.
25     Q.   What is his race?

Page 106

1      B. Williams - by Mr. Bradley
2      A.   African-American.
3      Q.   Do you know how long he was station
4  commander at Mercer?
5      A.   Two years before he was arrested and
6  retired.
7      Q.   Are you saying that his position
8  became available because he retired?
9      A.   No, I stand corrected. He was at
10 Mercer station as a station commander before I
11 got there. He was given a lateral transfer to
12 Troop S. At one point, there were two
13 lieutenants at Mercer. One was in charge of
14 Troop S. This section, he was in charge of
15 Meadville and Mercer Troop S troopers.
16       The barracks was basically divided
17 in half. They had two commands under one
18 barracks. Shortly after that, sometime within
19 a year after that --
20     Q.   What is that? Your arrival at
21 Mercer as station commander?
22     A.   Right. I got there in 1993,
23 somewhere around 1994. Like I say, I replaced
24 him as a commander of Troop D part of the
25 barracks. He moved laterally and took over

Page 107

1      B. Williams - by Mr. Bradley
2  command of Troop S. He was in the same
3  building and he was in charge of Troop S.
4      Shortly after that, he got arrested
5  for some problems and had to retire.
6      Q.   How long after that did that occur,
7  do you know?
8      A.   Best guess, about a year-and-a-half.
9      Q.   That would take it to about 1994 or
10 1995?
11     A.   Somewhere in there, yes.
12     Q.   Again, just for the record,
13 Lieutenant Grolemund, Lieutenant Brown and
14 Lieutenant Jungling, they're white?
15     A.   Caucasian, correct.
16     Q.   You indicated that the discipline
17 order came on January 9, 2001, approximately?
18     A.   That's when I signed it. It was
19 dated I think January 4 or January 5. I signed
20 it, and I received it January 9.
21     Q.   Between January 9, 2001 when you
22 signed the discipline order and April 16, 2001
23 when you signed the PHRC complaint, was there
24 any event that occurred that made you decide to
25 file the complaint?

Page 108

1      B. Williams - by Mr. Bradley
2      MR. SANDERS:  You're talking
3  about Exhibit No. 1?
4      MR. BRADLEY:  Yes.  Exhibit
5  No. 1.
6      MR. SANDERS:  He signed it on
7  April 16, 2001.
8      MR. BRADLEY:  I'm sorry.  What
9  did I say?
10     MR. SANDERS:  April 9.
11     MR. BRADLEY:  I'm sorry.  Let
12 me rephrase the question.
13 BY MR. BRADLEY:
14     Q.   From the time you signed the
15 disciplinary order on January 9, 2001 until the
16 time you signed the PHRC complaint, which is
17 Exhibit No. 1, on April 16, 2001, was there
18 anything that occurred that in your mind caused
19 you to file the complaint?
20     A.   Yes.  The transfer to Erie that took
21 place on January 20.  They punished me.
22     Q.   Was there any other event or was the
23 transfer to Erie sort of the straw that broke
24 the camel's back, for lack of a better term?
25     A.   The combination of the

27 (Pages 105 to 108)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 109

1    B. Williams - by Mr. Bradley
2    two transfers. Then the final thing that broke
3    the camel's back was that whole event. The
4    whole sequence of events was why I filed that
5    complaint.
6        Q.    Did you ever appear, testify, or
7    make any oral statements at any PHRC or EEOC
8    proceedings or hearing that were based on the
9    complaint at Exhibit No. 1?
10       A.    Are you talking about the Human Relations
11   preconference hearing or something with the Human Relations
12   committee?
13           MR. SANDERS: Yes.
14       A.    Yes, myself, Corporal Tyzinski,
15   Captain Simon and the FOP, the state police
16   attorney was there July 2, 2001 in Pittsburgh.
17       Q.    Did you offer any testimony at that
18   proceeding?
19       A.    Yes. I think they called it a
20   preconference hearing or something to that
21   effect, a meeting, a preconference meeting.
22       Q.    Other than the Complaint itself --
23   and not referring to any preexisting state
24   police documents or things that you may have
25   prepared in the course of your employment with

Page 110

1    B. Williams - by Mr. Bradley
2    the state police -- did you make or file any
3    written statements with the PHRC?
4        A.    I think I did, but I'm not sure at
5    this time. I think there is some other
6    paperwork I submitted besides this
7    (indicating).
8            MR. SANDERS: He means other
9    than you referring to Exhibit No. 1.
10       A.    I believe I did, but I'm not sure at
11   this time.
12       Q.    Would that have been something on a
13   PHRC form that you filled out?
14           MR. SANDERS: If you recall.
15       A.    I don't recall at this time.
16       Q.    Are you familiar with the state
17   police harassment and discrimination policies?
18       A.    Yes. They were not followed in my
19   case.
20       Q.    Under that policy, if you have a
21   complaint of discrimination, what options are
22   available to you?
23       A.    I don't understand the question.
24       Q.    If you feel you're being
25   discriminated against in your employment with

Page 111

1    B. Williams - by Mr. Bradley
2    the state police, under their policies, what
3    are you supposed to do?
4        A.    Under their policies, I have the
5    right to take it up with my supervisor, which
6    has been one of the persons that perpetrated
7    against me. Also, his supervisor is the main
8    person, so basically, I had no options; or I
9    could try to discuss the matter with the
10   department EEOC officer.
11       Q.    Did you ever discuss the problem
12   with the EEOC officer?
13       A.    Yes. It was a very frustrating
14   waste of time.
15       Q.    Who was that?
16       A.    She did nothing.
17       Q.    Who was that individual?
18       A.    Lieutenant Marcy Robinson.
19       Q.    Marcy Robinson?
20       A.    Correct. She has since given up
21   that position. She gave it up this year. She
22   decided and I heard she was telling people that
23   it was just a figure-head job. She had no
24   authority, so she transferred out.
25       Q.    When did you talk with her?

Page 112

1    B. Williams - by Mr. Bradley
2            MR. SANDERS: What year?
3        A.    2003.
4        Q.    At any time prior to 2003, did you
5    speak with her?
6        A.    Not with her, but her previous EEOC
7    officer, Major Virginia Smith, I spoke to her
8    in 1994, 1997, and informally in 2001.
9        Q.    You indicated that there were
10   three years that you spoke to Virginia Smith.
11   Would that have been on one occasion in each
12   year?
13       A.    I don't recall. That sounds about
14   right. I don't recall. It could have been
15   more than once. In 1995 I think was more than
16   one occasion. In 1995 I think it was three or
17   four occasions.
18       Q.    Do you recall speaking to her in
19   1998?
20       A.    I don't recall to be specific. I
21   spoke with her quite a few times formally and
22   informally. When I was down in Harrisburg, I
23   might run into her. We would talk, and she
24   would ask me how things were going. I would
25   tell her about the discriminatory things and so

28 (Pages 109 to 112)

Page 113

1    B. Williams - by Mr. Bradley
2  forth. I seen her quite a bit over the years
3  until she retired in 2002 or 2001.
4        MR. SANDERS:  You're talking
5  about Virginia Smith?
6        THE WITNESS:  Virginia Smith,
7  right.
8     Q.   Did you ever make any formal
9  complaints to Virginia Smith?
10    A.   Yes, I did.
11    Q.   When would those have occurred?
12    A.   1995 or 1996.
13    Q.   Any other years?
14    A.   No. She actually came out here and
15  arranged a meeting between me and -- myself and
16  Major, then-Captain, Seilhamer to try to
17  resolve the issues. I met her down in Butler.
18    Q.   When was that meeting?
19        MR. SANDERS:  Was it
20  pre Mercer or post Mercer?
21    A.   It was in Mercer.
22        MR. SANDERS:  No. Pre Mercer
23  or post Mercer, to help Scott. Was it while
24  you were already the station commander in
25  Mercer or was it before?

Page 114

1    B. Williams - by Mr. Bradley
2        THE WITNESS:  While I was
3  station commander in Mercer. It was 1995. I
4  got there in 1993. This was in 1995 or 1996.
5    Q.   That you had these meetings?
6    A.   Correct.
7    Q.   I think from your testimony you have
8  indicated that after 1997 you didn't make any
9  formal contact with Virginia Smith in her role
10  as the EEOC officer until sometime in 2001?
11    A.   I believe I wrote her a letter in
12  1997 or 1998. It was a letter about the
13  ongoing discrimination problems -- I believe in
14  1997. It could have been 1998, but I think the
15  letter to the best of my memory is 1997 --
16  discrimination problems with Captain Seilhamer
17  and Mercer station personnel.
18    Q.   Other than speaking with either
19  Virginia Smith or Marcy Robinson, did you make
20  any other formal complaints to anybody in the
21  state police about discrimination?
22    A.   Yes, two commissioners, Paul Evanko,
23  June 7 of 2000. In fact, I went to Attorney
24  Greg Markman. I wrote him a letter complaining
25  about my treatment, harassment treatment at

Page 115

1    B. Williams - by Mr. Bradley
2  Mercer station.
3        On August 10 of 2001, I sent a
4  letter to the Commissioner Paul Evanko with an
5  internal investigation complaint, a 13-page
6  complaint alleged about violation of letters of
7  discrimination, violations of civil rights,
8  violations of constitutional rights, and so
9  forth, and the state police would not conduct
10  an investigation.
11        I asked for a personal meeting with
12  Commissioner Evanko, and he denied my request
13  for the personal meeting to discuss the issues.
14  I then followed up with the new Commissioner
15  Miller in January of 2003.
16        I then sent in a request with a
17  complaint with an internal investigation
18  worksheet about the discrimination practices of
19  Captain Simon and Major Seilhamer. Again, I
20  was denied an investigation, and I was also
21  denied a personal meeting with the
22  commissioner.
23    Q.   With respect to those actions, let's
24  start with the Markman letter that was sent in
25  June 2000 you said?

Page 116

1    B. Williams - by Mr. Bradley
2    A.   Correct.
3    Q.   Do you know what, if any, response
4  the state police made to that letter?
5    A.   Yes. They had Major Seilhamer
6  conduct a supervisor investigation.
7    Q.   What was the results of that
8  investigation?
9    A.   I have no idea. He never told me.
10  I do know that Captain Simon's actions towards
11  me escalated. He continued his harassment and
12  discrimination, so it had no effect. It didn't
13  stop anything.
14    Q.   After June 2000, that's the time
15  frame we're talking about, what discrimination
16  -- was it Captain Simon or Major Seilhamer that
17  you just referred to?
18        MR. SANDERS:  Both.
19    A.   Both. Major Seilhamer conducted the
20  supervisor investigation. It's an
21  investigation that is less than a full internal
22  investigation.
23    Q.   Other than the transfers that we've
24  already talked about, since June of 2000, what
25  had Seilhamer and Simon done towards you that

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 117

1       B. Williams - by Mr. Bradley
2   you believe is discriminatory?
3       A.   After June of 2000?
4       Q.   Yes.
5       A.   Seilhamer and Simon continued to
6   punish me by the transfer. He allowed Simon to
7   transfer me despite knowing that the
8   allegations were false, knowing that his
9   request or reason for transferring me was
10  totally false.
11      Q.   Other than the transfer, is there
12  anything Major Seilhamer or Captain Simon have
13  done to you since of June 2000 that you feel is
14  discriminatory?
15      A.   Yes. He cut my manpower.
16          MR. SANDERS:  Who is "he"?
17          THE WITNESS:  Both.
18      A.   It took both of them to do it. They
19  cut manpower at Mercer station which forced me
20  to go out on the road as a road supervisor and
21  in the capacity of a corporal. When I
22  requested overtime, they denied the overtime.
23          MR. SANDERS:  Who is "they"
24  and "he"?
25          THE WITNESS:  Seilhamer and

Page 118

1       B. Williams - by Mr. Bradley
2   Simon. They denied my station of overtime that
3   they approved for other stations for
4   supervision. They denied it for my station,
5   which in effect meant that I personally had to
6   go out on the road and perform the duties of
7   the corporal because the state police
8   regulations required a road supervisor.
9       I had a number of supervisors on
10  either restricted duty or away for training or
11  on sick leave, so by not approving overtime, it
12  meant that it forced me out the door. That was
13  only at my station that they had that policy.
14  BY MR. BRADLEY:
15      Q.   Again, other than the fact it was
16  directed to you and not to anybody else, do you
17  have any evidence that that was racially
18  motivated?
19      A.   No. I think by circumstantial
20  evidence it's clearly indicated in my opinion
21  it's racially motivated. It only impacted me.
22      Q.   Other than that, cutting the
23  manpower at Mercer station and the transfers,
24  was there anything else after June 2000?
25      A.   Nothing I can think of at this time.

Page 119

1       B. Williams - by Mr. Bradley
2          MR. SANDERS:  Other than what
3   you already talked about which includes the
4   office in Butler.
5          THE WITNESS:  Yes, correct.
6       Q.   Let's just pick 1995 since there was
7   at that point some ongoing things at the Mercer
8   station. Do you believe that since 1995 every
9   state police decision that has been made
10  affecting your employment or your position has
11  been based on your race?
12      A.   I don't know about every single
13  decision, but in my opinion most of them were.
14      Q.   Was there a time when you first
15  began to believe that most of the decisions
16  being made that affected your employment were
17  based on your race?
18          MR. SANDERS:  You're asking
19  him for a year?
20          MR. BRADLEY:  Yes.
21      A.   1994.
22      Q.   Was there any specific event that
23  occurred in 1994 that caused you to believe
24  that, or was there an accumulation of things
25  that happened up to that point?

Page 120

1       B. Williams - by Mr. Bradley
2       A.   Accumulation plus the transfer from
3   Mercer to Butler for the phony reason of being
4   the acting crime lieutenant with no duties, and
5   then the denial of over 200 hours of overtime.
6       Q.   Is that the overtime that you were
7   able to recoup through your grievance?
8       A.   No.
9       Q.   That's applied to an investigation
10  that you were doing?
11      A.   It was a murder investigation that
12  he took me off of and put a white lieutenant in
13  charge of the investigation, even though I was
14  the designated crime lieutenant.
15          Even though state police rules and
16  regulations and the troop policy require that I
17  be in charge of a murder investigation,
18  Captain Simon removed me from the first day.
19  He took me off the murder investigation and
20  denied me over 200 hours of overtime.
21      Q.   Just to be clear, you didn't work
22  that 200 hours. You would have been able to
23  work that 200 hours if you had been allowed to
24  remain as the primary investigator?
25      A.   He ordered me off the investigation,

30 (Pages 117 to 120)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 121

1    B. Williams - by Mr. Bradley
2  and he turned the investigation over to a white
3  junior lieutenant.
4    Q.   I understand that, but you didn't
5  work 200 hours that weren't compensated --
6    A.   No, and I --
7          MR. SANDERS:  Wait. Relax.
8  Let him ask the question.
9    Q.   You weren't denied compensation for
10  200 hours you worked. You were denied the
11  opportunity to work those 200 hours?
12    A.   Correct.
13    Q.   You grieved all the issues; is that
14  correct?
15    A.   Correct.
16    Q.   You did not prevail on the grievance
17  as to that issue?
18    A.   As to the issue of the overtime, I
19  did not prevail, correct.
20    Q.   As to the reassignment of the murder
21  investigation?
22    A.   They were one in the same collated
23  together, 200 hours deprived from a murder
24  investigation.
25    Q.   You also make claims in the criminal

Page 122

1    B. Williams - by Mr. Bradley
2  Complaint that the state police have taken
3  certain acts of retaliation --
4          MR. SANDERS:  You mean civil.
5  You said criminal.
6          MR. BRADLEY:  I'm sorry. I
7  misspoke.
8    Q.   With respect to the civil complaint
9  that you filed against the Pennsylvania State
10  Police at No. 03239-E, you indicate that the
11  state police took acts of retaliation against
12  you?
13    A.   Yes.
14    Q.   Let me ask it this way. Is there
15  anything -- apart from what we've already
16  discussed today in terms of the transfers and
17  the treatment you were accorded as the station
18  commander at Mercer both by your supervisors
19  and by your subordinates, is there anything
20  other than that that you feel was specifically
21  retaliatory because you made complaints about
22  racial discrimination?
23    A.   Yes, lots of them. If I may?
24    Q.   Sure.
25    A.   There were a number of occasions.

Page 123

1    B. Williams - by Mr. Bradley
2  There were false allegations and false
3  complaints lodged against me. Each and every
4  instance, Captain Simon and Major -- I got
5  punished even though I was lawfully --
6          MR. SANDERS:  Finish the
7  names. Major who?
8          THE WITNESS:  Major Terry L.
9  Seilhamer and Captain Sidney A. Simon punished
10  me knowing that the allegations were totally
11  false and had no merit.
12          MR. SANDERS:  You already said
13  that. Scott is asking you if there is anything
14  else that you haven't told him that you feel
15  was retaliation because of complaints that you
16  filed or the grievance that you filed?
17    A.   Yes. On September 7, 1999, after
18  meeting with the members and having a meeting
19  with the FOP and the members of Mercer station,
20  Captain Simon issued what I called at the time
21  and still to this day a racial order. He
22  ordered me that I could not visit my station
23  after hours, after 4:30 every night.
24          He ordered me to leave Mercer
25  County. I had to get out of Mercer County by

Page 124

1    B. Williams - by Mr. Bradley
2  5:30 every day. I could not visit my station
3  at any time on my days off, nighttime or no
4  time. The first time I visited my station, I
5  got a note on March 29, 2000. I got a nasty
6  E-mail dressing me down and reminding me of the
7  September 1999 order to stay away from the
8  station during dark or after hours.
9    Q.   Do you recall the exact terms of
10  that order?
11    A.   Yes. The exact terms of what I
12  said. He had the meeting with the personnel at
13  Mercer station --
14          MR. SANDERS:  Just answer the
15  question. Just stay with the question.
16    A.   Yes.
17    Q.   The order expressly indicated that
18  you had to leave the county by a certain time?
19    A.   Correct.
20    Q.   At any part of the discussion
21  surrounding that order, did issues arise out of
22  your use of the state vehicle come up?
23    A.   Yes.
24    Q.   Was it explained to you there were
25  concerns you were using the state vehicle in

31 (Pages 121 to 124)

Powers, Garrison & Hughes

Page 125

1    B. Williams - by Mr. Bradley
2  what might be an unauthorized manner?
3    A.   He raised the issue and I denied it.
4         MR. SANDERS:  Who is "he"?
5         THE WITNESS:  Captain Simon.
6    A.   I told him it was a blatant lie.
7  The allegations was that I had been seen in a
8  state police car at night with a white female
9  in the car.  I totally denied the allegation.
10        He punished me knowing that it was a
11 lie or should have known it was a lie.  Not
12 only that, he also alleged this unknown
13 person -- and he would never give me the name
14 of anybody.  Every time he punished me, he
15 would only say "the FOP."  He would never give
16 me the name except for Ray Meldar.
17        Along with that allegation of having
18 a white female in the state police car, it was
19 alleged that somebody had
20 told him that I had driven to Elyria, Ohio, to
21 purchase an Ohio lottery ticket, which is
22 50 miles into the State of Ohio.  It went on
23 and on from there.  As a result of the alleged
24 thing, he told me I could not drive the car.
25    Q.   From his position, the order was

Page 126

1    B. Williams - by Mr. Bradley
2  implemented to address issues related to your
3  use of the state vehicle after hours?
4    A.   My interpretation is he was issuing
5  discriminatory acts.  He has been a racist --
6  well, not a racist.  I should not say that, but
7  Major Seilhamer was a racist.  He was just
8  basically following Major Seilhamer's order to
9  harass me in any kind of way that they could.
10   Q.   At least the explanation he gave you
11 was that it related to the issues regarding the
12 use of state vehicle after hours; is that
13 correct?
14   A.   Yes.  He mentioned something to that
15 effect, correct.
16   Q.   You used the term "punished" a
17 number of times.  I want to be clear what you
18 mean by that.  You had talked about earlier on
19 in your career of a disciplinary transfer
20 related to allegations of gambling.  We have
21 discussed at length the ten-day suspension and
22 the disciplinary transfer to Erie.
23        Other than those two events, have
24 there been any occasions where you have been
25 formally disciplined by the state police?  I'm

Page 127

1    B. Williams - by Mr. Bradley
2  just looking for a yes or no answer at this
3  point.
4    A.   Can you repeat that question?
5    Q.   Other than the disciplinary transfer
6  based on the allegations of gambling earlier in
7  your career and the transfer discipline related
8  to the quota investigation, has there been any
9  other time you have been formally disciplined
10 by the state police?
11   A.   Yes, in 1994, the transfer to
12 Butler, from Mercer to Butler for three months.
13 Other than that, no.
14   Q.   Again, the transfer to Butler, it's
15 only characterized by you as being
16 disciplinary?
17        MR. SANDERS:  The 1994 one?
18        MR. BRADLEY:  1994 transfer to
19 Butler.
20   Q.   It was not characterized by the
21 state police as disciplinary, was it?
22   A.   That was their version.  It was
23 clearly discipline to me.  It resulted from the
24 false complaint.
25   Q.   If somebody were looking at your

Page 128

1    B. Williams - by Mr. Bradley
2  record, that would not appear as an act of
3  discipline; is that correct, the 1994 transfer
4  to Butler?
5    A.   They would see that I grieved it for
6  disciplinary reasons.
7    Q.   The transfer itself wasn't imposed
8  as formal discipline?
9         MR. SANDERS:  I will object to
10 the repeated asking of the question and the
11 answer that he felt it was punishment and it
12 was discipline.  The paperwork may have been
13 written to say otherwise, but this
14 Lieutenant/witness/Plaintiff disagrees.
15        MR. BRADLEY:  I understand
16 that.  I just want to make it clear.
17        MR. SANDERS:  If you want to
18 fairly ask it another time, give it a shot, and
19 I'll make the same objection.
20        MR. BRADLEY:  That's okay.  We
21 can move on.
22 BY MR. BRADLEY:
23   Q.   Other than those three incidents
24 that you have characterized, the two formal
25 disciplinary transfers and then the 1994

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 129

1          B. Williams - by Mr. Bradley
2    incident, other than that, there were no other
3    formal disciplinary actions from the state
4    police during your employment?
5        A.   Are you talking about 1981, 1994,
6    2000, and 2001?
7            MR. SANDERS: Other than
8    those.
9        A.   Other than those, no.
10       Q.   So my question is when you say
11   that -- I think you referred to both
12   then-Captain Seilhamer as the troop commander
13   at Butler and then after 1999 Captain Simon and
14   Major Seilhamer punishing you, what are you
15   referring to?
16       A.   I'll give you an example. His words
17   and actions. Captain Simon at a troop
18   conference in October of 1999 in the middle of
19   a troop conference, he called me out and said,
20   "Hey, Lieutenant Williams, I need to talk to
21   you to," in a real negative kind of
22   connotation. As I was leaving the room, I
23   heard somebody else in the room say, "I hope he
24   got the Vaseline ready."
25          He called me to his office and told

Page 130

1          B. Williams - by Mr. Bradley
2    me that the FOP, Ray Meldar, made some
3    complaints against me about allegedly that I
4    had members patrol the interstate highways,
5    troopers patrol the interstate highway system
6    in Mercer County and do nothing but count dead
7    deer.
8            He had a very negative -- almost
9    like he was turning beet-red. He's
10   African-American but he's at least half and
11   half. He's half-white and half-black. He was
12   turning beet-red. I clearly told him that it
13   was totally false. I explained to him that
14   Mercer station averaged 140 to 150 incidents
15   with dead animals on the highway a year.
16          What had happened in the incident
17   that they were complaining about is two ladies
18   had called the barracks. They were traveling
19   on 79.
20          MR. SANDERS: Slow down.
21       A.   They were on I-79, northbound. They
22   had come across four dead deer on the roadway.
23   They had called the state police barracks.
24   When they called the 911 center to relay the
25   call to the Pennsylvania State Police, at first

Page 131

1          B. Williams - by Mr. Bradley
2    the state police refused to send anybody down.
3    They said, "Call PennDot."
4            PennDot decided not to respond to
5    remove the dead deer. I ordered a trooper to
6    respond to the scene. First of all, I didn't
7    believe there were four dead deer in one spot.
8    The trooper responded and, in fact, found four
9    dead deer, two of them laying on the highway.
10          As per standard state police policy
11   that I've done myself in the past, he drug the
12   dead deer off the road and to the berm and left
13   the scene. I explained that to Captain Simon.
14   I considered it punishment as the way he drug
15   me out of the troop conference and the way he
16   addressed me all the time. He continually in
17   front of everybody else always called me Bill.
18   He never called me Lieutenant Williams.
19       Q.   I just want to be clear that when
20   you do refer to punishment, other than those
21   transfers we referred to, you've never been
22   subject to a suspension or a loss of pay or any
23   other formal impact on your employment as a
24   result of the actions of the Captain then, now
25   Major Seilhamer, and Captain Simon?

Page 132

1          B. Williams - by Mr. Bradley
2        A.   I lost pay. I lost overtime
3    continually. To this day I lose overtime
4    because of their acts. I've been a staff
5    lieutenant, not a station commander. I lose
6    overtime on a monthly basis, the overtime
7    shift.
8            MR. SANDERS: That's the
9    witness' answer to the question about whether
10   there has been loss of pay.
11          MR. BRADLEY: I understand
12   that. I want to clarify the answer.
13       Q.   I understand what you're saying is
14   that had you remained the station commander of
15   Mercer, that your compensation would have been
16   at a higher rate than it is as a staff
17   lieutenant?
18       A.   That's right.
19       Q.   That is what you're saying?
20          MR. SANDERS: No, that's not
21   all he's saying.
22       Q.   What I'm asking you is in terms of
23   your compensation and hours that you were
24   actually working and specifically -- strike
25   that. I am just going to move on.

Powers, Garrison & Hughes

Page 133

1      B. Williams - by Mr. Bradley
2          (Short recess taken.)
3      Q.   I just have a few more questions.
4  We were speaking about retaliation. You had
5  talked about that you felt that the punishment
6  that Major Seilhamer and Captain Simon had
7  imposed upon you at various times were some
8  acts of retaliation.
9          Again, apart from those and apart
10  from the other things we had talked about
11  today, are there any other specific acts of
12  retaliation that you feel the state police
13  subjected you to since you filed your
14  complaints of discrimination?
15     A.   I'm sure there are others, but I
16  can't think of them right now.
17     Q.   As a result of these incidents, have
18  you sought out counseling or medical treatment?
19     A.   Yes.
20     Q.   When did you first do that?
21     A.   April 1, 2000. I would say -- well,
22  if I might backtrack. I first contacted the
23  State Police Member Assistance Program. They
24  referred me to Trooper Jim Ruff who was in
25  charge of the Member Assistance Program,

Page 134

1      B. Williams - by Mr. Bradley
2  referred me to a psychiatrist up in Erie by the
3  name of Robert Nelsen.
4          I met with him on April 1, 2000. I
5  advised him of the problems I was having with
6  the state police and the discriminatory
7  treatment and so forth, and he noticed I was
8  very angry and upset. He also suggested that I
9  should seek some kind of medication besides
10  talking to him.
11          Later on that year, I met with
12  another psychiatrist by the name of Lance
13  Besner. I've been seeing him on a monthly
14  basis since then. In fact, I last visited him
15  last week, October 12. My next visit with him
16  is December 14. I have been seeing him on a
17  monthly basis for the past three years.
18          This December will be the first time
19  it will go to every other month in two years.
20  I've been taking Wellbutrin XL 300. Well,
21  first 150 milligrams, and this year he switched
22  it to 300.
23     Q.   What's the medication?
24     A.   Wellbutrin XL. It's for anxiety and
25  depression. I've been taking it for three

Page 135

1      B. Williams - by Mr. Bradley
2  years now over these events. It was, like I
3  said, 150 milligrams twice a day. He now has
4  me to 300 milligrams once a day.
5      Q.   The dosages remained the same. It's
6  just that you take it all at once instead of
7  twice a day?
8      A.   Correct, recently at 300 milligrams
9  versus 150.
10     Q.   How many times did you see
11  Dr. Nelsen?
12     A.   Once.
13     Q.   How long after you saw him did you
14  begin seeing Dr. Besner?
15          MR. SANDERS:  Start with the
16  year. If you saw Dr. Nelsen in 2000, did you
17  see Dr. Besner for the first time in 2000 or a
18  year after that?
19     A.   The first time I saw him was in
20  2000. It was probably about three or four
21  months after seeing Dr. Nelsen.
22     Q.   You indicated that Dr. Nelsen was
23  referred to you by a counselor at the state
24  police. Who referred you to Dr. Besner?
25     A.   I don't recall at this time. I got

Page 136

1      B. Williams - by Mr. Bradley
2  his name from Dr. Nelsen or someone else. I
3  can't recall at this time.
4      Q.   In answering this next question, I
5  don't want you to tell me what, if anything, it
6  was, but was there anything else other than the
7  problems you were encountering at the state
8  police that caused you to seek mental health
9  treatment?
10     A.   Absolutely not. It's all about the
11  state police that triggered it to this day.
12  That's the first time in my life I ever went to
13  see a psychiatrist. In fact, that's why I
14  resisted.
15          Trooper Ruff, when he mentioned
16  it -- I put it off for about a month or so. I
17  did not want to go see a psychiatrist, but I
18  noticed my anger and my emotional --
19  humiliations and everything was rising. I was
20  yelling at people, at my kids, at home and so
21  forth, so I decided I better go.
22     Q.   Has Dr. Besner made any diagnosis
23  with regard to your situation?
24     A.   Depression.
25     Q.   Do you know at what point in the

34 (Pages 133 to 136)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 137

1    B. Williams - by Mr. Bradley
2  time that you saw him that he made that
3  diagnosis?
4    A.  I would say about the second or
5  third visit. It could have been the first. I
6  don't know. It was early on.
7        MR. SANDERS:  The records will
8  speak for themselves.
9    Q.  I believe in the Complaint you
10  indicated you were deprived of a promotion. Do
11  you recall making that claim?
12    A.  Basically, I considered
13  transferring, making a lateral transfer, and
14  decided not to put in for it. Also, recently
15  the state police filled two positions on the
16  state gaming board. I am the senior
17  lieutenant. Of the 114 lieutenants on the
18  state police, I am the second in seniority.
19        Had they taken a normal track and
20  posted the gaming board, I would have been able
21  to and I made it well known I was considering
22  putting in for that.
23        They didn't post it. They promoted
24  two sergeants to lieutenant, and they didn't
25  post it like they normally do. I feel that was

Page 138

1    B. Williams - by Mr. Bradley
2  kind of vented towards me because it was well
3  known that I wanted the position.
4        If they posted two positions, I
5  would have been able to bid to get one of those
6  slots on the gaming board. That took place in
7  July of this year.
8    Q.  Other than that situation, there has
9  never been a time that you have requested a
10  promotion or tested for a promotion and were
11  denied?
12    A.  No.
13        MR. BRADLEY:  That's all the
14  questions I have. Thank you very much,
15  Lieutenant Williams.
16        MR. SANDERS:  I have some
17  questions. You had mentioned a procedure that
18  you wanted to follow. May I just speak to
19  Bryan about that for a minute?
20        MR. BRADLEY:  Sure.
21        MR. SANDERS:  Can I address my
22  questions now before you start so that I can
23  keep some kind of order for the Judge rather
24  than go back to it later?
25        MR. CAMPBELL:  Yes, you could.

Page 139

1    B. Williams - by Mr. Sanders
2  I don't see a problem.
3        MR. SANDERS:  I don't have
4  many, but it may cause Scott to have some
5  follow-up, but I think at least it will be --
6        MR. CAMPBELL:  Well, yes. We
7  won't be jumping back and forth.
8        -----
9        EXAMINATION
10  BY MR. SANDERS:
11    Q.  Lieutenant, I'm going to be asking
12  you some questions now concerning some subjects
13  that you discussed with Mr. Bradley this
14  morning. We may have to take a break for a
15  moment for me to take care of another matter,
16  but we'll get as far as I can and then I'll
17  pick it up in a few minutes. Okay?
18    A.  Okay.
19    Q.  I'm sort of going to go in reverse
20  order and talk to you about some subjects that
21  Scott brought up with you just recently, and
22  then we'll work back towards ten o'clock this
23  morning? Okay?
24    A.  Okay.
25    Q.  Can you tell us how your allegations

Page 140

1    B. Williams - by Mr. Sanders
2  in this case of an unlawful transfer from
3  Mercer to Butler in 2000 or 2001 impacted your
4  earnings?
5    A.  It denied me shift differentials.
6  It denied me untold amount of overtime. I was
7  denied approximately $12,000 time-and-a-half
8  for the actual drive time every day from Mercer
9  to Butler.
10    Q.  Did you suffer any more economic
11  loss in your opinion from the transfer from
12  Butler to Erie?
13    A.  Yes. Until this day I'm still
14  suffering economic loss.
15    Q.  Explain what the continuing economic
16  loss is now that you are in Erie.
17    A.  A station commander normally would
18  get more overtime because of his assignment
19  than a staff lieutenant. As station commander,
20  a lot of things come in on patrols, murder
21  investigations or any kind of high-profile
22  investigation. You're subject to get overtime.
23  I don't get it as a staff lieutenant up in
24  Erie.
25    Q.  The figure that you just spoke of,

Powers, Garrison & Hughes

Page 141

1      B. Williams - by Mr. Sanders
2   this $12,000 or so, is that your calculation of
3   the approximate loss that you suffered as a
4   result of being assigned and transferred to
5   Butler in 2000 or 2001?
6      A.   Yes.  That's based on approximately
7   that I was there five-and-a-half months.
8   That's based on approximately 210 to 220 hours
9   of overtime that I was entitled to get.  I
10  filed for it under my grievance.
11     Q.   As I understand it, you are now
12  being treated in Erie not as a station
13  commander but as a staff lieutenant?
14     A.   Correct.
15     Q.   Is that what you just described to
16  us that has caused you to suffer this
17  additional or continuing loss of pay?
18     A.   Yes.
19     Q.   Barring a change in your assignment,
20  do you anticipate that that loss will continue
21  until the time that you will be forced to
22  retire?
23     A.   No.  It will continue until I'm
24  forced to retire in December of next year when
25  I turn age 60.

Page 142

1      B. Williams - by Mr. Sanders
2      Q.   So the answer is yes?
3      A.   Yes.
4      Q.   This loss that you just described,
5   would you have suffered that loss had you been
6   permitted to remain in Mercer?
7      A.   No, I would not.  It's an ongoing
8   loss.  I would not be suffering.
9      Q.   Early this morning, you were asked
10  by Mr. Bradley about officers or troopers in
11  Mercer that you believe engaged in racial
12  discrimination towards you.  Do you remember
13  that?
14     A.   Yes.
15     Q.   What are some of the names of the
16  troopers in Mercer that were behind what you
17  feel was racially motivated?
18     A.   Sergeant Randy Anderson, Corporal
19  Patrick Whalen, Corporal Robert J. Rossman,
20  Corporal Kelly.  I can't think of his first
21  name right now.
22     Q.   David?
23     A.   Yes, Corporate David Kelly.  Yes.
24     Q.   Do you remember any other names?
25     A.   I know there are other troopers, but

Page 143

1      B. Williams - by Mr. Sanders
2   I can't think of them right now.
3          MR. BRADLEY:  Can you put a
4   time frame on that question for those troopers?
5      Q.   These troopers that you are naming
6   here, are these troopers that were under your
7   command when you were transferred to Mercer?
8      A.   Yes.
9      Q.   Were they under your command when
10  you received the telephone call in June of 1999
11  from Caption Simon?
12     A.   Yes.
13     Q.   Did they continue to be under your
14  command until you got the notification from
15  Simon and Seilhamer that you were to pack up
16  and come to Butler?
17     A.   Yes.
18     Q.   You mentioned a name to Scott and
19  Bryan earlier today by the name of Simpson?
20     A.   Yes.
21     Q.   Does he have a first name?
22     A.   Brian Simpson.
23     Q.   Was Brian Simpson ever someone that
24  you supervised?
25     A.   No, he was a lieutenant.

Page 144

1      B. Williams - by Mr. Sanders
2      Q.   Was he within Seilhamer's troop or
3   area?
4      A.   Area, yes.  It was part of out of
5   Erie, out of the Meadville station.
6      Q.   Did Mr. Simpson engage in any kind
7   of racial misbehavior that you were aware of
8   during this period of time from say 1999 to the
9   present?
10     A.   Yes.
11     Q.   What was that?
12     A.   He told me that I was an American
13  trooper.  He told a Caucasian trooper that
14  Meadville station was an Irish descent and that
15  the Irish were the niggers of Europe.
16     Q.   What was the name of the person he
17  told that to?
18     A.   Trooper Jon McClain.
19     Q.   Were you present when Simpson made
20  the comment to McClain?
21     A.   No.
22     Q.   Who told you that Simpson had made
23  that comment?
24     A.   I was made aware of the comment
25  through Captain Conley, the troop commander at

36 (Pages 141 to 144)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 145

1    B. Williams - by Mr. Sanders
2    the time.
3       Q.   Did you report any of that to
4    Seilhamer at any time?
5       A.   I didn't, but Captain Conley advised
6    me he did.
7       Q.   That would by Erby Conley?
8       A.   Correct.
9       Q.   That would be the same Erby Conley
10   that you had give a deposition in this case?
11      A.   Yes.
12      Q.   Mr. Conley is black?
13      A.   Correct.
14      Q.   Did you ever have an occasion where
15   you spoke to Seilhamer one-on-one between
16   June of 1999 until the present where you
17   brought your racial complaints to his
18   attention?
19      A.   Yes.
20      Q.   What year did that conversation take
21   place between you and Seilhamer?
22      A.   Well I spoke to him prior to 1999,
23   but after June 1, 1999, it was July 14 of 2000.
24      Q.   Where did that discussion take place
25   physically?

Page 146

1    B. Williams - by Mr. Sanders
2       A.   Butler headquarters.
3       Q.   What did you tell him then?
4       A.   I told him about the discrimination
5    treatment complaints. I complained. He was
6    questioning Attorney Greg Markman's June
7    letter. He was conducting an inquiry. I
8    happened to be at Butler, and he called me up
9    to his office and said, "I want to question you
10   about your Attorney Markman's letter."
11      Q.   Was this the investigation that you
12   talked about with Mr. Bradley earlier?
13      A.   Yes.
14      Q.   If I understand you correctly, it's
15   your position that basically he was
16   investigating himself?
17      A.   Correct.
18           MR. SANDERS: Let's just take
19   a break for a moment.
20           (Short recess taken.)
21      Q.   We're back on the record. I would
22   like to draw your attention to where we just
23   left off. You said to Scott earlier today that
24   after the Seilhamer supervisor's investigation,
25   the mistreatment of you escalated? Do you

Page 147

1    B. Williams - by Mr. Sanders
2    remember that?
3       A.   Yes.
4       Q.   I assume you thought or remember
5    everything you can today about what events
6    occurred after June 2000 that you felt were
7    attributable to you having filed a complaint?
8       A.   Yes.
9       Q.   Am I correct that one of the
10   examples that you're giving in this case of
11   being punished or discriminated against is the
12   way you were treated in Butler by Seilhamer?
13      A.   Correct.
14      Q.   You described, if I understand, the
15   office that you were in?
16      A.   Correct.
17           MR. BRADLEY: We are referring
18   to the transfer in 2000, not 1994?
19      Q.   Did you understand my question?
20      A.   Yes.
21      Q.   You understood my question to be
22   about what happened to you in Butler in
23   2000 and 2001?
24      A.   Correct.
25      Q.   I am correct in when I say you were

Page 148

1    B. Williams - by Mr. Sanders
2    still in Butler in the early part of 2001
3    before you were retransferred to Erie, correct?
4       A.   Correct.
5       Q.   You described that to Scott and
6    Bryan as a five-and-a-half month period; is
7    that correct?
8       A.   Correct.
9       Q.   The state police employee that
10   replaced you in Mercer, you mentioned his name
11   earlier today? What is it again?
12      A.   Francis Grolemund.
13      Q.   Is he white?
14      A.   He is white.
15      Q.   Now, with regards to Mr. Grolemund,
16   Brown and Jungling, am I understanding you
17   correctly --
18           Now I am looking at and referring to
19   Exhibit No. 1, your EEOC/PHRC complaint of
20   racial discrimination. You say here that
21   similarly situated Caucasian employees such
22   Lieutenants Grolemund, Brown and Jungling --
23   let me ask you this. I assume that you agree
24   that they have been transferred from time to
25   time?

Page 149

1    B. Williams - by Mr. Sanders
2    A.   Correct.
3    Q.   Is it your position in this case
4  however that your transfers were racially
5  motivated and theirs were not?
6    A.   Correct.
7    Q.   Your transfers, the one from Mercer
8  to Butler and Butler to Erie, were due to your
9  having filed grievances and complaints about
10  the mistreatment that you were being subjected
11  to at Mercer?
12    A.   Correct, and I have an example if I
13  could.
14    Q.   What is the example?
15    A.   For instance, in Commonwealth Court
16  on October 19, 2000, Captain Simon and
17  Major Seilhamer was there.  There are
18  two reasons why he transferred me from Mercer
19  to Butler.
20        One was because of a fight at Mercer
21  station, and because the trooper allegedly
22  making an insubordinate comment to the
23  sergeant.  He told the sergeant that he didn't
24  want to talk to the lieutenant.
25        This alleged fight that took place

Page 150

1    B. Williams - by Mr. Sanders
2  at Mercer station was a shoving match, a
3  corporal shoving a trooper.  It happened at
4  12 midnight on a weekend.  I was barred from
5  the station, so I was not allowed to be at the
6  station at 12 midnight.  It happened on a
7  weekend, and I was not allowed to work
8  weekends.  It was not a normal shift for me.
9  My normal shift was normally 8:30 to 4:30.
10    Q.   You were being blamed for that?
11    A.   I was being blamed for it.
12    Q.   Now let me ask you this.  One of the
13  comebacks that the state has or one of the
14  defenses that the state has is that you didn't
15  have control or weren't properly handling your
16  subordinates in Mercer.  You're aware of that
17  allegation?
18    A.   Yes.
19    Q.   Do you agree with that allegation?
20    A.   Absolutely not.  I performed
21  control.  In fact, that's why they kept making
22  the false complaints about me.  They didn't
23  like my orders.  I was a no-nonsense type of
24  person.
25        If I may give you an example with

Page 151

1    B. Williams - by Mr. Sanders
2  the fight.  There were three fights in Erie or
3  four.  I mentioned Lieutenant Brian Simpson
4  earlier.  Trooper Jon McClain, he was involved
5  in a fight with Trooper Lynchman, and
6  Lieutenant Simpson was there.  He was in his
7  office right across the hallway from the fight.
8  The Major or Simon didn't transfer him, but he
9  allowed Simon to transfer me.
10        A trooper in Butler had a fight
11  where he punched another trooper.  This was at
12  Butler headquarters while the Major and Simon
13  were right there in 2003.
14        A trooper punched another trooper
15  while they were on patrol and broke his jaw.
16  That trooper got arrested for aggravated
17  assault and battery.  No one got transferred
18  about that.
19        Then you had the fight down in
20  Punxatawney at Troop C, which is under
21  Commander Major Seilhamer, where one trooper
22  kicked another trooper in the private area.  It
23  cost him to lose one of his balls.  He was
24  arrested for aggravated assault and battery.
25        In all three incidents, the

Page 152

1    B. Williams - by Mr. Sanders
2  commander did not get transferred, yet they
3  transferred me because of a shoving match that
4  took place at 12 midnight.
5    Q.   Let me direct your attention now to
6  your efforts to try to resolve this with Evanko
7  and Miller.  You indicated that you had
8  requested a meeting with the commissioners,
9  both of them?
10    A.   Yes.
11    Q.   In making that request, did you make
12  that request through another representative of
13  yourself or yourself?
14    A.   Myself.  I went through the chain of
15  command.
16    Q.   Did you have to go through Simon or
17  Seilhamer?
18    A.   I stand corrected.  The August 2001,
19  I submitted a request through -- wait --
20    Q.   Don't talk out loud.  Think of your
21  answer, because she takes down even your
22  thoughts leading up to your answer.
23        Let me ask the question again.
24  Listen to the question, please.  Did you make
25  the request yourself to talk to Evanko and

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 153

1      B. Williams - by Mr. Sanders
2  Miller, or did you go through someone?
3      A.   I requested myself through the chain
4  of commands.  For the personal meeting, I
5  requested myself.
6      Q.   Now, you keep saying "the chain of
7  command."  Did you go and do it yourself, or
8  did you have somebody through the chain of
9  command contact Evanko's office or Miller's
10 office and request it?  Which is it?
11     A.   I did it myself by typing a letter.
12     Q.   Did you ever call yourself to
13 Evanko's office?
14     A.   Never.
15     Q.   Did you ever call to Miller's
16 office?
17     A.   Never.
18     Q.   Are you certain as you sit here
19 under oath that Miller and Evanko's offices
20 received your letter?
21     A.   I got a response back from
22 Major Simon saying the commissioner refused or
23 turned down my request to meet with him.
24     Q.   That would be the same Seilhamer
25 that you're accusing of being a racially

Page 154

1      B. Williams - by Mr. Sanders
2  motivated individual in this case?
3      A.   Yes.
4      Q.   Is Virginia Smith black or white?
5      A.   Black.
6      Q.   Is Marcy Robinson black or white?
7      A.   Black.
8      Q.   You worked through them on a number
9  of occasions to try to resolve this matter?
10     A.   Correct.
11     Q.   It was unsuccessful?
12     A.   Correct.  Both advised me that they
13 had no real authority.  That's why they both
14 quit.  Virginia retired and Marcy transferred.
15     Q.   Did you bring anyone to the PHRC
16 meeting at the State Office building in
17 Pittsburgh in 2001?
18     A.   Yes, Corporal Matthew Tyzinski.
19     Q.   The same Matthew Tyzinski that
20 testified in this case?
21     A.   Yes.
22     Q.   Did you bring anyone else other than
23 Matthew Tyzinski with you?
24     A.   No.
25     Q.   I assume that Hample is white, up in

Page 155

1      B. Williams - by Mr. Sanders
2  Erie?
3      A.   Correct.
4      Q.   You have two witnesses that are
5  supporting your case in this matter.  One is
6  retired Captain Conley; is that correct?
7      A.   Correct.
8      Q.   And former employee Tyzinski?
9      A.   Retired Corporal Tyzinski, correct.
10          MR. BRADLEY:  I want to object
11 to the characterization of supporting.  Their
12 depositions will speak for themselves.
13     Q.   You mentioned the name Todd Johnson.
14     A.   Yes.
15     Q.   Is he white or black?
16     A.   White.
17     Q.   If I understand correctly, he was
18 the crime lieutenant?
19     A.   Correct.
20     Q.   He was out on some type of
21 assignment, and you were being pulled in to
22 replace him, or was that Brian Simpson in 1994?
23     A.   That was Brian Simpson.
24     Q.   The same Brian Simpson that you have
25 attributed a racial remark to?

Page 156

1      B. Williams - by Mr. Sanders
2      A.   Correct.
3      Q.   Todd Johnson, if I understand
4  correctly, was standing in for Mike Hample in
5  Erie recently or at some point when you first
6  got to Erie in 2001?  Is that correct?
7      A.   He was standing in for Captain Erby
8  Conley.
9      Q.   He's the one that started to
10 implement your suspension?
11     A.   Correct.
12     Q.   He is white?
13     A.   Correct.
14          (Short recess taken.)
15     Q.   Lieutenant, when I left off with
16 you, let me pick up from there.  If I
17 understand your testimony, you are of the
18 position in this case that your transfers in
19 1994 that you talked about when you went from
20 Mercer to Butler, that that was a form of
21 discipline.  Is that your position?
22     A.   Correct.
23     Q.   You feel the same way about your
24 2000/2001 transfers from Mercer to Butler and
25 Butler to Erie?

39 (Pages 153 to 156)

Page 157

1       B. Williams - by Mr. Sanders
2       A.   Absolutely, yes.
3       Q.   Now, it was your contention, am I
4   correct, that this is all racially motivated by
5   Mr. Seilhamer?
6       A.   Yes.  He's the main perpetrator.
7       Q.   You had racial issues filed against
8   him, if I understand you correctly, in the
9   early 1990s?
10      A.   Correct.
11      Q.   What was your reasoning for not
12  filing a lawsuit then when they gave you the
13  right to sue letter?
14      When the EEOC gave you the right to
15  sue letter -- you may have answered this, but I
16  just want to pursue this a little bit more --
17  why didn't you file in that 90-day right to sue
18  period they gave you?
19      A.   Well, I had not spoken to a civil
20  rights attorney.  Because of the time frame, I
21  really thought that maybe the attitude would
22  change and things would get better.
23      Q.   Let me ask you this.  I assume it's
24  your position they did not get better?
25      A.   No, they did not.  They got worse.

Page 158

1       B. Williams - by Mr. Sanders
2       Q.   Is it your testimony in this case
3   that Mr. Seilhamer was aware of your race case
4   in 1994?
5       A.   Absolutely.
6       Q.   How do you know that then
7   Captain Seilhamer and now Major Seilhamer was
8   aware of your filing a EEOC/PHRC charge in the
9   1994, 1995 and 1996 period of time?
10      A.   The complaint went to the state
11  police, and it was against him.
12      Q.   Did you ever sense a difference in
13  the way he treated you from the time prior to
14  the filing of the 1994 Complaint alleging race
15  and the treatment you got after the expiration
16  of your right to go to court expired?
17      A.   Well initially, he acted like he was
18  more friendly.  I was aware that he had made a
19  few statements around the troop that he did not
20  believe -- if he wanted to punish me or someone
21  else, that he would not come at me directly, he
22  would go through somebody else.
23      Q.   Did you know that Mr. Conley felt
24  the way he did about Mr. Seilhamer being a
25  racist before you filed your charges in the

Page 159

1       B. Williams - by Mr. Sanders
2   case, before Exhibit No. 1 was filed?  Did you
3   know how Mr. Conley felt about Mr. Seilhamer?
4       A.   Before April 2001?
5       Q.   Yes.
6       A.   No.
7       Q.   Now, even though Barry Titler's name
8   appears on the paperwork transferring you from
9   Butler to Erie, is it your position that to get
10  to Titler, that matter had to go through
11  Seilhamer?
12      A.   Correct.
13      Q.   Was that the ordinary chain of
14  command that Captain Simon would have followed?
15      A.   Yes.  Captain Simon needs the
16  approval of Major Seilhamer to conduct that
17  action.  It has to go through him for his
18  review.
19      Q.   What was the name of the son that
20  you had to come get you for the 45-minute
21  incident in Erie 2001?
22      A.   Damean.
23      Q.   That's D-A-M-O-N (sic)?
24      A.   It's D-A-M-E-A-N.  Damean D.
25  Williams.

Page 160

1       B. Williams - by Mr. Sanders
2       Q.   Did he actually make it to Erie to
3   come get you that day?
4       A.   Yes.  Just as he was arriving,
5   Lieutenant Johnson advised me that he had
6   spoken to Harrisburg and canceled the
7   suspension.  Harrisburg recommended that I not
8   serve the suspension because I filed a
9   grievance.
10      Q.   Is it your contention in this case
11  that Lieutenant Johnson's conduct was
12  retaliatory or racially motivated?
13      A.   No.  I can't say that by him.  I
14  think he was just following orders.  No, I
15  can't say that about Lieutenant Johnson.
16      Q.   Do you know from whom he got those
17  orders, whether that was Seilhamer or from
18  someone else?  Do you know for a fact?
19      A.   I don't know.
20      MR. SANDERS:  Let's take a
21  break.
22      (Short recess taken.)
23      Q.   Back on the record.  Lieutenant, you
24  are currently in what position in Erie?
25      A.   Staff Lieutenant.

40 (Pages 157 to 160)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 161

1       B. Williams - by Mr. Sanders
2       Q.   Is the Erie office that you're
3   working out of now still under the Butler area?
4       A.   Yes. It's under Area 4.
5       Q.   Who's currently in charge of the
6   Butler area?
7       A.   Major Terry Seilhamer.
8       Q.   That has been the same throughout
9   the period of time from the time that you have
10   described today?
11       A.   Yes, sir.
12       Q.   Have you had any contact with
13   Major Seilhamer let's say in the last year or
14   he with you?
15       A.   I believe, yes, I had two or three.
16   It was down in Punxatawney at an Area 4
17   conference with the deputy commissioner. He
18   was there, and I was there. All of the
19   lieutenants from all of the areas were there
20   plus the deputy commissioner and the major.
21   That happens every three months.
22       Q.   Other than those quarterly
23   situations, were you two in the same room or
24   conference, or have there been any other
25   occasions where the two of you had to deal with

Page 162

1       B. Williams - by Mr. Sanders
2   one another?
3       A.   Not since I was transferred out of
4   Butler. When I was in Butler, his office was
5   three doors down.
6       Q.   This position they made for you in
7   Butler in 2001, you called it special projects?
8       A.   Special projects officer.
9       Q.   When you were transferred to Erie,
10   did they replace you in Butler, to your
11   knowledge?
12       A.   Not with a lieutenant. They may
13   have filled it later with a sergeant, but not
14   with a lieutenant.
15       Q.   If I understand you correctly, you
16   were saying that in 1994 you were the victim of
17   discrimination when you know you were
18   reassigned to Butler, correct?
19       A.   Correct.
20       Q.   Who was in charge of the area at
21   that time?
22       A.   Area 4, Major Vanderpool.
23       Q.   Was Seilhamer or Simon in the area
24   or in the troop at that time at all?
25       A.   Seilhamer was captain of Troop D.

Page 163

1       B. Williams - by Mr. Sanders
2   He was commanding officer.
3       Q.   He was your direct supervisor?
4       A.   Correct.
5       Q.   What was the name of the officer --
6   I don't know that you gave us his name -- that
7   got most of the duties that went with that
8   position they claim?
9       A.   Sergeant Al Brown.
10       Q.   Is Al Brown white or black?
11       A.   White.
12       Q.   How long were you stuck in Butler
13   with Seilhamer in 1994?
14       A.   Three months.
15       Q.   Where had you been transferred from,
16   Mercer?
17       A.   Mercer.
18       Q.   What was your position when you were
19   transferred, station commander?
20       A.   Correct.
21       Q.   Who did your station commander
22   duties in Mercer in 1994 when you were brought
23   into Butler?
24       A.   Sergeant David Julock.
25       Q.   White or black?

Page 164

1       B. Williams - by Mr. Sanders
2       A.   White.
3       Q.   Now if I remember from this file,
4   there is a letter from the district attorney of
5   the Commonwealth of Pennsylvania County of
6   Mercer who did an investigation of the quota
7   issue and found there was none; is that
8   correct?
9       A.   Correct.
10       Q.   When you grieved the 1994 transfer
11   to Butler so that Brian Simpson could go do
12   what he needed to do for the FBI, did you claim
13   that you lost some money as a result of that?
14       A.   Yes.
15       Q.   Was that part of your grievance?
16       A.   Yes.
17       Q.   Did any part of your grievance at
18   that time result in anything favorable to you
19   or any finding in your favor or reimbursement?
20       A.   Yes. The arbitrator ruled they had
21   to reimburse me for the travel time from Mercer
22   to Butler. It came out to about 101 or
23   110 hours of overtime. The total was $4,385.
24       Q.   What was this accusation about late
25   uniform wearing that you didn't get back to

41 (Pages 161 to 164)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 165

1      B. Williams - by Mr. Sanders
2   talking to Mr. Bradley about?
3      A.   All I know is that Captain Simon
4   told me that the FOP had told him that I on
5   occasion was late changing into my uniform from
6   civilian clothes.
7      Q.   Did Seilhamer or Simon ever tell you
8   the name of this white woman that you allegedly
9   had in your patrol car, Lieutenant?
10     A.   No.  No name, not even the name of
11  my accuser or even a date or the year.
12     Q.   Now, in this case you have sought
13  through subpoena some information about some of
14  the white troopers that made allegations
15  against you challenging their credibility, have
16  you not?
17     A.   Correct.
18     Q.   What are their names?
19     A.   Corporal David Kelly, Corporal Ray
20  Meldar.
21         MR. CAMPBELL:  Corporal?
22         THE WITNESS:  Yes.  He's a
23  corporal.  He is the FOP president in Butler.
24  His position is a corporal.
25     Q.   Anybody other than Kelly and Meldar?

Page 166

1      B. Williams - by Mr. Sanders
2      A.   None I can think of right now.
3      Q.   With regards to Mr. Kelly, is he one
4   of the white troopers from the Mercer troop
5   that was part of the group making accusations
6   about your poor performance?
7      A.   Yes.
8      Q.   Is he white?
9      A.   Yes.
10     Q.   What is it that you have become
11  aware of concerning Mr. Kelly that you feel has
12  bearing on his credibility?
13     A.   Could you rephrase the question?
14     Q.   Is there something you have come to
15  know about David Kelly or Corporal Kelly or
16  whatever his title is that caused you to
17  subpoena information about any investigations
18  that are being done concerning him?
19     A.   I submitted some documents as to his
20  allegations against me.  He testified over the
21  telephone.  The records he had of his testimony
22  of an alleged staff meeting at Mercer.
23     Q.   What was the name of the other
24  officer that you feel you have information on
25  that was accusatory about you that you believe

Page 167

1      B. Williams - by Mr. Sanders
2   has run into some difficulties himself?
3      A.   Well, none from Mercer.
4      Q.   Any from the area that Seilhamer
5   controls or supervises?
6      A.   I requested documents relating to
7   the fight at the other station.
8      Q.   Let's talk about Titler.  His first
9   name is Barry?
10     A.   I believe.  We call him Barry, but I
11  think his real name is Robert Barry Titler.
12     Q.   Is he white or black?
13     A.   He's white.
14     Q.   Have you come to know about -- and
15  by the way, if necessary, we will do what is
16  necessary under a confidentiality umbrella with
17  regards to this question I'm asking you about
18  Mr. Titler.
19         In the course of your employment
20  with the state police, have you become aware of
21  what you understand is an ongoing investigation
22  about Mr. Titler?
23     A.   Yes.
24     Q.   Is it your understanding that this
25  investigation is still ongoing?

Page 168

1      B. Williams - by Mr. Sanders
2      A.   Correct.
3      Q.   Is this the same Mr. Titler that
4   signed off on the recommendation for discipline
5   against you that had been initiated by Simon
6   and Seilhamer in 2001?
7      A.   Correct.
8      Q.   What is your understanding that
9   Mr. Titler has done or was accused of?
10     A.   The deputy commissioner of
11  administration Sue Transue has made an
12  allegation against him of committing perjury
13  during arbitration of a trooper.
14     Q.   That Mr. Titler committed perjury?
15     A.   Yes.
16     Q.   How did you become aware of that?
17     A.   I became aware of it through an
18  E-mail that an anonymous person in the state
19  police had sent me copies of it and news
20  articles from the Harrisburg paper; and also at
21  the monthly discussion, the lieutenant captain
22  at the Erie station.
23         I know there was a criminal
24  investigation and a pending internal
25  investigation.

42 (Pages 165 to 168)

Page 169

B. Williams - by Mr. Sanders
1  Q.   Just a few more questions,
Lieutenant, and then I will turn it back over
to Mr. Bradley or to Mr. Campbell. Have you
received accommodations or awards over the
years since you have been the station commander
in Mercer?
   A.   I have received a couple
accommodations from the major about my
activities when I, along with a group of
corporals from Butler, prevented a guy from
committing suicide with a shotgun.
      In another instance, I, with another
trooper, engaged in a hot pursuit of a suspect
who had committed a theft from the mall. I
pursued him and apprehended and took a knife
off of him. He put out a letter.
   Q.   In this case, are you seeking
reinstatement back to Mercer as the station
commander, sir?
   A.   Yes.
   Q.   How much longer do you have until
they force you to retire?
   A.   December 24, 2005, next year.
   Q.   Now, you attributed a number of

Page 170

B. Williams - by Mr. Sanders
racial-motivated remarks to Major Seilhamer in
this case. Other than the ones you have told
us about today, are there any others that you
can recall that either the major said in front
of you or that you heard him say that you
believe are derogatory concerning blacks?
   A.   I'm sure there are other ones, but I
can't think of them right now.
   Q.   Did you bring the Cappy (sic) of
what you characterized as a racially derogatory
statement or word, did you ever bring that to
the attention of --
      MR. CAMPBELL: Slappy.
   Q.   I mean Slappy. Did you ever bring
that racially derogatory comment or how you
characterized it as racially derogatory to
either Simon or Seilhamer that it was being
used at the Mercer station in any of your
conversations with them?
   A.   I may have brought it to the
attention of Major Seilhamer when he was a
troop commander, but I don't recall ever
bringing it to the attention of Captain Simon.
   Q.   Did you bring it to Erby Conley's

Page 171

B. Williams - by Mr. Sanders
attention in any of your conversations with
him?
   A.   No.
   Q.   What about the two ladies that you
sought help from, the two black EEOC persons,
did you ever tell them about that?
   A.   Virginia Smith, yes.
   Q.   You did bring the Slappy issue to
her attention?
   A.   Yes.
   Q.   Did you bring the property damage to
her attention? The slashing and the black ink
on the door and stuff like that, did you bring
that to her attention?
   A.   Oh, yes.
   Q.   Do you recall the name of the state
police officers, the employee name that you
told Bryan and Scott about that told you that
your manual was thrown in the trash? Do you
remember the name of the person who told you
that the folks in Butler had thrown that in the
trash?
   A.   I can't recall at this time.
   Q.   Was it someone who worked in Butler?

Page 172

B. Williams - by Mr. Sanders
   A.   Yes.
   Q.   Did you ever keep a copy of that
manual that you worked on for the
five-and-a-half months that you were in Butler
in 2000 to 2001?
   A.   No. I don't have it now. It was in
my computer at work for a number of years since
then, but probably about a year ago, it was
deleted.
   Q.   Were you updating the manual or were
you starting from scratch?
   A.   Starting from scratch.
   Q.   The individuals that are being
disrespectful to you now in Erie, are they all
white?
   A.   They're all white. In fact, one of
them was in Mercer. I had written him up for
being disrespectful in Mercer in 1995.
   Q.   What's that person's name?
   A.   Steven Farabaugh.
   Q.   How do you spell the last name?
   A.   F-A-R-A-B-A-U-G-H.
   Q.   Is it your position in this case
that your request to be transferred to

Page 173

1    B. Williams - by Mr. Sanders
2  New Castle that was rejected by Seilhamer in
3  2000 and 2001 while you were serving that
4  five-and-a-half months in Butler was a form of
5  harassment or retaliation?
6    A.  Yes.
7    Q.  What position were you seeking
8  transfer to?
9    A.  Station commander, New Castle.
10   Q.  Was there a vacancy or an opening
11 for that?
12   A.  Yes.
13   Q.  Was it eventually filled?
14   A.  Yes.
15   Q.  Was it filled after you arrived in
16 Erie or before you left Butler?
17   A.  It was filled while I was in Butler.
18   Q.  By whom?
19   A.  Lieutenant Robert Martin.
20   Q.  Lieutenant Robert Martin, is he
21 black or white?
22   A.  He is white.  They allowed him to
23 transfer in from Troop C.
24   Q.  Now, do I understand you to say that
25 there was a meeting of your staff in Mercer

Page 174

1    B. Williams - by Mr. Sanders
2  conducted by Simon and/or Seilhamer without you
3  being present?
4    A.  Yes.
5    Q.  Was that the same period of time you
6  told Scott and Bryan when the order came down
7  for you to be limited to the time you could
8  spend in Mercer?
9    A.  That meeting triggered that order.
10   Q.  Were you permitted to speak at that
11 meeting on your own behalf?
12   A.  I was ordered not to be at the
13 station during that time.
14   Q.  But Matthew was there?
15   A.  He was at the second meeting with
16 the corporal, right.  If I may, they scheduled
17 the meeting on his day off.  They purposely
18 chose a day when he was off.
19   Q.  We're talking about
20 Matthew Tyzinski?
21   A.  Correct, but he did show up.  He
22 came in on his day off to attend the meeting.
23   Q.  He testified about what happened?
24   A.  Yes.
25      MR. SANDERS:  That's all I

Page 175

1    B. Williams - by Mr. Bradley
2  have right now.
3      MR. BRADLEY:  I have several
4  more questions for you.
5  -----
6      EXAMINATION
7  BY MR. BRADLEY:
8    Q.  With regard to the Slappy comments,
9  did you ever request Captain Seilhamer or
10 Captain Simon to conduct an investigation or do
11 a BPR to determine who was using that term?
12   A.  I don't recall at this time.
13   Q.  Mr. Sanders asked you if you could
14 recall any more racially derogatory remarks
15 made by Major Seilhamer.  You said you could
16 not recall any at this time.  Could you refresh
17 my memory as to any racially derogatory remarks
18 you have attributed to Major Seilhamer?
19   A.  He called Mercer station the black
20 hole in 1998.
21   Q.  Is there any other remarks?
22   A.  Not at this time.
23   Q.  This is more for the record.  A
24 number of times, the comment has been made that
25 you are forced to retire at the end of next

Page 176

1    B. Williams - by Mr. Bradley
2  year.
3    A.  Yes, they --
4      MR. SANDERS:  Let him ask the
5  question.
6    Q.  What is the rule with regard to
7  retirement in the state police?
8    A.  You have to retire when you turn 60.
9    Q.  That rule applies to everyone; is
10 that correct?
11   A.  Correct.
12   Q.  You're not being singled out by
13 being forced to retire?
14   A.  No.
15   Q.  You mentioned several
16 accommodations.  You said that they were from a
17 major, but you didn't identify the major.
18 Would that be Major Seilhamer?
19   A.  It was a letter.  He sent a letter
20 saying congratulations for a job well done.
21   Q.  This was from Major Seilhamer?
22   A.  Correct.
23   Q.  Have you ever met Captain Titler?
24   A.  Yes.
25   Q.  In what circumstances?

44 (Pages 173 to 176)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 177

1    B. Williams - by Mr. Bradley
2    A.   I have seen him at different
3    training events over the years.  I have known
4    him probably 20 years or so.
5    Q.   Did you ever have any interaction
6    with him regarding your job performances other
7    than him issuing the discipline sanction?
8    A.   No.
9    Q.   Are you suggesting that his decision
10   to set forth a ten-day suspension and a
11   disciplinary transfer was racially motivated?
12   A.   Yes, in my opinion.
13   Q.   What do you base that on other than
14   the fact that it happened?
15   A.   He and the state police were
16   treating me different than any other commander.
17   The fact that he allowed Captain Simon to
18   include stuff -- he basically -- or his
19   punishment was based on investigation.  That
20   investigation had stuff and information in
21   there which was not part of the investigation.
22         For example, Captain Simon put in
23   some comments, some negative comments about me
24   and my work performance when the internal
25   investigation was supposed to be about this

Page 178

1    B. Williams - by Mr. Bradley
2    quota investigation.  In the report are all
3    these lies and innuendos about my poor work
4    performance.
5          The state police had a special order
6    out, an AR-425, that states that if any poor
7    work performance is discovered during an
8    internal investigation, you are required -- or
9    two commanders shall conduct a separate
10   investigation of any alleged poor work
11   performance.
12         Captain Simon and the major did not
13   do that.  The commissioner of the state police
14   did not do that.  My opinion is Captain Titler
15   was well aware of that because that should have
16   been part of the record.  As part of the
17   personal meeting, he allowed that to stay in
18   there to serve as part of punishment of me.
19   Q.   Does the discipline order indicate
20   that the suspension is for a particular
21   transgression or the disciplinary transfer is
22   for a particular transgression?
23   A.   I don't have the report.  It lists
24   about three or four different things,
25   unbecoming conduct, obeying unlawful laws,

Page 179

1    B. Williams - by Mr. Bradley
2    something about performance.
3    Q.   Other than the fact that
4    Captain Titler signed the order imposing the
5    discipline, do you have any evidence of any
6    statement or action or document or comment made
7    that you heard from a third party that would
8    support your claim of racial discrimination by
9    Captain Titler?
10   A.   None I can think of right now.
11   Q.   Do you know how many black
12   lieutenants were in Area 4 in 1994?
13   A.   Yes, one.  Me.
14   Q.   In 2000, do you know how many black
15   lieutenants where in Area 4?
16   A.   Two.
17   Q.   Does that include you?
18   A.   Correct.
19   Q.   Who would the other one be?
20   A.   Rodney Patterson.
21   Q.   What was his position?
22   A.   Station Commander B.  I believe he
23   got promoted in 2000.
24   Q.   In 2001, how many black lieutenants
25   were in Area 4?

Page 180

1    B. Williams - by Mr. Bradley
2    A.   One because I was transferred out of
3    Troop D.  I was transferred to Erie.
4    Q.   I'm talking about Area 4.
5    A.   Still two.
6    Q.   The same two?
7    A.   Yes.
8    Q.   As of today, how many black
9    lieutenants are in Area 4?
10   A.   One, me.
11   Q.   Lieutenant Patterson is no longer a
12   lieutenant?
13   A.   He's a captain now.  He's in
14   Harrisburg.
15   Q.   You've talked about being
16   transferred because of a shoving match.  Is the
17   only reason you were transferred because of the
18   shoving match?
19   A.   Captain Simon testified that --
20         MR. SANDERS:  First you have
21   to answer, and then you can explain.
22   A.   Yes, there was.  Wait.  Can you
23   rephrase the question?
24   Q.   You talked about being transferred
25   because of a shoving match.  With respect to

Powers, Garrison & Hughes

Page 181

1    B. Williams - by Mr. Bradley
2  that transfer, and I believe that's the
3  transfer to Butler in 2000, was the shoving
4  match the only reason you were transferred in
5  your opinion?
6    A.  In my opinion, that's what was told
7  to me by Captain Simon.
8        MR. SANDERS:  That's not what
9  he is asking you.  He is asking you what you
10  believe.
11    A.  No.  I think what I believe is that
12  wasn't the reason.  I believe I was being
13  transferred for discrimination purposes.  The
14  fight, it was such a minor fight.  It took
15  place when I wasn't even working.  Clearly it
16  was a false -- he was giving me a false reason
17  for transferring me.
18    Q.  You indicated that that was not the
19  only reason he gave for transferring you?
20    A.  Correct.  He stated that a
21  Trooper Wolfson had told Sergeant Julock that
22  he did not want to speak with me.  Since that
23  was insubordination, he said for those
24  two reasons that I lost control of Mercer
25  station.

Page 182

1    B. Williams - by Mr. Sanders
2        MR. BRADLEY:  That's all the
3  questions I have.  Thank you.
4        MR. SANDERS:  One follow-up.
5        -----
6        EXAMINATION
7  BY MR. SANDERS:
8    Q.  If I understand you correctly, one
9  major difference between you and Rodney
10  Patterson is that you're a black individual who
11  brought race charges against a white major who
12  at the time was a captain in the mid 1990s, and
13  Rodney did not.
14    A.  Correct.
15    Q.  You also heard that Erby Conley
16  testified in this case.  He felt that the
17  Major, formally Captain, Seilhamer was a
18  racist?
19    A.  Correct.
20    Q.  Erby also said that he himself had
21  never brought formal charges against Seilhamer,
22  correct?
23    A.  Correct.
24    Q.  Now, Rodney is away from Seilhamer,
25  and he is in Harrisburg?

Page 183

1    B. Williams - by Mr. Campbell
2    A.  Correct.
3        MR. SANDERS:  That's all I
4  have.
5        (Discussion held off the
6  record.)
7    Q.  The Patterson that you mentioned
8  earlier, Rodney Patterson, has a brother?
9    A.  Yes.
10    Q.  What is Rodney Patterson's brother's
11  first name?
12    A.  Greg Patterson was the lieutenant I
13  replaced at Mercer.
14        MR. SANDERS:  Thank you.
15  That's all I have right now.
16        -----
17        EXAMINATION
18  BY MR. CAMPBELL:
19    Q.  Lieutenant Williams, you filed a
20  suit against the Troopers Association.  It's
21  Civil Action No. 03-130 E.  How long have you
22  been a member of the Troopers Association?
23    A.  Since about 1970.
24    Q.  Is a condition of employment for
25  being employed by the Pennsylvania State Police

Page 184

1    B. Williams - by Mr. Campbell
2  that you be a member of the Troopers
3  Association?
4    A.  No, but they do have the right to
5  take money from my paycheck for what's called a
6  fair share for bargaining purposes.
7    Q.  You do belong to the Troopers
8  Association?
9    A.  Correct.
10    Q.  Now, you had mentioned in your
11  testimony about the Fraternal Order of Police
12  Lodge.  I think the number was 54?
13    A.  54, Butler.
14    Q.  What's the relationship between the
15  Fraternal Order of Police Lodge 54 and the
16  Troopers Association?
17    A.  Lodge 54, Fraternal Order of Police
18  is part of the PSTA.
19    Q.  Let me ask you this question.  Is
20  Lodge 54 and its membership limited to state
21  troopers, or are there members of that lodge
22  that may belong to local municipal forces?
23    A.  They are all state troopers.
24    Q.  They are all state troopers.  Are
25  they restricted to a particular area of

46 (Pages 181 to 184)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 185

1        B. Williams - by Mr. Campbell
2    Pennsylvania, the members?
3        A.   I don't understand the question.
4        Q.   In other words, Lodge 54, does that
5    just take in Area 4 or others?
6        A.   Butler, Lodge 54 just covers the
7    troopers in Butler.
8        Q.   If you're a trooper in Mercer or
9    Erie, you're not a member of Lodge 54?
10       A.   Butler troop is Troop D.  In Mercer,
11   you're part of Troop D.  In Erie, you would be
12   in Lodge 48.
13       Q.   Now, you mentioned during your
14   testimony that you had a prior grievance that
15   was filed in 1994, and this dealt with a
16   transfer; is that correct?
17       A.   Correct.
18       Q.   Was that processed by the Troopers
19   Association to a hearing before an arbitrator?
20       A.   Yes, after three years.
21       Q.   I think you said that you did make
22   some recovery for a dollar amount as a result
23   of mileage that you had to drive?
24       A.   Mileage and the overtime for the
25   drive from Mercer to Butler, the amount of time

Page 186

1        B. Williams - by Mr. Campbell
2    it took.
3        Q.   Now, have you filed any other
4    grievances other than the two that are at issue
5    in this particular lawsuit, and the one we just
6    talked about in 1994?  Have you had occasion to
7    file any other grievances?
8        A.   Grievance D-140 I combined with 138.
9    138 was the transfer.  140 was once I got
10   there, they stripped my duties and denied me
11   overtime for the murder investigation.
12       Q.   In 1994, you had two grievances that
13   were both joined together for purposes of the
14   hearing?
15       A.   Right, correct.
16       Q.   What happened in the case that we
17   have before us today is that you filed
18   two grievances, and they were both joined for
19   purposes of the hearing?
20       A.   Yes.
21       Q.   My question is other than those
22   two grievance procedures, have you filed any
23   other grievances against the state police?
24       A.   When you say "two," are you talking
25   about the two --

Page 187

1        B. Williams - by Mr. Campbell
2        Q.   I'm talking about the joined ones.
3        A.   The two groups?
4        Q.   Yes, the two groups.
5        A.   Yes.  In 1994 I also filed D-136
6    against Major Seilhamer.
7        Q.   What was the nature of your
8    grievance at that time?
9        A.   I mentioned where a PCO said I lied
10   during an arbitration.  Major Seilhamer
11   punished me, and I grieved the punishment.
12       Q.   What was the outcome of the
13   grievance?
14       A.   They decided to settle without going
15   to arbitration and changed the determination
16   from nonsustained to unfounded.
17       Q.   That didn't actually get to a
18   hearing stage.  It was settled by the parties
19   prior to that?
20       A.   Correct, because I found some
21   additional information and sent it to him.
22       Q.   Again, the association at least
23   processed it to that step?
24       A.   Correct.
25       Q.   Now, in relation to your transfer, I

Page 188

1        B. Williams - by Mr. Campbell
2    think the grievance that you filed there has
3    been labeled D-200?
4        A.   Yes.  That's the transfer from
5    Mercer to Butler.
6        Q.   Right.  In that particular
7    grievance, what you were contesting was this
8    September 11, 2000 transfer from Troop D,
9    Mercer to Troop D, Butler; is that correct?
10       A.   That and reimbursement for the
11   travel costs for time-and-a-half.
12       Q.   One of the contentions in your
13   grievance was that this was really a
14   disciplinary transfer?
15       A.   Correct.
16       Q.   What you sought as a remedy was that
17   you wanted to be transferred back to Mercer as
18   the station commander --
19       A.   Correct.  If I may correct one
20   thing.
21       Q.   Let me finish my question, and then
22   you can add something.  Let me go back and ask
23   the question again.
24           What you were seeking as a remedy
25   when you prepared that grievance was that you

47 (Pages 185 to 188)

Powers, Garrison & Hughes

Page 189

B. Williams - by Mr. Campbell

1  wanted to be transferred back to Mercer into
2  the position you had before which was the
3  station commander?
4     A.  Correct.
5     Q.  In addition, you wanted some
6  overtime pay for the extra commuting time from
7  your home in Erie to Butler?
8     A.  Correct.
9     Q.  Was there any other remedy that you
10 wanted with this one particular grievance which
11 has been labeled D-200?
12    A.  I want any negative connotation
13 removed from my personnel file, and I also
14 indicated that I filed for violations of my
15 civil rights, discrimination.
16    Q.  When you say for your violation of
17 civil rights, you mean as a grievance, through
18 the grievance procedure?
19    A.  Yes. Under the disciplinary system,
20 they said it was a disciplinary transfer, but
21 in the body of that grievance, I also listed
22 that I was grieving it because of
23 discrimination and violation of my civil
24 rights.

Page 190

B. Williams - by Mr. Campbell

1     Q.  Did you draft the grievance?
2     A.  Yes. I wrote it.
3     Q.  Now, the procedere is when you draft
4  the grievance, what is the next step?
5     A.  You have 15 days to submit it to the
6  Bureau of Labor Relations in Harrisburg. At
7  that time, you also have five days to submit a
8  copy to the union PSDA.
9     Q.  When you submit a grievance, is that
10 subject to approval by the Troopers Association
11 as a valid grievance, a matter that they're
12 willing to process and ultimately if necessary
13 take to a hearing?
14    A.  Yes.
15    Q.  Now, you had testified earlier that
16 you originally were born in Mississippi, but at
17 some time in your life, you apparently moved to
18 Erie, Pennsylvania; is that correct?
19    A.  Correct.
20    Q.  When was that?
21    A.  Six months old.
22    Q.  Have you lived in Erie since you
23 were six months old?
24    A.  Yes.

Page 191

B. Williams - by Mr. Campbell

1     Q.  Of course, you spent some time in
2  the Service, but this has always been your
3  residence?
4     A.  Correct. Actually, that's not
5  correct. When I was stationed in Butler, I
6  lived in New Castle.
7     Q.  Did you still have a residence in
8  Erie though?
9     A.  No.
10    Q.  You sold your house here and moved?
11    A.  I rented an apartment.
12    Q.  Are you married?
13    A.  No.
14    Q.  You mentioned that you had children.
15    A.  Yes.
16    Q.  You were married at some time?
17    A.  No.
18    Q.  You have never been married?
19    A.  Never.
20    Q.  How many children do you have?
21    A.  Eight.
22    Q.  Are they all by the same woman?
23    A.  No.
24    Q.  By different women?

Page 192

B. Williams - by Mr. Campbell

1     A.  Yes.
2     Q.  Have you lived with any of these
3  women in Erie?
4     A.  No.
5     Q.  Do any of the children live with
6  you?
7     A.  No. I'm with them a lot.
8     Q.  I'm sorry. I didn't hear you.
9     A.  I'm with them a lot, but they live
10 with their mothers.
11    Q.  So you live alone?
12    A.  Correct.
13    Q.  Do each of the children have a
14 separate mother?
15    A.  Three separate mothers.
16    Q.  Now, from your residence in Erie,
17 what is the driving distance to the station in
18 Mercer where you were working?
19    A.  68 miles.
20    Q.  Is that one way?
21    A.  One way, correct.
22    Q.  What is the distance from your home
23 to the station in Butler to which you were
24 transferred?

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 193

1          B. Williams - by Mr. Campbell
2      A.   It was another 55 miles.
3      Q.   So that's an additional 55 miles
4  over the 68?
5      A.   Correct. I had to drive past Mercer
6  to get to Butler.
7      Q.   When you were in Butler, in effect,
8  you were driving in excess of 100 miles a day
9  one way?
10     A.   55 miles additional one way. On the
11  return trip back it was another -- both ways it
12  was an additional 100 miles.
13     Q.   Correct. So you were spending a
14  good part of each day actually driving to and
15  from work?
16     A.   Correct.
17     Q.   As long as you obeyed the speed
18  limit?
19     A.   Yes.
20     Q.   Now, the second grievance which you
21  filed, that was as a result of your getting
22  your note that you were to be suspended and
23  transferred for a second time?
24     A.   Correct.
25     Q.   I have a date of January 2, 2001, as

Page 194

1          B. Williams - by Mr. Campbell
2  to when they informed you that you were to be
3  suspended for ten days, and then you would be
4  transferred from Butler to Erie. Is that
5  correct in terms of what you were grieving?
6  Somebody gave you notice that there is a
7  ten-day suspension, and in addition, you're
8  being transferred for disciplinary reasons?
9      A.   I saw something dated January 2 and
10  January 4, but my official notification was
11  that Captain Simon --
12          MR. SANDERS: He's not getting
13  hung up on that.
14          MR. CAMPBELL: No.
15          MR. SANDERS: He's just asking
16  you if that's what you were grieving over.
17     A.   Yes, that's what I'm grieving over.
18     Q.   Again, when you found out about
19  that, you prepared a grievance. What you were
20  seeking as a remedy was that you disputed that
21  you should not be suspended at all.
22     A.   Yes.
23     Q.   You also wanted to be transferred
24  back to Mercer.
25     A.   Correct.

Page 195

1          B. Williams - by Mr. Campbell
2      Q.   In addition, you requested that
3  there be an investigation done of the people
4  that were basically making accusations against
5  you at the Mercer station.
6      A.   Correct.
7      Q.   Again, that grievance went through
8  the procedure and ultimately had to go to the
9  Troopers Association for processing; is that
10  correct?
11     A.   Correct.
12     Q.   Now, at some point, the Association
13  approved taking both of those matters, both of
14  your grievances, to binding arbitration; is
15  that correct?
16     A.   They first denied it and then
17  approved it.
18     Q.   With that approval, they also
19  provided you with an attorney, a Mr. Tony
20  Caputo?
21     A.   For the arbitration?
22     Q.   Yes.
23     A.   Yes.
24     Q.   That is the procedure. The
25  Association had hired a law firm in Harrisburg,

Page 196

1          B. Williams - by Mr. Campbell
2  Lightman & Welby. That's the firm that
3  represents the Troopers Association. If you
4  ask for their legal assistance, they assign one
5  of those attorneys to present the grievance.
6      A.   I didn't ask for it. The union
7  asked for it, not me.
8      Q.   I'm sorry. I just want to get this
9  clear. You filed the grievance?
10     A.   Right.
11     Q.   What you were asking the association
12  to do was to process the grievance, and if
13  necessary, take it to binding arbitration?
14     A.   Correct.
15     Q.   They ultimately agreed to do that.
16  In doing that, they also provided you with
17  legal counsel.
18     A.   Correct.
19     Q.   Through the association.
20     A.   Correct.
21     Q.   Now, you didn't pay that attorney.
22  The association was going to pay the attorney.
23     A.   Correct.
24     Q.   Now, there was an arbitrator that
25  was selected in order to hear your

Powers, Garrison & Hughes

Page 197

B. Williams - by Mr. Campbell

1  two grievances. I think the gentleman's name
2  was Simonnett. Is that correct?
3
4      A.   Correct.
5      Q.   Was he an African-American?
6      A.   I believe so.
7      Q.   He appeared to be to you?
8      A.   Yes.
9      Q.   One of the things that I think you
10  made clear in your testimony today was that the
11  situation you faced in Mercer was that you had
12  a Captain Simon who was your supervisor, and
13  who you believed wasn't treating you fairly.
14  Would that be a correct statement of what you
15  said?
16      A.   I believe he wasn't treating me
17  fairly upon directions from Major Seilhamer.
18      Q.   You don't believe then that
19  Captain Simon had any personal animosity
20  towards you. Would that be correct?
21      A.   I would not know.
22      Q.   Did the two of you ever have any
23  conversations or discussion that would lead you
24  to believe that he personally was against you
25  or didn't like you?

Page 198

B. Williams - by Mr. Campbell

1      A.   I never had a conversation, so I
2  don't know.
3
4      Q.   Now, your testimony has been that
5  his supervisor, Major Seilhamer, was really
6  behind the problems that you were having.
7      Other than your belief, do you have
8  any objective evidence such as a document or a
9  conversation that you may have had that would
10  indicate he was manipulating Captain Simon?
11      A.   Yes.
12      Q.   What is that?
13      A.   August 1999, the week before the
14  first meeting at Mercer station. Major
15  Seilhamer called me into his office. I was in
16  Butler for another reason. He saw me and
17  called me into his office. He advised me that
18  he was going to direct Captain Simon to visit
19  my station and have a meeting with the members
20  at Mercer station due to a complaint from
21  Ray Meldar, FOP president.
22      Q.   Is that it?
23      A.   When I asked Captain Simon in
24  September about him punishing me by not
25  allowing me to visit the station after dark and

Page 199

B. Williams - by Mr. Campbell

1  getting out of Mercer County, and I asked him
2  specifically if the major was aware of it.
3
4      He advised me that he had cleared it
5  with the major, the major was fully aware of
6  what he was doing to me. I personally told the
7  major about the situation in July 14, 2000. I
8  asked in writing and verbally, I asked him to
9  please put a stop to the illegal treatment and
10  harassment. He failed to do that.
11      Q.   So the situation you're faced with
12  then is that your immediate supervisor and the
13  next highest ranking supervisor, it appears
14  that they're being unfair or discriminatory
15  towards you?
16      A.   Correct.
17      Q.   Now I think, according to your
18  testimony, you listed a number of names that
19  while you were at Mercer there were also people
20  that were under you or your command,
21  specifically, Sergeant Anderson and
22  Corporals Whelan, Rossman and Kelly, who
23  appeared to be making what you believe to be
24  false accusations or allegations about the way
25  you were running the troop and things you were

Page 200

B. Williams - by Mr. Campbell

1  doing. Is that also correct?
2      A.   They were absolutely false
3  accusations.
4
5      MR. SANDERS:  He is asking you
6  if that was correct?
7      A.   That's correct, yes.
8      Q.   Then even below those ranks, there
9  were numerous troopers who were also filing
10  complaints through the union or somehow to your
11  supervisors complaining about how you were
12  running the station.
13      A.   Correct.
14      Q.   Basically, you had a situation where
15  of all the people under your command -- there
16  was really only one person who was a supporter
17  of yours, and that was Corporal Tyzinski?
18      A.   Totally false.
19      Q.   Totally false?
20      A.   I had 50 people at Mercer station.
21  The problem area was from about 20 or 25 of
22  them.
23      Q.   Now, in February of the year 2000,
24  did you give some indication to the people
25  under your command that you were dissatisfied

Page 201

1    B. Williams - by Mr. Campbell
2  with the performance of some of them?
3    A.   In February?
4    Q.   Yes, February of the year 2000.
5  Maybe I can give you some examples. Reports
6  weren't being completed on time. You felt
7  there was some overtime abuse. The patrol
8  mileage was low, and the citation stats were
9  low.
10    A.   I believe I mentioned a few things
11  at a staff meeting on February 2 or February 3.
12  I directed the sergeant to handle the problem
13  and talk to the troopers.
14    Q.   Also, February 1, 2001, did you
15  eliminate the midnight shift at Mercer?
16    A.   Yes.
17    Q.   Do you feel that that was unpopular
18  with the people that had been working that
19  shift?
20    A.   It was very unpopular. I knew that
21  when I issued the order.
22    Q.   At some point in time,
23  Corporal Whelan, who we mentioned before, he
24  met with the troopers and basically told some
25  of them that they were on an unacceptable list.

Page 202

1    B. Williams - by Mr. Campbell
2  By that, I mean in terms of their performance,
3  citations they were writing and things like
4  that. Is that correct?
5    A.   That's what he said in the letter to
6  me.
7    Q.   Now, at some point, did
8  Captain Simon then instruct you to issue what's
9  called a supervisor's notation to Corporal
10  Whelan, not disciplining him, but sort of
11  counseling him on that was unacceptable?
12    A.   Sort of. I was already in the
13  process of doing that when he mentioned that.
14  I advised him of that.
15    Q.   What was it that the corporal was
16  doing that you felt was unacceptable?
17    A.   He had that meeting with the
18  troopers and was discussing a number of 20, to
19  issue 20 citations was unacceptable.
20    Q.   This is sort of where the idea of
21  the imposed quota started from?
22    A.   Yes. I gave him the supervisor's
23  notation and then immediately upon me giving
24  him the supervisor's notation, then the
25  allegation was made against me.

Page 203

1    B. Williams - by Mr. Campbell
2    Q.   That's a situation where it's a form
3  of corrective action, but it's short of the
4  disciplinary procedure where somebody gets a
5  written reprimand or an oral reprimand or even
6  a suspension. Would that be correct, a
7  supervisor's notation, that's a term of art?
8    A.   Can you say that again?
9    Q.   There's a form. It's called a
10  supervisor's notation.
11    A.   It's not a formal form of
12  discipline.
13    Q.   It's like counseling?
14    A.   Correct.
15    Q.   It's like telling them, look, you
16  didn't handle that properly.
17    A.   Correct.
18    Q.   Apparently, Corporal Whelan was
19  upset with that, and then he filed a written
20  response?
21    A.   Correct.
22    Q.   Now, what brought the quota system
23  to a head was one of the troopers under your
24  command, Trooper Perrine, he went to a private
25  attorney, an Attorney Cline. Apparently,

Page 204

1    B. Williams - by Mr. Campbell
2  Attorney Cline then sent a letter to
3  Captain Simon and complained about unlawful
4  quotas at the station?
5    A.   No. What brought it to a head was
6  right after I gave Corporal Whelan the
7  supervisor's notation, that very day within a
8  matter of an hour, Corporal David Kelly made a
9  complaint over to Ray Meldar. I believe he
10  E-mailed him an E-mail alleging that Whelan was
11  following my order. That's what started it.
12        That was on the 9th, the same day I
13  gave Whelan the supervisor's notation. The
14  attorney letter was dated the next day, the
15  10th.
16    Q.   Basically, what happened now was
17  that your professional responsibility within
18  the Pennsylvania State Police, they started an
19  investigation. I think the district attorney
20  of Mercer County at some point in time even
21  investigated the allegation that there was some
22  imposed quota of citations?
23    A.   Correct. The district attorney
24  called me down to his office.
25    Q.   Ultimately, the district attorney

Page 205

1    B. Williams - by Mr. Campbell
2  issued a finding that he didn't find anybody in
3  the troop that was guilty of, or he wasn't
4  going to press any charges on the basis that
5  anybody imposed quotas?
6    A.  He plainly stated that he didn't
7  find any quotas imposed at Mercer station.
8  Correct.
9    Q.  Now, subsequently though, it was
10  September 11, that's when you were transferred
11  to Butler?
12    A.  I was told on September 6.  It took
13  effect on September 11.
14    Q.  It was only about four days after
15  that that Captain Simon came down with his
16  report and basically concluded that you had
17  imposed a quota.  He also noted in there that
18  you were guilty of some administrative
19  deficiencies.
20    A.  Correct.
21    Q.  As we said earlier, you filed
22  grievances as to the initial transfer, and
23  ultimately when they imposed discipline for the
24  quotas, you also grieved that?
25    A.  Correct.

Page 206

1    B. Williams - by Mr. Campbell
2    Q.  Now, your allegations against the
3  association -- and I will make reference to the
4  Complaint, Subparagraph A -- is that you had to
5  pay for the services of a court reporter.  The
6  initial hearings before the arbitrator were on
7  May 24 and May 25 of 2001; is that correct?
8    A.  Correct.
9    Q.  Now, prior to the hearings on
10  May 24 and May 25, had you met with
11  Attorney Caputo?
12    A.  Yes.  I met with him in Oil City.
13    Q.  Did you discuss with him your desire
14  to have a court reporter present for the
15  noncourt-marshal hearing?
16    A.  For the hearing, correct.
17    Q.  Did you indicate to him at that time
18  that you felt some of the people who were going
19  to testify against you were not going to be
20  testifying truthfully, and you would want a
21  copy of the transcript in order to impeach them
22  in a suit you were thinking about bringing?
23    A.  I don't believe I told him I was
24  going to bring a suit.  I mentioned an EEOC
25  complaint.

Page 207

1    B. Williams - by Mr. Campbell
2    Q.  Maybe that's what I mean by a suit.
3  You were upset with the people that had made
4  accusations against you, and you wanted their
5  testimony under oath.
6    A.  The reason I wanted their testimony
7  under oath is I suspected that they would be a
8  little bit more truthful than they would have
9  if it was just a blanket testimony and nothing
10  they said was recorded.
11    Q.  Now, did Attorney Caputo inform you
12  that neither the Troopers Association nor the
13  Commonwealth would have a court reporter
14  present for a noncourt-martial hearing?
15    A.  I believe he mentioned something to
16  that effect.  I disagreed with him on that.  I
17  had numerous cases where they did have them
18  there for lots of noncourt-martial offenses.
19    Q.  The day you showed up for the
20  hearing on May 24, 2001, the only court
21  reporter that was there was the one you
22  privately engaged?
23    A.  Correct.
24    Q.  The Commonwealth didn't have one
25  there?

Page 208

1    B. Williams - by Mr. Campbell
2    A.  Correct.
3    Q.  And the neutral arbitrator,
4  Mr. Simonnett, hadn't ordered or brought a
5  court reporter?
6    MR. SANDERS:  I am going to
7  object to the characterization of Mr. Simonnett
8  as neutral.
9    MR. CAMPBELL:  We'll just
10  strike neutral and call him an arbitrator.
11    MR. SANDERS:  Thank you.
12    Q.  Now, at the time of the hearing,
13  when the arbitrator saw that there was a court
14  reporter there, did he indicate that if you
15  were going to have it transcribed, he wanted a
16  copy of the transcript?
17    A.  At the end of the hearing on the
18  first day, May 24, he indicated that since
19  testimony had been recorded by a court
20  reporter, that he had to have a copy of the
21  transcript.  He basically said I don't care
22  which one of you three provide it, but one of
23  you are to provide me with a copy of the
24  transcript.
25    Joanna Reynolds and Attorney Caputo

52 (Pages 205 to 208)

Page 209

1    B. Williams - by Mr. Campbell
2 indicated that they were not going to do it. I
3 spoke to Caputo outside in the hallway. He
4 advised me that he didn't think the union would
5 provide the transcript, but he would request
6 that they did. Then he also indicated that I
7 may also want to contact the union to provide
8 the transcript.
9    Q.  Now, if you hadn't brought a court
10 reporter yourself, this hearing would have gone
11 ahead with the arbitrator, with Joanna
12 Reynolds, who represented the state police, and
13 with Attorney Caputo, and having a hearing
14 without a transcript; is that correct?
15    A.  I don't know. Maybe, I don't know.
16    Q.  Well, you agree the Commonwealth
17 didn't have a court reporter there?
18    A.  Right.
19    Q.  The arbitrator hadn't brought a
20 court reporter?
21    A.  Right. However, in September at the
22 second part of the hearing, Attorney Caputo had
23 contacted me and said --
24    Q.  Well, wait a second. We're not
25 there yet. I'm talking about May 24 and

Page 210

1    B. Williams - by Mr. Campbell
2 May 25.
3    At the initial two days of the
4 hearing, you were the one that brought the
5 court reporter?
6    A.  Correct.
7    Q.  Now, what you state in Paragraph A
8 is that similarly situated employees were
9 treated differently. The first name I have
10 here is Richard Queen?
11    A.  Correct.
12    Q.  What was the situation with Richard?
13    A.  He was a lieutenant. He had
14 received two or three suspensions from his
15 major or some type of investigation for some
16 work performance. I think one was a five-day
17 suspension and a three-day suspension. He had
18 grieved it, and the court reporter was there.
19 It was not a dismissal hearing. He was
20 grieving the suspension.
21    Q.  You're saying that in the case of
22 Richard Queen, this was a noncourt-martial
23 hearing?
24    A.  Correct. Also in Lieutenant
25 Stackhouse.

Page 211

1    B. Williams - by Mr. Campbell
2    Q.  Well, we're going through each one.
3 It is your understanding that if it's a
4 court-martial, meaning the person is to be
5 terminated, there is a record made. Do you
6 know that?
7    A.  I'm not sure I was aware of that at
8 that time. I always assumed that.
9    Q.  Go ahead. Finish your answer.
10    A.  The reason why I assumed there would
11 be a court reporter for these is because in
12 1997, for that arbitration of D-138 and D-140,
13 the union provided a court reporter.
14    Q.  Was that a noncourt-martial hearing?
15    A.  That was the transfer down to Butler
16 from 1994.
17        MR. SANDERS: So the answer is
18 yes?
19        THE WITNESS: The answer is
20 yes.
21    Q.  As opposed to be being a grievance?
22    A.  It was a grievance. I filed a
23 grievance for the transfer.
24    Q.  Were you grieving under the contract
25 as opposed to grieving discipline that had been

Page 212

1    B. Williams - by Mr. Campbell
2 imposed on you?
3    A.  I was grieving discipline. The
4 transfer was discipline, so I grieved it under
5 the same section I grieved the D-200.
6    Q.  The next name is Arthur Hershey? Do
7 you know what the situation was with
8 Trooper Hershey?
9    A.  Yes. He was a sergeant in charge of
10 a station. There were some allegations made
11 against him. His troop commander did to him
12 the same as Captain Simon did to me later.
13 That was I believe in 1995. December of 1995 I
14 believe it was.
15        His troop commander transferred him
16 in the midst of an internal investigation,
17 transferred him away from his station. He
18 filed a grievance. There was a court reporter
19 at that arbitration hearing.
20        I also might add, it was held within
21 40 days. It followed the grievance, and the
22 arbitration was scheduled and heard within
23 40 days. Mine took three years in 1994, and a
24 year-and-a-half for this last one.
25    Q.  Now, the next is Patrick Mannion.

53 (Pages 209 to 212)

Page 213

1         B. Williams - by Mr. Campbell
2   Do you know what was involved with that?
3         A.   I don't recall at this time.  I do
4   recall that the court reporter was there.
5         Q.   You don't know the nature of the
6   hearing?
7         A.   I can't think of it right now.  I'm
8   sure it will come to me later.
9         Q.   The next name is Gregory Styers.
10        A.   I believe he was grieving some
11  suspension time.
12        Q.   So you think that was also a
13  noncourt-martial?
14        A.   Yes.
15        Q.   Roy Guthrie?
16        A.   Noncourt-martial.  Roy was a
17  trooper.
18        Q.   A trooper?
19        A.   Roy was a trooper who received --
20  let me think now -- suspension time for not
21  arresting a guy in a toll booth, him and
22  another trooper.  I think they were suspended.
23  They grieved it.
24            When they grieved it, because a
25  witness was not available, they postponed the

Page 214

1         B. Williams - by Mr. Campbell
2   grievance as opposed to what they did at mine,
3   they let a witness testify on the telephone.
4         Q.   Christopher Aubrecht.
5         A.   He was the second trooper I was
6   talking about.  Those two were together.
7         Q.   The last one is Diane Stackhouse?
8         A.   Yes.  She was a lieutenant.  They
9   conducted an investigation for her allegedly
10  having answers to the promotion test from the
11  lieutenant.  They conducted an investigation of
12  her.  The union alleged that they violated her
13  rights by improperly investigating witnesses.
14            Not only did they have a court
15  reporter there for that, but she also filed a
16  suit in the Commonwealth Court or I'm thinking
17  it may be even federal court on her behalf.
18        Q.   Now, when you hired the court
19  reporter for this hearing, were you under the
20  impression that the cost of the court reporter
21  might only be a couple hundred dollars?
22        A.   That's what I assumed.  When I hired
23  the court reporter, my understanding was that I
24  may have to pay for the court reporter.  At the
25  time I hired a court reporter, there was no

Page 215

1         B. Williams - by Mr. Campbell
2   mention of that I may have to pay for the
3   transcript.  I assumed it would be about two to
4   three hundred bucks.
5         Q.   So you thought when you hired the
6   court reporter you were just going to have to
7   pay for like her time or appearance fee as
8   opposed to paying for that plus a transcript?
9         A.   I thought I was going to pay for her
10  cost, period, two or three hundred bucks for
11  her being there.
12        Q.   Now, under Subparagraph B, you
13  stated that you feel you weren't fairly
14  represented because a witness was allowed to
15  testify by phone on September 27 of 2001.  Who
16  was that witness?
17        A.   Corporal David Kelly.
18        Q.   Was he your witness, or was he the
19  Commonwealth's?
20        A.   Commonwealth's.  He was the one that
21  started the quota allegation.  He was central
22  to my defense.  I wanted to cross-examine him.
23        Q.   Now, was he out of state at the
24  time?
25        A.   Allegedly.

Page 216

1         B. Williams - by Mr. Campbell
2         Q.   It was a telephone deposition?
3         A.   Correct.  If I might add, he also
4   took off and was allegedly out of the state
5   back on May 24 and May 25.  So in September
6   when he testified over the telephone, that was
7   the second time that he conveniently went out
8   of the state.
9         Q.   Prior to his testifying, had he been
10  faxed or mailed the exhibits he had to testify
11  about?
12        A.   I was not aware of that until I
13  walked in there on September 27.
14        Q.   Were you present during his
15  testimony?
16        A.   Yes.
17        Q.   Who called him as a witness?
18        A.   Joanna Reynolds for the PSP.
19        Q.   Was Attorney Caputo permitted to
20  cross-examine?
21        A.   Yes, but it was limited.
22        Q.   How was it limited?
23        A.   He could only cross-examine him on
24  documents that Corporal Kelly had with him
25  wherever he was at.  I was sitting there with a

54 (Pages 213 to 216)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 217

1    B. Williams - by Mr. Campbell
2    lot of documents to have Attorney Caputo
3    question him on which would prove he was lying
4    or at least to my defense. Because he didn't
5    have the documents in front of him, he could
6    not or he was unable or he refused to ask him
7    any of those questions.
8        So, none of those documents, those
9    additional documents that I had there -- which
10   normally if he would have been there in the
11   room, we would have been able to produce the
12   documents and question him on them. Because he
13   was away, we could not, and we were not allowed
14   to ask him any questions because he didn't have
15   the documents with him.
16   Q.   Was he testifying about the quota?
17   A.   Yes.
18   Q.   You were cleared ultimately of all
19   the charges of the quota by the arbitrator,
20   correct?
21   A.   Correct. If I might add one thing,
22   he also testified about my alleged work
23   performance, the fact that he did not want me
24   to be station commander at Mercer.
25   Q.   That was his opinion?

Page 218

1    B. Williams - by Mr. Campbell
2    A.   Yes.
3    Q.   There weren't any documents involved
4    for that?
5    A.   No.
6    Q.   Now, a lot of these witnesses that
7    were called to testify, were they giving
8    opinions as to your ability to manage the
9    station?
10   A.   I don't know. As far as I was
11   concerned, there was just a bunch of lies
12   because of the discrimination.
13   Q.   I understand that. My question is
14   the people that were called as witnesses
15   by the Commonwealth, were they giving testimony
16   that was critical of your ability to administer
17   the station?
18   A.   Yes.
19   Q.   Would that have been true of all of
20   the Commonwealth witnesses?
21   A.   No. Some of them just testified
22   about the alleged quota comment.
23   Q.   How many witnesses did the
24   Commonwealth call?
25   A.   Five supervisors from Mercer,

Page 219

1    B. Williams - by Mr. Campbell
2    Captain Simon -- it would be about seven or
3    eight.
4    Q.   Of the seven or eight, the ones who
5    were supervisors either above or below you,
6    would they have been critical of you in
7    relation to your administrative skills?
8    A.   Captain Simon was, and two or three
9    of the supervisors were. Yes.
10   Q.   Now, the next witness, it was on
11   November 8, 2001. That individual who
12   testified by phone, was that actually at a
13   hearing before the arbitrator?
14   A.   No. He was not before an
15   arbitrator. It was done by a deposition.
16   Q.   The idea was then that this
17   individual was going to be deposed much as
18   you're being deposed today, but it was being
19   done by telephone?
20   A.   I don't know. I was not in
21   Harrisburg to see how they handled it. I was
22   upset and disappointed that Attorney Caputo
23   would not subpoena him. So that when we were
24   in Butler on May 24, May 25, September 27 and
25   September 28, he refused to subpoena him as I

Page 220

1    B. Williams - by Mr. Campbell
2    requested.
3        Therefore, on the date when he was
4    due to testify, he conveniently took off from
5    work and never showed up. The attorneys among
6    themselves agreed that they would depose him
7    out of sight and out of ear of the arbitrator.
8    I thought it was unfair to me. I was upset.
9    So what happened in Harrisburg, I don't know,
10   because I didn't go to Harrisburg.
11   Q.   Ultimately, was there a transcript
12   introduced into the record of this particular
13   person's deposition?
14   A.   I don't know. I've never seen what
15   he said. No one ever told me.
16   Q.   Who was the witness?
17   A.   Corporal Dean Longs from Mercer.
18   Q.   What was he testifying to?
19   A.   He was testifying to the fact that
20   he had never heard me issue a quota allegation
21   at Mercer station.
22   Q.   He was actually a witness that was
23   favorable for you?
24   A.   He was a hostile witness that was
25   favorable for me.

Page 221

1    B. Williams - by Mr. Campbell
2    Q.   You were cleared ultimately of that
3  charge of imposing the quota?
4    A.   Correct.
5    Q.   In Subparagraph C, you say that you
6  were denied fair representation by a failure to
7  subpoena specific documents such a weekly work
8  rosters, leave slips, the IAD investigation
9  report and relevant E-mails?
10    A.   Yes.
11    Q.   What specifically would these
12  documents have shown?
13    A.   It would have shown that this
14  alleged quota meeting that I had with these
15  five supervisors would have been impossible to
16  have. We never worked the same shift in that
17  time frame.
18    Q.   Did you testify at these grievance
19  hearings?
20    A.   Yes.
21    Q.   Did you testify to that?
22    A.   Yes.
23    Q.   You were believed?
24    A.   Yes.
25    Q.   You are saying this information just

Page 222

1    B. Williams - by Mr. Campbell
2  would have supported your credibility? In
3  other words, these were documents that would
4  have also supported what you were testifying to
5  the arbitrator?
6    A.   Correct. Also, it would have gone
7  and clearly impeached their testimony as it
8  related to me for alleged poor work
9  performance.
10    Q.   I thought you said it went as to
11  imposing quotas. Specifically, what would
12  these documents have had to do with your work
13  performance?
14    A.   Like I said, it would have further
15  impeached their testimony and showing they were
16  clear liars, clearly lying.
17    Q.   Now, you say these type of records
18  are routinely subpoenaed. What's your basis
19  for saying that?
20    A.   I have been on the state police for
21  35 years. I am aware of numerous and have seen
22  numerous meeting notes from grievances around
23  the state that on numerous occasions the PSDA
24  requested the subpoenaed copies of the internal
25  investigation.

Page 223

1    B. Williams - by Mr. Campbell
2    Q.   Now, did Attorney Caputo introduce
3  exhibits on your behalf?
4    A.   Yes.
5    Q.   I think the record shows he
6  submitted approximately 30 exhibits.
7    A.   I believe so.
8    Q.   Now, Subparagraph D states that on
9  October 8 of 2001, you were forced to pay for
10  the cost of the arbitration transcript?
11    A.   Correct, $3,373.
12    Q.   Again, you say that -- and I won't
13  go through all of the individuals. You cite
14  the same names in Paragraph D that you cited up
15  in Paragraph A?
16    A.   Correct.
17    Q.   Was it your impression that the
18  transcript, if it had been paid by the
19  association, would have been your transcript?
20    A.   No. I knew the transcript would go
21  to an arbitrator, not me. I had been to a
22  grievance before.
23    Q.   You also know that that would have
24  been the property of the association. You
25  would have no right to that transcript?

Page 224

1    B. Williams - by Mr. Campbell
2    A.   Correct.
3    Q.   You know that under the law they are
4  not permitted to copy it for you?
5    A.   Correct. I never asked for a copy
6  of the transcript.
7    Q.   So what you're saying is that the
8  transcript would have helped Attorney Caputo in
9  preparing his brief?
10    A.   Yes, and also probably reminded him
11  of stuff he left out, stuff he left out of the
12  brief as in the AR-425. He and I discussed
13  that. He and I and Joanna Reynolds discussed
14  that in great detail.
15        In fact, when he produced it at the
16  arbitration hearing, she said it was out of --
17  what's the word? It had expired and was not in
18  effect, she would go back to Harrisburg and
19  check. Then she did advise him before he filed
20  the final brief that it was a valid special
21  order still in effect. In fact, it didn't get
22  changed until March of this year 2004.
23    Q.   Now, did you ever get a copy of
24  Attorney Caputo's brief?
25    A.   Yes, the brief.

56 (Pages 221 to 224)

Page 225

1    B. Williams - by Mr. Campbell
2    Q.   Was that prior to the submission of
3  the brief to the arbitrator?
4    A.   I believe it was at the same time.
5    Q.   Did you request any changes in the
6  brief?
7    A.   I didn't have time.  I believe the
8  letter indicated, or I think it was addressed
9  to myself and the arbitrator.  I think he cc'd
10  me something he sent to the arbitrator.  I
11  believe that's what it was.  It was already
12  gone.
13    Q.   Now, do you know if the attorneys,
14  the attorney for the Commonwealth and your
15  attorney, cleared it with the neutral
16  arbitrator?
17         MR. SANDERS:  Objection again.
18  You said the word "neutral."
19         MR. CAMPBELL:  Do you have any
20  reason to believe he wasn't neutral?
21         MR. SANDERS:  I'm not
22  testifying.  I'm just making objections.
23         MR. CAMPBELL:  I will say
24  "neutral arbitrator," and I'll note the
25  objection.

Page 226

1    B. Williams - by Mr. Campbell
2  BY MR. CAMPBELL:
3    Q.   Do you know if they discussed with
4  him the taking of testimony by phone and/or by
5  transcript?
6    A.   I don't know.
7    Q.   Well, you were present at the
8  hearings.  Are you saying that this took place
9  outside of the actual hearings?
10    A.   Discussion of telephone?
11    Q.   How the testimony of these witnesses
12  would take place.
13    A.   It took place out of my earshot.
14    Q.   Are you saying there has never been
15  a situation other than yours where somebody has
16  testified by telephone or by deposition?
17    A.   I don't know, but I objected to it.
18  I figured I had the right to object to anybody
19  testifying on the telephone, especially one of
20  my main accusers.
21    Q.   If you weren't there to hear the
22  arrangements, how could you object to it?
23    A.   I objected to it when
24  Attorney Caputo mentioned to me like one or
25  two days before the September 27 hearing.  He

Page 227

1    B. Williams - by Mr. Campbell
2  told me it was a done deal and there was
3  nothing he could do about it.
4    Q.   Going to Paragraph E, I think you
5  probably in the Complaint have the wrong name.
6  It is Solicitor Sean T. Welby, however, that's
7  Tony Caputo, who denied Plaintiff fair
8  representation by filing a brief without a copy
9  of the arbitration transcript.  Did you note
10  during the hearings that Attorney Caputo was
11  keeping notes?
12    A.   A very limited amount of notes.
13    Q.   Do you know how many pages of notes
14  he kept?
15    A.   My best guess is -- I don't know,
16  five to ten, I guess.  I remember sitting
17  beside him real concerned because he was not
18  taking notes, which is why I took almost a
19  complete notebook pad full of notes.
20    Q.   If I could produce for you 30 pages
21  of notes, would that change your opinion?
22         MR. SANDERS:  Now?  After the
23  fact, you're asking him?
24         MR. CAMPBELL:  Yes.
25         MR. SANDERS:  Answer the

Page 228

1    B. Williams - by Mr. Campbell
2  question.  If he produces 30 pages now for the
3  litigation, is that going to change your mind?
4         THE WITNESS:  That will not
5  change my mind at all.
6    Q.   You're saying he only took five or
7  ten pages of notes?
8    A.   To my best guess, somewhere around
9  five to ten of what I could see.  It would not
10  change my mind at all.
11    Q.   Now, you're also saying you were
12  denied fair representation by unduly delaying
13  the grievance proceeding?
14    A.   Correct.
15    Q.   What do you know about the
16  scheduling of the grievance proceedings?
17    A.   I filed a grievance.  The first one
18  I filed was in September.  I was notified on
19  December 12 that it had been denied and that
20  the state police and the commissioner had the
21  right to transfer lieutenants.
22         I then asked the grievance committee
23  to reconsider the determination.  They advised
24  me that they were sticking to their
25  determination, no.

Page 229

1        B. Williams - by Mr. Campbell
2        On January 16, 2001, I sent a letter
3    to the union. I attached to it a copy of the
4    Hershey decision from the arbitration decision
5    which basically he had grieved the same thing I
6    was saying. He was illegally transferred
7    during an internal investigation. Also the
8    fact that he had a hearing within 45 days. He
9    filed it, and the arbitration was scheduled
10   within 45 days. Then he was transferred back
11   to his station.
12       It was not until then that they
13   changed their mind. I then received another
14   letter probably in February saying we
15   reconsidered and now we're going to argue your
16   grievance and go forward. The problem with
17   that delay is that it allowed my illegal
18   transfer to stay in.
19       So under the union contract, once I
20   filed a grievance, what the union should have
21   done was force the state police either by
22   injunction or by court order to hold off any
23   punishment.
24   Q.   Didn't you go to court and attempt
25   to enjoin the proceeding?

Page 230

1        B. Williams - by Mr. Campbell
2    A.   Correct, in the Commonwealth Court.
3    Q.   You were denied?
4    A.   Correct. The judge ruled that since
5    we're bound to get binding arbitration, that
6    had to first be exhausted with the arbitration
7    procedure.
8    Q.   Now, your second grievance wasn't
9    filed until January 2001, correct?
10   A.   I believe January 20, or something
11   like that.
12   Q.   The two grievances, the one you
13   filed in September of 2002 and the one in
14   January 2001, were joined together?
15   A.   Only after I insisted on it.
16   Q.   How long was your hearing following
17   the filing of the January 2001 second
18   grievance?
19   A.   What do you mean?
20   Q.   Well, it looks from the record that
21   it was scheduled for May?
22   A.   Scheduled for May, right.
23   Q.   Now, is there a time limitation
24   under the collective bargaining agreement for
25   when arbitrators have to hear grievances?

Page 231

1        B. Williams - by Mr. Campbell
2    A.   I'm not aware of any.
3    Q.   Are you aware how those are
4    scheduled?
5    A.   No. The one I filed in 1994 was not
6    heard until 1997. This one was heard quicker
7    than that one, but I'm not aware.
8    Q.   You don't know that it's the
9    availability of the arbitrator who is selected?
10   A.   No, I don't know.
11   Q.   You don't know of Attorney Caputo
12   doing anything to delay this?
13   A.   No, I don't know.
14   Q.   Under Paragraph No. 8, you say,
15   Defendant was denied fair representation by
16   allowing Ray Meldar and Lou Lazzaro to sit on
17   Plaintiff's grievance committee?
18   A.   Yes.
19   Q.   Now, these grievances were approved
20   by the association?
21   A.   At the first meeting.
22   Q.   Then they did go to hearings?
23   A.   Yes.
24   Q.   How were you prejudiced?
25   A.   By delaying it.

Page 232

1        B. Williams - by Mr. Campbell
2    Q.   We'll get to that. Now the last one
3    is you're saying that you were denied equal
4    benefits in that they refused to assist you in
5    giving you financial assistance in your attempt
6    to get a court injunction?
7    A.   Correct.
8    Q.   Now, basically what the court said
9    was what the association was doing was the
10   proper procedure, they were filing the
11   grievance for you.
12   A.   Correct; however, Captain Ober, when
13   he made a request to the PSDA for assistance,
14   they gave him $2,000. They gave me nothing.
15   Q.   Did he go to court and enjoin a
16   hearing?
17   A.   Yes. In fact, he had the same
18   attorney from Baltimore that I had.
19   Q.   What was the difference then in your
20   case than in his if it's the same?
21   A.   I don't know, but he personally told
22   me that he requested assistance, and they gave
23   him $2,000.
24   Q.   Do you know the outcome of his case?
25   A.   Yes. They came to an agreement that

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 233

1          B. Williams - by Mr. Campbell
2    he would accept a transfer back to Harrisburg.
3        Q.    So that was settled?
4        A.    Settled, correct.
5        Q.    It didn't go to arbitration?
6        A.    I don't recall. I don't remember
7    him telling me. I don't think he told me what
8    happened, but he did tell me he got $2,000 for
9    the attorney.
10       Q.    I'm sure you have reviewed or read
11   the decision of the arbitrator when the matter
12   was finally decided. As to your original
13   grievance where you complained about being
14   transferred from Mercer to Butler, he found in
15   your favor on that, didn't he?
16       A.    Mercer to Butler, no.
17       Q.    Didn't he say that this was "double
18   jeopardy" that was really a disciplinary
19   transfer?
20       A.    Yes.
21       Q.    So you won on that point.
22       A.    But I didn't get reimbursed for the
23   two-hundred-and-some hours of travel time.
24       Q.    The arbitrator's decision and what
25   they decide is final and binding, correct?

Page 234

1          B. Williams - by Mr. Campbell
2        A.    Correct.
3        Q.    Now on the question of the ten days'
4    suspension. We already discussed that. It was
5    not imposed prior to the hearing. The
6    arbitrator also found that there was no basis
7    to conclude that you had imposed any type of a
8    quota, so you didn't serve a ten-day
9    suspension.
10       A.    No, but I was transferred.
11       Q.    Now, he transferred you. From
12   reading it, is it your conclusion that he
13   transferred you because of your lack of
14   administration or managerial skills at Mercer?
15       A.    What are you talking about?
16       Q.    The decision.
17       A.    Mercer to Butler?
18       Q.    No. I'm talking about that you were
19   transferred from Butler to Erie. Ultimately,
20   you wanted to go back to Mercer, correct?
21       A.    Correct.
22       Q.    Are you saying that on the
23   disciplinary transfer from Butler to Erie in
24   which you also received or were to receive a
25   ten-day suspension, that you would have taken a

Page 235

1          B. Williams - by Mr. Campbell
2    transfer back to Butler?
3        A.    Back to Mercer.
4        Q.    You wanted to go to Butler. You
5    didn't want to go back to Mercer?
6        A.    I wanted to go back to Mercer.
7        Q.    On the second grievance, you were
8    sent from Butler to Erie. If you won that
9    second grievance, you didn't want the
10   arbitrator to send you back to Butler, did you?
11       A.    No. I want to go back to Mercer
12   which is why I filed both grievances together.
13       Q.    He made a finding in his decision,
14   and he felt that there was a basis to uphold
15   the transfer to Erie. Now as I understand it,
16   the reason you want to go back to Mercer is for
17   the appearance; is that correct?
18       A.    No.
19       Q.    Why would you want to go back and
20   work where your immediate supervisor and his
21   supervisor are apparently discriminating
22   against you, and that all the people or at
23   least half the people that are working under
24   you are hostile toward you and are resistant to
25   your leadership?

Page 236

1          B. Williams - by Mr. Campbell
2        A.    A lot of them are no longer there,
3    plus it's my right as an American citizen to
4    work where I want. It's also the right of
5    anybody else on the state police. We have a
6    right to put in a request to be stationed where
7    we want. There is nothing on the state police
8    that says that you can't be stationed somewhere
9    because someone has hostile intent toward you.
10       Q.    Let me ask you this. Is the
11   procedure within the state police, can you bid
12   on certain jobs by reason of your seniority?
13       A.    Yes.
14       Q.    I have to believe you have to be
15   probably one of the most senior lieutenants?
16       A.    Second on the state police.
17       Q.    Does that give you the right to bid
18   wherever you want to within the state system?
19       A.    Yes.
20       Q.    Have you exercised that right to
21   bid?
22       A.    No. I was pending the outcome of
23   the grievances and this EEOC lawsuit.
24       Q.    Is there some reason why you are
25   forbidden to bid back into Mercer?

59 (Pages 233 to 236)

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 237

1        B. Williams - by Mr. Campbell
2           MR. SANDERS: I object to the
3  question. He has already answered. He is
4  waiting for the outcome of this case. This
5  case is his vehicle rather than the bidding
6  process is what he is telling you.
7           MR. CAMPBELL: I want to know
8  if the bidding process is an alternative to
9  this case. That's what I'm asking.
10         MR. SANDERS: Go ahead.
11  BY MR. CAMPBELL:
12    Q.  How often are you permitted to bid?
13    A.  If I want to put in a request for a
14  transfer, anytime, but you won't get a transfer
15  unless there's an opening. You can't request a
16  certain station in the troop. You have to put
17  in a request to the troop headquarters. Then
18  the captain determines which station you go to
19  or what position.
20    Q.  I guess my question is your bidding
21  procedure doesn't permit you to bump people on
22  the basis of seniority?
23    A.  No.
24    Q.  The only thing you could do now that
25  you're stationed in Erie is you can put in a

Page 238

1        B. Williams - by Mr. Campbell
2  request to go back to Troop D. If, in fact,
3  you did go back there, whoever is in charge
4  could then determine where you would work
5  within the troop?
6    A.  Correct.
7    Q.  Once you're in Troop D, you can't
8  say I'm the most senior lieutenant, and I want
9  to bid on Mercer.
10    A.  Correct.
11    Q.  So effectively, you feel this
12  lawsuit is the only way you can get back to
13  Mercer?
14    A.  Correct.
15          MR. SANDERS: Before he turns
16  60.
17          MR. CAMPBELL: I think that
18  does it.
19          MR. SANDERS: Is it okay if I
20  do the same thing, Scott? Before I turn it
21  over to you, can I ask my client, or do you
22  want to ask your questions first?
23          MR. BRADLEY: Yes, go ahead.
24  I don't think I'm going to have any questions
25  unless something comes up.

Page 239

1        B. Williams - by Mr. Sanders
2          -----
3           EXAMINATION
4  BY MR. SANDERS:
5    Q.  Lieutenant, I just have a few
6  questions for clarification for the benefit of
7  my colleague who is sitting across the table
8  here, Mr. Campbell.
9      If I understand you correctly, with
10  regards to Mr. Caputo, you are not complaining
11  that Tony Caputo is a racist, are you?
12    A.  No, I'm not.
13    Q.  Not only are you not claiming he's a
14  racist, but your claim with regards to the
15  attorney is that he didn't go along with your
16  request to bring up race in front of this black
17  arbitrator; is that correct?
18    A.  Correct.
19    Q.  Is it your belief that had you
20  brought up a race card or a race issue, which
21  you had already put in your grievance and
22  called it civil rights violations, would have
23  had an impact on the arbitrator with regards to
24  the decision he finally rendered to the effect
25  that he felt that the transfer was appropriate?

Page 240

1        B. Williams - by Mr. Sanders
2    A.  Yes, that and also the defense for
3  me for alleged poor work performance. He
4  refused to address that issue also.
5    Q.  Let's talk about the $3,370. Is it
6  your contention in this case with regards to
7  the association that the decision that you be
8  the one to pay the $3,370 was racially
9  motivated?
10    A.  Yes.
11    Q.  I believe you gave an example of a
12  Captain Ober who had gotten $2,000 worth of
13  assistance, or so he said, correct?
14    A.  Correct.
15    Q.  It's your belief that in this case
16  that the $3,370 should have been paid all or a
17  portion of it by the FOP?
18    A.  Correct. Under the contract, that
19  cost is normally split between the FOP and the
20  state police.
21    Q.  In this case, are you seeking
22  recovery of the $3,370?
23    A.  Yes, I am. If I may also add?
24    Q.  Wait for the next question.
25    A.  Okay.

Powers, Garrison & Hughes

Page 241

1      B. Williams - by Mr. Sanders
2      Q.   Did you, in fact, talk to Tony
3  Caputo prior to the arbitration sessions in
4  front of the black arbitrator to the effect
5  that you wanted the opportunity to bring up the
6  race issue when you had a chance to testify?
7      A.   Yes.  I met him in Oil City,
8  Pennsylvania.
9      Q.   Did Mr. Caputo advise you against
10 that?
11     A.   Yes, he did.  He rejected it.
12     Q.   Did he tell you why, or did he give
13 you an explanation as to why even though your
14 grievance talked about civil rights that he
15 instructed you that he felt it was not
16 advisable to bring up your belief that you were
17 being racially discriminated against?
18     A.   Yes.  I met him, and he was eating
19 lunch in the restaurant there.  I repeatedly
20 requested that the fact of the civil rights and
21 the violation of the discrimination, and he
22 specifically told me to save that for another
23 form, and that he preferred to not address it
24 as part of this procedure.
25     Q.   At the time of that meeting in

Page 242

1      B. Williams - by Mr. Sanders
2  Oil City, you had not filed Exhibit No. 1, had
3  you?
4      A.   Correct.
5      Q.   You had not filed the race
6  discrimination charges on or about April 16,
7  2001; is that correct?
8      A.   Correct.
9      Q.   You did that subsequent?
10     A.   Yes.
11     Q.   It's your position as you sit here
12 today that you did not accept Mr. Caputo's
13 explanation of a different form, and that you
14 should have been able to bring it up in front
15 of the black arbitrator?
16     A.   Correct.
17     Q.   I am assuming that you believe in
18 retrospect that the black arbitrator hearing
19 about the race allegations may have resulted in
20 your winning all of your points?
21     A.   Correct.
22     Q.   Had you won all of the points, is it
23 your contention in this lawsuit that you
24 then would have been awarded a return to
25 Mercer?

Page 243

1      B. Williams - by Mr. Sanders
2      A.   Yes.
3      Q.   In fact, that did not occur?
4      A.   Correct.
5      Q.   Mr. Campbell asked you if this was
6  all about saving face before you retired.  You
7  wanting to go back to Mercer, is that part of
8  it?
9      A.   Part of it, and I would like to get
10 my reputation back.
11     Q.   Let me ask you something.  If for
12 this particular lawsuit you are successful and
13 you are awarded as part of your remedy
14 reinstatement to commander in Mercer, you would
15 find that to be a favorable result for you?
16     A.   Yes.
17     Q.   Even though as Bryan pointed out or
18 implied, you would be back under Simon and
19 Seilhamer?
20     A.   Yes.
21     Q.   In fact, you're still under Simon
22 and Seilhamer in Erie, aren't you?
23     A.   Seilhamer.
24     Q.   I didn't mean to cut you off earlier
25 when you started to add something.  Is there

Page 244

1      B. Williams - by Mr. Sanders
2  something else that you feel you would like to
3  say now that is responsive to your suit against
4  Mr. Campbell's client, the association, sir?
5      A.   Yes.
6      Q.   Would you please tell us what that
7  is.
8      A.   On August 4, 2000, there was an
9  internal investigation.  They interviewed me.
10 I had requested the use of the PSDA solicitor
11 to represent me.  The union refused.  Normally
12 in past cases, they would have if I would have
13 been white.  White Caucasian members of the
14 state police would have been allowed to use the
15 union solicitor attorney.
16     As a result of that, I had to spend
17 $729 out of my pocket to hire attorney John
18 Christopher from Mercer County to represent me
19 at the interview of Internal Affairs.
20     Q.   What color is Ober?
21     A.   White.
22     Q.   So the Captain Ober who told you he
23 got the $2,000 bit of help from the FOP is
24 white?
25     A.   Correct.

61 (Pages 241 to 244)

Page 245

1      B. Williams - by Mr. Campbell
2      Q.   Dean Lawrence who was permitted to
3   testify by telephone is white?
4      A.   Correct.
5      Q.   Kelly is white?
6      A.   Correct.
7      Q.   I never met her, but is Ms. Reynolds
8   white?
9      A.   Yes, Joanna Reynolds.
10         MR. SANDERS: That's all I
11  have right now.
12         MR. CAMPBELL: I have a few
13  other questions.
14         -----
15         EXAMINATION
16  BY MR. CAMPBELL:
17     Q.   Are you aware that the association
18  paid almost $15,000 in legal expenses for you
19  on these two grievances that they processed?
20     A.   I paid almost $20,000.
21     Q.   Pardon me?
22     A.   I paid almost $20,000.
23     Q.   Out of your own pocket?
24     A.   Yes.
25     Q.   You know the association paid that

Page 246

1      B. Williams - by Mr. Campbell
2   much for the grievances?
3      A.   I don't know what they paid.
4      Q.   Do you know what they normally pay
5   to process a grievance?
6      A.   I have no idea.
7      Q.   Do you think that that's a small
8   amount of money, $15,000?
9      A.   I don't know, but for 35 years I
10  have been paying my fair share. Now it's up to
11  $500 a year. That's why they are to represent
12  me.
13     Q.   So in effect, you almost got back
14  all of the dues that you ever paid plus all the
15  benefits they gave you by being your collective
16  bargaining --
17     A.   I did not.
18     Q.   You didn't what?
19     A.   Get back everything I paid.
20     Q.   Well, you mean all the years you've
21  been in the department, you never got the pay
22  raises, the increase in the health care, and
23  all those things that the union negotiates?
24     A.   Along with all of the other members.
25     Q.   Right, and they all pay.

Page 247

1      B. Williams - by Mr. Campbell
2      A.   Yes.
3      Q.   So you benefited just like everyone
4   else?
5      A.   During bargaining sessions?
6      Q.   Sure.
7      A.   Yes.
8      Q.   Now, at the time of the hearing, if
9   you wanted to bring up the racial aspect of it,
10  why didn't you just testify to it? You were
11  free to testify.
12     A.   Attorney Caputo refused.
13     Q.   You were testifying.
14     A.   I followed. He was counsel, and I
15  followed his lead. I mentioned that at
16  arbitration, and he said, "Absolutely not." He
17  repeated that thing about another form. That's
18  another issue away from this. I kept
19  insisting, and he kept resisting.
20     Q.   Was that because of your prior
21  discussion with him about wanting the
22  transcript because you were thinking of
23  bringing an EEOC complaint?
24     A.   I have no idea. All I know is I was
25  requesting --

Page 248

1      B. Williams - by Mr. Campbell
2      Q.   The EEOC is another form, isn't it?
3      A.   Yes.
4      Q.   In fact, that's where you went?
5      A.   Correct.
6      Q.   You went there with charges of
7   racial discrimination?
8      A.   Correct. I also had it listed in
9   part of the grievance. He refused to address
10  that part of the grievance.
11     Q.   Under the contract in the
12  definitions of what you can and cannot grieve,
13  is there a provision under the collective
14  bargaining agreement that you can grieve what
15  you say is a civil rights violation?
16         MR. SANDERS: If you know.
17     A.   I don't know. I think you're
18  allowed to grieve discrimination as I listed
19  them on my grievances from 1994 and 1995.
20     Q.   That's what you believe?
21     A.   Yes.
22     Q.   When you were transferred to Erie,
23  apparently your supervisor was Captain Conley?
24     A.   Correct.
25     Q.   Apparently, you were friends with

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 249

1    B. Williams - by Mr. Campbell
2  him?
3    A.  I've known him for 30 some years.
4    Q.  You were in the academy together?
5    A.  No.
6    Q.  He's a good, fair man, isn't he?
7    A.  For the most part.
8    Q.  While you were under his command,
9  none of the things happened to you that were
10 happening to you in Mercer?
11   A.  It did happen; Troopers failing to
12 salute me. He did put a stop to it, if that's
13 your question.
14   Q.  That's correct. That's what I'm
15 saying. He was your boss, and he protected
16 you.
17   A.  Not so much protected me. He
18 followed state police orders and procedures.
19   Q.  When you were working in Erie, not
20 only were you near your home, but you were
21 working for a boss who, in fact, was very fair
22 and basically implemented the rules and
23 regulations?
24   A.  I worked for a lot of bosses on the
25 state police from here to Bethlehem that were

Page 250

1    B. Williams - by Mr. Sanders
2  fair and implemented them. He was one of them.
3    Q.  A lot of them are white?
4    A.  Yes.
5    Q.  How far is your workplace from here
6  to Erie from your residence?
7    A.  Nine miles.
8        MR. CAMPBELL: Those are all
9  the questions I have.
10       MR. SANDERS: It's hard not to
11 follow up something like that, so bear with me
12 here.
13       -----
14       EXAMINATION
15 BY MR. SANDERS:
16   Q.  The fact that you're nine miles now,
17 does that change the fact that you were and had
18 presented evidence of discrimination?
19   A.  No, it does not.
20   Q.  Does that change the fact that your
21 record now after all these years of service has
22 been permanently tainted?
23   A.  Correct, right.
24   Q.  If I understand you correctly, this
25 lawsuit is in part an effort to address what

Page 251

1    B. Williams - by Mr. Sanders
2  Seilhamer did to you?
3    A.  Correct.
4    Q.  In the process of doing that, it's
5  to ask that before you retire that your
6  reputation be reinstated?
7    A.  Yes.
8    Q.  That you be compensated financially
9  for what you have been through at the hands of
10 Mr. Seilhamer?
11   A.  Yes.
12   Q.  To be reimbursed for the losses that
13 you told both these attorneys that you suffered
14 at the hands of Mr. Seilhamer?
15   A.  Yes.
16   Q.  As soon as Erby left and he was
17 replaced by a white commander in Erie to whom
18 you are now reporting, you continue to be
19 humiliated?
20   A.  Correct. It escalated.
21   Q.  Have you had to pay the psychiatrist
22 out of your own pocket or has all of that been
23 paid by insurance?
24   A.  All has been paid by Blue Cross/Blue
25 Shield insurance.

Page 252

1    B. Williams - by Mr. Bradley
2    Q.  As you sit here today, do you recall
3  how much the psychiatrist's rate or charges for
4  each visit is, approximately?
5    A.  I believe he charges 120 bucks, and
6  I think Blue Cross/Blue Shield pays their
7  allowance which is $50 or $60 per visit.
8    Q.  It's your belief for your allegation
9  in this case that those records that now exist
10 in the hands of that psychiatrist would not
11 have been necessary had it not been for
12 Mr. Seilhamer?
13   A.  Correct.
14       MR. SANDERS: That's all I
15 have.
16       MR. BRADLEY: I have a couple
17 of questions.
18       -----
19       EXAMINATION
20 BY MR. BRADLEY:
21   Q.  Mr. Sanders just mentioned and I
22 believe you agreed with his characterization
23 that your record has been tainted.
24   A.  Yes.
25   Q.  I guess we're talking about your

63 (Pages 249 to 252)

Powers, Garrison & Hughes

Billy R. Williams
October 21, 2004

Billy R. Williams v.
Pennsylvania State Police

Page 253

1    B. Williams - by Mr. Bradley
2  career service record with the state police.
3  How do you feel that has been tainted?
4    A.  This allegation about me imposing a
5  quota and not being a good decent station
6  commander has been spread all over the state
7  police. Captain Simon and Seilhamer openly
8  joked about it in Harrisburg, and it's all over
9  the state.
10    Q.  At least with respect to the quota
11  allegation, you were cleared of that?
12    A.  Correct.
13    Q.  I guess when you talk about having
14  your reputation reinstated, that addresses that
15  same concern?
16    A.  No, because to this date, there are
17  still people in the state police that think I
18  was found guilty of it and I had a quota. As
19  far as I last heard, Simon is still telling the
20  world that I set a quota at Mercer station, and
21  Major Seilhamer.
22    Q.  Finally, Mr. Sanders asked if you
23  continue to be, and I think the word he used
24  was, humiliated, once Captain Conley retired at
25  Erie. Do you agree with that assessment?

Page 254

1    B. Williams - by Mr. Sanders
2    A.  Yes.
3    Q.  Is that based on the lack of respect
4  from the other troopers at the station who
5  refused to salute you?
6    A.  That, plus the violation of the
7  chain of command, but yes.
8    Q.  Just the things you talked about
9  before?
10    A.  Yes, correct.
11    MR. BRADLEY:  That's all I
12  have.
13    MR. SANDERS:  Just a follow-up
14  to that.
15    -----
16    EXAMINATION
17  BY MR. SANDERS:
18    Q.  If my understanding is correct, your
19  contention in this case is that that disrespect
20  that you're still experiencing is being allowed
21  to occur while Seilhamer is still in control?
22    A.  Yes.
23    Q.  That lack of respect is something
24  that you take personally and professionally; is
25  that correct?

Page 255

1    B. Williams - by Mr. Sanders
2    A.  Yes.
3    Q.  It's my understanding that these
4  officers that seek to disrespect you are white?
5    A.  Correct.
6    Q.  If I understand you, it's your
7  contention in this case that even though Hample
8  has made it clear that he doesn't expect the
9  procedures to be followed, that you still
10  believe it should be followed with regards to
11  you?
12    A.  Yes, I do, as per state police
13  regulations.
14    Q.  Has Seilhamer seen fit to step into
15  your work area in Erie yet?  Has he, for lack
16  of a better way to phrase it, had the guts to
17  come up to Erie anytime since you were
18  transferred there?
19    A.  I think I only saw him up there in
20  Erie. I saw him at a state police
21  Memorial Day. I think I only saw him twice or
22  three times.
23    Q.  Did he greet you?
24    A.  Yes, he spoke.
25    MR. SANDERS:  That's all I

Page 256

1    B. Williams - by Mr. Campbell
2  have.
3    MR. CAMPBELL:  Just one
4  question.
5    -----
6    EXAMINATION
7  BY MR. CAMPBELL:
8    Q.  Under the rules and regulations of
9  the Pennsylvania State Police, if a subordinate
10  officer shows disrespect for a superior
11  officer, you have the right to bring
12  disciplinary charges, don't you?
13    A.  Correct, but I have nobody to go to
14  because the captain has that policy that he
15  doesn't believe is saluting.
16    Q.  Can you go beyond the captain to
17  someone higher in the chain of command?
18    A.  I would have to go to
19  Major Seilhamer.
20    Q.  Why don't you?
21    A.  Because I know he won't do anything
22  about it based on past history with him.
23    Q.  Well, you haven't done it?
24    A.  Correct, I have not done it.
25    Q.  Why don't you try to do it and see

Powers, Garrison & Hughes

Page 257

1
2  if it works?
3    A.  I don't know.  I may consider it.
4      MR. CAMPBELL:  That's all I
5  have.
6      MR. BRADLEY:  Nothing further.
7      MR. SANDERS:  We have nothing
8  further, but we would like to read and make a
9  copy available to me.
10      (Signature not waived.)
11      (Whereupon, the above-entitled
12  matter was concluded at 4:10 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 259

1
2  COMMONWEALTH OF PENNSYLVANIA)
    COUNTY OF ALLEGHENY    )
3
4    I, MARLENE A. ROBINSON, a notary
  public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the
  witness, BILLY R. WILLIAMS, was by me first
6  duly sworn to testify the truth, the whole
  truth, and nothing but the truth; that the
7  foregoing deposition was taken at the time and
  place stated herein; and that the said
8  deposition was recorded stenographically by me
  and then reduced to typewriting under my
9  direction, and constitutes a true record of the
  testimony given by said witness, all to the
10  best of my skill and ability.
11    I further certify that the inspection,
  reading and signing of said deposition were not
12  waived by counsel for the respective parties
  and by the witness.
13
    I further certify that I am not a
14  relative, or employee of either counsel, and
  that I am in no way interested, directly or
15  indirectly, in this action.
16    IN WITNESS WHEREOF, I have hereunto
  set my hand and affixed my seal of office this
17  4th day of November 2004.
18
19
20    -------------------------------
    Marlene A. Robinson
21    Professional Court Reporter
22
23
24
25

Page 258

1
2  COMMONWEALTH OF PENNSYLVANIA )  E R R A T A
  COUNTY OF ALLEGHENY     )  S H E E T
3
4  Billy R. Williams
    vs.
5  Pennsylvania State Police and the
  Pennsylvania State Troopers Association
6
7    I, BILLY R. WILLIAMS, have read the
  foregoing pages of my deposition given on
8  Thursday, Octoer 21, 2004, and wish to make the
  following, if any, amendments, additions,
9  deletions or corrections:
10  Pg. No.  Line No.  Change and reason for
          change:
11
12
13
14
15
16
17
18
19
20
  In all other respects the transcript is true
21  and correct.
22    _____
      BILLY R. WILLIAMS
23
  Subscribed and sworn to before me this
24  _____ day of _____, _ .
25    _____
    Notary Public      (MAR)

# Exhibit E
# Transcript of Deposition of
# Erby L. Conley
# 08-10-04

10/06/2007  01:09    8148361542                 AMDPGD
                                                                   PAGE  03

**Page 1**

1    ERBY L. CONLEY, first being duly sworn,
2         testified as follows:
3
4    MR. SANDERS:  Would you kindly state your
5    full name for the record?
6    THE DEPONENT:  Erby Lee Conley.  C-O-N-L-E-Y.
7    First name is E-R-B-Y.  Middle initial L.
8    MR. SANDERS:  My name is Neal Sanders and I
9    am the plaintiff's attorney, Lieutenant Billy
10   Williams' lawyer here in a case -- Captain?
11   THE DEPONENT:  I was a Captain.  I'm retired
12   now.
13   MR. SANDERS:  Retired captain -- in a case
14   that has been docketed here in Pittsburgh or,
15   actually, I guess it's Erie.  It's been
16   consolidated.  Billy R. Williams, Plaintiff
17   versus the Pennsylvania State Troopers
18   Association.  And Billy R. Williams,
19   Plaintiff versus the Pennsylvania State
20   Police.  And we're here today to take your
21   deposition.  I want to thank you for coming.
22   All of these documents are not part of your
23   deposition so, if you're thinking this is
24   part of your deposition, it's just some
25   things I've used.

**Page 4** (right column top)

1    question out and I will then honor your space
2    and let you answer it as you see fit to
3    answer it and not start my next question
4    until you're finished.  Do you follow that?
5    THE DEPONENT:  Yes I do.
6    MR. SANDERS:  Also, if for any reason you
7    want to take a break, that's totally
8    permissible.  And you just need to verbalize
9    the fact that you want to take one and then
10   we just take one.  All we ask that you do, at
11   that point, is finish answering the question
12   that was pending at the time that you sought
13   to take the recess or the break.  Do you
14   follow that?
15   THE DEPONENT:  Yes I do.
16   MR. SANDERS:  Do you know of any reason today
17   that, from your own medical point of view
18   concerning your own self, is there any reason
19   you're not able to testify or understand the
20   questions and be able to verbalize the
21   answers?
22   THE DEPONENT:  No, none whatsoever.
23   MR. SANDERS:  Those are just the things we
24   have to ask.
25   THE DEPONENT:  Okay.

**Page 2**

1    Have you, Mr. Conley, have you ever in
2    your life time, prior to today, ever given a
3    deposition where you have been put under oath
4    by a court reporter, a representative of the
5    court, and asked questions by an attorney in
6    a civil suit?
7    THE DEPONENT:  Yes, sir.
8    MR. SANDERS:  Perhaps you remember some of
9    the introductory remarks that you were given
10   by the attorney who questioned you at the
11   time.  But for the sake of thoroughness, just
12   bear with me while I go over the introductory
13   comments.  It doesn't take long, but it's
14   helpful.  Basically the setting we're in is
15   called a deposition.  It's a question and
16   answer session.  And I'm going to be asking
17   you some questions this afternoon.  And these
18   questions require that you give a verbal
19   response provided you understand the
20   question.  Do you follow that?
21   THE DEPONENT:  10:4.
22   MR. SANDERS:  And, also, if for any reason
23   you're asked a question and you don't
24   understand the question and, as you may know,
25   when lawyers speak sometimes we're accused of

**Page 5** (right column)

1                    DIRECT EXAMINATION
2    BY MR. SANDERS:
3    Q.   How old are you now?
4    A.   61.
5    Q.   Afro-American?
6    A.   Yes, sir.
7    Q.   And when we started talking here recently this
8    afternoon you mentioned you're retired.  Retired from where?
9    A.   Pennsylvania State Police.
10   Q.   And during the course of your employment with
11   the Pennsylvania State Police, did you come to become
12   acquainted and familiar with Lieutenant Billy Williams, the
13   plaintiff in this case?
14   A.   Yes, sir.
15   Q.   Captain, did you know Billy Williams before you
16   joined the state police?
17   A.   No, sir, I didn't.
18   Q.   And do you socialize with him outside of work?
19   A.   On a couple of occasions he's been at my house
20   for a picnic and we've been at parties, partied together for
21   the state police.
22   Q.   Would you consider yourself to be close friends
23   or just friends?
24   A.   Friends.
25   Q.   Now Lieutenant Williams has been on the force

**Page 3**

1    maybe confusing the person with what we're
2    saying or asking.  If that should happen
3    today, I apologize, but that's a cue to you
4    to verbalize that confusion.  If you go ahead
5    and answer the question today it will be
6    assumed that you understood the question.  Do
7    you follow that?
8    THE DEPONENT:  Yes I do.
9    MR. SANDERS:  So don't hesitate or be bashful
10   should you get asked a question to say you
11   don't understand it.  That's a cue to us, as
12   lawyers, to rephrase the question so that by
13   the time you do end up answering it it's
14   because you now understand the question.  Do
15   you follow that?
16   THE DEPONENT:  Yes I do.
17   MR. SANDERS:  Also, one of the things we
18   notice happens in depositions sometimes, not
19   all of the time, is that the lawyer and the
20   witness actually are talking at the same
21   time.  And Ann Marie here over to your right
22   can probably go bonkers if that happens too
23   frequently because she's trying to get the
24   question down and then the answer down.  So
25   if you would just give me a chance to get the

**Page 6** (right column)

1    for 30-plus years and he's still on the force.  How long
2    were you on the force?
3    A.   30 years, 5 months.
4    Q.   And did you get to that mandatory retirement
5    point in your life where you had to step down?
6    A.   Unfortunately, yes I did.
7    Q.   Is it fair to say that had not been the
8    law you would have continued?
9    A.   That is fair to say.  I would have continued.
10   Q.   Captain, from what you understand of the system,
11   the Pennsylvania State Police system, are there
12   opportunities for folks like yourself in a retired capacity
13   to come back in some consultant form?
14   A.   Not that I know of, sir.
15   Q.   Now in your 30-plus years of employment, have
16   you been at different stations?
17   A.   Yes, sir.
18   Q.   You finished your career, where?
19   A.   Troop E, Erie.
20   Q.   And you retired from Troop E, Erie in, what,
21   2003?
22   A.   Yes, sir.
23   Q.   What particular month?
24   A.   May, May 13th.
25   Q.   So you would be a May baby then?

364                        **ERBY CONLEY**                    Pages 1 to 6

10/06/2007  01:09    8148361542                    AMDPGD                              PAGE  04

---

**7**

```
1   A.   Yes, sir.
2   Q.   One day before your 60th birthday you put the
3 papers in or the papers become effective?
4   A.   My birthday is May 14th and I left the 13th.
5   Q.   And when you retired, was Lieutenant Billy
6 Williams in your troop?
7   A.   Yes, sir.
8   Q.   My understanding is he had been in your troop
9 since January of '01.  Does that sound about right?
10  A.   I believe that's true.
11  Q.   He came to you on a transfer from Butler, Troop
12 D?
13  A.   Yes, sir.
14  Q.   Now when you were in the final stages of your
15 career in Troop E, were you familiar with people like Major
16 Terry Seilhammer?
17  A.   Yes, sir.
18  Q.   And Syd Simon?
19  A.   Yes.
20  Q.   And that would be Captain Simon or had he moved
21 to a different title when you retired?
22  A.   He was captain when I retired.
23  Q.   What about Paul Evanko, the former commissioner?
24  A.   He was commissioner.
25  Q.   Would he have been commissioner in 2003 when you
```

---

**8**

```
1 retired or just prior to that?
2   A.   Just prior to that.
3   Q.   For the sake of the judge who may not know all
4 of these situations, Terry Seilhammer would be white,
5 Caucasian.
6   A.   Yes, sir.
7   Q.   Syd Simon would be biracial?
8   A.   I believe so.
9   Q.   Paul Evanko, white?
10  A.   Yes, sir.
11  Q.   Obviously, Lieutenant Williams, Afro-American?
12  A.   Yes, sir.
13  Q.   The last name Kelly --
14  A.   Can I clear one thing.
15  Q.   Sure.
16  A.   You said Syd Simon, biracial.  I really don't
17 know that.  I never met his parents.  I heard that but I
18 don't know.
19  Q.   Whether you met his parents or not, what kind of
20 an environment would you have heard that in, Captain?
21  A.   Just people talking, that's all.
22  Q.   What about you talking to him?
23  A.   We never talked about his background that way.
24  Q.   But that's something that you heard during the
25 course of your employment in Troop E, that he was biracial?
```

---

**9**

```
1   A.   No.  I believe I heard it from you, sir, when we
2 talked on the phone one time.
3   Q.   Prior to your talking to me on the phone and
4 that issue of biracial coming up, had you ever heard that
5 during your employment?
6   A.   No I hadn't.
7   Q.   Did you consider him to be Afro-American?
8   A.   Yes.  He looked Afro-American to me.
9   Q.   Some other names, people like Mr. Titler or
10 Captain Titler or Corporal Titler, are you familiar with
11 him?
12  A.   Barry, yes, sir.
13  Q.   And would he be caucasian?
14  A.   Yes, sir.
15  Q.   What about Trooper Perrine?  Have you ever heard
16 that name, P-E-R-R-I-N-E?
17  A.   It doesn't ring a bell, sir.
18  Q.   What about Melner?
19  A.   Doesn't ring a bell.
20  Q.   What about Sergeant Anderson?
21  A.   Doesn't ring a bell.
22  Q.   What about Pat Weyland?
23  A.   I can't put a face with the name.
24  Q.   What about Kelly?
25  A.   Yes.  I do know Corporal Kelly.  He was a
```

---

**10**

```
1 corporal.
2   Q.   David Kelly?
3   A.   Yes, sir.
4   Q.   Caucasian?
5   A.   Yes, sir.
6   Q.   Now when you retired from the Pennsylvania State
7 Police in May of 2003, would you have had done any kind of
8 performance evaluations for Lieutenant Williams at all?
9   A.   Yes, sir.
10  Q.   And that would have been, what, two years, '01
11 to '02 and '02 to '03?
12  A.   I believe I would have done two or three of them
13 in a row.  Probably three.
14  Q.   And what's your recall, as you sit here today,
15 about what your professional opinions were of Lieutenant
16 Williams serving under your command?
17  A.   I thought he did a good job.  He did everything
18 I asked him to do.
19  Q.   Were there any issues or any areas where you had
20 counseled him or in anyway felt that he needed to improve?
21  A.   Not that I can remember -- well, maybe I'd tell
22 Billy his uniform needed to be squared away sometimes.
23  Q.   Do you want to kind of elaborate on that, if you
24 could for those of us that don't know what you mean by.
25 square away his uniform?
```

---

**11**

```
1   A.   It's hard to explain.
2   Q.   Give it a try.
3   A.   Billy's uniform, it was always unkept.  When I
4 say, unkept -- it's hard to explain it.  Some guys look like
5 poster boards and other guys don't and that's what it was.
6 It wasn't nothing detrimental to his job performance or
7 anything.  It's just some guys look better in a uniform
8 than other guys.
9   Q.   Is this something that you saw fit to put in
10 writing?
11  A.   No, it wasn't that bad.
12  Q.   Was this true of other people in your command?
13  A.   Yes, sir.  I was known as a nit-picker, in a
14 sense that, if I would walk by and your collar was up I
15 would straighten it out for you.  If your tie was crooked or
16 you didn't have your shirt right I'd straighten it out.
17 Yes.  Just like when I came in, I asked Billy why he didn't
18 have a tie on today.
19  Q.   In the background for your career you, if I
20 remember correctly, told me on the telephone you have a
21 brother who is employed in the state police.  Is that
22 correct?
23  A.   He's retired.
24  Q.   He's also retired?
25  A.   Yes, sir.
```

---

**12**

```
1   Q.   And he would be, Hawthorne?
2   A.   Yes, sir.
3   Q.   Hawthorne Conley?
4   A.   Yes, sir.
5   Q.   Who retired first?
6   A.   He did.
7   Q.   Do you recall what year he retired?
8   A.   2003.
9   Q.   Do you remember what month?
10  A.   I think he went in the end of March or the first
11 part of April, I'm not sure.
12  Q.   Did you and your brother, Hawthorne, ever get
13 into any discussion about Lieutenant Williams and the
14 grievances that the Lieutenant had filed over his transfer
15 from Mercer to Butler and Butler to Erie?
16  A.   At time to time we spoke about it, yes.
17  Q.   Did your brother ever tell you that he had
18 testified in the arbitration proceedings in 2001?
19  A.   I honestly don't remember, sir.
20  Q.   The fact that you don't remember, would that
21 also indicate that you don't ever have any recollection as
22 to reading his testimony?  Did you ever see a transcript of
23 your brother's testimony?
24  A.   I saw transcripts of some of the testimony but I
25 don't remember if I read my brother's or not.
```

---

**ERBY CONLEY**

10/06/2007  01:09    8148361542                AMDPGD                    PAGE  05

---

**13**

```
 1   Q.   Do you recall whose testimony you read?
 2   A.   No.  Lieutenant Williams showed me some
 3 transcripts on occasion.
 4   Q.   Up at the barracks in Erie?
 5   A.   Yes, sir.
 6   Q.   And that would have been when he was under your
 7 command?
 8   A.   Yes, sir.
 9   Q.   When Lieutenant Williams was under your command
10 for that last two years of your career, January of '01 until
11 May of '03, how would you have rated him in terms of the way
12 in which the troopers subordinate to him dealt with him and
13 treated him?  Did he generate respect?
14   A.   Yes, I think so.  The guys that worked for him
15 they respected Billy because Billy was a hard worker
16 himself.  He wouldn't ask anybody to do anything that he
17 wouldn't do.
18   Q.   Did anyone ever come to you, either in writing
19 or unofficially, when Lieutenant Williams was in your
20 command for that two years, plus, four months, with any type
21 of complaints about Lieutenant Williams?
22   A.   Only the time that him and Lieutenant Johnson
23 got into it, that I can remember.  Billy was the OD one
24 weekend when a trooper died and they did the funeral
25 arrangements together and they sort of bumped heads a little
```

---

**14**

```
 1 bit.
 2   Q.   Was this a Lieutenant Johnson?
 3   A.   Yes.
 4   Q.   Do you remember his first name?
 5   A.   Tim Johnson.
 6   Q.   And do you remember any of the details of that,
 7 what you called, bumping heads?
 8   A.   Billy was down doing the job as OD and Tim
 9 didn't want him to do his job because it was his station.
10 But Billy was down there as my representative and he was
11 doing what he was supposed to be doing.  And they kept
12 calling me on Sunday for different little things and I
13 finally said, work it out yourselves.
14   Q.   Is that how you handled things when you were in
15 your command at the time, let them work it out themselves
16 initially and see if it works that way?
17   A.   These were two lieutenants, sir.  These weren't
18 two troopers.  They're professionals.  They're officers on
19 the Pennsylvania State Police, they should be able to work
20 things out.  It wasn't life threatening or anything like
21 that.  It was just a little bit of a turf battle.
22   Q.   Lieutenant Johnson, you said, Tim Johnson?
23   A.   Yes.
24   Q.   Caucasian?
25   A.   Yes.
```

---

**15**

```
 1   Q.   Is that the sum and substance then of any
 2 complaints that I asked you about that may have come to your
 3 attention about Lieutenant Williams while he was under your
 4 command toward the end of your career, other than the
 5 uniform and the tie and no tie?
 6   A.   If it was something it was so minor it slipped
 7 my mind.  I can't think of anything else that would have
 8 been so earth shaking that I would talk to Billy on or
 9 anything like that.
10   Q.   Let me ask you now about your experience in the
11 troop.  When you inherited Lieutenant Williams in January of
12 2001, he was transferred to your Troop E in Erie where he
13 apparently still is.  Is that correct, to the best of your
14 knowledge?
15   A.   Yes he is.
16   Q.   Do you remember whose position he filled or was
17 he an add-on like he had been in Butler?
18   A.   No, he wasn't an add-on.  I think Lieutenant
19 Johnson maybe transferred to Seneca and then Billy took his
20 place.  I'm not sure.
21   Q.   The reason I'm asking you is, I'm trying to find
22 out whether you recall if it was a transfer vacancy or a
23 retirement vacancy that resulted in there being a position
24 for him in Erie?
25   A.   I don't remember, sir, honestly.
```

---

**16**

```
 1   Q.   Let's talk a little bit about chain of command,
 2 something I'm sure you're all too familiar with in your 30-
 3 plus years in the state police.  Is that a fair statement,
 4 that you're familiar with the chain of command?
 5   A.   Yes, sir.
 6   Q.   Down there in Butler at the barracks, not far
 7 from my office, you would have someone like Terry Seilhammer
 8 who would be the area commander.  Is that where he would
 9 have been?
10   A.   That's where he would have been.
11   Q.   And under him you'd have a guy named Syd Simon?
12   A.   He was the captain of Troop D, yes, sir.
13   Q.   And then at the highest levels of the state
14 police in Harrisburg back in '99 and 2000, you'd have Paul
15 Evanko the commissioner?
16   A.   Yes, sir.
17   Q.   In terms of the way in which discipline gets
18 metered out and eventually put into effect, for lack of a
19 better term, would it be correct to say that the
20 recommendation would start with someone like Syd Simon and
21 would move up to Major Terry Seilhammer?
22   A.   No, sir.  If there was a BPR, you know, if
23 somebody makes an official complaint on you --
24   Q.   Correct.  Let me rephrase it.  If there's going
25 to be a recommendation of discipline in the form of a
```

---

**17**

```
 1 transfer, a suspension, something to that effect, would Syd
 2 Simon recommending that be something that Major Terry
 3 Seilhammer would ordinarily know about?
 4   A.   What Syd Simon as a captain would do he would
 5 adjudicate the BPR.  He would not recommend any type of
 6 discipline.  And that would go to the major and then to the
 7 department disciplinary officer who would then make out a
 8 discipline.
 9   Q.   That major, in this particular set of
10 circumstances, this time frame, we're talking '99, 2000,
11 2001, 2002, that major would have been Terry Seilhammer?
12   A.   Right.
13   Q.   And you then talk about this disciplinary
14 officer.  Let's talk about that for a few minutes.  In this
15 case his name is Barry Titler?
16   A.   Right.
17   Q.   Now this disciplinary office position, is that a
18 full-time position?
19   A.   Yes, sir.
20   Q.   And that's all this human being does every
21 single day is to become involved in complaints and
22 grievances and disciplinary matters?
23   A.   Yes, sir.
24   Q.   Have you ever had occasion to talk to Barry
25 Titler about Billy Williams -- or I shouldn't say you with
```

---

**18**

```
 1 him or, about him with you?  Did that conversation or
 2 discussion take place between Erby Conley or Barry Titler
 3 where the subject was Billy Williams?
 4   A.   I can't really say that.  I talked to Barry on
 5 numerous occasions.  Since Billy was in my troop, I don't
 6 think so.
 7   Q.   Let's talk about before.
 8   A.   Are you trying to say, how did Billy end up
 9 getting to my troop?
10   Q.   Of course I know that.  Let me rephrase the
11 question so you know what the question is I'm asking.  Prior
12 to the transfer of Lieutenant Williams from Butler to you in
13 Erie, in January of '01, did you and Barry Titler have any
14 discussions about Lieutenant Williams being down in Butler
15 having previously been in Mercer, if you remember?
16   A.   I don't remember.  Once again, I had a
17 conversation on Lieutenant Williams down in Mercer.  I kept
18 hearing he was going to come to Erie and he didn't want to
19 come to Erie.  But I'm not sure if this was told to me by
20 Seilhammer or through the disciplinary officer.  I'm not
21 completely clear on that.
22   Q.   All right.
23   A.   But I was told that Billy did not want to come
24 up to Troop E in Erie because he was afraid of me.
25   Q.   Who told you that?
```

---

10/06/2007   01:09   8148361542                        AMDPGD                                    PAGE   06

---

**19**

1    A.    Seilhammer did.
2    Q.    And have you ever seen anything that would cause
3  you to believe that that was a correct statement?
4    A.    When Billy first came he was very quiet. I was
5  told he was afraid of me and he didn't want to come to tria
6  and that he expected me to get him. In so many words. I
7  called him in when he first came there and I told Billy
8  that, whatever happened in Mercer I didn't know about
9  it. It had nothing to do with Troop E. And there was a
10 blank sheet of paper on the wall and he could write whatever
11 he wanted to write on it and I would treat him the way he
12 worked in Troop E.
13   Q.    And the person who was veining this comment to
14 you about you getting him came from, whose mouth?
15   A.    Seilhammer said the commissioner, one of the
16 deputy commissioners was laughing saying that Billy was
17 afraid to come and see me because I would get him and stuff,
18 you know.
19   Q.    Who was the commissioner or the assistant
20 commissioner?
21   A.    I don't remember, sir. It was just a
22 conversation we had.
23   Q.    Was this on the phone or in person?
24   A.    On the phone.
25   Q.    You and Seilhammer?

---

**20**

1    A.    Yes.
2    Q.    And this is prior to you getting Williams in
3  January '01?
4    A.    Right.
5    Q.    Did Lieutenant Williams ever tell you straight
6  out that he was afraid of you?
7    A.    No.
8    Q.    Did you ever address my client, Lieutenant
9  Williams, to tell him about the conversation that you had
10 had with Seilhammer about getting him?
11   A.    Yes.
12   Q.    And did you tell him that after he became a
13 member of your troop or before?
14   A.    After.
15   Q.    And do you recall the circumstances in which you
16 chose to tell him that?
17   A.    My first meeting with him when I told him about
18 the blank sheet of paper.
19   Q.    This meeting or discussion you had with
20 Lieutenant Williams in January of '01 took place, where?
21   A.    In my office, probably.
22   Q.    Where is that, physically?
23   A.    In Troop E headquarters.
24   Q.    Where is that around here?
25   A.    East of here in Lawrence Park.

---

**21**

1    Q.    Do you recall anything about that meeting, other
2  than what you've just told us, in terms of, perhaps, what
3  Lieutenant Williams responded to you or said to you when you
4  echoed the comments you've just testified to?
5    A.    Not about the comments but when I said about him
6  being treated fairly and judged on his work he said, thank
7  you.
8    Q.    Let's talk about the quiet comment. You made a
9  comment that when Billy first arrived in January of '01 in
10 Erie, I think you made the comment that he was quiet.
11   A.    Yes.
12   Q.    You and I know that's not his normal
13 disposition, don't we?
14   A.    Yes. Billy's talkative.
15   Q.    Not only is he talkative, but did he ever come
16 out of that quietness during the two years and four months
17 you had him?
18   A.    Yes.
19   Q.    Did you come to know or believe what it was that
20 had him so quiet? Were you familiar, for instance, with
21 what he had gone through with the Mercer to Butler transfer
22 and the Butler to Erie transfer?
23   A.    The only thing I knew prior to Billy coming to
24 us is there were problems down in Mercer with Billy
25 Williams. When Billy came up I had my conversation with him

---

**22**

1  and we didn't talk any more about it. He went about doing
2  his job and I'd say a year, 14 months, over time with me,
3  Billy opened up and started telling me different things that
4  happened. I imagine he started trusting me after awhile.
5    Q.    Not only did he trust you but he had, what,
6  would you say numerous conversations with you in that two
7  years and four months about what he had been through?
8    A.    Yes.
9    Q.    Did you ever take any notes or write anything
10 down anywhere about those conversations?
11   A.    You mean as far as what he was telling me, make
12 notes of what he was saying?
13   Q.    Yeah, that's my question.
14   A.    I don't think so.
15   Q.    Did these discussions, any of them take place in
16 a more social environment, Captain, as opposed to at work?
17   A.    In my office or in his office.
18   Q.    During those conversations that he had with you,
19 did the subject of how he had been treated in Mercer ever
20 come up?
21   A.    Yes.
22   Q.    Anything about his tires being slashed or his
23 property being vandalized?
24   A.    Billy told me quite a few things. I can't
25 remember those two, but he did tell me numerous incidents

---

**23**

1  that happened to him.
2    Q.    Had you ever heard that in your 30-plus years
3  from other black officers?
4    A.    Yes.
5    Q.    Had you ever had that occur to you personally?
6    A.    My tires being slashed?
7    Q.    Just what you would call harassment.
8    A.    I've been called a nigger when I'm in another
9  room. I was at a friend's house one time, he's the police
10 chief of Lawrence Park now, he's white. We were classmates.
11 He invited me to his house for dinner one time, he and his
12 wife, and some white trooper was there and he wanted to know
13 why you invited a nigger to your house.
14   Q.    Did that comment at the social engagement
15 actually take place in front of you?
16   A.    No. They thought I was out of earshot but I
17 wasn't. My friend said, he's my friend, that's why he's
18 here.
19   Q.    The officer or trooper you overheard say that,
20 was that a white trooper or officer?
21   A.    Yes.
22   Q.    Was that a state police employee?
23   A.    Yes.
24   Q.    Was that anybody from the E or the D Troop?
25   A.    E Troop.

---

**24**

1    Q.    Is that anybody you had in your command?
2    A.    He was way senior than me. I was brand new at
3  that time. He was 30 years ago or more.
4    Q.    As we sit here today, do you remember anything
5  else that Lieutenant Williams shared with you during that
6  two years and four months you had him in your command about
7  what he had gone through in Mercer?
8    A.    Well the most outrageous thing that I remember
9  is when Billy told me that he was not allowed on his station
10 after 4:00 o'clock at night. And if you're a station
11 commander, to me, that's incredible that somebody would make
12 that statement and tell the station commander you cannot
13 administer your station.
14   Q.    Did you ever find out yourself or through
15 Lieutenant Williams who had issued that order?
16   A.    He told me but, offhand, I can't remember. I
17 want to say it was Syd Simon, but I'm not positive about
18 that.
19   Q.    Let's talk about that for a minute. At the time
20 that he would have been the commander in Mercer --
21   A.    Yes.
22   Q.    -- so we're talking about the early '90s, '93,
23 '94, up till his transfer to Butler in 2000, in that time
24 frame. For a portion of that time, would he have had a
25 senior person above him named Syd Simon for a time?

---

Pages 19 to 24

10/05/2007  01:09     8148361542                     AMDPGD                          PAGE  07

---

**25**

```
 1    A.    Yes he would.
 2    Q.    And, also, Barry Seilhammer?
 3    A.    Yes.
 4    Q.    Did the subject of race, Billy's race, your
 5 race, ever come up in any of those gut wrenching
 6 conversations you were describing he was having with you
 7 where he was describing what happened to him in Butler and
 8 Mercer, did the issue of race ever come up?
 9    A.    Yes it did.
10    Q.    Did the Lieutenant bring that up or did you
11 bring it up?  Do you remember how it came up?
12    A.    It could have been either way.  When somebody
13 says something you ask a question and however they answer
14 just leads to something else.  I can't just say he started
15 off by saying this happened because you were black or,
16 whatever, you know.
17    Q.    But at some point it came up?
18    A.    Right.
19    Q.    Did it come up more than once during that
20 two-and-a half years.
21    A.    Yes, sir.  Can I say one other thing too?
22    Q.    Sure.
23    A.    You mentioned about tires being slashed.  I
24 don't remember Billy's tires being slashed, but years ago
25 Colonel Sharp's tires were slashed and he was a lieutenant.
```

**26**

```
 1    Q.    Ron Sharp?
 2    A.    Yes.
 3    Q.    In your 30-plus years on the force, did you ever
 4 have the opinion that there was an unequal playing field
 5 with regard to the race issue?
 6    A.    Yes, sir.
 7    Q.    And you say that under oath today, even though
 8 you know and I know that Ron Sharp is black?
 9    A.    Yes, sir.
10    Q.    And that there have been other black officers
11 who have reached levels in the state police or, like
12 yourself, of respect?
13    A.    Yes, sir.
14    Q.    Have you ever seen fit, prior to today, to ever
15 speak that opinion in any other kind of case or setting or
16 situation?
17    A.    I've never been asked to.
18    Q.    Let's talk about commanders and commanders
19 gaining respect from their supervisors and their
20 subordinates for awhile.
21    A.    Yes, sir.
22    Q.    Would you agree with me that, that issue was a
23 two-way street?  In other words, that a commander can be
24 accused, as Lieutenant Williams was in the Mercer/Butler
25 situation, of not having the respect of his subordinates
```

**27**

```
 1 arise because of, let's say, an effort to create problems
 2 that really don't exist?
 3    A.    It could happen.
 4    Q.    In this case, have you ever had the opportunity,
 5 Captain, to read the arbitration decision in Lieutenant
 6 Williams' case?
 7    A.    I believe Billy let me read that one time, yes.
 8    Q.    And this would have been a period of time when
 9 you inherited Williams from Butler?
10    A.    Yes.
11    Q.    So you had Lieutenant Williams for over a year-
12 and-a-half before the award from Alan Simonet (phonetic),
13 impartial arbitrator, came out.  So would you have read it
14 shortly after it came out?
15    A.    I would have.
16    Q.    And in the decision on Page 14th in part it
17 says, quote:  "The only reason that Captain Simon believed
18 the assertions of the supervisory staff over Lieutenant
19 Williams is simply due to the number of individuals who had
20 concocted this theory."  You've heard of that word,
21 concocted, made up?
22    A.    Yes.
23    Q.    Quote:  "Therefore, there was no credible basis
24 for Captain Simon's conclusion that Lieutenant Williams had
25 imposed a quota system."  Unquote.  Were you aware of the
```

**28**

```
 1 fact that Lieutenant Williams had been accused of creating
 2 an atmosphere in Mercer that rose to the level of an illegal
 3 quota system, had you heard that?
 4    A.    I heard Billy had problems down there.  I didn't
 5 know the specifics until Billy came to Troop E and then I
 6 got all of the specifics on that.  I heard there were all
 7 kinds of problems.  I heard Billy is doing this and he's in
 8 this kind of trouble.
 9    Q.    Since not everybody understands your profession,
10 that sort of information, would that come to you in meetings
11 or informally?
12    A.    You have to understand me, sir.  Some commanders
13 like to gossip.  They're on the phone with other commanders
14 all of the time.  I don't believe in gossip.  I don't
15 gossip.  If I call you I have a reason to call you to ask
16 you about state police or something that's going on.  So I
17 didn't call around to other troop commanders gossiping.  If
18 somebody told me something about Billy it was unsolicited,
19 just talking.  But there are other troop commanders that
20 were on the phone all of the time.  So I would have gotten
21 information from talking to Billy or just arbitrations.
22 It's just not my nature to gossip.
23    Q.    Did you observe anything from Lieutenant
24 Williams, for the two-and-a-half years you had him in Erie,
25 that would cause you to believe that he created moral
```

**29**

```
 1 problems for his staff?
 2    A.    No, sir.  If I can go back further.  I was a
 3 trooper when Lieutenant Williams was a sergeant.  He was
 4 staff sergeant in Erie.  And he had the civilians, the desk
 5 personnel and people like that, under his command.  I
 6 remember hearing the civilians how they spoke highly of him.
 7 That he was one of the few people they had over the years
 8 that actually treated them with respect.  And then
 9 Lieutenant Williams and I were both stationed in Bethlehem
10 at different times, and he was and I was staff out there.  I
11 think I went in behind him.  I'm not sure.  And I remember
12 Captain Wards telling me -- he must have went in after me
13 because I met Captain Wards later on -- what a great man
14 Billy was and how he did a great job on his staff out there.
15    Q.    Now through your discussions with Lieutenant
16 Williams and other people, in a non gossiping manner, I
17 assume you learned that there were these allegations about
18 Lieutenant Williams in Mercer?
19    A.    Yes.
20    Q.    And, from what I understand of your testimony
21 today, those things that you heard totally differ from what
22 your experience was with him?
23    A.    Yes, sir.
24    Q.    Did you ever get any talk or conversation from
25 Simon or Seilhammer after you got Billy about how he was
```

**30**

```
 1 doing or how he was conducting himself?
 2    A.    On a couple of occasions after I'd be talking
 3 with Major Seilhammer and I'd tell him what a good job Billy
 4 is doing for me.  I would say, whatever happened down there
 5 sure is not happening in this troop.  Whenever I rated Billy
 6 it had to go through his office too and he'd see that I was
 7 giving Billy good ratings.  I said, he deserves them.  I
 8 don't know what happened down there but it sure isn't
 9 happening up here.  He's working out very well for me.
10    Q.    Do you ever recall Seilhammer's reaction to your
11 comments?
12    A.    Yeah.  Kind of incredulous, like, amazed that I
13 would say that.
14    Q.    And did he ever say anything that caused you to
15 feel the reaction was the way you just described it, were
16 there any words you recall him using?
17    A.    No, just his body reaction.
18    Q.    These discussions were one on one in person?
19    A.    Yes.
20    Q.    And these would be down in the Butler barracks?
21    A.    No, when he'd visit Erie.
22    Q.    From the comments that Major Seilhammer made to
23 you about Billy after you got him in January of '01 through
24 your retirement in May of '03, did you get the impression
25 that Seilhammer was hoping or looking for Billy to mess up?
```

---

**ERBY CONLEY**

10/06/2007  01:09    8148361542                    AMDPGD

PAGE 08

---

**31**

```
 1    A.   Yes.
 2    Q.   Now when you retired you would have retired as
 3 the commander?
 4    A.   Yes.
 5    Q.   Were you replaced by an Afro-American or a
 6 white?
 7    A.   A white.
 8    Q.   And this individual who replaced you, his name
 9 is, what?
10    A.   Mike Rample.  R-A-M-P-L-E, I believe.
11    Q.   When you left Billy in Rample's hands, did you
12 have any concern going forward or did you give it any
13 thought about Terry Seilhammer and Rample looking to target
14 Billy or see if he could mess up at all?
15    A.   No, sir, because I've known Mike Rample since
16 1973, we went through the training Academy together.  I was
17 there when his wife were born.  He's a very decent person.
18 I have no thoughts that anything like that would happen.
19    Q.   For the few more months that Billy has left, you
20 are hopeful that he's in good hands, even though Seilhammer
21 is still running the show?
22    A.   Yes.
23    Q.   Now Billy will be out in December of '05, so,
24 again, do you stay in contact with your colleagues, at all,
25 in Erie now that you're enjoying or, I assume you're
```

---

**32**

```
 1 enjoying retirement?
 2    A.   No, sir, I don't stay in contact at all.  Billy
 3 and his wife were at my house the other day.  I have a
 4 picnic every year at my house and I invite some troopers,
 5 some people I work with now and friends in the neighborhood.
 6 And that's probably the only time I'll see Billy, maybe once
 7 or twice a year.  That picnic is when I do see him.  I don't
 8 go to the barracks.  When I left there I was through, as
 9 much as I loved the job, I'm not a hanger-on or anything
10 like that.  Also, I have no use for Major Seilhammer,
11 whatsoever, and I wouldn't want to see him.
12    Q.   Have you felt that way for some years going
13 backwards?
14    A.   A long time.
15    Q.   Do any of those feelings which have grown over
16 the years have any race undertone?
17    A.   Yes.
18    Q.   Have you ever seen fit to take that up with the
19 major?
20    A.   Yes.
21    Q.   Have you seen fit to do it in a one-on-one
22 setting or in some other setting?
23    A.   Over the phone one time.  One on one in his
24 office.
25    Q.   And do you recall whether or not these two
```

---

**33**

```
 1 occasions that you can recall are pre '95 or post '96?
 2    A.   Well I didn't come to Troop E as a troop
 3 commander till January of '98.
 4    Q.   So what you're telling us is all post '98?
 5    A.   Right.  I knew Major Seilhammer prior to that.
 6 I met him when I took over the LCB office in Pittsburgh.
 7 When he made lieutenant I took it over.
 8    Q.   Now with your feelings for and comments about
 9 Terry Seilhammer that go back, what, at least till '98, or
10 are you saying even before that?
11    A.   No, was ambivalent towards him when I just
12 knew of him.  When I became troop commander is when I
13 started actually interacting.
14    Q.   So the feelings you just spoke of all grew from
15 1998 till the time of your retirement?
16    A.   Yes.
17    Q.   Now let's talk about Syd Simon for a few
18 minutes.  I assume Simon has to survive under Seilhammer?
19    A.   I would imagine so.
20    Q.   In your 60-plus years on the planet, have you
21 seen occasions where Afro-Americans will act in a certain
22 way in order to persuade white supervisors that they can
23 discipline other Afro-Americans?
24    A.   Yes.
25    Q.   And from what you could see of your years in E
```

---

**34**

```
 1 under Simon and Seilhammer, did you find that to be ever
 2 the case about Simon?
 3    A.   I have a hard time answering that because I like
 4 Syd Simon.  We've always gotten along.  I didn't like what I
 5 read in those papers.  But Syd has never given me any
 6 indication, other than he was a decent person trying to make
 7 a career on the state police.
 8    Q.   Syd Simon never took you on?
 9    A.   No, sir.
10    Q.   But from your reading the papers concerning
11 Lieutenant Williams, did you come to any kind of a
12 conclusion that Simon took Billy on?
13         MR. CAMPBELL:  I'm going to object to the
14         question.  You can answer.
15    A.   I came to the conclusion, yes, Billy was given a
16 raw deal down there.
17    Q.   And when you say, down there, are you talking
18 about the Mercer to Butler, Butler to Erie transfers?
19    A.   No.  Just what he showed me and what I read in
20 the paperwork, the transcripts and the different e-mails he
21 had showed me that went back and forth on him, to me it just
22 wasn't right.  Something was wrong and he was getting the
23 short end of the stick, for some reason, down there.
24    Q.   You knew when you read those documents that this
25 was happening under Terry Seilhammer?
```

---

**35**

```
 1    A.   Yes.
 2    Q.   Have you read anything recently about some
 3 problems that Barry Titler is having?
 4    A.   A friend of mine, my best friend who is still in
 5 the state police, told me that Barry got in some trouble.
 6    Q.   He, you understand, was the disciplinary officer
 7 in the Billy Williams' case?
 8    A.   Yes.
 9         MR. SANDERS:  Captain, I'm going to take a
10         break for a few minutes.
11         (Off the record at this time)
12
13 BY MR. SANDERS:
14    Q.   Captain, I just have a few more questions.
15    A.   Yes, sir.
16    Q.   I want to direct your attention to the way you
17 ran things in Erie, mainly what they call staff meetings?
18    A.   Right.
19    Q.   How often did you see fit to have staff
20 meetings?
21    A.   We had a staff meeting, I think, twice a week.
22    Q.   Did you hear through talking to Lieutenant
23 Williams or from other channels that one of the accusations
24 against him in Mercer was he had too many staff meetings?
25    A.   I did hear that.
```

---

**36**

```
 1    Q.   What was your reaction?
 2    A.   That's crazy.  How do you know what's going on.
 3    Q.   Unless you have them, you mean?
 4    A.   Right.
 5    Q.   I want to draw your attention back now to Tim
 6 Johnson.  Do you recall an occasion where this white
 7 lieutenant who you previously described, had a go around
 8 with Lieutenant Williams in Erie, you yourself had a go
 9 around with?
10    A.   Yes.
11    Q.   And do you recall making a recommendation to
12 Seilhammer, Major Seilhammer in Butler, that Johnson be
13 transferred and you were overruled?
14    A.   Yes.
15    Q.   Do you remember any of the details of the
16 conversation you had with Seilhammer when you brought that
17 to his attention?
18    A.   Yes.
19    Q.   Did you tell Seilhammer that you felt, or
20 something to the effect that Johnson had been disrespectful
21 to you?
22    A.   Yes.
23    Q.   And what was Seilhammer's reaction, if you
24 recall?
25    A.   Well, can I take you back to the beginning of
```

---

Pages 31 to 36

**ERBY CONLEY**

369

10/06/2007  01:09    8148361542                    AMDPGD                              PAGE   09

---

**37**

```
 1  it?
 2      Q.     Fine.
 3      A.     When this happened between Billy and Lieutenant
 4  Johnson and I told him to straighten it out, well,
 5  Lieutenant Johnson took it that I was taking Billy's side on
 6  it.  After the kids funeral he called me up one day and just
 7  became very disrespectful on the phone and then he hung up
 8  so I called him back and I said, you come up to Erie right
 9  now you have a commanding officer.  But I like Tim Johnson,
10  I've been with him since he was a trooper.  And I guess I'm
11  getting towards the end of my career and I'm getting a
12  little soft and I didn't want to hurt him.  So I called
13  Major Seilhammer up and I told him what had happened here.
14  He said, well, think it over what you want to do and I'll
15  back you.  Give it a few days and think how you want to
16  handle this.  Lieutenant Johnson comes in and he apologizes
17  and I accept his apology but, still, we have a chain of
18  command.  We have a structure on the state police and we
19  can't go outside that structure.  So I waited a few days and
20  I thought it over and I recommended that he be transferred
21  to Erie.  And I was going to transfer another lieutenant who
22  lives down where he does who traveled from Seneca every day
23  to Erie, I was going to transfer him down there.  I called
24  Major Seilhammer and told him what I was going to do.  I
25  wrote the transfer up and he overruled it and said I waited
```

---

**38**

```
 1  too long.  I said, wait a minute, you're the one that told
 2  me to think it over when I explained everything that
 3  happened here.  And we got into a huge argument over the
 4  phone and I said I want to see somebody above you because
 5  this isn't right what you've done and it's not the first
 6  time you've done this.  And he ordered me that, you cannot
 7  see somebody above me.  And I said, I will see somebody
 8  above you, but I went through the regulations and I can't.
 9  So I'm stuck there now with being made to look like a fool
10  with this lieutenant since he knows he's done wrong and
11  friends know he's done wrong and Seilhammer takes his side
12  on it.  It was a very hard pill to swallow because I was
13  trying to do the right thing.  I would never let anybody
14  disrespect one of my officers, one of my lieutenants, like
15  that.  I never have and I never would.  But it goes back
16  further than that.  When I took over the troop we were down
17  17, 18 men and we had to go through the measures to keep the
18  troop running, keep people on the road.  And one of our
19  stations was running overtime completely.  People were
20  living off their overtime wages.  And the commissioner said,
21  you can't do that, you have to stop this.  So I put some
22  Jacobson measures out and I stopped the overtime and the
23  people in that station completely went bonkers, that I was
24  picking on them.  That I was against them and I was a racist
25  because I was black and it was a white station.  There were
```

---

**39**

```
 1  no black people in that station.  And they had a meeting and
 2  they made up all of these things that I was doing wrong to
 3  these troopers down there.  I mean, they had charges that
 4  were so ridiculous and they had a laundry list of things.
 5  And I was on vacation when this happened.  And while I'm on
 6  vacation Major Seilhammer meets with these people at the
 7  Meadville station and they give him this laundry list of
 8  things.
 9      Q.     Without you there, you mean?
10      A.     Without me there.  All of these things that I had
11  done.  I wrote them down.  I have them at home someplace.
12  They were so ridiculous, like, one person put that I didn't
13  smile at people.  Just stupid things like that.  When I come
14  back from vacation there's this note for me to report to the
15  major's office.  And Lieutenant Johnson, another Lieutenant
16  Johnson, who was my prime section commander, told me what
17  happened while I was gone.  So I went down to Butler and
18  when I got in there he was going to jump all over me and I
19  said, you don't do that.  You treat me as a person.
20      Q.     Who's the he?
21      A.     Seilhammer.  I said, you treat me as a person.
22  You don't treat me any different.  He backed off then.  And
23  then he ran down this long list of what I was going to do
24  and how wrong I was and all of these different things.  And
25  he got to reading them and they were so ridiculous I started
```

---

**40**

```
 1  laughing.  And he told me, you're going to change this and
 2  you're going to change this and that.  I said, Major, if I
 3  done all of these things here I don't deserve to run this
 4  troop.  I want you to BPR me right now.  I want this
 5  settled.  I'm requesting an investigation.  I want this
 6  officially recorded.  And he said, we don't need to do that.
 7  I said, yes we do because you've made accusations, they've
 8  made ridiculous accusations and you backed them up and you
 9  met with these people without first coming to me to ask me
10  my side of it.  I said, I want this investigated.  He said,
11  we don't have to do this, Erby.  I said, yes, we do, we have
12  to investigate this.  Well to make a long story short, he
13  backed off everything then.  When I left there nothing was
14  going on and it was exactly the way it was before when I
15  walked in.  The thing I was doing I kept on doing because I
16  was right.  But that's not the only time he's done things
17  like that.  And the FOP came to me, the FOP president, and
18  told me how the FOP felt about those charges and how
19  ridiculous.  He went down and met with these people and what
20  they were saying was so ridiculous he wouldn't even type it
21  up.  He came to me and told me about it.  He said, we never
22  --
23      Q.     Does the word "he" have a name after it?
24      A.     President McKee (phonetic).  These things were
25  just out of the realm.  But another time because of shortage
```

---

**41**

```
 1  of manpower, they wanted you to think out of the box, so I
 2  come up with an order where I put crime men one day a week
 3  on the road in uniform to alternate the uniform guys.  Half
 4  the crime unit would go this Thursday and the next Thursday
 5  the other half would go.  And on these days we put extra
 6  patrols out.  And I sent this order down to Major Seilhammer
 7  to let him see what I'm doing and he said it was a great
 8  order.  He liked it, but somebody went and complained.  And,
 9  once again, I was on vacation and when I came back he had
10  told Lieutenant Johnson to stand down on those orders.
11      Q.     Let me ask you this:  This exchange that you
12  have just described that has gone on between you and the
13  major in the same area that Lieutenant Williams is finishing
14  out his command in, which would be D and E, does this have
15  any similarity to what you gathered from Billy went through?
16      A.     You know, I never really thought about that
17  until I was talking to him today and he mentioned it.
18      Q.     Who's, him, Attorney Bradley?
19      A.     Yes.  And it does.  But also, there was another
20  time when a trooper got in some trouble.  A Trooper McClain
21  (phonetic) had gotten in some trouble and had a BPR on him
22  and he's talking to a station commander and the station
23  commander says that -- I don't know exactly how the
24  conversation came out, but it came out that McClain said he
25  was being picked on or, whatever.  And the station commander
```

---

**42**

```
 1  said he was Irish and the Irish were the niggers of Europe
 2  back then.  So when I read this report I highlighted that
 3  and I called BPR and I said, I want this investigated.  I
 4  made sure the major knew about it.
 5      Q.     This is Brian Simpson?
 6      A.     Yes.  And I thought for sure Major Seilhammer
 7  would take and pick up on this and want to know what's going
 8  on because I knew if it had been someone else he'd want to
 9  know what's going on, if it had been anything else going on.
10  He never once mentioned this to me, that this man had made
11  this racial statement on this report in that station in
12  front of other troopers.
13      Q.     What kind of discipline did Simpson get?
14      A.     Nothing.  What happened is, they did an
15  investigation and it came out that nobody wanted to come
16  forward on it to back McClain's statement up.  But the major
17  never asked me a word about that.  He never said one word
18  about it to me.
19      Q.     Captain, these feelings that you've echoed today
20  in your deposition concerning these racial overtones that
21  you experienced and that you feel that Lieutenant Williams
22  experienced, do you have these discussions with Hawthorne,
23  too?
24      A.     My brother and I have talked this over, yes.
25      Q.     Has Hawthorne, to your knowledge, gone through
```

---

360                                    **ERBY CONLEY**                          Pages 37 to 42

10/06/2007  01:09    8148361542                    AMDPGD                              PAGE 10

---

**43**

1  these kind of racial events in his career?
2      A.      There's not a black man in the Pennsylvania
3  State Police who hasn't went through something.
4      Q.      Can you count on one hand how many cases have
5  gone to court by Afro-Americans like Lieutenant Williams?
6      A.      I really couldn't say, sir.
7      Q.      Would this be the first one you're aware of that
8  has made it as far as it's made it with the plaintiff being
9  an Afro-American trooper or and Afro-American commander or
10 Afro-American lieutenant?
11     A.      You're asking me to answer something I don't
12 know, sir.
13             MR. SANFORD:  That's all of the question I
14     have right now.
15             THE DEPONENT:  Thank you, very much.  I would
16     like to say something though.  I felt that,
17     in my time under Major Seilhammer, he treated
18     me differently than he treated white
19     commanders.
20             MR. SANFORD:  Did you tell him that when you
21     had those discussions with him?
22             THE DEPONENT:  Yes I did.  I thought Major
23     Seilhammer was a racist.
24             MR. SANDERS:  Thank you.
25             MR. BRADLEY:  I have a few questions.

---

**46**

1      Q.      When you were having your discussions after
2  2001, after trooper Williams transferred to Erie, your
3  discussions with Trooper Williams about his situation down
4  in Mercer and Butler, did you take these as official
5  complaints or was this just conversation between two fellow
6  workers?
7      A.      I took it Billy was explaining to me what
8  happened to him down there after he had gotten comfortable
9  with me up in Erie and started trusted me.  That he wanted
10 to tell me what had happened to him down there.
11     Q.      Did you feel any obligation to take those
12 discussions further than between the two of you?
13     A.      Where could I take them to?
14     Q.      To file any official reports?
15     A.      These were things that had happened.  These were
16 not official reports.  He was telling me what had happened to
17 him.  These were all records.  This wasn't like this
18 happened just that day.  This happened a year ago or two
19 years ago.  Maybe I didn't understand the question, I'm
20 sorry.
21     Q.      I guess what I'm looking at, was this just sort
22 of a conversation between two guys about something that
23 happened or did you feel that he was making an official
24 complaint regarding his treatment?
25     A.      He told me what happened.  This was between the

---

**44**

1
2                    CROSS EXAMINATION
3  BY MR. BRADLEY:
4      Q.      Within each troop of the Pennsylvania State
5  Police, how many division are there?
6      A.      Three.
7      Q.      Can you describe those?
8      A.      Patrol, crime and staff.
9      Q.      Could you briefly describe each of those
10 sections?
11     A.      Well patrol section are the guys you see in
12 uniform.  They do all of your primary investigations.
13 They're the first people you meet at a crime scene and they
14 do traffic work.  Your staff people are your mop and broom
15 people.  They're the ones that keep the station clean, keep
16 it running, keep the CSOs running.  The crime people are the
17 people that do the secondary work, the major crime work.
18     Q.      In your encounters with the plaintiff,
19 Lieutenant Williams, in the state police, you had indicated
20 that when you were at Troop R, as a trooper he was a staff
21 sergeant?
22     A.      Yes.
23     Q.      Does that mean that he was in the staff section?
24     A.      Yes.
25     Q.      And at Bethlehem, what section was he in?

---

**47**

1  two guys.
2      Q.      So this was, in your mind, outside of the chain
3  of command?
4      A.      Yes.
5      Q.      And, basically, he was telling you his side of
6  the situation?
7      A.      He was just telling me what had happened to him.
8  He brought both sides in, what had happened to him.
9      Q.      After 2001, did you ever talk to Captain Simon
10 or Major Seilhammer about what their side of the story was?
11     A.      No I didn't.
12     Q.      And in response to a question you had made the
13 comment, after looking at the papers, Billy was getting a
14 raw deal down there.  Do you recall saying that?
15     A.      Yes.
16     Q.      What papers were you referring to?
17     A.      He showed me a lot of papers.  He showed me
18 e-mails and transcripts and an order that kept him out of
19 his station.  To me that's a raw deal.  You're a station
20 commander, how can you keep somebody off of their station.
21 He said that was the worse thing that ever happened to him.
22             MR. BRADLEY:  That's all of the questions I
23     have.
24
25                    CROSS EXAMINATION

---

**45**

1      A.      I believe he was staff out there too.
2      Q.      And under your command in Erie he was also with
3  the staff division?
4      A.      Yes.
5      Q.      Were you able to ever observe him in the role of
6  that?
7      A.      I have been on Mercer stations for meetings when
8  Lieutenant Williams was there as the station commander, but
9  only for a couple of hours or so.
10     Q.      You never evaluated his performance as a station
11 commander?
12     A.      No I haven't.
13     Q.      In answering a question earlier you had talked
14 about a conversation, I believe you had with Major
15 Seilhammer on the phone.  And this concerned the transfer of
16 Trooper Williams into Troop E in 2001 and there was some
17 reference to, getting him?
18     A.      It was said he was afraid to come here because I
19 would get him.
20     Q.      You're not testifying that you were ever ordered
21 by anybody to get him?
22     A.      No, not at all.
23     Q.      And there was never any suggestion or anything
24 of that nature?
25     A.      No, just that he was afraid of me.

---

**48**

1  BY MR. CAMPBELL:
2      Q.      Mr. Conley, at the time of Lieutenant Williams'
3  transfer to Erie in January of 2001, where did he reside?
4      A.      I think he resided in Erie.
5      Q.      He did.  And he had resided in Erie prior to
6  that?
7      A.      Yes.
8      Q.      And the two assignments that he had, one was in
9  Mercer and one was in Butler, approximately, how far is it
10 from Erie to Mercer?
11     A.      You're looking at 45, 50 minutes.
12     Q.      And how long is the ride to Butler on a daily
13 basis?
14     A.      Probably another 20, 25 minutes.
15     Q.      So when he was transferred to Erie his only real
16 objection is it was his fear of you and the fact that you
17 might be out to get him.  Is that right?
18     A.      This is what I was told.
19     Q.      Did he ever tell you that?
20     A.      No, he never told me that.
21     Q.      Do you have a particular reputation as a
22 supervisor, as far as you know?
23     A.      Strict.  I was a strict supervisor.
24     Q.      But would you say strict, but fair?
25     A.      100 percent fair.

---

**ERBY CONLEY**

369

10/05/2007  01:09    8148361542                    AMDPGD

---

**49**

1    Q.    Once Lieutenant Williams got to know you a
2  little better and opened up to you, did he ever mention that
3  he had any fear of you as a supervisor when he first came
4  here?
5    A.    No. As a matter of fact, I even asked him and
6  he said no.
7    Q.    And did he ever tell you that he was actually
8  happier to be working up in Erie than to be working in
9  either Mercer or Butler?
10   A.    No. He said he enjoyed Erie. He said he
11 enjoyed what he was doing but he never said I'm happier to
12 be here.
13   Q.    Well it's more convenient in terms of the
14 commute every day. And, of course, he'd be under your
15 command and, from what you said, you're a fair individual?
16   A.    I try to be, yes, sir.
17   Q.    And he's never voiced any complaint to you about
18 any treatment or any orders, anything that you've ever done?
19   A.    No, sir.
20   Q.    And, as I understand it, you performed, is it
21 yearly evaluations?
22   A.    Yes.
23   Q.    And those evaluations, are you called upon to
24 give your opinion as to Lieutenant Williams in relation to
25 his job as a supervisor?

---

**50**

1    A.    There's a section at the end, yes, you can write
2  remarks and comments down.
3    Q.    And you've always been complimentary in that
4  section?
5    A.    I've said he's done his job here without
6  complaint. I'm very happy with what he's doing. And that's
7  not verbatim.
8    Q.    Actually, while he's working here with you, as I
9  understand it, there is a certain amount of protection from
10 Major Seilhammer?
11   A.    Well any troop commander is a buffer to any of
12 his men, yes.
13   Q.    Correct. In other words, the major is in no
14 position to take any direct action against him because he's
15 not dealing with him on a day-in and day-out basis?
16   A.    I don't know that that question is worded in a
17 way I can answer it. Can you word that differently?
18   Q.    Well, as far as I can see from the way it's
19 organized, it there was to be discipline taken against a
20 trooper, normally it would come from within the station
21 where he's assigned?
22   A.    Discipline comes from the department
23 disciplinary officer. A troop commander only adjudicates
24 reports. We send in our -- not even recommendation, we just
25 adjudicate did this happen or did this not happen.

---

**51**

1    Q.    So it never gets to the adjudicator without it
2  first starting out of the troop?
3    A.    Right.
4    Q.    One of the things I think you mentioned that you
5  had had a chance to review the arbitrator's decision and you
6  read through it. Is that correct?
7    A.    There came a time when the state police policy
8  was that all arbitration decisions were sent to the troops
9  and all troop commanders read them, yes.
10   Q.    The 10-day suspension, of course, was
11 overturned?
12   A.    I don't remember, sir.
13   Q.    But the transfer was upheld?
14   A.    Yes.
15   Q.    Do you know the race of the arbitrator who
16 decided that case?
17   A.    No, sir, I don't.
18   Q.    Did Lieutenant Williams ever tell you that it
19 was an Afro-American arbitrator?
20   A.    No, he never did.
21   Q.    You mentioned that there were a couple of
22 occasions where you had some interaction with Major
23 Seilhammer but you didn't state, specifically, what they
24 were. Do you recall mentioning two occasions?
25   A.    Yes I did. I did recall. I said the time that

---

**52**

1  the people made me the stories on me on the one station
2  where I tried to get ahold of overtime and they concocted
3  all these stories of different things I was doing. And the
4  other one was innovative things with scheduling. And the
5  other one was with Lieutenant Johnson. Those are my three
6  main things.
7    Q.    So there are three, not fifty?
8    A.    Yes, sir.
9    Q.    You mentioned that a Ron Sharp had his tires
10 slashed. Was it ever determined who had slashed the tires?
11   A.    They were slashed in the Union Town Station, as
12 I understand the troopers did it. But that's 20-some years
13 ago.
14   Q.    Were they actually charged with it?
15   A.    I don't think anybody was ever charged with it.
16        MR. CAMPBELL:  I think those are all of the
17 questions I have.
18        THE DEPONENT:  Thank you.
19
20            REDIRECT EXAMINATION
21 BY MR. SANDERS:
22   Q.    Irregardless of whether Lieutenant Williams is
23 now dealing with a small commute, Captain, in your
24 experience with what he's gone through, has that left a
25 permanent scar on his reputation?

---

**53**

1    A.    I think it has, yes, sir.
2    Q.    And irregardless of the color of what the
3  arbitrator was, are you still of the opinion you gave
4  earlier that Seilhammer, in your opinion from your dealings
5  with him, is a racist?
6    A.    Yes, sir.
7    Q.    Given what you have experienced, and I'm talking
8  now about Lieutenant Williams' performance under you and so
9  forth. Given what you witnessed in his performance from
10 January '01 to May of '03, plus the times you would
11 experience him as a troop commander in Mercer for the times
12 you went to meetings that you described, in your opinion,
13 was he qualified to replace you?
14   A.    He did. Whenever I'd go away I'd take and
15 rotate out of class between the lieutenants in the station
16 and Billy got his turn too. Lieutenant Johnson and the
17 other lieutenant, I rotated between the three of these.
18   Q.    Who, in your understanding, as far as the chain
19 of command is in your area, made the decision that Hample
20 would be your replacement and not Billy?
21   A.    Oh, that was done a couple of months after I
22 left the state police. It stayed empty and it was made in
23 Harrisburg. I had nothing to do with that.
24   Q.    What I'm getting at is, do you have an
25 understanding as to whether Seilhammer would have had any

---

**54**

1  input in '03 as to who replaced you on a permanent basis?
2    A.    Yes he did. I know that for a fact because one
3  of the lieutenants told me that at a meeting Major
4  Seilhammer when he introduced Captain Hample said, I
5  personally picked him. To that effect.
6    Q.    How many times did Seilhammer contact you in '03
7  and ask you your opinion as to whether or not it should be
8  Billy that replaces you rather than Hample?
9    A.    Well he couldn't have because Billy was not on
10 the list to replace me. He had to be on a list and Billy
11 was not on that list.
12   Q.    And the fact that Billy was not on that list,
13 would that in anyway be due to the prior issues that he had
14 gone through?
15   A.    I don't believe so because you have to take a
16 test to be on that list.
17        MR. SANDERS:  Thank you, that's all I have.
18        THE DEPONENT:  I'd like to make one other
19 statement, too, since Mr. Campbell brought it
20 up two or three times. There was a permanent
21 time, too, that I'd like to bring up. Just
22 prior to 9/11, the state police were sending
23 a detail down to the WTO, the World Trade
24 Organization, was going to meet in D.C.. And
25 it was told to me by Major Seilhammer that an

---

**ERBY CONLEY**

10/06/2007  01:09   8148361542                          AMDPGD                          PAGE  12

---

**55**

```
 1        Erie commander, other than him, had requested
 2        that I come and be in charge of his detail
 3        because Major Seilhammer told everybody that
 4        I was an operational type person.  I was very
 5        good operationally.  But because I'm not in
 6        that area it was said, no, you can't do it.
 7        It was never really -- I'd seriously consider
 8        it, I think, because it would have been a
 9        slap in the face to the other captains and I
10        understood that.  When we got our platoons
11        together Major Seilhammer put me at a lower
12        position than any other captains around.  I
13        had no decision making powers, at all.  Yet,
14        he had said that I was the strongest one
15        operationally and stuff.  This was the kind
16        of person I was dealing with.
17   MR. SANDERS:  Anything further you'd like to
18        say, sir?
19   THE DEPONENT:  No, that's all.
20   MR. CAMPBELL:  I just have a question or two.
21
22               RECRUSS EXAMINATION
23 BY MR. CAMPBELL:
24   Q.   In terms of the arbitration decision reached in
25 Lieutenant Williams' grievance, do you have any knowledge or
```

---

**56**

```
 1 any information that Major Seilhammer had anything to do
 2 with influencing the ultimate decision that was made?
 3   A.   No, sir, I don't.
 4   Q.   Just one thing, in terms of rank, for instance,
 5 you had the rank of captain.  Could you just briefly
 6 describe the process or procedure whereby individuals can be
 7 promoted to a rank, such as a lieutenant, captain or a
 8 major?
 9   A.   Yes, sir.  It's a testing procedure.  There's an
10 oral and written component to this testing procedure.  And
11 you take the written test and it's like a four or five hour
12 test and you have to have to a certain score.  And you go
13 onto the oral board.  There's three oral boards and they
14 take your combined scores there and they come out with a
15 final composite score.  But you have to score above a
16 certain percentage point to be considered.  That doesn't
17 mean you get promoted.  You have to be above that to be
18 considered.  And then the commissioner for captain, major,
19 whatever, he goes into this pool of candidates and he picks
20 the people out of there that he wants.
21   Q.   As I understand it then, he can pick anyone who
22 is within this pool?
23   A.   Right.
24   Q.   They're not ranked in any order?
25   A.   No.  That's for captain and major, no, they're
```

---

**57**

```
 1 just in this pool.  It's called qualified and unqualified.
 2   Q.   It's like pass/fail?
 3   A.   Right.
 4   Q.   And, obviously, the written test you get, that's
 5 an objective score?
 6   A.   Right.
 7   Q.   But the oral would be subjective in the sense
 8 that the people who listen to it sort of --
 9   A.   No, they have anchors.  When you're talking they
10 give you a scenario and when you go to that scenario there's
11 anchors that they're looking at to see if you're hitting
12 those anchors as you go along that prove that you know, you
13 understand where you want to go with this.  Sometimes you
14 can get extra credit if you say something that's not an
15 anchor but it really fits that.
16   Q.   So it's not completely subjective on the part of
17 the people that are sitting and listening to your orals?
18   A.   Right.
19   MR. CAMPBELL:  That's all.
20   MR. SANDERS:  I just have a few follow-up
         questions.  Sorry, captain.
         THE DEPONENT:  That's okay, sir.
22
23
24
25              REDIRECT EXAMINATION
```

---

**58**

```
 1 BY MR. SANDERS:
 2   Q.   Just so we're certain and, especially, so the
 3 judge understands.  This test that you've just been asked
 4 about, was this a test for commander position?
 5   A.   It's a test, it's a captain and major test.
 6   Q.   Let's forget about captain and major for a
 7 minute.  Were you also the commander at the Erie Troop E
 8 when you retired?
 9   A.   Yes.
10   Q.   What I was asking you earlier was, whether or
11 not -- now, mind you, my client, Billy Williams, had been
12 the commander in Mercer.  Correct?
13   A.   Yes.
14   Q.   He wasn't a captain?
15   A.   Right.
16   Q.   He wasn't a major?
17   A.   Right.
18   Q.   Now focus on that.  Now I'll give you the next
19 question.
20   A.   Okay.
21   Q.   Where is it written, if you know, is there any
22 restriction that my client could have been the commander in
23 Erie when you retired, captain or no captain?
24   A.   Yes.  It's written he can't because he wasn't on
25 the list, sir.
```

---

**59**

```
 1   Q.   Apparently he was on a list that got him to
 2 Mercer.  There was a point in his career where he became the
 3 commander in Mercer?
 4   A.   Yes, sir.
 5   Q.   Had he had to pass the test back then with the
 6 orals and the writtens then?
 7   A.   Here's what you're missing, sir.  Billy was a
 8 station commander.  He made lieutenant so he's eligible to
 9 be a commander of a certain size station.
10   Q.   I see.
11   A.   And then when you get into that troop as a
12 lieutenant or a sergeant the troop commander places you at a
13 station or he can put you at headquarters.  To become a
14 troop commander the commissioner says, he looks over his
15 eligible captains and says, we have a vacancy in a troop and
16 this is the man I think can run that troop.  When you get to
17 that troop then you place your station commanders around.
18   Q.   Let's revisit that now.
19   A.   Okay.
20   Q.   So what you're telling me is, Erie is bigger
21 than Mercer?
22   A.   Well, Erie is a station, sir.
23   Q.   What was Mercer?
24   A.   You have to understand Troop E, Erie, is made up
25 of six stations.  Troop D, Butler, is made up of five, which
```

---

**60**

```
 1 would be Mercer, Butler, Chippewa, New Castle.  Erie is made
 2 up of Corry, Warren, Seneca, Girard and Corry.
 3   Q.   So by my client being taken down by the process
 4 from Mercer back to Butler or being transferred to
 5 Erie, isn't it true then that, had he been returned to
 6 Mercer, had he gone back to Mercer, he could have gone back
 7 as a commander without taking any more tests within Erie or
 8 oral?
 9   A.   As a station commander, not a troop commander.
10   Q.   I understand.  But he left as a station
11 commander?
12   A.   He left as a station commander.
13   Q.   And he could have gone back as a station
14 commander, could he not have?
15   A.   He could have, yes, if the captain so chose to
16 put him on a station.
17   Q.   And the captain would be Simon?
18   A.   Yes.
19   Q.   And the major would be Seilhammer?
20   A.   Right.
21   Q.   Let's visit a question that Attorney Campbell
22 chose to ask you.  And I'm glad he brought it up because I
23 actually had forgotten.  Let's talk about Seilhammer's
24 impact on this decision.  I'm holding up now the arbitration
25 decision.  Okay?
```

---

Pages 55 to 60                          **ERBY CONLEY**                          369

10/06/2007  01:09    8148361542          AMDPGD                    PAGE  13

---

**61**

1  A.  Okay.
2  Q.  Isn't it true that Lieutenant Williams, in the
3 course of his discussions with you when you two developed a
4 trusting relationship, had told you that there were certain
5 trooper witnesses.  A guy named Matthew Tyzinski (phonetic).
6 And a guy named Bob Shrontz (phonetic), that he had wanted
7 to call or have testify on his behalf at the arbitration.
8 Do you recall that ever coming up with Lieutenant Williams?
9  A.  Sir, one of the worse things in my life.  I'm a
10 very visual person.  I have to see a persons name several
11 times.  I would not be able to answer that question.
12  Q.  Would you be able to answer it if you saw the
13 name on a piece of paper?
14  A.  No.  I would not remember their names, is what
15 I'm saying.
16  Q.  Forget about the names, then.  Let's go to just
17 the general situation.  Did Lieutenant Williams ever share
18 with you the fact when it came down, this arbitration
19 decision, that uphold the transfer whereby he was not able
20 to go back to Mercer as a station commander, did it ever
21 come up in conversation from him with you that he had had
22 some trooper witnesses in Mercer that were willing to
23 testify on his behalf but had not been called?
24  A.  More than likely, but I can't say positive, sir,
25 because we had so many conversations on this.  We talked

**62**

1 about this a lot.
2  MR. SANDERS:  That's all I have.
3
4  RECROSS EXAMINATION
5 BY MR. CAMPBELL:
6  Q.  When Lieutenant Williams was transferred to
7 Erie, could he have been made a station commander?
8  A.  If there was a station open, yes, sir.
9  Q.  Do you know if any station openings came up?
10  A.  I believe it was Lieutenant Johnson lived in the
11 Seneca area.  And it was my policy to try to put my station
12 commanders as close to home as possible.  It didn't always
13 work because there's a Lieutenant Steele riding down there
14 because two come from the same area, which is a 90-minute
15 ride a day.  That was just my policy.  I always believed
16 that a happy person was a productive person.  If you had a
17 person close to home they were more comfortable.
18  Q.  And it would have been your decision in terms of
19 a station commander?
20  A.  Yes, sir.
21  MR. CAMPBELL:  That's all I have.
22  MR. SANDERS:  Just so we have it on the
23 record.  Is there anything else that you
24 would like to say that you believe is
25 relevant to this case, Captain?

**63**

1  THE DEPONENT:  Yes, sir.
2  MR. SANDERS:  Go ahead.
3  THE DEPONENT:  I just thought of something
4 else.  We talked about Major Seilhammer and I
5 already said what I think about him.  We had
6 promotions coming out for lieutenant and we
7 had a couple of people that were eligible for
8 lieutenant in Troop E.  As I was telling Mr.
9 Bradley, during my time as troop commander I
10 went out quite a bit to work with other state
11 police agencies and I had to go to Florida to
12 work with the Florida Highway Patrol.  Major
13 Seilhammer was going around telling me a
14 sergeant that he was going to make lieutenant
15 and he had recommended him for lieutenant,
16 but he never talked to me about it, not once
17 in one conversation.  And then Lieutenant
18 Simpson was going around telling everybody
19 that this sergeant was making lieutenant.
20 Everybody but me knew about this.  Thank God,
21 I'm in Florida and Lieutenant Williams calls
22 me and he says, are you aware that they're
23 making lieutenants in the troop.  I said, I
24 know they're going to make them but nobody
25 has called me yet to ask me who I would

**64**

1 recommend for lieutenant.  And he said, well,
2 they're saying they're making this one guy
3 lieutenant and it's all over the troop and
4 you don't know about it.  So I got on the
5 horn and I call the commissioner.
6  MR. SANDERS:  Who was, who?
7  THE DEPONENT:  It was Lieutenant Colonel
8 Wertz (phonetic) at the time.  And I told
9 him that Major Seilhammer had not discussed
10 this with me.  We had other people that were
11 eligible for lieutenant and he completely cut
12 me out to the detriment of, he undermanned my
13 authority in the troop by going into my troop
14 and recommending somebody for promotion
15 without me being involved in that decision
16 making process.  Well, Lieutenant Colonel
17 Wertz agreed with me and rescinded his
18 promotion and promoted the person that I
19 wanted promoted because I had to work with
20 these people.  And Seilhammer did not like
21 that.  And I think that's part of why he
22 wanted to get me as much as he could.
23  MR. SANDERS:  Anything else, Captain?
24  THE DEPONENT:  That's all, sir.
25  MR. SANDERS:  When a deposition comes to an

**65**

1 end, like yours just did, you have a right
2 that you need to know about.  And then we
3 need to know how you'd like to exercise that
4 right.  Let me tell you what the right is and
5 then you can let me know how you want to
6 handle it.  You have a right to have myself
7 and AnnMarie here make this transcript
8 available to you.  Have it sent to your home
9 and you have 30 days to review it and to get
10 it back to me if there's any corrections that
11 need to be made, or you can waive that right.
12 Would you like to tell us which way you'd
13 like to go?
14  THE DEPONENT:  I'd like to review it.
15  MR. SANDERS:  Let the record show that the
16 witness has not waived signature and we'll
17 make arrangements, you and I, to get that to
18 him.
19  (Deposition concluded at 4:35 p.m.)

**66**



IN THE COURT OF COMMON PLEAS
OF PENNSYLVANIA

BILLY R. WILLIAMS,
    Plaintiff
  vs
PENNSYLVANIA STATE TROOPERS
ASSOCIATION,
    Defendant

BILLY R. WILLIAMS,
    Plaintiff
  vs
PENNSYLVANIA STATE POLICE
    Defendant

APPEARANCES

NEAL A. SANDERS, ESQUIRE, Law Offices of Neal A.
Sanders, Attorney for Plaintiff, Billy Williams

SCOTT A. BRADLEY, SENIOR DEPUTY ATTORNEY GENERAL,
Pittsburgh, Pennsylvania

BRYAN CAMPBELL, ESQUIRE, Sixth Floor, 220 Grant Street,
Pittsburgh, Pennsylvania 15219

ANN MARIE SULLIVAN

10/06/2007  01:09    8148361542

AMDPGD

1                        I N D E X
2  ERBY L. CONLEY
3  Direct Examination by Mr. Sanders  . . . .    5
4  Cross Examination by Mr. Blakley   . . . .   40
5  Redirect Examination by Mr. Sanders . . .   55
   Redirect Examination by Mr. Campbell . . .   90
6  Recross Examination by Mr. Campbell  . . .   91
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**ERBY CONLEY**

1   COMMONWEALTH OF PENNSYLVANIA   )      CERTIFICATE

2   COUNTY OF ERIE                 )      SS: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

3

4       I, Ann Marie A. Sullivan, a Certified Court Reporter and

5   Notary Public in and for the Commonwealth of Pennsylvania,

6   do hereby certify that the deposition of ERBY CONLEY, first

7   duly sworn to testify to the truth, the whole truth and

8   nothing but the truth; that the foregoing testimony was

9   taken at the time and place stated herein; and that the said

10  statements were recorded stenographically by me and then

11  reduced to printing under my direction, and constitutes a

12  true record of the testimony given by said witnesses.   I

13  further certify that I am not a relative, employee or

14  attorney of any of the parties, or a relative or employee of

15  either counsel, and that I am in no way interested directly

16  or indirectly in this action.   IN WITNESS WHEREOF, I have

17  hereunto set my hand and affixed my seal of office this 27th

18  day of November, 2007.

19

20                                          Notary Public

21

22

23                  COMMONWEALTH OF PENNSYLVANIA
                            Notarial Seal
24          Ann Marie A. Sullivan, Notary Public
                    Millcreek Twp., Erie County
        My Commission Expires May 24, 2010
25      Member, Pennsylvania Association of Notaries

Exhibit F
Plaintiff's Proposed
Trial Exhibits 30A, 97, 98

Herald
07/27/00



**SERVING**

## MERCER COUNTY

# Quota case isn't criminal, DA says

**By Joe Pinchot**
*Herald Staff Writer*

No criminal charges will be filed over allegations local state troopers had to write a certain number of citations and make arrests to avoid assignment to the worst work shifts, District Attorney James P. Epstein said.

But the completion of Epstein's investigation doesn't mean the end of the case instigated by troopers from the Mercer barracks in Jackson Township who say a quota system violates state law and their union contract.

The state police Bureau of Professional Responsibility is continuing to investigate and administrative disciplinary measures are still possible, said Capt. Sidney A. Simon.

Epstein said it was important to complete the criminal part of the investigation because even policemen have the right not to speak to investigators or answer questions that might be incriminating.

With no charges looming, troopers can be compelled to answer questions and cooperate with investigators or face sanctions, Epstein said. The police contract contains the only restraints the investigation.

"It's important that we have a firewall between the criminal aspect of this thing and the administrative side," Epstein said.

Jack W. Cline, an attorney hired by troopers, said he was not surprised that no criminal charges would be filed.

"We never alleged there was anything criminal," Cline said.

But troopers still believe that quotas were in place in violation of state law and that troopers were evaluated based on the quota system, which violates their contract, Cline said.

A letter from Cline to Simon dated Feb. 10 prompted the captain to launch the investigation.

Troopers alleged quotas were set and troopers who failed to meet them were placed on undesirable shifts. Citations issued under a quota system would be null and void.

Epstein said he believes no criminal cases have been compromised as a result of the troopers' allegations.

Simon said in February that

*See QUOTA, page A-2*



PLAINTIFF'S EXHIBIT
30

ATTACHMENT # 11
PAGE 1 OF 2

⊃ BPR HDQTRS ☎ 717 541 7896    08/07/00  09:56  :02/02 NO:602

⊃ R+D  Hbg Pa ☎ 717  772 1435    08/03/00  15:12  :02/02 NO:901

troopers at the Mercer barracks in Jackson Township were not required to fill quotas, but some "mis-representation or miscom-munication" had taken place.

Epstein said that after re-viewing the investigation, which included interviews and written submissions from troopers, there were "signifi-cant failures of communications and management."

Simon, who commands state police stations in five counties, said in February he took mea-sures to make sure it doesn't happen again.

"To my knowledge that has stopped," Cline said of the al-leged quotas. "I don't know what has been done there."

"I am convinced that every-one assigned to the Mercer barracks knows that quotas are illegal and will not be tolerat-ed," Epstein said.

Cline said he's pleased that the investigation is not over.

Simon had said he hoped to have a report on the investiga-tion by now, but doesn't expect one before Sept. 1. He said there are only four internal af-fairs investigators in western Pennsylvania and they handle such investigation in the order in which allegations are made.

---

# Reaching
# The Herald

http://www.sharon-herald.com
*52 S. Dock St., Box 51*
*Sharon, Pa. 16146*
**Business hours:**
9 a.m. to 5 p.m. weekdays
**Phone:**
(724) 981-6100
or toll-free in Ohio and western Pa.:
(800) 981-1692
**After hours:**

ATTACHMENT # ___11___
PAGE ___2___ OF ___2___

¬ PSTN-18



Wednesday,
Sept. 27, 2000

Sharon, Pennsylvania

# C

| Classified | C-4 |
| TV grid | C-8 |



**David E. Dale/Herald**

### Let the band play

Master Sgt. Darryl Brenzel of the Army Field Band Jazz Ambassadors plays "Who Can I Turn To" on his saxophone. At right, band members play "The Star Spangled Banner" at the beginning of their concert Tuesday in Mercer High School Auditorium. The concert was sponsored by Mercer Community Band and The Herald.

## MERCER COUNTY

# No traffic quotas at local barracks, state police say

By Joe Pinchot
*Herald Staff Writer*

An investigation into whether state police at the Mercer barracks were ordered to meet a quota of arrests is complete.

"There was no actual quota schedule or the enforcement thereof at the Mercer station," said Capt. Sidney A. Simon, commander of Troop D.

"There were some administrative deficiencies discovered in the investigation," he added.

Because of those deficiencies, which Simon would not detail, "administrative corrective action" was taken, he said. Simon would not go so far as to call the action disciplinary and would not say how many people were affected.

The investigation was launched after a Feb. 10 letter from lawyer Jack W. Cline, who said he had been retained by a state trooper and had documentary and testimonial evidence that a quota system was being used at the barracks in Jackson Township.

A quota is a requirement that a policeman write a set number of citations or make arrests. Quotas are illegal under state and federal law, and violate the police union contract.

Citations issued under a quota system would be void.

Troopers alleged they were put on undesirable shifts for failing to meet quotas.

In July, Mercer County District Attorney James P. Epstein announced that no criminal charges would be filed as a result of the investigation.

While a criminal investigation is under way, even policemen have the right not to speak to investigators or answer questions that might be incriminating.

Once the criminal question was out of the way, troopers could be compelled to answer questions and cooperate with investigators or face sanctions. The police contract provided the only restraints on the investigation.

Epstein had said there were "significant failures of communications and management."

Simon said he took administrative steps shortly after receiving Cline's letter to make sure no misrepresentation or miscommunication, which occurred in this case, ever happens again.

The captain said he took further steps once the state police Bureau of Professional Responsibility, Internal Affairs Division, completed its investigation and report.

Simon said he submitted his final report last week.

A message left for Cline was not returned.

Simon said he looked upon the investigation as a positive event.

"Clearly, when you have an investigation of this type, it uncovers some possible deficiencies in your organization," he said. "You don't have the opportunity to know that without this type of investigation."

# OTHER BUSINESS

week and customers will receive one more bill this year. The annual rate of $81.80 had been billed quarterly at $20.45. Each bill will now be for $13.63.

Saturday's 'Take Time

# nity



Wednesday,

Sharon, Pennsylvania

# C

| Classified | C-4 |
|---|---|



David E. Dale/Herald

### Let the band play

Master Sgt. Darryl Brenzel of the Army Field Band Jazz Ambassadors plays "Who Can I Turn To" on his saxophone. At right, band members play "The Star Spangled Banner" at the beginning of their concert Tuesday in Mercer High School Auditorium. The concert was sponsored by Mercer Community Band and The Herald.

MERCER COUNTY

# No traffic quotas at local barracks, state police say

By Joe Pinchot
*Herald Staff Writer*

An investigation into whether state police at the Mercer barracks were ordered to meet a quota of arrests is complete.

"There was no actual quota schedule of the enforcement thereof at the Mercer station," said Capt. Sidney A. Simon, commander of Troop D.

"There were some administrative deficiencies discovered in the investigation," he added.

Because of those deficiencies, which Simon would not detail, "administrative corrective action" was taken, he said. Simon would not go so far as to call the action disciplinary and would not say how many people were affected.

The investigation was launched after a Feb. 10 letter from lawyer Jack W. Cline, who said he had been retained by a state trooper and had documentary and testimonial evidence that a quota system was being used at the barracks in Jackson Township.

A quota is a requirement that a policeman write a set number of citations or make arrests. Quotas are illegal under state and federal law, and violate the police union contract.

Citations issued under a quota system would be void.

Troopers alleged they were put on undesirable shifts for failing to meet quotas.

In July, Mercer County District Attorney James P. Epstein announced that no criminal

charges would be filed as a result of the investigation.

While a criminal investigation is under way, even policemen have the right not to speak to investigators or answer questions that might be incriminating.

Once the criminal question was out of the way, troopers could be compelled to answer questions and cooperate with investigators or face sanctions. The police contract provided the only restraints on the investigation.

Epstein had said there were "significant failures of communications and management."

Simon said he took administrative steps shortly after receiving Cline's letter to make sure no misrepresentation or miscommunication, which occurred in this case, ever happens again.

The captain said he took further steps once the state police Bureau of Professional Responsibility, Internal Affairs Division, completed its investigation and report.

Simon said he submitted his final report last week.

A message left for Cline was not returned.

Simon said he looked upon the investigation as a positive event.

"Clearly, when you have an investigation of this type, it uncovers some possible deficiencies in your organization," he said. "You don't have the opportunity to know that without this type of investigation."

# OTHER BUSINESS



Saturday's 'Take Time



**erald**

ER COUNTY AREA FOR 135 YEARS

Thursday
February 17,
2000

3 sections 30 pages
Sharon, Pennsylvania

http://www.sharon-herald.com
Volume 136, Number 309

50 cents



David E. Dale/Herald

...un. today. According to
...e police and firefighters
...tatements.

## MERCER COUNTY

# Internal police probe looks at alleged quotas

By Joe Pinchot
*Herald Staff Writer*

A state police captain has launched an investigation into whether quotas were imposed on troopers at the Mercer barracks.

Capt. Sid Simon, who is based in Butler, launched the investigation after receiving a letter from lawyer Jack W. Cline, who alleged to have evidence that troopers at the Jackson Township police station were required to make a specified number of motor vehicle citations and arrests for other offenses.

In the letter, Cline said his office, Stranahan, Stranahan and Cline of Mercer, was hired by Trooper Robert Perrine.

"I've initiated an internal investigation into the whole mat-

ter," said Simon, who commands state police stations in five counties, including Mercer. "A determination will be made if in fact anything happened."

Although Simon said he was investigating the allegations, he denied troopers from Mercer are required to fill quotas. "It seems there is some misrepresentation or miscommunication has occurred at that station," he said.

Simon said he took "administrative, internal steps" to make sure the misrepresentation and miscommunication never happens again.

Quotas are illegal under state and federal law, and are not imposed by state police, he said.

Simon said he talked with a lawyer — he wasn't sure who

*See* **PROBE**, *page A-2*

## SPORTS



AP

**Pittsburgh Penguins' Jaromir Jagr, left, works in front of the goal crease with Buffalo Sabres' Alexei Zhitnik during third-period action. The teams skated to a 1-1 tie.**
*Page B-1*

## INSIDE

W. Scott Hodge plans to retire this month from Svedala Industries Hodge Foundry. His departure will end 124 years of family leadership at the Hempfield Township company.

*Business, page A-7*

## DEATHS

**Theresa "Terri" Basile,** 52, of 788 S. Irvine Ave., Sharon.

**Mary Q. Eaton,** 49, of 421 Main St., Rimersburg.

**Mary Kavulic Sotak Franek,** 96, Fort Lauderdale, Fla., formerly of Cleveland and Farrell.

**The Rev. Lynn I. Hepler,** 76, Marlboro, N.J., formerly of Bellwood, Pa., and Sharon.

**Dominic P. "Mickey" John,**

# last pouring

...t took a hard look at workers buy the plant, ...ept didn't fly.

Local 1153 represents ...00 production workers

used to pump oil and natural gas through pipelines, Cooper has been hard hit in recent years by rock bottom oil prices.

Cooper closed the manufac-
...in 1998 and turned

operating in the borough for more than 100 years.

The plant is part of Cooper Energy Services based in Mount Vernon, Ohio. Cooper Energy Services is owned by

# Probe

## Internal police probe looks at quotas

*from page A-1*

— in Cline's office after receiving the letter.

"I'm sure we have an agreement that there are no quotas at the Mercer station," Simon said.

Cline could not be reached for comment.

In his letter, dated Feb. 10, Cline said station supervisors are making accusations against troopers who fail to meet quotas and punishing them by placing them on undesirable shifts.

Cline said state law deems any citation issued under a quota system null and void. "That would void all citations and tickets issued in the year 2000," he wrote.

Cline demanded that the barracks stop charting citations and arrests and categorizing the troopers as acceptable or unacceptable.

He also called for scheduling duties to be returned to the sergeant, with schedules reverting to the way they were before the "quota-related retaliation."

Lt. Billy Williams, commander of the Mercer barracks, referred all questions to Simon.

too
worke
ept di
Local
00 produ



ENCLOSURE # 2



Wednesday,
Sept. 27, 2000

Sharon, Pennsylvania

C

| | |
|---|---|
| Classified | C-4 |
| TV grid | C-8 |

MERCER COUNTY

# No traffic quotas at local barracks, state police say

By Joe Pinchot
*Herald Staff Writer*



An investigation into whether state police at the Mercer barracks were ordered to meet a quota of arrests is complete.

"There was no actual quota schedule or the enforcement thereof at the Mercer station," said Capt. Sidney A. Simon, commander of Troop D.

"There were some administrative deficiencies discovered in the investigation," he added.

Because of those deficiencies, which Simon would not detail, "administrative corrective action" was taken, he said. Simon would not go so far as to call the action disciplinary and would not say how many people were affected.

The investigation was launched after a Feb. 10 letter from lawyer Jack W. Cline, who said he had been retained by a state trooper and had doc-

charges would be filed as a result of the investigation.

While a criminal investigation is under way, even policemen have the right not to speak to investigators or answer questions that might be incriminating.

Once the criminal question was out of the way, troopers could be compelled to answer questions and cooperate with investigators or face sanctions. The police contract provided the only restraints on the investigation.

Epstein had said there were "significant failures of communications and management."

Simon said he took administrative steps shortly after receiving Cline's letter to make sure no misrepresentation or miscommunication, which occurred in this case, ever happens again.

The captain said he took further steps once the state police Bureau of Professional Respon-

ATTACHMENT 12

David E. Dale/Herald

**Let the band play**

Master Sgt. Darryl Brenzel of the Army Field Band Jazz Ambassadors plays "Who Can I Turn To" on his saxophone. At right, band members play "The Star Spangled Banner" at the beginning of their concert Tuesday in Mercer High School Auditorium. The concert was sponsored by Mercer

A quota is a requirement that a policeman write a set number of citations or make arrests. Quotas are illegal under state and federal law, and violate the police union contract.

Citations issued under a quota system would be void.

Troopers alleged they were put on undesirable shifts for failing to meet quotas.

In July, Mercer County District Attorney James P. Epstein announced that no criminal

Simon said he submitted his final report last week.

A message left for Cline was not returned.

Simon said he looked upon the investigation as a positive event.

"Clearly, when you have an investigation of this type, it uncovers some possible deficiencies in your organization," he said. "You don't have the opportunity to know that without this type of investigation."

PITTSBURGH POST-GA...

# WEST

# L O C

## BEAVER COUNTY

### Trooper cops plea

A state trooper charged with illegally accepting almost $20,000 from garage owners he was assigned to audit has forfeited his right to be a police officer in Pennsylvania in a deal with prosecutors.

Kenneth Brickett, 37, asked for money from commercial and school bus garage owners when he was assigned to the vehicle fraud unit out of the Beaver barracks. He asked for the money to fund a gambling habit.

The former officer will enter a rehabilitation program as part of a two-year probation after waiving his preliminary hearing.

Brickett could have received 35 years in prison if convicted on seven counts he faced involving alleged violations of the Public Official and Employee Ethics Act.

### BCCC gets $1.8 million

Commissioners yesterday approved a $1.8 million contribution to the 2002-03 Beaver County Community College's $14.3 million operating budget. The commissioners approved taking over the college last year because of its financial problems.

The commissioners take over July 1 and have already approved a new board of trustees.

## ELLWOOD CITY

### Oncology unit to close

Ellwood City Hospital will close its oncology unit next month after the unit's only cancer specialist announced he was leaving.

"We've been offering oncology services for 15 years and we would like to be able to continue," said Carolyn Izzo, chief operating officer. "But unfortunately, it looks as if we will have to discontinue those services right now."

The hospital will continue to look for a replacement doctor for the oncology center, which is scheduled to be closed July 5, Izzo said.

The current oncologist, Dr. George Garrow, told hospital officials he has too many patients at his Mercer County practice to continue.

## MEADVILLE

### Murder trial opens

Prosecutors took only 12 minutes during opening statements to tell a jury they have DNA, fingerprints and two confessions that tie a 16-year-old boy to the rape and murder of an elderly woman.

Aaron Louis Wilson, of Meadville, is being tried as an adult in the July 3 slaying of his 73-year-old neighbor.

Police said Wilson, who was 15 at the time, broke into Katherine Peterson's house to steal her car keys and strangled her with a belt when she confronted him. The car was recovered in Erie.

Prosecutors are not seeking the death penalty. Wilson is charged with homicide, burglary, rape and theft.

# URA approv

By Timothy McNulty
*Post-Gazette Staff Writer*

The city's Urban Redevelopment Authority board yesterday approved housing developments in Homewood and Observatory Hill, a Homewood business plan, and tax incentives for a Panther Hollow technology center.

Board members also spoke out on rules to spur contracting and hiring from minority- and women-owned firms, and denounced newspaper articles alleging authority wrongdoing in the Hill District.

The board approved about $964,000 in grants and loans to support the $1.6 million development of seven housing units on Perrysville and Marshall avenues in Observatory Hill, where three existing homes will be demolished and four others rehabilitated. Sales prices will be between $135,000 and $206,000.

The agency also approved two Homewood projects. Ten parcels of vacant land on Finance Street, near Homewood Avenue, were conveyed to the Pittsburgh Housing Development Corp. to develop seven to 10 housing units, in

an estimat
A Frank
Homewoo
for $50,00
10,000-squ
and up to
tablishme
issued to
improvem
The bo
a $3.48 mi
plan to fin
$33 millio
ing garag
to Carne
struction
in Augus
proved b
and Pitts
The si
lon, a tax
become
center is
Industri
·City C
er board
cies for
women-
the boar

# County panel fires

By Jeffrey Cohan
*Post-Gazette Staff Writer*

The Allegheny County Retirement Board yesterday fired RRZ Investment Management after the firm turned $75 million into $42 million over the past year and a half.

Although the $33 million loss coincided with an overall decline in the stock market, RRZ's fund fared worse than the Russell 1000 Growth Index, the benchmark used to measure the firm's performance.

The board, which oversees a $640 million pension fund for county government retirees, decided to drop RRZ in a 6-1 vote.

County Manager Bob Webb, one of

the boa
ing fact
of the I
ing the
"The
Webb
reduce
Cou
the lon
guing t
a chan
The
since t
millio
In ;
RRZ (
the Re
en his
makir



PLAINTIFF'S EXHIBIT
97

FRIDAY, JUNE 14, 2002

# L NEWS / GOVERNMENT

# s developments

$1.4 million project.

own Avenue vacant lot in business district was sold Byzantine Inc. to build a e-foot Family Dollar store ree other small retail es-. Also, a $50,000 grant was e developer to make site ts.

gave its latest approval to n tax-increment financing ce infrastructure work at a chnology center and park-Panther Hollow, adjacent Mellon University. Con-the center is due to start after the financing is ap-he city, Allegheny County gh Public Schools.

s owned by Carnegie Mel-empt organization, but will able once the technology nded over to the Regional evelopment Corp.

cilman Sala Udin told oth-embers that new URA poli-tracting with minority- and ied firms will be issued to draft form next month.

The policies will tie contracting goals to the available number of con-tractors in the area, instead of using traditional participation goals of 25 per-cent minority and 10 percent women-owned firms. They will seek to boost employment of women and minorities by requiring contractors to report on the race and gender of employees and require inspections of contracting of-fices to make sure they are legitimate.

Board Chairman Tom Cox halted the beginning of yesterday's session to lash out at the Pittsburgh Tribune-Re-view for articles criticizing URA land acquisition policies in the Hill District, particularly a report that the authority was targeted for a federal criminal in-vestigation. Cox called the newspaper accounts "outrageous" and "complete-ly unsubstantiated."

Last month, a U.S. Department of Housing and Urban Development spokesman said a preliminary investi-gation of the URA found no evidence of criminal misconduct in the methods the authority used to acquire Hill Dis-trict properties for an urban renewal project.

# Controller says booking centers aren't being used

By Jeffrey Cohan
Post-Gazette Staff Writer

Suburban police departments are not making much use of the satellite booking centers that Allegheny County has created for them, coun-ty Controller Dan Onorato said in a report released yesterday.

The county's suburbs must use the centers more extensively to jus-tify the estimated $1.5 million ex-pense of maintaining them each year, Onorato concluded.

"You must have the municipali-ties participate," he said.

To save suburban police depart-ments the time and money it takes to transport arrestees Downtown for processing, the county opened up satellite booking centers in Penn Hills and Hampton in Sep-tember 2000 and in McKeesport in July.

But, more often than not, subur-ban police are still making the trip Downtown to a central booking cen-ter in the Pittsburgh municipal courts building.

Figures presented in Onorato's report show that suburbs in the vicinity of Hampton, Penn Hills and McKeesport make about 600 ar-rests a month. About 110 of those arrests are being processed in the satellite centers.

Onorato said the expense of run-ning the centers could be reduced by a staffing change. Instead of de-ploying two sheriff's deputies at each satellite for each shift, the county should man the centers with one deputy and one lower-paid tech-nician.

County Manager Bob Webb and District Attorney Stephen A. Zap-pala Jr. had yet to review Onorato's report when contacted yesterday. Sheriff Pete DeFazio could not be reached for comment.

A report due next month by Con-sad Research Corp. of East Liberty is expected to provide either a basis for closing the centers or recom-mendations to make them more successful.

# nvestment firm after loss

s members, said the decid-vas the retirement last year executive who was manag-nty's investments.

rm is not the firm we hired," "They are a substantially m in terms of experience." Controller Dan Onorato cast te against dumping RRZ, ar-he board should give the firm perform in a bull market. k market has been bearish oard invested more than $70 h RRZ in November 2000. tement released yesterday, man Charles Gomulka said ment Board should have giv-n another 18 months before lecision.

"Successful investment strategy is by definition a long-term strategy," he said. "It should not be viewed or evalu-ated with a short-term perspective."

But Yanni Partners, the board's in-vestment adviser, recommended get-ting rid of RRZ yesterday, emphasizing the firm's failure to outperform the Russell 1000 Growth Index.

Overall, RRZ lost about 44 percent of the $75 million county investment. The index of growth stocks declined about 35 percent during the same period.

The $42 million of county pension funds still under RRZ's control yester-day will be transferred to Boston-based State Street, which will also be evaluated against the Russell 1000 Growth Index.

# Trooper faces felony charge

*Fight occurred between partners in January*

By Felicia A. Petro
*Allied News Staff Writer*

A fist fight between two state policemen in January was the subject of a preliminary hearing last week before district court in Slippery Rock, which resulted in a felony charge against the defendant in the case.

Trooper Henry Cole Moretti, 31, of Saxonburg, went before District Justice Clifford Woessner on March 4 for allegedly punching Trooper Steven R. Sheldon, 37, of Butler, in the left eye while they were on patrol during the midnight shift on Jan. 17.

State police filed charges against Moretti on Feb. 3 for simple assault and harassment/strike, shove, kick. The Butler County District Attorney's office added a felony aggravated assault charge at last week's preliminary hearing, which was reportedly unexpected by the defense. Moretti attended the hearing with his attorney, Alexander Lindsay Jr.

The DA's office added the felony charge after seeing the photographs taken of Sheldon with the alleged injury to his eye, said Assistant DA Jerry Cassady, who said in an inter-

See **TROOPER**, *page A-2*

**PLAINTIFF'S EXHIBIT**
98

# Trooper

## Trooper faces felony charge

*from page A-1*

view that DA Tim McCune, Sheldon and witnesses also attended the hearing.

The level of aggravated assault filed against Moretti involves "intentionally causing bodily injury," rather than "serious" bodily injury in higher aggravated assault charges, he added. Individuals are also given the felony charge when it involves any public officer on duty, Cassady said.

"To make it easy, simple assault becomes aggravated assault when it's a police officer on duty," he said. "(The defense) can't be surprised about it. It's not an obscure law. It's a well-known fact."

Sgt. Max Mohney Jr. was brought in from the New Castle barracks for the hearing. He initially investigated the case because both Moretti and Sheldon worked for the Butler County barracks.

According to court reports, an argument between the men began around 2:30 a.m. Jan. 17 while they were traveling south

on Route 8 in Brady Township. "They just happened to be assigned together that evening," said state police press secretary Jack Lewis from Harrisburg. "They are not regular partners on midnight shift, when there's always two troopers in a car. Normally, there's just one trooper during daylight hours."

The argument between the troopers escalated, and Moretti allegedly reached from the passenger's side and grabbed Sheldon's right arm off the steering wheel, court records stated. From the action, Sheldon allegedly sustained a pulled abdominal muscle, it added.

Sheldon brought the vehicle to a stop and Moretti allegedly punched the driver in the left eye, which caused bruising, swelling and "substantial pain," records stated. Sheldon allegedly needed medical attention for his injuries and reported the incident the evening of Jan. 18.

At the preliminary hearing, Sheldon was the only one to give testimony. Cassady stated that Sheldon recounted pushing Moretti away by the face and hitting the back of his head in defense.

Lindsay said in an interview

that he could not discuss if his client was seeking charges against Sheldon. Also, the lawyer would not disclose if Moretti admitted harming Sheldon.

Cassady would not discuss any reasons stated about why the alleged argument occurred.

"My objective was to keep the testimony at the preliminary hearing limited to the elements of crime," he said. Preliminary hearings only establish whether the charges are reasonable, he added. Motive for an alleged crime doesn't have to be established in such a hearing. That would come out during the discovery process in a Butler County common pleas court trial.

During a Jan. 22 interview, Sheldon stated that he and Moretti had "bad feelings" for a long time, according to court records. Moretti has been with the state police since 1993; Sheldon, since 1994.

Moretti who is currently suspended without pay from his job. He was released on a recognizance bond, yet faces up to 10 years in jail and $25,000 in fines for the felony aggravated assault charge alone, Lewis said.

The simple assault charge was classified a 2nd degree

misdemeanor, with a maximum penalty of two years and $5,000 in fines. The harassment charge has up to 30 days in prison and a $500 fine, he added.

Moretti's greatest worry will most likely be the felony charge, which still would have to be determined in a higher court during a trial. "There's no question he could (serve time)," Cassady said. "But, it's up to the judge."

With no pun intended, "Any case in which an officer is charged gives a black eye to all law enforcement," Lewis said. "But, we do vigorously investigate any allegations against officers, whether by the public or by another officer, and charge, if the law is violated."

Once the criminal case is completed, an internal investigation will be held by the force to see whether Moretti violated policies and regulation of the state police.

"It could result in disciplinary action to a letter in a file to being dismissed from the department," Lewis said. "If he were convicted, it's most likely an internal investigation would recommend dismissal. Theoretically, it's possible (he could stay on the force), but it's not likely."

Case 1:03-cv-00239-MBC Document 45-3 Filed 12/03/2007 Page 95 of 95

**Allied News**

Serving the Grove City, Lakeview, Mercer, Harrisville and Slippery Rock areas

Since 1879

Wednesday, March 12, 2003

**Four sections, 36 pages**

*Volume 124, No. 11*

Copyright © 2003 Allied Newspapers, Grove City, Pa.

50 cents

# State budget could affect local district

## *Funding in question for programs*

By Felicia A. Petro
*Allied News Staff Writer*

Like others school districts in Pennsylvania, Grove City is worried that this year's state budget by newly elected Gov. Ed Rendell may cause drastic budget problems in the district, including layoffs of administrators and teachers.

"The state budget is disturbing at this point," said Superintendent Robert Post.

The state House of Representatives approved House Bill 648 on March 6, which has absolutely no new money to fund education in the Commonwealth, as well as cutting out many school programs. The state Senate is expected to soon follow the House's lead, and the governor has threatened to veto his own budget, citing that it was to be given in two phases and was passed by the House prematurely.

Post said the governor would most likely be able to veto the budget, or items within it. However, he warned at Monday's school board meeting that the district should still prepare itself for tough times ahead.

Already, the district is looking at increases in retirement payouts next year. It shares the cost of the retirement plan with the state. Grove City alone is expected to contribute another $340,000 by next year.

Added to that are increases in medical insurance, which is expected to go up 30 percent. That will affect the district by $425,000.

With a mill currently being $150,000, tax increases alone could not offset the $765,000 deficit the district is facing next school year, Post said.

"We have those things, let alone inflation, teachers' salaries, and we won't be able to continue certain programs without additional support from the state," he said. "We're going to be negatively impacted."

Post has currently started looking at creating versions of the district's future budget with an eye on what's happening in Harrisburg. The worst-case scenario would be employee layoffs, increased real estate taxes and a decrease in educational programs, he said.

"I have to look at what money we have to spend, what revenue we have, what we can afford millage-wise, and what to cut out," Post said.

First, the district would look at cutting out programs it doesn't need. "We don't have a lot there," he said. "We run pretty lean programs now."

The district could save between $50,000 to $100,000 in not buying new technology. It could also save about $150,000 by not buying new curriculum for the 2004-2005 focus year. The district has already budgeted materials for next year's focus in social studies, Post said.

After educational programs are cut, the next to go will be new equipment, and then people, he added.

"For example, the administrators would have to come together and decide who we can cut and assign the rest extra duties," Post said. Currently, the district is not looking to fill

*See* **DISTRICT**, *page A-2*

# Board, teachers OK contract

## *5-year pact raises pay 3.7% annually*

Mercer Area School Board and its teachers' union Thursday agreed on a new five-year contract after 14 months of negotiations.

Both the board and the 103 members of the Mercer Education Association made concessions to reach the agreement. According to a release, teachers will get a 3.7 percent — or $1,780 — raise each year of the contract; in return they agreed to work two additional days a year and to begin paying part of their health-care benefit for the first time.

"The contract negc process was a long and process," school board gotiator Jeffery Brand the release. The

P. Saternow

Slippery n target rach Wit- in the nament. 1.

ACS's r er Soci- it, needs Daffodil paign. ded to , Sandy

March g Sites: el RX Senior nity Liv- Hall in s Thur- nd Mer- se and Mercer. the sale 724-346-

n GC d Grove